## In the United States District Court
## for the Southern District of Ohio

| | |
|---|---|
| **Nicholas K. Meriwether**,<br><br>*Plaintiff*,<br><br>*v.*<br><br>**The Trustees of Shawnee State University**—Francesca Hartop, Joseph Watson, Scott Williams, David Furbee, Sondra Hash, Robert Howarth, George White, Wallace Edwards, Brett Rappold, and Leen Heresh—in their official capacities; **Jeffrey A. Bauer**, Interim President, Provost, and Vice President of Academic Affairs at Shawnee State University, in his official capacities; **Roberta Milliken**, Acting Dean of the College of Arts & Sciences at Shawnee State University, in her official capacities; **Jennifer Pauley**, Chair of the Department of English and Humanities at Shawnee State University, in her official capacities; **Tena Pierce**, Title IX Coordinator at Shawnee State University, in her official capacities; **Douglas Shoemaker**, Deputy Title IX Coordinator at Shawnee State University, in his official capacities; and **Malonda Johnson**, Director of Human Resources and Deputy Title IX Coordinator at Shawnee State University, in her official capacities,<br><br>*Defendants*. | Case No: _____<br><br>**Jury Trial Demanded** |

### Plaintiff's Verified Complaint

Plaintiff Nicholas K. Meriwether, by and through counsel, and for his Verified Complaint against Defendants, hereby states as follows:

### Introduction

1.    The cornerstone of higher education is the ability of professors to participate freely in the "marketplace of ideas," where all viewpoints can be heard and debated on their merits. That marketplace depends on free and vigorous debate among professors and students, a debate that is often reflected in an individual speaker's choice of rhetoric. But at campuses throughout the country, this marketplace of ideas

1

is under attack. All too often, university officials—including those at Shawnee State University ("University")—use a myriad of different policies to silence, censor, and restrict those who express ideas to which they or others object.

2.      Seeking to participate in this marketplace, Dr. Nicholas Meriwether became a philosophy professor at the University. As such, he desires to help students seek knowledge, wisdom, and truth; to challenge them to think deeply and critically about the issues of the day; and to gain a more accurate and thoughtful perspective on human nature, how we should live, and how we should govern ourselves. In the process, he presents his own views on these issues and communicates consistently with them.

3.      In January 2018, a male student demanded that Dr. Meriwether address him as a woman because he identified as such and threatened to have Dr. Meriwether fired if he declined. To accede to these demands would have required Dr. Meriwether to communicate views regarding gender identity that he does not hold, that he does not wish to communicate, and that would contradict (and force him to violate) his sincerely held Christian beliefs. Thus, he declined but offered to use whatever proper name the student preferred to accommodate this student and to make him feel as comfortable as possible without violating his own deeply-held beliefs and convictions.

4.      Unsatisfied, the student complained to the University. Rather than allowing the student and Dr. Meriwether to communicate their views as they each chose, the University sought to silence Dr. Meriwether and punished him for expressing views that differ from its own orthodoxy and for declining to express its mandated ideological message. Continuing in their role as the self-appointed grammar police, Defendants threaten to punish him again if he continues to express his views. Under their policies, all professors must refer to each student—both in and out of class— using whatever pronouns the student claims reflect his gender identity. They demand this even though the concept of gender identity is entirely subjective and fluid, even

though the number of potential gender identities is infinite (with over one hundred different options currently available), and even though the number of potential pronouns has likewise multiplied in recent years—all for the purpose of lending credence to cultural ideas Dr. Meriwether does not share or wish to advance.

5.     Defendants have retaliated against Dr. Meriwether for exercising his First Amendment rights, have violated his First Amendment rights to free speech and free exercise of religion, have violated the unconstitutional conditions doctrine, have deprived him of due process and equal protection of law, have denied him his right to exercise his religion under the Ohio constitution, and have breached their contract with him. Thus, this action concerns the denial of Dr. Meriwether's fundamental and clearly established rights under the Free Speech and Free Exercise Clauses of the First Amendment, the unconstitutional conditions doctrine, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and Article I § 7 of the Ohio Constitution.

## JURISDICTION & VENUE

6.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

7.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.     This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

9.     This Court has supplemental jurisdiction over the state law claims made herein pursuant to 28 U.S.C. § 1367.

10.    Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)

and S.D. Ohio Civ. R. 82.1 because Defendants reside in this district and division and/or all of the acts described in this Complaint occurred in this district and division.

**PLAINTIFF**

11. Dr. Nicholas Meriwether is a resident of Ohio and a professor at the University.

**DEFENDANTS**

12. Defendants Francesca Hartop, Joseph Watson, Scott Williams, David Furbee, Sondra Hash, Robert Howarth, George White, Wallace Edwards, Brett Rappold, and Leen Heresh are, and were at all times relevant to this Complaint, members of the Board of Trustees of Shawnee State University (hereinafter collectively, "Trustee Defendants"), a public university organized and existing under the laws of Ohio, and are responsible for, among other things, the adoption and authorization of policies that govern faculty expression at the University, including the policies challenged herein.

13. As members of the Board of Trustees, the Trustee Defendants have the responsibility for final policymaking authority for rules and regulations that govern the University, including the policies governing faculty members.

14. Each of the Trustee Defendants is responsible for the enactment, amendment, and repeal of Board of Trustee policies, including those challenged herein.

15. As members of the Board of Trustees, the Trustee Defendants possess the authority to change and enforce the policies challenged herein.

16. The Trustee Defendants have not modified the policies challenged herein governing faculty to comply with constitutional mandates.

17. Each of the Trustee Defendants acquiesces in, sanctions, and supports the actions of the other Defendants in enforcing the policies and procedures governing faculty members, including the policies challenged herein.

4

18. None of the Trustee Defendants have instructed University personnel, including the other Defendants, to change or alter the policies and practices challenged herein to comply with constitutional mandates or to change the way those policies are applied to faculty members, including Dr. Meriwether.

19. Defendant Jeffrey A. Bauer is the Interim President of the University, having assumed that position on September 14, 2018.

20. Before September 14, 2018, Defendant Bauer was at all other times relevant to this Complaint the Provost and Vice President of Academic Affairs at the University.

21. As interim president, Defendant Bauer is the chief executive, educational, and administrative officer of the University.

22. Defendant Bauer's authority and powers include oversight and control of the University.

23. Defendant Bauer's duties include, among others, authorizing, executing, enforcing, and implementing the policies governing faculty members at the University and overseeing the operation and management of the University.

24. As interim president, Defendant Bauer directly oversees Defendant Pierce.

25. Both as interim president and as provost, Defendant Bauer directly oversees Defendant Milliken.

26. As interim president, Defendant Bauer has the responsibility for final policymaking authority concerning faculty members at the University.

27. As interim president, Defendant Bauer possesses the authority and responsibility for governing, overseeing, and disciplining faculty members at the University.

28. As interim president and as provost, Defendant Bauer is and was aware of the retaliatory and unconstitutional actions authorized by and occurring under the challenged policies and has not instructed University personnel, including the other

Defendants, to change or alter either the policies or the actions taken pursuant to those policies to comply with constitutional mandates.

29. As interim president, Defendant Bauer has the authority to review, approve, or reject the decisions of other University officials, including the other Defendants, regarding the policies challenged herein.

30. Defendant Bauer has authorized, approved, and implemented the policies that are challenged herein and that are being used to restrict Dr. Meriwether's expression.

31. Defendant Bauer has confirmed, sanctioned, and ratified University officials' application of the policies challenged herein to Dr. Meriwether in a discriminatory and retaliatory fashion.

32. Defendant Roberta Milliken is, and was at all times relevant to this Complaint, the Acting Dean of the College of Arts and Sciences at the University.

33. Defendant Milliken possesses the authority and responsibility for governing and regulating faculty in the College of Arts and Sciences at the University.

34. Defendant Milliken's duties include overseeing the various departments that comprise the College of Arts and Sciences at the University, including the Department of English and Humanities.

35. Defendant Milliken's duties include overseeing Defendant Pauley and Dr. Meriwether.

36. Defendant Jennifer Pauley is, and was at all times relevant to this Complaint, the Chair of the Department of English and Humanities at the University.

37. Defendant Pauley possesses the authority and responsibility for governing and regulating faculty in the Department of English and Humanities at the University.

38. Defendant Pauley's duties include overseeing Dr. Meriwether.

39.   Defendants Milliken and Pauley each possesses the authority to interpret and enforce the University policies challenged herein.

40.   Defendant Tena Pierce is, and was at all times relevant to this Complaint, the Title IX Coordinator at the University.

41.   Defendant Pierce's duties include overseeing the University's Title IX office and compliance efforts.

42.   Defendant Pierce's duties include overseeing Defendants Shoemaker and Johnson.

43.   Defendant Douglas Shoemaker is, and was at all times relevant to this Complaint, a Deputy Title IX Coordinator at the University.

44.   Defendant Malonda Johnson is, and was at all times relevant to this Complaint, a Deputy Title IX Coordinator at the University.

45.   Defendants Pierce, Shoemaker, and Johnson each possesses the authority to enforce the University policies challenged herein and to recommend changes to them.

46.   Defendants Bauer, Milliken, Pauley, Pierce, Shoemaker, and Johnson, independently and in consultation with each other, enforced the policies challenged herein against Dr. Meriwether.

47.   Defendants Bauer, Milliken, Pauley, Pierce, Shoemaker, and Johnson each has the authority under the policies challenged herein to investigate, recommend disciplinary actions, and impose disciplinary actions on faculty at the University.

48.   In executing their respective responsibilities, Defendants Bauer, Milliken, Pauley, Pierce, Shoemaker, and Johnson each implements the policies challenged herein.

49.   Defendants Bauer, Milliken, Pauley, Pierce, Shoemaker, and Johnson, independently and in consultation with each other, are responsible for enforcing the policies challenged herein and applying them to Dr. Meriwether.

50.   Defendants Bauer, Milliken, Pauley, Pierce, Shoemaker, and Johnson have

failed to recommend any changes to the policies challenged herein or to how those policies are enforced to comply with constitutional mandates.

51. Defendants Bauer, Milliken, Pauley, Pierce, Shoemaker, and Johnson have failed to stop University officials, including each other and the other Defendants, from applying the policies challenged herein to faculty, including Dr. Meriwether.

52. Each and every Defendant is sued in his or her official capacity.

**FACTUAL BACKGROUND**

## I.  Defendants' Unconstitutional Nondiscrimination Policies

53. Shawnee State University is a public four-year college in the University System of Ohio and receives funding from the State of Ohio in order to operate.

54. University officials are bound by the policies adopted by the Trustee Defendants and the University president.

55. Defendants have adopted and enforced a series of policies that govern faculty expression, including the following (hereinafter collectively, "Defendants' *Nondiscrimination Policies*"), portions of which Dr. Meriwether challenges:

    a. Defendants' *Non-Discrimination and Sexual Harassment Policy*, a true, accurate, and correct copy of which is attached to this Complaint as Exhibit 1; and

    b. Defendants' policy entitled *Reporting & Investigating Sexual Assault, Sexual Misconduct & Other Forms of Discrimination*, a true, accurate, and complete copy of which is attached to this Complaint as Exhibit 2.

56. Dr. Meriwether challenges facially and as-applied the provisions of Defendants' *Nondiscrimination Policies* that prohibit and define "gender identity" discrimination. *See infra* ¶¶ 59–83.

57. The Trustee Defendants approved and adopted the University's *Non-Discrimination and Sexual Harassment Policy*. *See* Ex. 1 at 1.

58. Defendants' policy entitled *Reporting & Investigating Sexual Assault, Sexual*

*Misconduct & Other Forms of Discrimination* was approved by the University president. *See* Ex. 2 at 1.

59. Defendants' *Nondiscrimination Policies* "serve[] to ensure that there are University structures and processes in place that prohibit discrimination against any individual because of . . . gender identity. . . ." Ex. 1 at 1; *accord* Ex. 2 at 1 (noting that Defendants' policy entitled *Reporting & Investigating Sexual Assault, Sexual Misconduct & Other Forms of Discrimination* "serves to implement the . . . provisions of Policy 5.01 [*i.e.*, Ex. 1]).

60. If Defendants' *Nondiscrimination Policies* are violated, the University "will take steps, whether individual or systemic, to stop the alleged . . . discrimination, prevent its recurrence, eliminate any hostile environment, and remedy the discriminatory effects on the complainant and others." Ex. 2 at 11 ¶ 17.0.

61. Defendants' *Nondiscrimination Policies* define "sex and gender based discrimination" to include "[n]egative or adverse treatment based on . . . gender identity . . . and the treatment denies or limits the individual's ability to obtain the benefits of Shawnee State's programs or activities." Ex. 2 at 12 ¶ 18.3.

62. Defendants' *Nondiscrimination Policies* define "gender identity" as a "person's innermost concept of self as male or female or both or neither—how individuals perceive themselves and what they call themselves." Ex. 2 at 12 ¶ 18.4.

63. Defendants' *Nondiscrimination Policies* note that "[o]ne's gender identity can be the same or different than the sex assigned at birth." Ex. 2 at 12 ¶ 18.4.

64. Under Defendants' *Nondiscrimination Policies*, students may select any gender identity they choose because the selection is based entirely on an individual student's subjective feelings.

65. Defendants claim that "[t]here are a wide range of gender identities, including man, woman, transgender, genderqueer, etc." A true, accurate, and complete copy of the LGBTQIA webpage from Defendants' Campus Counseling

Services Office is attached to this Complaint as Exhibit 3.

66. By using the term "genderqueer," Defendants claim that there are an infinite variety of gender identities because they define this term to mean a person "whose gender identity is neither woman or man, both woman and man, somewhere in between, or is some combination of genders." Ex. 3 at 4.

67. Defendants note that gender identity is completely subjective, saying that "[s]ince gender identity is internal, one's gender identity is not necessarily visible to others." Ex. 3 at 4.

68. Currently, some sources say that there are over one hundred different options for one's gender identity, including ones that "refuse[] to be categorized," that are "affected by mood swings," or that "change[] depending on which friend you're with."[1]

69. Those sources say that this "is an on-going list of gender identities" and that each individual can customize his gender identity by "mix[ing] and match[ing] your own prefixes and suffixes to create the identity that best describes you."[2]

70. Other sources note that the number of possible gender identities is infinite.[3]

71. Under Defendants' *Nondiscrimination Policies*, students may demand that professors refer to them by any pronoun they choose, from the standard English pronouns (*e.g.*, "he" or "she"), to the standard pronouns applied in a nonstandard way (*e.g.*, "they" used to refer to one person), to those invented within the last few years (*e.g.*, "ze," "zie," "sie," "hir," "hirs," "zie," "xe," "xem," "xyr," "xyrs," "per," "ve," "ver," "vis," "fae," "faer," "ae," "aer," "e," "ey," "em," "eir," "eirs," "tey," "ter," "tem," "ters"),[4]

---

[1]  *See, e.g.*, *Genderfluid Support*, *available at* http://genderfluidsupport.tumblr.com/gender (last visited Nov. 5, 2018).
[2]  *Id.*
[3]  *See, e.g.*, Marco A. Hildalgo, Diane Ehrensaft, *et al.*, *The Gender Affirmative Model: What We Know and What We Aim to Learn*, 56 Hum. Dev. 285, 288 (2013) (advocating for "self-acceptance within an infinite variety of authentic gender selves").
[4]  *See, e.g.*, Univ. of Wis., Milwaukee, Lesbian, Gay, Bisexual, Transgender Res. Ctr., *Gender Pronouns*, *available at* https://uwm.edu/lgbtrc/support/gender-pronouns/ (last visited Nov. 5, 2018).

to any others a student idiosyncratically requests.

72. According to some sources, the number of possible pronouns is infinite because "[a]ny combination is possible."[5]

73. Under Defendants' *Nondiscrimination Policies*, professors have two choices when referring to students: (1) eliminate all gender-based titles and all pronouns when speaking to all students, which is impossible, impractical, and unreasonable given the way professors speak, particularly in classes that feature a lot of class discussion; or (2) use pronouns that refer to each student's gender identity, even though that gender identity may change from day to day, may change based on which friends the student is with, or may change based on the student's mood, among other possibilities.

74. Defendants' *Nondiscrimination Policies* specify that "[s]exual harassment can take two forms—quid pro quo or hostile environment." Ex. 2 at 12 ¶18.6.2.

75. Defendants' *Nondiscrimination Policies* define "hostile environment in the educational context" to include "any situation in which there is harassing conduct that limits, interferes with or denies educational benefits or opportunities, from both a subjective (the complainant's) and an objective (reasonable person's) viewpoint." Ex. 2 at 12–13 ¶ 18.6.2.2.

76. Defendants use the definition of "hostile environment" from this sexual harassment provision when assessing claims of gender identity discrimination.

77. Defendants' *Nondiscrimination Policies* specify that the "determination of whether an environment is 'hostile' is based on the totality of the circumstances." Ex. 2 at 13 ¶ 18.6.2.2.

78. Defendants' *Nondiscrimination Policies* define "gender identity" using such elusive and subjective terminology that they give professors no notice as to what

---

[5] *See, e.g.*, Univ. of Cal., Davis, LGBTQIA Res. Ctr., *Pronouns*, *available at* https://lgbtqia.ucdavis.edu/educated/pronouns (last visited Nov. 5, 2018).

constitutes gender identity, what constitutes gender identity discrimination, and how to avoid charges of such discrimination.

79. Defendants' *Nondiscrimination Policies* provide no objective guidelines, standards, or criteria for University officials to use when deciding what constitutes gender identity or gender identity discrimination, thereby granting those officials unbridled discretion to restrict expression.

80. Defendants, by policy and practice, apply their *Nondiscrimination Policies* to regulate the expression of individual faculty members.

81. Defendants, by policy and practice, apply their *Nondiscrimination Policies* to regulate all interactions professors have with students, whether in the classroom or outside of it.

82. If a full-time faculty member violates Defendants' *Nondiscrimination Policies*, he is subject to discipline under the policies outlined in "the article titled 'Complaint Resolution and Disciplinary Process' in the collective bargaining agreement between the University and the Shawnee Education Association [hereinafter, 'Union']." Ex. 2 at 10 ¶ 16.2.1.1. A true, accurate, and complete copy of this *Collective Bargaining Agreement* is attached to this Complaint as Exhibit 4.

83. Under the *Collective Bargaining Agreement*, a faculty member who violates Defendants' *Nondiscrimination Policies* is subject to a range of disciplinary actions, from a "written warning" to immediate "[t]ermination." Ex. 4 at 110.

## II.  Defendants' Enforcement of Their Unconstitutional Policies
### A. Dr. Meriwether's Theological Beliefs

84. Dr. Meriwether is a professing evangelical Christian and a member of the Presbyterian Church of America, who strives to live out his faith on a daily basis.

85. Dr. Meriwether's Christian faith governs the way he thinks about human nature, marriage, gender, sexuality, morality, politics, and social issues, and it causes him to hold sincerely-held religious beliefs in these areas.

86. Dr. Meriwether's convictions concerning human nature, the purpose and meaning of life, and ethical standards that are to govern human conduct are drawn from the Bible.

87. Dr. Meriwether believes that God created human beings as either male or female, that this gender is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires.

88. Dr. Meriwether also believes he cannot affirm as true ideas and concepts that are not true, as this would violate Biblical injunctions against dishonesty and lying.

89. Dr. Meriwether also believes that he is required to treat each person with dignity, love, and care, as each is an individual created in the image of God.

90. Because of his sincerely held religious beliefs, Dr. Meriwether objects to communicating a University-mandated ideological message regarding gender identity that he does not believe, that he does not wish to communicate, and that contradicts (and would force him to violate) his sincerely held religious beliefs.

### B. Dr. Meriwether's Distinguished Career at Shawnee State University

91. In the fall of 1996, Dr. Meriwether joined the University faculty as an assistant professor in the Department of English and Humanities.

92. In 1999, Dr. Meriwether was promoted to associate professor at the University and received a continuing contract, which at the time was the same as obtaining tenure.

93. In 2011, Dr. Meriwether was promoted to full professor at the University.

94. On three separate occasions between 2010 to the present, Dr. Meriwether has also taught philosophy classes in German as a *Gastdozent* (*i.e.*, guest lecturer) at the Pädagogische Hochschule in Ludwigsburg, Germany.

95. In 2017, Dr. Meriwether taught two courses in Berlin, Germany with Western Kentucky University's Kentucky Institute for International Studies.

96. At the University, Dr. Meriwether has focused his scholarship and teaching

on the intersection of philosophy, ethics, religion, and political theory.

97. As a graduate student, Dr. Meriwether specialized in the areas of ethics, social and political philosophy, and the history of philosophy.

98. At the University, Dr. Meriwether teaches or has taught a variety of philosophy courses, including the following:

   a. Ethics: focusing on human flourishing, natural law, and the split between pre-modern and modern approaches to ethics;

   b. Political Philosophy: surveying the great political ideas from Plato to Rawls, including a survey of Reformation political thought.

   c. Judaism, Christianity, and Islam: examining the historical engagement of the three religions, the question of religious militancy, and apologetical issues.

   d. Ethics and Technology in the 21st Century: focusing on issues of bioethics and biotechnology.

   e. History of Christian Thought: examining the development of Christian doctrine from the early church to the modern period.

   f. Introduction to Philosophy: covering the major ideas of Western philosophy chronologically from Plato to Nietzche, with a special emphasis on the development of modern philosophy from Descartes and Hume to Kant.

99. During his career at the University, Dr. Meriwether has also published at least four scholarly articles and a review essay and presented at a minimum of eleven scholarly conferences.

100. For the past several years, Dr. Meriwether has been researching and writing a multi-volume work that examines the intersection of philosophy, ethics, religion, and political theory from the standpoint of historic Reformed theology. One volume is currently under review for publication as a stand-alone work.

101. At the University, Dr. Meriwether has served on the Faculty Senate

(including serving as its vice president at one time); led multiple study-abroad trips; designed a baccalaureate degree program in Philosophy and Religion; introduced a minor in Philosophy program; served on various committees; and hosted, moderated, and spoken at numerous panels and colloquia.

102. Over the course of his career, Dr. Meriwether has belonged to the American Philosophical Association, the Society of Christian Philosophers, and the Evangelical Philosophy Society.

103. Before the spring of 2018, Dr. Meriwether was never the subject of any University disciplinary actions.

## C. Dr. Meriwether's Unsuccessful Efforts in 2016 to Persuade Defendants to Respect First Amendment Rights

104. In August 2016, Dr. Meriwether received an e-mail from Union president Chip Poirot, regarding the U.S. Department of Education's recent "Dear Colleague" letter and how it addressed issues related to transgenderism. A true, accurate, and complete copy of this e-mail string is attached to this Complaint as Exhibit 5. (In February 2017, the U.S. Department of Justice and U.S. Department of Education "decided to withdraw and rescind" this "Dear Colleague" letter.[6])

105. In these e-mails, Dr. Poirot informed faculty members that they could face disciplinary action from the University if they "refused to use a [student's] requested name or pronoun." Ex. 5 at 6–7.

106. Dr. Poirot also indicated that these restrictions on how professors speak could apply outside the classroom. Ex. 5 at 7.

107. Shortly before October 27, 2016, Dr. Meriwether wrote Defendant Milliken, asking what University policies required of faculty on issues related to gender identity.

---

[6]  U.S. Dep't of Justice & U.S. Dep't of Educ., "Dear Colleage" Letter, Feb. 22, 2017, *available at* https://www.hlregulation.com/files/2017/02/colleague-201702-title-ix1-1.pdf (last visited Nov. 5, 2018).

108. On October 27, 2016, Defendant Milliken visited Dr. Meriwether's office to answer his questions.

109. Defendant Milliken stated that Dr. Meriwether must utilize a student's preferred pronoun, regardless of what pronoun the student requested he use and regardless of the professor's convictions or views on the subject.

110. Defendant Milliken stated that a professor's academic freedom and free speech rights has no bearing on whether he must use a pronoun that reflects a student's self-asserted gender identity.

111. Defendant Milliken stated that a professor could be subject to administrative disciplinary procedures if he refused to use a pronoun that reflects a student's self-asserted gender identity.

112. Dr. Meriwether asked whether the University had any policies that outlined how professors must respond to a student's demand to use a pronoun that reflects that student's self-asserted gender identity.

113. Defendant Milliken stated that the University does not need to have policies on this subject because students have a right to be referred to by their chosen gender and faculty must comply or be disciplined.

114. Sometime around November 3, 2016, Defendant Pauley discussed issues related to transgenderism and gender identity with Dr. Meriwether.

115. During this meeting, Defendant Pauley claimed that adherents to the Christian religion are primarily motivated out of fear.

116. Defendant Pauley also claimed that the Christian doctrines regarding hell are harmful and should not be taught and that anyone who believes hell exists should not be allowed to teach these doctrines.

117. Defendant Pauley also stated that faculty members who adhere to a certain religion should be banned from teaching courses regarding that religion.

118. Defendant Pauley stated that the purpose of higher education is to liberate

students, that religion oppresses students, and thus, the presence of religion in higher education is counterproductive.

119. In saying these things, Defendant Pauley exhibited hostility toward Dr. Meriwether and his religious beliefs.

120. On November 7, 2016, Dr. Meriwether sent Defendant Milliken an e-mail, asking to see the University's written policies on this subject. A true, accurate, and complete copy of this e-mail is attached to this Complaint as Exhibit 6.

121. That same day, Defendant Milliken e-mailed Dr. Meriwether to say "there is no formal policy specific to transgender students, faculty, or staff at the [U]niversity. However, the [U]niversity does have a non-discrimination policy that includes 'gender identity.' (See policy 5.01 and its reporting procedure 5.01:02 [*i.e.*, Defendants' *Nondiscrimination Policies*].)" Ex. 6 at 1.

**D. Dr. Meriwether's Ill-Fated Efforts to Exercise His First Amendment Rights in 2018 and Defendants' Initial Reactions**

122. In January 2018, Dr. Meriwether returned from a semester-long sabbatical and began teaching a new set of classes, including Political Philosophy.

123. In his classes, Dr. Meriwether regularly calls on students to answer questions about the assigned readings and to participate in class discussions. In any given class period, Dr. Meriwether may call upon five to ten students, and he calls on all students several times over the course of a semester. To him, using the Socratic method of instruction is fundamental to teaching philosophy because it helps students learn to defend their positions, allows flawed reasoning to be identified, and increases the level of engagement with the concepts being taught.

124. On January 9, 2018, during the first class of Political Philosophy, Dr. Meriwether responded to a question from a student, Alena Bruening, by saying, "Yes, sir."

125. Dr. Meriwether responded in this fashion because Bruening is male.

126. Since the early 1990s, Dr. Meriwether has referred to all students in his classes by their last names and a title (*i.e.*, "Mr.," "Ms.," "Mrs.," "Miss") and as "sir" or "ma'am."

127. Dr. Meriwether has always used the titles and pronouns that refer to a student's biological gender.

128. Dr. Meriwether has never knowingly used feminine titles and pronouns to refer to men or masculine titles and pronouns to refer to women.

129. Dr. Meriwether refers to students in this fashion to foster an atmosphere of seriousness and mutual respect that is befitting the college classroom.

130. Dr. Meriwether believes that this formal manner of addressing students helps them view the academic enterprise as a serious, weighty endeavor.

131. Dr. Meriwether has also found that addressing students in this fashion helps them learn how to accept and discuss in a respectful fashion the different (and often opposing) views many of their fellow students hold on controversial issues.

132. Dr. Meriwether has found that addressing students in this fashion is an important pedagogical tool in all of his classes, but especially in Political Philosophy where he and students discuss many of the most controversial issues of public concern.

133. After class on January 9, 2018, Bruening approached Dr. Meriwether, stated that he was transgender (*i.e.*, that he identified as female), and demanded that Dr. Meriwether refer to him as a woman (*i.e.*, with feminine titles and pronouns).

134. After a brief hesitation, Dr. Meriwether responded by saying that he was not sure he could comply with Bruening's demand and that he was not sure students can dictate how professors must refer to them.

135. At this point, Bruening became belligerent, circling around Dr. Meriwether and getting in his face in a threatening fashion.

136. While doing this, Bruening told Dr. Meriwether, "Then I guess this means I

can call you a cunt."

137. Before walking away, Bruening promised to see to it that Dr. Meriwether would be fired if he did not accede to Bruening's demands.

138. That afternoon, Dr. Meriwether reported Bruening's conduct to Defendant Pauley, who found it and his use of profanity appalling.

139. Defendant Pauley then relayed her conversation with Dr. Meriwether to Dr. Marc Scott, a professor at the University and president of the faculty senate.

140. The next day, fearing that Bruening would behave belligerently or even violently in class, Dr. Meriwether asked a security guard if security personnel could be in the vicinity when his Political Philosophy class met again on January 11, 2018.

141. After hearing how Bruening had misbehaved, the security officer recommended that Dr. Meriwether report the misbehavior to the Dean of Students.

142. On January 10, 2018, Dr. Scott e-mailed Defendant Shoemaker, informing him of the Bruening matter and noting that a Title IX complaint was possible. A true, accurate, and complete copy of this e-mail is attached to this Complaint as Exhibit 7.

143. Early on the morning of January 11, 2018, Dr. Meriwether reported the incident to the Dean of Students via e-mail, copying Defendant Pauley. A true, accurate, and complete copy of this e-mail is attached to this Complaint as Exhibit 8.

144. Later that morning, the Dean of Students e-mailed Defendant Shoemaker, informing him of the e-mail she had received from Dr. Meriwether.

145. That same morning, Defendant Shoemaker met with Bruening, apprised Defendant Milliken of Bruening's complaint, and advised her on how to proceed.

146. Just before noon on January 11, 2018, Defendant Milliken visited Dr. Meriwether's office to discuss this situation.

147. Defendant Milliken advised Dr. Meriwether to begin referring to all students by their last names only and to eliminate all gender references from his expression.

148. Dr. Meriwether explained that referring to students by last names alone

would undermine the serious pedagogical environment he seeks to create because that is the way people refer to one another in junior high or on an athletic team. It is not the way scholars, engaged in a serious, respectful enterprise, refer to one another.

149. In addition, it is unreasonable, impractical, and impossible either to remove all pronouns from one's speech when leading class discussions or to keep track of which pronouns to use for each student, especially when the possible pronoun options are so numerous and a student's preference could change at any time.

150. Dr. Meriwether proposed instead that he would continue referring to all of his students as he had for years, but he would accommodate Bruening by referring to him by his last name.

151. At the time, Defendant Milliken indicated that she approved this arrangement, though she later changed her mind.

152. Meanwhile, Bruening continued to attend Dr. Meriwether's Political Philosophy class without incident and frequently contributed to class discussions, often one to three times or more per class period.

153. On January 25, 2018, Defendant Milliken again visited Dr. Meriwether's office to discuss the Bruening matter.

154. Defendant Milliken announced that Bruening was not satisfied with the accommodation that Dr. Meriwether had proposed on January 10, 2018 and had threatened to file a Title IX grievance over Dr. Meriwether's expression.

155. Defendant Milliken then explicitly rejected the accommodation Dr. Meriwether proposed on January 10, 2018 (*i.e.*, referring to Bruening by his last name only and referring to all other students the same way Dr. Meriwether had done for years).

156. Defendant Milliken threatened Dr. Meriwether, stating that if he did not comply with Bruening's (and now her own) demands, he would be violating Defendants' *Nondiscrimination Policies*.

157. During his February 1, 2018 Political Philosophy class, Dr. Meriwether inadvertently referred to Bruening using the title "Mr." before immediately correcting himself (*i.e.*, saying something like "Mr. Bruening—I mean, Bruening").

158. In early February 2018, Bruening also spoke with Defendant Pierce, indicating that his complaint had not been resolved and threatened to contact a lawyer if it was not resolved quickly to his satisfaction.

159. Defendant Pierce then contacted Defendant Shoemaker so that further action could be taken, and ultimately Defendants agreed that Defendant Milliken should take the next steps.

160. On February 12, 2018, Defendant Milliken again visited Dr. Meriwether's office to see if he had decided how he would proceed in light of their January 25th conversation.

161. During this conversation, Dr. Meriwether asked Defendant Milliken to clarify what would be allowed under Defendants' *Nondiscrimination Policies*.

162. Specifically, he asked whether he would be complying with those policies if he (1) referred to all students by their self-asserted gender identity and (2) placed a disclaimer in his syllabus, noting that he was doing so under compulsion and setting forth his personal and religious beliefs about gender identity.

163. Defendant Milliken informed Dr. Meriwether that this disclaimer approach would still violate Defendants' *Nondiscrimination Policies*.

164. Dr. Meriwether explained that he was willing to refer to Bruening by whatever legal name he preferred (*i.e.*, first or last) without using any titles but that he was not willing to refer to Bruening as a woman (*i.e.*, with feminine titles or pronouns).

165. Dr. Meriwether also explained that he was not willing to stop referring to all other students by their last names and gender appropriate titles.

166. Defendant Milliken responded by saying, "Well, you know what this means."

167. In saying this, Defendant Milliken threatened Dr. Meriwether with disciplinary action under Defendants' *Nondiscrimination Policies*.

168. During the rest of the semester, Bruening remained in Dr. Meriwether's Political Philosophy class.

169. During the rest of the semester, Dr. Meriwether called on Bruening regularly, allowing him to participate in class discussions on the same basis as any other student.

170. During the rest of the semester, Bruening participated frequently in class discussions in Dr. Meriwether's Political Philosophy class, expressing freely his views on whatever topic the class was discussing at each given time.

171. At the end of the semester, Dr. Meriwether awarded Bruening a high grade for the Political Philosophy class, reflecting his very good work in the class and his frequent participation in class discussions.

172. Throughout the spring 2018 semester, Bruening was never denied any of the benefits of Dr. Meriwether's Political Philosophy class.

## E. Defendants' Unconstitutional Disciplinary Actions & Speech Code
### 1. Defendants Investigate Dr. Meriwether

173. In short order, Defendant Milliken followed through on her threats, threats that were as old as 2016 and as new as February 12, 2018.

174. On February 13, 2018, Defendant Milliken sent Dr. Meriwether a letter outlining again her position on this matter. A true, accurate, and complete copy of this letter is attached to this Complaint as Exhibit 9.

175. Defendant Milliken stated that her letter was "a formal notification that you are expected to comply with [Defendants' *Nondiscrimination Policies*] by treating all students the same, irrespective of their gender identity. Ex. 9 at 1.

176. Defendant Milliken stated that if Dr. Meriwether continued to refuse to accede to Bruening's demands, "the University may conduct an investigation" and he

"could be subject to informal or formal disciplinary action." Ex. 9 at 1.

177. On February 16, 2018, before Dr. Meriwether even had a chance to respond to this letter, Defendant Milliken informed him via e-mail that she had launched a formal investigation against him. A true, accurate, and complete copy of this e-mail is attached to this Complaint as Exhibit 10.

178. Defendant Milliken explained that she was launching this formal investigation because she had received "another complaint from a student in your Political Philosophy class." Ex. 10 at 1.

179. The student Defendant Milliken referenced was Bruening.

180. Defendant Milliken explained that she was launching this formal investigation due to "a potential violation of University Policy 5.01 REV [*i.e.*, Defendants' *Nondiscrimination Policies*] that addresses unlawful discrimination and harassment." Ex. 10 at 1.

181. Defendant Milliken referred the investigation to Defendants Johnson and Shoemaker. Ex. 10 at 1.

182. Defendant Milliken then explained that the "potential violation" came in two forms. Ex. 10 at 1.

183. First, Defendant Milliken noted that Dr. Meriwether "continue[d] to address this student differently than others within the class by calling her by her surname while other students are addressed as Ms. ___ or Mr. ___." Ex. 10 at 1.

184. Second, Defendant Milliken noted that Dr. Meriwether continued to use masculine pronouns when referring to Bruening. Ex. 10 at 1.

185. In launching this formal investigation, Defendant Milliken violated several provisions of the *Collective Bargaining Agreement*.

186. The *Collective Bargaining Agreement* specifies that "[f]ormal actions shall be imposed only for just cause." Ex. 4 at 110.

187. The *Collective Bargaining Agreement* then outlines nine instances that

qualify as "just cause" for formal disciplinary action. Ex. 4 at 110–11.

188. None of these nine instances applied to Dr. Meriwether's expression, and yet Defendant Milliken commenced formal disciplinary proceedings anyway.

189. The *Collective Bargaining Agreement* outlines professors' academic freedom rights. Ex. 4 at 24.

190. Under the *Collective Bargaining Agreement*, professors' academic freedom includes "[f]reedom in their classroom when discussing subject matter that is reasonably related to the relevant course material and established curriculum." Ex. 4 at 24.

191. Many of Dr. Meriwether's classes, including his Political Philosophy class, naturally touch on controversial issues, such as questions of ethics and human nature. His comments about gender identity are thus reasonably related to his teaching and scholarship.

192. Under the *Collective Bargaining Agreement*, professors' academic freedom includes the freedom to "[c]hoose . . . pedagogical techniques." Ex. 4 at 24.

193. Dr. Meriwether's manner of addressing students is a pedagogical technique designed to foster an atmosphere of seriousness and respect that is vital when discussing such controversial and hotly debated issues as gender identity. It also communicates his own personal views on these subjects.

194. Under the *Collective Bargaining Agreement*, professors' academic freedom includes the "[f]reedom to . . . speak freely . . . on educational and curricular matters and on matters of public concern." Ex. 4 at 24.

195. On February 23, 2018, Dr. Meriwether responded via e-mail to Defendant Milliken's February 13th letter and February 16th e-mail. A true, accurate, and complete copy of this response is attached to this Complaint as Exhibit 11.

196. In his response, Dr. Meriwether noted that he was still evaluating how to respond to the investigation and that he could "ultimately conclude that [he] could

not comply with [Defendant Milliken's] directives due to [his] conscience, ethical or religious convictions, or [his] views on free speech." Ex. 11 at 3–4.

197. In addition, Dr. Meriwether reminded Defendant Milliken of his sincerely held religious beliefs as a Christian and explained how those beliefs impacted issues related to gender identity. Ex. 11 at 4.

198. Dr. Meriwether also summarized the accommodation he had proposed and how Defendant Milliken had rejected it. Ex. 11 at 4.

199. Dr. Meriwether then inquired whether he would be allowed to refer to all students by their last names alone and continue to use biologically-appropriate pronouns, rather than pronouns reflecting a student's self-asserted gender identity. Ex. 11 at 4.

200. Dr. Meriwether explained that he was not sure this accommodation would be acceptable to him, as it would undermine the educational environment he strived to achieve in his classroom, but he asked if it would comply with University policy. Ex. 11 at 4.

201. On February 26, 2018, Defendant Milliken replied, explaining that under Defendants' *Nondiscrimination Policies*, Dr. Meriwether had two choices: "calling every student in your classes by his/her last name or by his/her first name." Ex. 11 at 2.

202. As Defendant Milliken did not address the use of pronouns, Dr. Meriwether reiterated this question on March 1, 2018. Ex. 11 at 1–2.

203. Specifically, Dr. Meriwether asked: "Would the policy prevent me from using biologically correct pronouns when referencing other students, as long as I addressed the student in question using first or last name and refrained from using pronouns?" Ex. 11 at 2.

204. On March 12, 2018, Defendant Milliken replied: "Every student needs to be treated the same in all of your classes. In other words, the policy seeks to ensure that

what is done for one student is done for all to avoid issues of discrimination. This regards names, pronoun usage, and most any other matter." Ex. 11 at 1.

205. In sum, Defendant Milliken indicated that Dr. Meriwether would violate Defendants' *Nondiscrimination Policy* (1) if he referred to Bruening using masculine pronouns; or (2) if he stopped using pronouns in reference to Bruening but continued to use biologically correct pronouns for all other students; or (3) if he referred to transgender students by their name of choice but continued to refer to all other students by their last names and titles (*i.e.*, "Mr.," "Ms.," "Miss," or "Mrs.").

206. Thus, with respect to names, Defendant Milliken indicated that Dr. Meriwether had only two choices if he wanted to comply with Defendants' *Nondiscrimination Policies*: (1) stop referring to students by their last names and titles, thereby altering the pedagogical environment in his classroom; or (2) use titles that refer to each student's self-asserted gender identity, which would require him to violate his conscience and sincerely held religious beliefs.

207. Thus, with respect to pronouns, Defendant Milliken indicated that Dr. Meriwether had only two choices if he wanted to comply with Defendants' *Nondiscrimination Policies*: (1) stop using pronouns altogether, which is unreasonable and impossible, especially given the Socratic teaching style that he uses; or (2) use pronouns that refer to each student's self-asserted gender identity, which would require him to violate his conscience and sincerely held religious beliefs.

208. On the same day, Dr. Meriwether sent a letter to the University's president and Defendant Bauer, asking them to suspend the investigation. A true, accurate, and complete copy of this letter is attached to this Complaint as Exhibit 12.

209. In this letter, Dr. Meriwether recounted Bruening's demands and threatening behavior, his efforts to reach an accommodation with Defendant Milliken, and her refusal to agree to any arrangement that would allow Dr. Meriwether to follow his religious convictions. Ex. 12 at 2–3.

210. Dr. Meriwether also explained how launching this investigation violated the *Collective Bargaining Agreement*, as there was no sufficient basis for the investigation. Ex. 12 at 3.

211. Later that day, Defendant Bauer responded, refusing to suspend the investigation. Ex. 12 at 1.

212. Upon information and belief, Defendant Bauer consulted with the University's president before responding to Dr. Meriwether.

213. Upon information and belief, Defendant Bauer acted at the instruction or with the approval of the University's president when he responded to Dr. Meriwether.

214. On April 12, 2018, Defendant Johnson submitted the results of her investigation to Defendant Milliken. A true, accurate, and complete copy of her investigation report, as updated on May 9, 2018, is attached to this Complaint as Exhibit 13.

215. Defendant Johnson's investigation involved interviewing just four witnesses, including Bruening and Dr. Meriwether. Ex. 13 at 1–2.

216. Defendants Johnson and Shoemaker and their staff never interviewed any non-transgender students from Dr. Meriwether's class as part of the investigation so as to get a more disinterested perspective on the environment in that class.

217. Upon information and belief, Defendants Johnson and Shoemaker and their staff interviewed only students that Bruening recommended.

218. Defendants Johnson and Shoemaker and their staff never asked Dr. Meriwether to recommend any potential witnesses they could interview.

219. Defendant Johnson concluded that Dr. Meriwether's "disparate treatment has created a hostile environment" for Bruening, thereby violating both of Defendants' *Nondiscrimination Policies*. Ex. 13 at 1, 4.

220. Upon information and belief, Defendants Johnson and Shoemaker consulted with Defendant Pierce in conducting their investigation and in preparing Defendant

Johnson's investigation report.

221. Upon information and belief, Defendants Johnson and Shoemaker acted at the instruction or with the approval of Defendant Pierce in conducting their investigation and in preparing Defendant Johnson's investigation report.

### 2. Defendants Formally Charge Dr. Meriwether

222. On April 18, 2018, Defendant Milliken notified Dr. Meriwether that she was pursuing a "formal charge" against him. A true, accurate, and complete copy of Defendant Milliken's charge notice is attached to this Complaint as Exhibit 14.

223. In this charge notice, Defendant Milliken explained to Dr. Meriwether that, according to the investigation, "your disparate treatment of the complainant in your class has caused a hostile environment." Ex. 14 at 1.

224. On April 21, 2018, Dr. Meriwether e-mailed Defendants Shoemaker, Johnson, and Milliken, requesting additional documentation and correcting factual inaccuracies in Defendant Johnson's investigation report. A true, accurate, and complete copy of this e-mail is attached to this Complaint as Exhibit 15.

225. On May 8, 2018, Dr. Meriwether sent Defendant Milliken an e-mail responding to a timeline of events included in Defendant Johnson's investigation report, which he had not received until April 27, 2018. A true, accurate, and complete copy of this e-mail is attached to this Complaint as Exhibit 16.

226. In this e-mail, Dr. Meriwether elaborated further on his beliefs regarding gender identity, reiterated his objection to being forced to communicate a message he does not believe and that conflicts with his religious beliefs, and responded to some misleading statements in Defendant Milliken's timeline. Ex. 16 at 1.

227. On May 29, 2018, Defendant Milliken issued a report, setting forth her findings after the formal investigation of Dr. Meriwether. A true, accurate, and complete copy of her report is attached to this Complaint as Exhibit 17.

228. In her report, Defendant Milliken concluded that because Dr. Meriwether

refused to refer to Bruening as a woman, he had violated Defendants' *Nondiscrimination Policies*. *See* Ex. 17 at 2 ("Because Dr. Meriwether repeatedly refused to change the way he addressed Ms. Bruening in his class due to his views on transgender people, and because the way he treated Ms. Bruening was deliberately different than the way he treated others in his class, I found that he effectively created hostile environment for Ms. Bruening. This is a direct violation of Policy No. 5.01REV.").

229. Defendant Milliken recommended punishing Dr. Meriwether by issuing a written warning. *See* Ex. 17 at 2 ("[I]n order to ensure a safe educational experience for all students, I propose the formal action of a written warning being placed in Dr. Meriwether's personnel file.").

230. On June 1, 2018, Dr. Meriwether sent Defendant Bauer an e-mail correcting Defendant Milliken's mischaracterizations of his actions towards Bruening. A true, accurate, and complete copy of this e-mail is attached to this Complaint as Exhibit 18.

231. Dr. Meriwether explained to Defendant Bauer that "this whole controversy arose because I was treating [Bruening] precisely the same as I treat all other students. Regardless of his gender identity, Bruening is biologically male, and I referred to him the same way as I refer to all other biologically male students." Ex. 18 at 1.

232. Dr. Meriwether went on to note that he only started to refer to Bruening differently in an effort to accommodate Bruening's request, that he never treated Bruening differently in any other way, and that Bruening's "access to educational benefits and opportunities was never jeopardized." Ex. 18 at 1.

233. On June 14, 2018, Defendant Bauer agreed with Defendant Milliken that Dr. Meriwether had violated Defendants' *Nondiscrimination Policies*. A true, accurate, and complete copy of his decision is attached to this Complaint as Exhibit 19.

234. In agreeing with Defendant Milliken, Defendant Bauer approved her recommended disciplinary action and asked her to "provide [him] with a letter of warning that will be placed in [Dr. Meriwether's] personnel file." Ex. 19 at 2.

### 3. Defendants Sanction Dr. Meriwether & Impose a Speech Code

235. On June 22, 2018, Defendant Milliken issued the written warning to Dr. Meriwether. A true, accurate, and complete copy of her warning is attached to this Complaint as Exhibit 20.

236. Defendant Milliken's warning reiterated that Dr. Meriwether had violated Defendants' *Nondiscrimination Policies*. Ex. 20 at 1.

237. Defendant Milliken warned Dr. Meriwether to change the way he addresses transgender individuals "to avoid further corrective actions." Ex. 20 at 1.

238. On June 25, 2018, Defendant Bauer formally notified Dr. Meriwether of Defendant Milliken's warning via e-mail. A true, accurate, and complete copy of this e-mail is attached to this Complaint as Exhibit 21.

### 4. Defendants Affirm Their Disciplinary Actions & Speech Code

239. On July 2, 2018, Dr. Meriwether submitted a grievance request to the Union, outlining provisions of the *Collective Bargaining Agreement* that Defendants violated in disciplining him for his expression. A true, accurate, and complete copy of Dr. Meriwether's grievance request is attached to this Complaint as Exhibit 22.

240. On August 16, 2018, the Union submitted a formal grievance on Dr. Meriwether's behalf. A true, accurate, and complete copy of this formal grievance is attached to this Complaint as Exhibit 23.

241. In this grievance, Dr. Meriwether asked the University to vacate the disciplinary action taken against him and to allow him to continue speaking consistent with his religious beliefs. Ex. 23 at 4.

242. On August 22, 2018, Dr. Poirot and Dr. Meriwether met with Defendant Bauer to discuss the grievance.

243. Defendant Bauer, as provost, was the first official who would review Dr. Meriwether's grievance.

244. At the meeting, Dr. Poirot attempted to explain how Defendants' disciplinary action against Dr. Meriwether imperiled his ability to live consistent with his sincerely held religious convictions, his academic freedom, and his free speech rights. A true, accurate, and complete copy of Dr. Poirot's account of this meeting is attached to this Complaint as Exhibit 24.

245. Defendant Bauer repeatedly interrupted Dr. Poirot, clearly indicating that he had no interest hearing Dr. Meriwether's grievance.

246. When Dr. Poirot outlined the religious beliefs that Dr. Meriwether and his church hold and how Defendants' disciplinary actions would force Dr. Meriwether to violate those teachings, Defendant Bauer openly laughed.

247. By laughing, Defendant Bauer displayed open hostility towards Dr. Meriwether and his religious beliefs.

248. During the meeting, Dr. Poirot again inquired as to whether Dr. Meriwether would be complying with Defendants' *Nondiscrimination Policies* if he (1) referred to all students by their self-asserted gender identity and (2) placed a disclaimer in his syllabus, noting that he was doing so under compulsion and setting forth his personal and religious beliefs about gender identity.

249. Defendant Bauer dismissed this approach, indicating that even this would violate Defendants' *Nondiscrimination Policies*.

250. Defendant Bauer's conduct throughout the meeting was so uncooperative that Dr. Poirot "was not able to present the grievance." Ex. 24 at 2.

251. On September 5, 2018, Defendant Bauer e-mailed Dr. Meriwether stating, "I am denying your grievance." A true, accurate, and complete copy of this e-mail, including the attached decision and rationale, is attached to this Complaint as Exhibit 25.

252. On September 6, 2018, Dr. Meriwether appealed Defendant Bauer's decision to the University's president.

253. Shortly thereafter, the University's president resigned and Defendant Bauer was appointed interim president.

254. As a result, Defendant Bauer would be reviewing as interim president his own decision made as provost.

255. On September 14, 2018, Dr. Poirot and Dr. Meriwether met with Mr. David Zender and Mr. Michael McPhillips, Defendant Bauer's representatives, to discuss the grievance. A true, accurate, and complete copy of Dr. Poirot's notes from this meeting are attached to this Complaint as Exhibit 26.

256. On October 4, 2018, Defendant Bauer issued his decision on Dr. Meriwether's grievance in his role as interim president. A true, accurate, and complete copy of his decision as interim president is attached to this Complaint as Exhibit 27.

257. Defendant Bauer denied Dr. Meriwether's grievance and adopted Mr. Zender's recommended decision. Ex. 27 at 11.

258. Defendant Bauer erroneously claimed that "this is not a hostile environment claim." Ex. 27 at 13.

259. In saying this, Defendant Bauer contradicted Defendant Johnson's investigation report, Ex. 13 at 1, 4; Defendant Milliken's charge notice, Ex. 14 at 1; and Defendant Milliken's report outlining her findings after the investigation, Ex. 17 at 2.

260. Defendant Bauer erroneously claimed that Dr. Meriwether "refused to stop singling out [Bruening] because of her gender identity." Ex. 27 at 13.

261. In reality, Dr. Meriwether offered to accommodate Bruening by referring to him by whatever name Bruening preferred.

262. Dr. Meriwether never singled out Bruening for any reason, including his self-asserted gender identity.

263. Defendant Bauer concluded that Dr. Meriwether discriminated against Bruening based on gender identity. Ex. 27 at 13.

264. However, Defendant Bauer never explained how Dr. Meriwether's expression "denie[d] or limit[ed] [Bruening's] ability to obtain the benefits of Shawnee State's programs or activities." Ex. 27 at 13.

265. Defendant Bauer concluded again that Dr. Meriwether had violated Defendants' *Nondiscrimination Policies*. Ex. 27 at 13.

266. Defendant Bauer concluded that he could not grant Dr. Meriwether's requested religious accommodation because "it is conceivable that SSU employs or may in the future employ faculty members with sincerely held religious beliefs that, e.g., one national origin is superior to another national origin, or one sex is inferior to the other sex." Ex. 27 at 13.

267. That is, Defendant Bauer dismissed Dr. Meriwether's request for accommodation of his religious beliefs by equating them with those of hypothetical racists and sexists. Ex. 27 at 13.

268. In so doing, Defendant Bauer displayed open hostility to Defendant Meriwether's religious beliefs.

269. Defendant Bauer also concluded that Dr. Meriwether would still violate Defendants' *Nondiscrimination Policies* if he were to refer to students by their self-asserted gender identity and include a disclaimer in his syllabus setting forth his personal and religious beliefs on the subject. Ex. 27 at 13.

270. With respect to names, Defendant Milliken had given Dr. Meriwether only two choices if he wanted to comply with Defendants' *Nondiscrimination Policies*, and Defendant Bauer now gave him the same two choices: (1) stop referring to students by their last names and titles, thereby altering the pedagogical environment in his classroom; or (2) use titles that refer to each student's self-asserted gender identity, which would require him to violate his conscience and sincerely held religious beliefs.

271. With respect to pronouns, Defendant Milliken had given Dr. Meriwether only two choices if he wanted to comply with Defendants' *Nondiscrimination Policies*, and Defendant Bauer now gave him the same two choices: (1) stop using pronouns altogether, which is unreasonable and impossible, especially given the Socratic teaching style that he uses; or (2) use pronouns that refer to each student's self-asserted gender identity, which would require him to violate his conscience and sincerely held religious beliefs.

STATEMENTS OF LAW

272. At all times relevant to this Complaint, each and all of the acts and policies alleged herein were attributed to Defendants who acted under color of a statute, regulation, or custom of the State of Ohio (*i.e.*, under color of state law and authority).

273. Defendants knew or should have known that they were violating Dr. Meriwether's constitutional and contractual rights by:

    a. Subjecting Dr. Meriwether to disciplinary action because he spoke in a way that communicated his beliefs regarding gender identity;

    b. Placing a warning letter in his personnel file that threatens further disciplinary action if he engages in "any such behaviors" in the future;

    c. Compelling Dr. Meriwether to speak in a way that affirms and recognizes as true the idea that a person can change his or her gender or identify differently than his or her birth sex;

    d. Prohibiting Dr. Meriwether from living and speaking in a way that is consistent with his religious beliefs and punishing him when he tried to do so;

    e. Refusing to grant Dr. Meriwether a religious accommodation;

    f. Disciplining Dr. Meriwether in violation of the *Collective Bargaining Agreement*.

274. The policies and practices that led to the violation of Dr. Meriwether's

constitutional and contractual rights remain in full force and effect.

275. Dr. Meriwether is suffering irreparable harm from Defendants' *Nondiscrimination Policies* and the way those policies have been enforced.

276. Dr. Meriwether has no adequate or speedy remedy at law to correct the deprivation of his rights by Defendants.

277. Defendants' actions and policies, as set forth above, do not serve any legitimate or compelling state interest and are not narrowly tailored to serve any such interests.

278. Defendants' *Nondiscrimination Policies* and related practices are not narrowly tailored as applied to Dr. Meriwether because Dr. Meriwether's expression does not implicate any of the legitimate interests Defendants might have.

279. Unless the policies and conduct of Defendants are enjoined, Dr. Meriwether will continue to suffer irreparable injury.

280. Under 42 U.S.C. §§ 1983 and 1988, Dr. Meriwether is entitled to appropriate relief invalidating Defendants' challenged policies and related conduct.

FIRST CAUSE OF ACTION
**Violation of Plaintiff's First Amendment Right to Freedom of Speech
Retaliation
(42 U.S.C. § 1983)**

281. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–280 of this Complaint.

282. By punishing and threatening to punish Dr. Meriwether for expressing his views regarding gender identity, Defendants have retaliated and are retaliating against Dr. Meriwether for exercising his First Amendment rights.

283. When Dr. Meriwether communicated his views regarding transgenderism through his choice of titles and pronouns in his interactions with students and in his classroom, he was speaking on a matter of public concern, engaging in speech related to teaching and scholarship, and engaging in expression the First Amendment protects.

284. Dr. Meriwether's interest, as a professor at a public university, in discussing matters of public concern in the context of teaching and scholarship outweighs Defendants' interest in the efficient provision of services.

285. Dr. Meriwether's speech on matters of public concern in the context of teaching and scholarship never prevented Defendants from efficiently providing services to the public (or even threatened to do so).

286. Defendants' *Nondiscrimination Policies*, their enforcement of those policies, and their threatened future enforcement of those policies would deter a person of ordinary firmness from exercising his right to free speech in the future.

287. Defendants have enforced their *Nondiscrimination Policies* against Dr. Meriwether and threaten to do so in the future at least in part because of the views he has expressed on matters of public concern in the context of teaching and scholarship, expression that the First Amendment protects.

288. Defendants subjected Dr. Meriwether to discipline and threaten to do so again in the future due to the content and viewpoint of Dr. Meriwether's speech.

289. Defendants' *Nondiscrimination Policies* and their enforcement of those policies violate Dr. Meriwether's right to free speech as guaranteed by the First Amendment to the United States Constitution.

## SECOND CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### Content & Viewpoint Discrimination
### (42 U.S.C. § 1983)

290. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–280 of this Complaint.

291. By punishing and threatening to punish Dr. Meriwether for expressing his views regarding gender identity, Defendants have engaged in content and/or viewpoint discrimination in violation of the First Amendment.

292. Defendants' *Nondiscrimination Policies* require officials to evaluate the

content and viewpoint of faculty expression to determine whether it constitutes discrimination or harassment and whether it creates a hostile environment.

293. Defendants considered the content and viewpoint of Dr. Meriwether's expression when they decided to enforce their *Nondiscrimination Policies* against him and they threaten to do so again if he continues to express his views.

294. Defendants' *Nondiscrimination Policies* confer unbridled discretion upon University officials to discriminate based on content or viewpoint.

295. Defendants exercised this unbridled discretion when they punished Dr. Meriwether for expressing his views regarding gender identity.

296. Defendants' *Nondiscrimination Policies* and their enforcement of those policies are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.

297. The overbreadth of Defendants' *Nondiscrimination Policies* chills the speech of Dr. Meriwether, who seeks to engage in protected expression in his interactions with students on campus and in the classroom.

298. Dr. Meriwether's expression regarding gender identity is protected by the First Amendment.

299. By placing a written warning in his personnel file for allegedly violating their *Nondiscrimination Policies*, Defendants have punished Dr. Meriwether for engaging in expression the First Amendment protects.

300. Defendants' *Nondiscrimination Policies* and their enforcement of those policies violate Dr. Meriwether's right to free speech as guaranteed by the First Amendment to the United States Constitution.

**THIRD CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Compelled Speech**
**(42 U.S.C. § 1983)**

301. Plaintiff repeats and realleges each of the allegations contained in

paragraphs 1–280 of this Complaint.

302. By punishing and threatening to punish Dr. Meriwether for refusing to communicate a University-mandated ideological message regarding gender identity, Defendants have attempted and are attempting to compel Dr. Meriwether's speech, in violation of his rights under the First Amendment.

303. Defendants' *Nondiscrimination Policies* and their enforcement of those policies compel Dr. Meriwether to communicate messages about gender identity that he does not hold, that he does not wish to communicate, and that conflict with (and for him to violate) his religious beliefs.

304. Defendants' *Nondiscrimination Policies* and their enforcement of those policies violate Dr. Meriwether's right to free speech as guaranteed by the First Amendment to the United States Constitution.

### FOURTH CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Free Exercise of Religion (42 U.S.C. § 1983)

305. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–280 of this Complaint.

306. By punishing and threatening to punish Dr. Meriwether for exercising his sincerely held religious beliefs in the way he discusses issues regarding gender identity, Defendants have violated and are violating his right to free exercise of religion under the First Amendment.

307. Dr. Meriwether's views and expression related to gender identity are motivated by his sincerely held religious beliefs, are avenues through which he exercises his religious faith, and constitute a central component of his sincerely held religious beliefs.

308. Expressing the University's mandated message regarding gender identity would require Dr. Meriwether to violate his sincerely held religious beliefs.

309. Defendants' *Nondiscrimination Policies* and related practices are neither

neutral nor generally applicable but allow Defendants to target religious expression and activities specifically and to express hostility to such expression.

310. Defendants' *Nondiscrimination Policies* and related practices are neither neutral nor generally applicable because they represent a system of individualized assessments.

311. Defendants' *Nondiscrimination Policies* and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to the University's asserted interests unprohibited.

312. Defendants' *Nondiscrimination Policies* and related practices burden several of Dr. Meriwether's constitutional rights, including his rights under the First Amendment (*e.g.*, freedom of speech, freedom from retaliation, free exercise of religion), the unconstitutional conditions doctrine, and the Fourteenth Amendment (*e.g.*, due process and equal protection).

313. Defendants violated Dr. Meriwether's right to free exercise of religion when they applied their *Nondiscrimination Policies* to discipline Dr. Meriwether for communicating his views on issues related to gender identity and to compel him to communicate views on those same subjects that violate his religious beliefs, and they continue to do so by threatening to punish him if he continues to communicate his beliefs or if he continues to refuse to communicate views on those same subjects that violate his religious beliefs.

314. Defendants' *Nondiscrimination Policies* and their enforcement of those policies violate Dr. Meriwether's right to free exercise of religion as guaranteed by the First Amendment to the United States Constitution.

**FIFTH CAUSE OF ACTION**
**Violation of Plaintiffs' Right to be Free from Unconstitutional Conditions**
**(42 U.S.C. § 1983)**

315. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–280 of this Complaint.

316. By conditioning Dr. Meriwether's status as a professor in good standing at the University (and ultimately his employment at the University) on his willingness to surrender various constitutional rights, Defendants have imposed and are imposing an unconstitutional condition on him in violation of his First Amendment rights.

317. Defendants' *Nondiscrimination Policies* and their enforcement of those policies impose an unconstitutional condition upon faculty members' right to free speech and their receipt of state benefits (*e.g.*, avoiding disciplinary actions up to and including termination, remaining a professor at a public university).

318. Defendants' *Nondiscrimination Policies* and their enforcement of those policies require faculty members to surrender their constitutionally protected rights to freedom of speech, free exercise of religion, due process, and equal protection to avoid disciplinary actions up to and including termination.

319. Defendants enforced their *Nondiscrimination Policies* against Dr. Meriwether, making it clear that he can only avoid further disciplinary action if he surrenders his constitutionally protected rights to freedom of speech, free exercise of religion, due process, and equal protection.

320. Defendants' *Nondiscrimination Policies* and their enforcement of those policies violate Dr. Meriwether's right to be free from unconstitutional conditions.

SIXTH CAUSE OF ACTION
**Violation of Plaintiff's Fourteenth Amendment Right to**
**Due Process of Law**
**(42 U.S.C. § 1983)**

321. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–280 of this Complaint.

322. By punishing and threatening to punish Dr. Meriwether under vague and overbroad policies, Defendants have violated and are violating Dr. Meriwether's right to due process of law under the Fourteenth Amendment.

323. Defendants' *Nondiscrimination Policies* and related practices are overbroad because they encompass a substantial amount of constitutionally protected speech.

324. Dr. Meriwether's expression regarding gender identity is protected by the First Amendment.

325. By placing a written warning in his personnel file for allegedly violating their *Nondiscrimination Policies*, Defendants have punished Dr. Meriwether for engaging in expression the First Amendment protects.

326. Defendants' written warning to Dr. Meriwether, issued under the authority of their *Nondiscrimination Policies*, threatens to punish him if he engages in a wide variety of constitutionally protected expression in the future in violation of Dr. Meriwether's right to due process of law under the Fourteenth Amendment.

327. Defendants' *Nondiscrimination Policies* and related practices are unconstitutionally vague because they grant University officials unbridled discretion in deciding what constitutes "gender identity" and "gender identity discrimination," because they utilize terms that are inherently subjective and elude any precise or objective definition that would be consistent from one official, professor, or student to another, because they are incapable of providing meaningful guidance to Defendants and other University officials, and because they force professors to guess whether expression that the First Amendment protects is in fact allowed on campus.

328. The lack of objective criteria, factors, or standards in Defendants' *Nondiscrimination Policies* and related practices renders these policies and practices unconstitutionally vague and in violation of Dr. Meriwether's right to due process of law under the Fourteenth Amendment.

SEVENTH CAUSE OF ACTION
**Violation of Plaintiff's Fourteenth Amendment Right to
Equal Protection of the Law
(42 U.S.C. § 1983)**

329. Plaintiff repeats and realleges each of the allegations contained in

paragraphs 1–280 of this Complaint.

330. By punishing and threatening to punish Dr. Meriwether for expressing his views regarding gender identity when they would not punish professors who express opposite views on those same subjects, Defendants have violated and are violating Dr. Meriwether's right to equal protection of the law under the Fourteenth Amendment.

331. Dr. Meriwether is similarly situated to other professors at the University.

332. Defendants take no disciplinary action against professors who support and endorse the concepts of gender identity, but they take disciplinary action against professors, like Dr. Meriwether, who refuse to endorse those concepts.

333. Defendants' *Nondiscrimination Policies* have also been applied to discriminate intentionally against Dr. Meriwether's rights to freedom of speech, right to be free from compelled speech, free exercise of religion, right to be free from unconstitutional conditions, and right to due process of law. Thus, discriminatory intent is presumed.

334. Defendants' *Nondiscrimination Policies* and related practices burden Dr. Meriwether's fundamental rights, target a suspect class (*i.e.*, religion), and have no rational basis.

335. Defendants' *Nondiscrimination Policies* and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to the University's asserted interests unprohibited.

336. Defendants applied their *Nondiscrimination Policies* and related practices to Dr. Meriwether in a discriminatory and unequal manner, granting other professors the right to express their views on issues related to gender identity while denying that right to Dr. Meriwether, in violation of Dr. Meriwether's right to equal protection of the law under the Fourteenth Amendment.

## EIGHTH CAUSE OF ACTION
## Violation of Plaintiff's Rights of Conscience and Free Exercise of Religion
### (Ohio Const. Art. I § 7)

337. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–280 of this Complaint.

338. By punishing and threatening to punish Dr. Meriwether for exercising his sincerely held religious beliefs according to the dictates of his own conscience in the way he discusses issues regarding gender identity, Defendants have violated and are violating his right to free exercise of religion under the Article I § 7 of the Ohio Constitution.

339. The religious convictions Dr. Meriwether expressed and with which he sought to live in accordance are sincerely held religious beliefs.

340. Defendants have infringed on Dr. Meriwether's right to engage freely in his religious practices by enforcing their *Nondiscrimination Policies* to force him to express views on gender identity that conflict with his religious beliefs and that force him to violate his conscience and religious convictions by expressing their preferred views on gender identity.

341. Defendants' *Nondiscrimination Policies* and related practices do not serve any government interests of sufficient magnitude to override Dr. Meriwether's right to live out the dictates of his faith according to his own conscience.

342. Defendants' *Nondiscrimination Policies* and their enforcement of those policies violate Dr. Meriwether's right to free exercise of religion as guaranteed by Article I § 7 of the Ohio Constitution.

## NINTH CAUSE OF ACTION
### Breach of Contract

343. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–280 of this Complaint.

344. Under Ohio law, the *Collective Bargaining Agreement* between the Shawnee Education Association and the University represents an enforceable contract between

the University and Dr. Meriwether.

345. Throughout his career at the University, Dr. Meriwether had substantially performed his duties under the *Collective Bargaining Agreement* and had not materially breached that *Agreement*.

346. By subjecting Dr. Meriwether to a formal investigation even though none of the contractual conditions were met and then subjecting him to disciplinary actions under their *Nondiscrimination Policies*, Defendants breached the *Collective Bargaining Agreement*.

347. By subjecting Dr. Meriwether to disciplinary action under their *Nondiscrimination Policies* for expression that is protected by academic freedom (as contractually defined) and the First Amendment, Defendants breached the *Collective Bargaining Agreement*.

348. Defendants have no legal excuse for these breaches of the *Collective Bargaining Agreement*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and provide Plaintiff with the following relief:

A. A declaratory judgment that Defendants' *Nondiscrimination Policies* and related practices violate Dr. Meriwether's rights under the First and/or Fourteenth Amendments;

B. A preliminary and permanent injunction prohibiting Defendants sued in their official capacities, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing Defendants' *Nondiscrimination Policies* to prohibit Dr. Meriwether from expressing his views regarding gender identity or to punish him for expressing those views, including addressing and referring to students based on their biological sex;

C. A preliminary and permanent injunction ordering Defendants sued in their

official capacities, their agents, officials, servants, employees, and any other persons acting on their behalf to purge Dr. Meriwether's personnel file of any reference to the punishment they imposed on him for expressing his views regarding gender identity, including the June 22, 2018 written warning;

D. Nominal damages for the violation of Plaintiff's First and Fourteenth Amendment rights;

E. Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

F. All other further relief to which Plaintiff may be entitled.

Respectfully submitted this 5th day of November, 2018.

*/s/ Travis C. Barham*

DAVID A. CORTMAN*
Georgia Bar No. 188810
TRAVIS C. BARHAM*
Arizona Bar No. 024867
Georgia Bar No. 753251
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

THOMAS W. KIDD, JR.
Ohio Bar No. 0066359
**KIDD & URLING, LLC**
8913 Cincinnati-Dayton Road
West Chester, Ohio 45069
Telephone: (513) 733–3080
Facsimile: (513) 577–7393
tkidd@kiddurlinglaw.com

TYSON C. LANGHOFER*
Arizona Bar No. 032589
JONATHAN M. LARCOMB
Virginia Bar No. 47274
**ALLIANCE DEFENDING FREEDOM**
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
tlanghofer@ADFlegal.org
jlarcomb@ADFlegal.org

* Applications for admission *pro hac vice* to be filed shortly.

*Attorneys for Plaintiffs*

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury for all issues so triable herein.

*/s/ Travis C. Barham*

TRAVIS C. BARHAM
*Attorney for Plaintiffs*

## DECLARATION UNDER PENALTY OF PERJURY

I, NICHOLAS K. MERIWETHER, a citizen of the United States and a resident of the State of Ohio, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this $\alpha$ day of November, 2018, at Portsmouth, Ohio.

_Nicholas K. Meriwether_
NICHOLAS K. MERIWETHER

45