# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

NICHOLAS K. MERIWETHER,
    Plaintiffs,

vs.

THE TRUSTEES OF SHAWNEE
STATE UNIVERSITY, *et al.*,
    Defendants.

Case No. 1:18-cv-753

Dlott, J.
Litkovitz, M.J.

**ORDER**

Plaintiff Nicholas K. Meriwether, a professor at Shawnee State University (Shawnee

State), brings this action against members of the Board of Trustees of Shawnee State and several

Shawnee State officials. Plaintiff alleges violations of his federal civil rights under 42 U.S.C. §

1983. He also brings claims for violations of his Ohio constitutional rights and breach of

contract under the Court's supplemental jurisdiction, 28 U.S.C. § 1367. The matter is before the

Court on Jane Doe and Sexuality and Gender Acceptance (SAGA)'s motion to intervene as

defendants in the lawsuit (Doc. 18), defendants' response to the motion (Doc. 24), plaintiff's

response in opposition to the motion (Doc. 26), the proposed intervenor's reply in support of the

motion (Doc. 28), plaintiff's notice of supplemental authority in opposition to the motion to

intervene (Doc. 40), and the proposed intervenors' response in opposition to plaintiff's notice of

supplemental authority (Doc. 42).[1]

## I.    Factual and procedural background

Plaintiff makes the following factual allegations in the amended complaint (Doc. 34).

Meriwether is a resident of Ohio and a professor at Shawnee State, a public university organized

---

[1] Defendants filed a motion to dismiss the complaint for failure to state a claim for relief on January 7, 2019, which is pending. (Doc. 22). Plaintiff filed an amended complaint on January 28, 2019, and a redacted version of the amended complaint. (Doc. 34). Doe and SAGA filed a proposed motion to dismiss the amended complaint for failure to state a claim for relief on February 11, 2019 (Doc. 37), but the Court stayed further briefing on the pending and proposed motions to dismiss until 21 days after the Court ruled on the motion to intervene (Doc. 41).

and existing under the laws of Ohio. (*Id.*, ¶¶ 11, 12). He has been employed as a professor by Shawnee State since 1996, first as an assistant professor, then as an associate professor with a continuing contract that was the equivalent of tenure, and finally as a full professor of philosophy. (*Id.*, ¶¶ 93-95). He is a "professing evangelical Christian" and member of the Presbyterian Church of America with sincerely-held religious beliefs about gender, and he does not believe that an individual's gender can be changed after the moment of conception. Because of his sincerely-held religious beliefs, he objects to communicating what he believes to be "a University-mandated ideological message regarding gender identity" that he does not believe and which "contradicts (and would force him to violate) his sincerely held religious beliefs." (*Id.*, ¶¶ 86-92).

Defendants Francesca Hartop, Joseph Watson, Scott Williams, David Furbee, Sondra Hash, Robert Howarth, George White, and Wallace Edward (Trustees) were, at all times relevant to the amended complaint, members of the Board of Trustees of Shawnee State. They are responsible for adopting and authorizing the university policies plaintiff challenges and have final policymaking authority to change and enforce those policies. (*Id.*, ¶¶ 12-15). Plaintiff sues each of the Trustees in their official capacity. (*Id.*, ¶ 52).

Defendant Jeffrey A. Bauer was the Provost and Vice-President of Academic Affairs at Shawnee State before September 14, 2018, and he has been Shawnee State's Interim President since that date. In his current role, Bauer is the chief executive, educational, and administrative officer of Shawnee State. He is charged with oversight and control of the university. He also directly oversees defendants Roberta Milliken and Tena Pierce. He authorized and implemented the policies challenged here and has final policymaking authority. He also approved and ratified

Shawnee State officials' discriminatory and retaliatory application of the challenged policies to plaintiff. (*Id.*, ¶¶ 19-31).

At all relevant times, defendants held the following positions and duties: Defendant Milliken was the Acting Dean of the College of Arts and Sciences at Shawnee State, whose duties include oversight of plaintiff Meriwether and defendant Jennifer Pauley. Pauley was the Chair of the Department of English and Humanities at Shawnee State, and her duties include overseeing Meriwether. (*Id.*, ¶¶ 32-38). Defendant Pierce was the Title IX[2] Coordinator at Shawnee State whose duties included oversight of the university's Title IX office and compliance efforts and who also oversaw defendants Douglas Shoemaker and Malonda Johnson, both Deputy Title IX Coordinators at Shawnee State. (*Id.*, ¶¶ 40-44). Defendants Bauer, Milliken, Pauley, Pierce, Shoemaker, and Johnson implemented the policies plaintiff challenges in this lawsuit; each had the authority under the challenged policies to investigate and recommend and impose disciplinary actions on faculty at Shawnee State; they are responsible for enforcing the policies and applying them to plaintiff; they have failed to recommend any changes to the policies or to the manner of enforcement so as to comply with constitutional mandates; and they have failed to stop Shawnee State officials from applying the policies to faculty, including plaintiff. (*Id.*, ¶¶ 46-51). Plaintiff sues each of these defendants in their official capacity. (*Id.*, ¶ 52).

Plaintiff challenges on their face and as applied portions of two policies which were adopted by the Trustee defendants and the Shawnee State Interim President. Those policies are

---

[2] Title IX, 20 U.S.C. §§ 1681-1688, which applies to Shawnee State, provides in pertinent part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . . " 20 U.S.C. § 1681(a).

binding on university officials. The first is the "Non-Discrimination/Sexual Harassment Policy" (Non-discrimination Policy), which was approved by the Board of Trustees. (Doc. 34, Exh. 1, Policy 5.01). The second is the policy for "Reporting & Investigating Sexual Assault, Sexual Misconduct & Other Forms of Discrimination" (Reporting Policy), which was approved by the Shawnee State President in October 2016. (Doc. 34, Exh. 2, Policy 5.01:2). The Non-discrimination Policy states that it "serves to ensure that there are University structures and processes in place that prohibit discrimination against any individual because of . . . gender identity. . . ." (*Id.*, Exh. 1, ¶ 1.2). The Reporting Policy states that the procedure "serves to implement the investigation and complaint provisions of Policy 5.01 . . . and to ensure that all discrimination complaints received by the University are reviewed and responded to promptly and in a fair and equitable manner." (*Id.*, Exh. 2, ¶ 1.1). If the Non-discrimination Policy is violated, the University "will take steps, whether individual or systemic, to stop the alleged . . . discrimination, prevent its recurrence, eliminate any hostile environment, and remedy the discriminatory effects on the complainant and others, as appropriate." (*Id.*, Exh. 2, ¶ 17.0). The Reporting Policy defines "Sex and Gender Based Discrimination" as including "[n]egative or adverse treatment based on . . . gender identity . . . [which] denies or limits the individual's ability to obtain the benefits of Shawnee State's programs or activities." (*Id.*, Exh. 2, ¶ 18.3). The Reporting Policy defines "Gender Identity" as a "person's innermost concept of self as male or female or both or neither - how individuals perceive themselves and what they call themselves." (*Id.*, Exh. 2, ¶ 18.4). It provides that "[o]ne's gender identity can be the same or different than the sex assigned at birth." (*Id.*, Exh. 2, ¶ 18.4).

Plaintiff interprets these policies as leaving Shawnee State professors with two choices in how they refer to their students: (1) "eliminate all sex-based titles and all pronouns when

4

speaking to all students," an option plaintiff describes as "impossible, impractical, and unreasonable given the way professors speak, particularly in classes that feature significant and frequent class discussion"; or (2) "use pronouns that refer to each student's gender identity," even though plaintiff alleges "that gender identity may change from day to day, may change based on which friends the student is with, or may change based on the student's mood, among other possibilities." (*Id.*, ¶ 75).

The Reporting Policy provides that "[s]exual harassment can take two forms - quid pro quo or hostile environment." (*Id.*, Exh. 2, ¶ 18.6.2). "[H]ostile environment in the education context" encompasses "any situation in which there is harassing conduct that limits, interferes with or denies educational benefits or opportunities, from both a subjective (the complainant's) and an objective (reasonable person's) viewpoint." (*Id.*, Exh. 2, ¶ 18.6.2.2). The definition of "hostile environment" set forth in the Reporting Policy is applied when assessing claims of gender identity discrimination, and the "determination of whether an environment is 'hostile' is based on the totality of the circumstances." (*Id.*, ¶¶ 78, 79; Exh. 2, ¶ 18.6.2.2). The Reporting Policy provides that a full-time faculty member who violates Shawnee State's non-discrimination policies is subject to discipline ranging from a "written warning" to immediate "termination" under the process provided in the collective bargaining agreement between Shawnee State and the Shawnee Education Association [hereinafter, 'Union']." (*Id.*, ¶ 85; Exh. 2, ¶ 16.2.1.1; *Id.*, Exh. 4 at 110).

In August 2016, the union president informed faculty members that they could face disciplinary action by Shawnee State, including suspension or dismissal, if they "refused to use a [student's] requested name or pronouns." (*Id.*, Exh. 5 at 6-7). Plaintiff contacted defendant Milliken to obtain clarification on gender identity policies, and Milliken informed plaintiff that

5

he must use a student's preferred pronoun regardless of the professor's convictions or views on the subject and that a professor would be subject to administrative disciplinary procedures if he refused to use a pronoun that reflected a "student's self-asserted gender identity." In response to plaintiff's inquiry as to whether Shawnee State had any policies that outlined how professors "must respond to a student's demand to use a pronoun that reflects that student's self-asserted genera identity," Milliken stated it was not necessary for Shawnee State to have such policies because "students have a right to be referred to by their self-asserted gender identity and faculty must comply or be disciplined." Milliken also informed plaintiff in November 2016 when he asked to see any written policies on this subject that "there is no formal policy specific to transgender students, faculty, or staff" at Shawnee State but the university "does have a non-discrimination policy that includes 'gender identity.' (See policy 5.01 and its reporting procedure 5.01:02 [*i.e.*, Defendants' *Nondiscrimination Policies*]"; *Id.*, ¶¶ 106-124).

In January 2018, plaintiff returned from a semester-long sabbatical and began teaching a new set of classes, including Political Philosophy, during which he regularly calls on students to answer question and participate in class discussion. Students may satisfy the participation component of the course by being prepared to answer assigned study questions when called upon. On January 9, 2018, during the first Political Philosophy class, plaintiff responded to a question from a student, Doe, by saying, "Yes, sir." Plaintiff contends that Doe responded in this fashion "because Doe is male," "Doe appears male," and plaintiff believed that no one seeing Doe would have assumed that Doe was "biologically female." Plaintiff alleges he has also used titles and pronouns that refer to a student's biological sex "to foster an atmosphere of seriousness and mutual respect that is befitting the college classroom" and is an "important pedagogical tool." After class that day, Doe approached plaintiff, stated that she was transgender ("i.e., that

[s]he identified as female"), and demanded that plaintiff refer to her as a woman with feminine titles and pronouns. When plaintiff responded that he was not sure he could comply with Doe's demand and he was "not sure students can dictate how professors must refer to them," Doe "became belligerent, circling around [plaintiff] and getting in his face in a threatening fashion" while telling plaintiff, "Then I guess this means I can call you a cunt." Doe told plaintiff that Doe would see to it that plaintiff would be fired if he did not accede to Doe's demands. Plaintiff reported Doe's conduct to Pauley, who relayed the conversation to the president of the student faculty, Marc Scott. On January 10, 2018, Scott informed defendant Shoemaker of the matter and informed him that "a Title IX complaint [by a student] was possible." (*Id.*, Exh. 7). Defendant Shoemaker met with Doe, apprised defendant Milliken of Doe's complaint, and advised Milliken on how to proceed. On the morning of January 11, 2018, Milliken met with plaintiff and advised him "to begin referring to all students by their last names only and to eliminate all sex-based references from his expression." Plaintiff proposed to continue referring to all students except Doe as he had for years as "Mr. ___" and "Ms. __" and referring to Doe by her last name. Milliken indicated she approved this arrangement, and Doe continued to attend plaintiff's class without incident and to frequently contribute to class discussions. (*Id.*, ¶¶ 125-159).

On January 25, 2018, Milliken informed plaintiff that Doe was not satisfied with plaintiff's solution of referring to Doe by last name only and had threatened to file a Title IX grievance. Defendant Milliken informed plaintiff that he would be in violation of Shawnee State's non-discrimination policies if he did not comply with Doe's demands. In late January or early February 2018, a union official and faculty member told plaintiff he could be suspended or dismissed if he continued to uses titles and pronouns that did not reflect "each students' [sic]

self-asserted gender identity." In February 2018, Doe told defendant Pierce that Doe's complaint had not been resolved and Doe "threatened to contact a lawyer. . . ." On February 12, 2018, plaintiff asked Milliken if it would comply with Shawnee State's non-discrimination policies to (1) refer to all students "by their self-asserted gender identity," and (2) include a disclaimer in the syllabus stating that "he was doing so under compulsion and setting forth his personal and religious beliefs about gender identity." Milliken said this approach would violate the policies, and plaintiff responded that he was willing to use Doe's first or last name without titles but was not willing to refer to Doe as a woman or to stop referring to all other students "by their last names and sex-based titles." Milliken sent plaintiff a "formal notification" on February 13, 2018, that (1) he was "expected to comply with [the Non-discrimination Policy] by treating all students the same, irrespective of their gender identity," and (2) otherwise, Shawnee State "may conduct an investigation" and plaintiff "could be subject to informal or formal disciplinary action." (*Id.*, Exh. 9 at 1). In the letter, Milliken stated she had spoken with plaintiff several times regarding an informal complaint made by a student in his Political Philosophy class who complained that plaintiff did not address her as "Ms." or "Miss" followed by her surname in line with his practice of addressing other female members in the class. Milliken stated that according to the student, after notifying plaintiff that she identified as female, he began calling this student by only her surname and he had referred to the student as "he" during one class the prior week. The letter stated that the student had notified the Dean of Students that plaintiff continued to ignore or reject her requests that plaintiff treat her the same as other students who identify as female. Milliken advised plaintiff that "Policy No. 5.01REV . . . has among its purposes the creation of an educational environment that prohibits discrimination on the basis of . . . 'gender identity,'" and the letter was a "formal notice that [plaintiff was] expected to comply with Policy

No. 5.01REV by treating all students the same, irrespective of their gender identity." Milliken then launched a formal investigation on February 16, 2018 and advised plaintiff that she was doing so because she had received another complaint from a student in his Political Philosophy class (Doe). (*Id.*, Exh. 10 at 1). Milliken stated that plaintiff had potentially violated the university's policies by (1) continuing "to address this student differently than others within the class by calling her by her surname while other students are addressed as Ms. __ or Mr. __," and (2) continuing to use masculine pronouns when referring to Doe. (*Id.*, ¶¶ 160-195).

On March 12, 2018, Milliken informed plaintiff via an email with the subject line "RE: Clarifying University Policies" that: "Every student needs to be treated the same in all of your classes. In other words, the policy seeks to ensure that what is done for one student is done for all to avoid issues of discrimination. This regards names, pronoun usage, and most any other matter." (*Id.*, Exh. 11 at 1). Plaintiff thus understood Milliken to be indicating that he would be in violation of Shawnee State's non-discrimination policies "(1) if he referred to Doe using masculine pronouns; or (2) if he stopped using pronouns in reference to Doe but continued to use sex-based pronouns for all other students; or (3) if he referred to transgender students by their name of choice but continued to refer to all other students by their last names and titles (*i.e.*, 'Mr.,' 'Ms.,' 'Miss,' or 'Mrs.')." Thus, Milliken left plaintiff with only two choices if he wanted to comply with the policies: "(1) stop using pronouns altogether. . . .; or (2) use pronouns that refer to each student's self-asserted gender identity. . . ." (*Id.*, ¶¶ 216-218).

Following an investigation, defendant Johnson concluded that plaintiff's "disparate treatment has created a hostile environment" for Doe, thereby violating Shawnee State's Non-discrimination Policy and Reporting Policy. (*Id.*, ¶ 230; Exh. 13 at 1, 4). A formal charge was filed against plaintiff, asserting that plaintiff's "disparate treatment of the complainant in your

9

class has caused a hostile environment." (*Id.*, Exh. 14 at 1). After a formal investigation, Milliken issued a report setting forth her findings and recommending the formal action of a written warning in plaintiff's personnel file. (*Id.*, Exh. 17). Milliken concluded that because plaintiff "repeatedly refused to change the way he addressed Ms. [Doe] in his class due to his views on transgender people, and because the way he treated Ms. [Doe] was deliberately different than the way he treated others in the class, I found that he effectively created a hostile environment for Ms. [Doe]. This is a direct violation of Policy No. 5.01REV." (*Id.*, Exh. 17 at 2). On June 14, 2018, defendant Bauer issued the "Provost's Decision on Formal Disciplinary Action" in which he agreed that plaintiff had violated Policy 5.01, which states that "Shawnee State is committed to having an educational and working environment for students . . . without unlawful or prohibited discrimination and harassment." (*Id.*, Exh. 19). Bauer found that plaintiff had not treated Doe the same as all other students because he "continued to address [Doe] differently from other students based on a trait that is protected under our anti-discrimination policy even after being warned by Dean Milliken that this was a violation of policy." (*Id.*, Exh. 19). On June 22, 2018, Milliken notified plaintiff that he was being issued a written warning. (*Id.*, Exh. 20). The union pursued a grievance on plaintiff's behalf. (*Id.*, Exh. 23). Bauer, in his role as Interim President, concluded that plaintiff discriminated against Doe based on gender identity, denied plaintiff's grievance, and adopted the recommended decision on October 4, 2018. (*Id.*, Exh. 27 at 11). The written warning was placed in plaintiff's personnel file and a copy was provided to plaintiff. (*Id.*, Exh. 20). The letter states in pertinent part:

> Provost Bauer approved this formal disciplinary action that comes as a result of a Title IX investigation and my findings regarding the violation of Shawnee State University's Policy 5:01.
>
> As [] Policy 5.01 makes clear, Shawnee State is dedicated to providing an educational environment that does not discriminate against any individual due to a

variety of traits, including gender identity. Given that you persisted in treating the complainant differently than other students in your class throughout spring term because of her gender identity, you engaged in behavior that is prohibited by the university. . . .

(*Id.*). The warning also cautioned plaintiff against similar behavior in the future to avoid further corrective action. (*Id.*, ¶¶ 230-270).

As a consequence of the warning letter and a statement by a union official and faculty member, Dr. Eugene Burns, that plaintiff could be fired for any subsequent violations after the warning letter, plaintiff "has not discussed issues related to gender identity or transgenderism when he otherwise would have done so" for fear he could be immediately suspended without pay or terminated. (*Id.*, ¶ 291). Plaintiff alleges that as a result, he "cannot address a high profile issue of public concern that has significant philosophical implications (*e.g.*, illustrating how modern society no longer treats the physical body and its purposes and functions as normative for human behavior and examining whether this philosophical shift is well-grounded or beneficial for the individual and society"). (*Id.*, ¶ 297). Plaintiff claims that the letter of warning in his file will make it difficult, if not impossible, for him to obtain a position "as an adjunct, professor, instructor, consultant, or administrator at another institution once he retires from the University." (*Id.*, ¶ 298).

Plaintiff asserts a facial challenge to the Non-discrimination Policy and to the Reporting Policy to the extent they include the term "gender identity." Plaintiff alleges that inclusion of the term "results in vague and overbroad restrictions upon his protected expression and grants Defendants unbridled discretion to restrict (or punish him for) his protected expression, among other constitutional flaws." (*Id.*, ¶ 58). Plaintiff alleges that Shawnee State's policies as they relate to the definition of "gender identity" are "elusive" and subjective and therefore "give professors no notice as to what constitutes gender identity, what constitutes gender identity

discrimination, and how to avoid charges of such discrimination. (*Id.*, ¶ 80). Plaintiff further alleges that the policies "provide no objective guidelines, standards, or criteria for University officials to use when deciding what constitutes gender identity or gender identity discrimination, thereby granting those officials unbridled discretion to restrict expression." (*Id.*, ¶ 81). Plaintiff also challenges the provisions of the policies that prohibit and define "gender identity" discrimination as applied to him. (*Id.*, ¶¶ 56, 57). Plaintiff alleges that defendants, by policy and practice, apply Shawnee State's non-discrimination policies to regulate individual faculty members' expression and professors' interactions with their students both in and outside of the classroom. (*Id.*, ¶¶ 82, 83).

Based on these allegations, plaintiff brings the following claims for relief: (1) retaliation against plaintiff for exercise of his right to freedom of speech in violation of the First Amendment (*Id.*, ¶¶ 308-316); (2) content and viewpoint discrimination in violation of plaintiff's First Amendment rights (*Id.*, ¶¶ 317-327); (3) compelled speech in violation of plaintiff's First Amendment rights (*Id.*, ¶¶ 328-331); (4) violation of plaintiff's First Amendment right to free exercise of his religion (*Id.*, ¶¶ 332-341); (5) violation of plaintiff's right to be free from unconstitutional conditions (*Id.*, ¶¶ 342-347); (6) violation of plaintiff's due process rights under the Fourteenth Amendment (*Id.*, ¶¶ 348-355); (7) violation of plaintiff's right to equal protection of the law under the Fourteenth Amendment (*Id.*, ¶¶ 356-363); (8) violation of plaintiff's rights of conscience and free exercise of religion under the Ohio constitution (*Id.*, ¶¶ 364-369); and (9) breach of contract under Ohio law (*Id.*, ¶¶ 370-375). As relief, plaintiff seeks a declaratory judgment that defendants' nondiscrimination policies and related practices violate plaintiff's rights under the First and Fourteenth Amendments on their face and as applied; a preliminary and permanent injunction prohibiting defendants from enforcing their nondiscrimination policies

to preclude plaintiff "from expressing his views regarding gender identity or to punish him for expressing those views, including addressing and referring to students based on their biological sex" and ordering defendants to "purge [plaintiff's] file of any reference to the punishment they imposed on him for expressing his views regarding gender identity," including the June 22, 2018 written warning; and plaintiff's reasonable attorney fees and costs under 42 U.S.C. § 1988. (Doc. 34 at pp. 47-48).[3]

## II.     Motion to intervene

Doe and SAGA move to intervene in this lawsuit as of right under Rule 24(a).  In the alternative, they ask the Court to grant them permissive intervention under Rule 24(b).  (Doc. 18).  In support of their motion, movants have submitted the declarations of Doe (Doc. 18-2) and Jae Ezra Keniston, Vice-President of SAGA (Doc. 18-3).  Doe and Keniston make the following assertions in their declarations:

Doe is a young transgender woman who has been living as a female in all aspects of her life for a number of years.  Over that time, she has legally changed her name and her identity documents to correctly reflect her female identity.  In the spring 2018 semester, she enrolled in plaintiff's Political Philosophy course, which fulfilled a general education requirement.  She had never met or interacted with plaintiff prior to class.  On the first day of class, January 9, 2018, when Doe raised her hand to participate in the class discussion, plaintiff incorrectly referred to her as "sir."  Doe approached him after class and informed him that she is a woman, showed him her driver's license which states she is a female and confirms that Ohio legally recognizes her as female, and asked that plaintiff use female honorifics and pronouns when referring to her.

---

[3] The document page numbers throughout the opinion refer to the ecf page numbers.

Plaintiff refused and continued to use male honorifics and pronouns or to refer to Doe by just her last name.

Doe was personally impacted by plaintiff's differential treatment of her. She dreaded participating in plaintiff's class but felt compelled to do so because plaintiff graded students on participation. She was concerned that classmates would notice the differential treatment, and on several occasions her classmates mistakenly used male honorifics and pronouns when referring to her. She suffered significant psychological strain and distress, including an exacerbation of her gender dysphoria. A few weeks after the first incident, Doe filed a complaint of discriminatory treatment with defendant Shoemaker. She provided a statement as part of Shawnee State's investigation. (Doe Declaration, Doc. 18-2).

SAGA is a student-led organization at Shawnee of which Doe is a member. (Keniston Declaration, Doc. 18-3). SAGA advocates for and engages in public education efforts on issues affecting LGBTQ people, and SAGA meets with administrators at Shawnee to discuss issues that affect the needs of its members. SAGA also advocates for Shawnee State to adopt policies that protect LGBTQ students from discrimination and which promote a safe and welcome learning environment for all students at the university, including LGBTQ students. After Doe shared her experience with some of her peers at SAGA, SAGA met with personnel at Shawnee State to express SAGA members' concerns that plaintiff was mistreating transgender students and to convey the importance of this issue for transgender students. Plaintiff's actions have impacted Doe and other transgender members of SAGA by limiting the courses they are willing to take, although some transgender members of SAGA will not be able to avoid taking his class. Further, SAGA's transgender members are concerned that other professors may start mistreating

transgender students and single them out in light of the support a small group of faculty members has expressed for plaintiff.

## A. Rule 24(a) standard

Doe and SAGA seek to intervene in this action as of right. Fed. R. Civ. P. 24(a) governs intervention as of right. Rule 24(a) provides:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).

The court considers four factors in evaluating whether a third party has a right to intervene in an action: 1) timeliness of the application to intervene, 2) whether the applicant has a substantial legal interest in the subject matter of the litigation, 3) whether the applicant's ability to protect that interest will be impaired in the absence of intervention, and 4) whether the applicant's interest is adequately represented by the parties already before the court. *Coal. to Def. Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007) (citing *Grutter v. Bollinger*, 188 F.3d 394, 397-98 (6th Cir. 1999)). If the proposed intervenor fails to meet any one of the four criteria, the court must deny the motion to intervene. *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989).

Intervention as of right involves "balancing two competing interests-judicial economy resulting from the disposition of related issues in a single lawsuit and focused litigation resulting from the need to govern the complexity of a single lawsuit." *Jansen v. City of Cincinnati*, 904 F.2d 336, 339-40 (6th Cir. 1990). The relevant "factual circumstances considered under Rule 24(a) should be 'broadly construed in favor of potential intervenors.'" *Davis v. Lifetime Capital,*

*Inc.*, 560 F. App'x 477, 489 (6th Cir. 2014) (quoting *Purnell v. City of Akron,* 925 F.2d 941, 950 (6th Cir. 1991)).

The Sixth Circuit interprets the second factor - the "substantial legal interest" in the subject matter of the case - expansively. *Grutter*, 188 F.3d at 398 (citing *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997)). *See also Providence Baptist Church v. Hillandale Comm., Ltd.*, 425 F.3d 309, 315 (6th Cir. 2005) (the Sixth Circuit has "adopted a rather expansive notion of the interest sufficient to invoke intervention of right"). The intervenor is not required to have the standing needed to initiate a lawsuit. *Grutter*, 188 F.3d at 398 (citing *Miller*, 103 F.3d at 1245; *Purnell*, 925 F.2d at 948). Further, it is not necessary to have a "specific legal or equitable interest." *Id.* (citing *Miller,* 103 F.3d at 1245) (quoting *Purnell*, 925 F.2d at 948). A direct, specific, and substantial legal interest in the subject matter of the case may suffice. *Id.* at 399 (finding that the proposed intervenors "enunciated a specific interest in the subject matter of th[e] case, namely their interest in gaining admission" to the defendant university that they had applied or intended to apply to) (citing *Miller*, 103 F.3d at 1245; *Purnell*, 925 F.2d at 948). Whether a claimed interest is sufficiently substantial is a fact-specific inquiry. *Id.* (citing *Miller*, 103 F.3d at 1245) (quoting *Purnell*, 925 F.2d at 948). "[C]lose cases should be resolved in favor of recognizing an interest under Rule 24(a)." *Id.* (quoting *Miller*, 103 F.3d at 1247).

To satisfy the third element of the Rule 24(a) test, the impairment of the proposed intervenors' substantial legal interest need only be "possible" if intervention is denied. *Miller*, 103 F.3d at 1247 (citing *Grutter*, 188 F.3d at 399). The proposed intervenor's burden to meet this element is "minimal." *Id.* (quoting *Grutter*, 188 F.3d at 399). A proposed intervenor can establish impairment by showing that a judgment adverse to its interest in the main action would

preclude its claims in a separate future litigation. *See Ne. Ohio Coal. For Homeless and Serv.*

*Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1007-08 (6th Cir. 2006) (finding that

an "adverse ruling could hinder the [proposed intervenor's] ability to litigate the validity of the

[law at issue]" and acknowledging that "potential *stare decisis* effects can be a sufficient basis

for finding an impairment of interest"). A proposed intervenor can also meet its burden on the

third factor by showing a situation is "time-sensitive." *Id.* (citing *Americans United for*

*Separation of Church and State v. City of Grand Rapids,* 922 F.2d 303, 305-06 (6th Cir. 1990)

(organization was granted leave to intervene as of right where the additional time required for the

organization to initiate a separate lawsuit to allow for the display of a menorah on public

property likely would have delayed the resolution past the approaching Chanukah season)).

A proposed intervenor's right to intervene depends also on whether the fourth factor -

adequate representation of the applicant's interest by the parties to the lawsuit - is satisfied. The

proposed intervenor bears the burden of showing inadequate representation, which is minimal.

*Davis*, 560 F. App'x at 495 (citing *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n. 10

(1972); *Linton ex rel. Arnold v. Comm'r of Health & Env't,* 973 F.2d 1311, 1319 (6th Cir.

1992)). An applicant can meet its burden by showing "that there is a *potential* for inadequate

representation." *Id.* (quoting *Grutter*, 188 F.3d at 400-01) (emphasis in original). However,

where the proposed intervenor and a party to the litigation "share the same ultimate objective,"

there is a "presumption of adequate representation" that the proposed intervenor must overcome.

*U.S. v. Michigan*, 424 F.3d 438, 443-44 (6th Cir. 2005) (citing *Bradley v. Milliken,* 828 F.2d

1186, 1192 (6th Cir. 1987)). To overcome the presumption, it "may be enough to show that the

existing party who purports to seek the same outcome will not make all of the prospective

intervenor's arguments." *Grutter*, 188 F.3d at 400. If the proposed intervenor and the

representative to the lawsuit seek the same outcome, though, a "slight difference in interests" between the two does not necessarily show inadequacy of representation. *Jansen*, 904 F.2d at 343 (quoting *Nuesse v. Camp*, 385 F.2d 694, 703 (D.C. Cir. 1967)).

## B. The parties' positions

Doe and SAGA seek to intervene in this lawsuit as of right to "safeguard the right of all students at Shawnee State University, including those who are transgender, to equal and respectful treatment by faculty." (Doc. 18 at 1). Doe and SAGA allege that they satisfy all of the requirements for intervention as of right because (1) the motion to intervene is timely; (2) they have substantial legal interests in this case; (3) denial of intervention would impair the legal interests of Doe and the transgender members of SAGA; and (4) defendants will not adequately represent those interests. They acknowledge that they share the same goal with the existing defendants - dismissal of plaintiff's claims - and that they do not intend to pursue affirmative claims for relief in this case. (*Id.* at 2, 4). They contend, though, that Shawnee State will not make the same arguments they will make to defend against plaintiff's claims. (*Id.* at 2).

In response, defendants do not dispute that the proposed intervenors' motion is timely and that they have asserted a legal interest in this case. (Doc. 24). Defendants disagree that Doe and SAGA's interests are not adequately represented, and Shawnee State contends it properly enforced the Non-discrimination Policy at issue. (*Id.* at 1). Defendants asks the Court to wait until after their motion to dismiss (Doc. 22) is fully briefed and the Court has reviewed the merits of the motion before ruling on the motion to intervene as of right.

Plaintiff opposes Doe and SAGA's motion to intervene as of right. (Doc. 26). Plaintiff does not dispute that the motion to intervene is timely so as to satisfy the first element of the four-factor test. Plaintiff disputes that the remaining three elements are met. Plaintiff denies that

Doe and SAGA have asserted a substantial legal interest in this case, that any such interest will be impaired absent their intervention in the lawsuit, and that the parties before the Court will not adequately represent Doe and SAGA's interests. Plaintiff argues that Doe and SAGA's rights and interests are adequately represented by Shawnee State, which enforced the non-discrimination policy at issue, and by the other defendants, who have moved to dismiss all of plaintiff's claims.

### C. Application of the four-part intervention of right standard

#### i. Timeliness

The first factor that a party must satisfy under Rule 24(a) is met here. Doe and SAGA filed their motion to intervene approximately six weeks after plaintiff filed this lawsuit, and none of the parties to the litigation disputes that the motion is timely.

#### ii. Substantial Legal Interest

In support of the second element, Doe and SAGA argue that they have a substantial legal interest in this case because Doe and SAGA's members are the beneficiaries of the Non-discrimination Policy challenged by plaintiff. (Doc. 18 at 10). Doe argues that she has a concrete interest in the litigation because she is the transgender student who asserts an interest in being treated in a non-discriminatory manner and in defending the constitutionality of Shawnee State's anti-discrimination policy. (*Id.*). SAGA argues it has a substantial interest in the litigation which mirrors that of Doe. (*Id.* at 11-12).

Plaintiff acknowledges that the Sixth Circuit has adopted a "rather expansive notion of the interest sufficient to invoke intervention as of right." (Doc. 26 at 7, citing *Granholm*, 501 F.3d at 780). But plaintiff argues that the substantial legal interest factor is not satisfied here. Plaintiff asserts that Doe and SAGA have not articulated a benefit they receive from plaintiff's

discipline or a university policy under which the discipline was administered, and they do not have a concrete interest in prohibiting the expression of ideas that are offensively subjective to some who hear them. (Doc. 26 at 6-9).

The Court finds that the second Rule 24(a) factor - a substantial legal interest in the subject matter of the litigation - is satisfied. Doe and SAGA have established a specific and direct interest in the subject matter of this litigation, which involves Shawnee State's Non-discrimination Policy and its application and enforcement for the protection of transgender students. Doe is the transgender female whose complaint against plaintiff, which was for conduct which Shawnee State ultimately determined violated its Non-discrimination Policy, gave rise to this lawsuit. Doe has a substantial interest in seeing that the policy as applied to plaintiff is not struck down in the face of his constitutional challenges. Doe has a specific and direct interest in the continued validity and enforcement of the policy, which protects students from discrimination on the basis of "gender identity." Doe's interest is shared by SAGA and its transgender members, who likewise have a significant interest in seeing that the Non-discrimination Policy is not struck down on its face and as applied.

### iii.    *Impairment of the substantial legal interest*

Doe and SAGA argue that the third factor - impairment of their substantial interest if intervention is denied - is satisfied because an adverse ruling in this case would invalidate a university policy that protects their rights and would lead to mistreatment by plaintiff and, potentially, other professors. (*Id.* at 12). They also allege that a ruling in plaintiff's favor would "inhibit" them from pursuing future claims that plaintiff's conduct violates Title IX, the Equal Protection Clause, and applicable disability discrimination laws. (*Id.*).

Plaintiff argues that Doe and SAGA have not met their burden on this element because they have not shown they have a substantial legal interest in the outcome of this case that could be impaired if they are not represented. (Doc. 26 at 8-9). Plaintiff also alleges that Doe and SAGA make only "generic and sweeping conclusory claims" about the legal interest that will be impaired. (*Id.*). The Court disagrees on both counts. The Court has concluded that Doe and SAGA do have a substantial legal interest in the subject matter of this litigation. Plaintiff's constitutional challenges to Shawnee State's Non-discrimination Policy implicate both Doe and SAGA's substantial interests in the protections afforded transgender students under the policy. An adverse ruling could subject them to disparate treatment and cause other detrimental impacts. In arguing otherwise, plaintiff has construed the relevant circumstances liberally in his own favor by presuming the only concern implicated by his actions is "subjective offense caused by professors who consistently treat all males and females equally using biological-correct pronouns." (*Id.* at 8). Plaintiff's interpretation of his treatment of Doe as innocuous and harmless, despite Shawnee State's warnings that it violated the Non-discrimination Policy, is inconsistent with the Sixth Circuit's directive that the relevant factual circumstances should be "'broadly construed in favor of potential intervenors'" when analyzing whether a potential intervenor satisfies the four-part test. *See Davis*, 560 F. App'x at 489-90. Doe and Saga have satisfied their minimal burden to show that their ability to protect their interest in securing protections for their rights under the law will be impaired if plaintiff prevails on his claims in this lawsuit. The third element of the Rule 24(a) test is satisfied.

iv.     *Inadequacy of the representation*

The fourth factor to be examined is whether the parties before the Court will adequately represent Doe and SAGA's legal interests. Doe and SAGA contend that they can establish there

is a potential for inadequate representation of their interests. (*Id.* at 12-13, citing *Grutter*, 188

F.3d at 400). Doe and SAGA concede that they do not seek any additional affirmative relief in

this litigation, but they allege they intend to present different arguments to defend against

plaintiff's claims. (Docs. 18, 28). They allege that as plaintiff's employer, Shawnee State has

"significantly different interests and motivations" in this case than do Doe and SAGA. (Doc. 18

at 13). They acknowledge that Shawnee State will "defend its authority to enforce

antidiscrimination policies, like the one at issue in this case," in order to limit its legal liability in

this litigation. (*Id.*). But they argue Shawnee State also has an incentive to limit its future legal

exposure. They allege that in order to do so, Shawnee State may forego an argument that Doe

and SAGA intend to make here: i.e., that Title IX, the Equal Protection Clause, and the disability

discrimination laws bar the disparate treatment of students solely because they are transgender.

(*Id.*). They argue that Shawnee State's motion to dismiss confirms that Shawnee State will avoid

this defense as the motion includes only the "general[]" argument that "[t]he nondiscrimination

policies challenged by the Complaint are part of the University's obligations under Title IX and

Title VII." (Doc. 28 at 4). Doe and SAGA assert that the "specific" argument and conclusion

that Shawnee State's own Title IX office reached - that "discrimination against transgender

students violates Title IX" and "Title IX requires professors to use pronouns consistent with

transgender students' gender identity" - is not set out in the motion to dismiss. (*Id.*). Doe and

SAGA contend that at a minimum, their interests will not be adequately represented in this case

because the parties' arguments are likely to have "a different focus" given that Shawnee State is

a public entity and the proposed intervenors are not. (Doc. 18 at 13-14). They assert that

Shawnee State will emphasize a public university's right to control the conduct of its employees,

while they plan to make the same argument but to "emphasize the specific harms" plaintiff's

conduct causes transgender students. (*Id*. at 14). Doe and SAGA allege that both the Sixth

Circuit and courts in this district have held that the possibility that a private intervenor may make

different arguments than a government litigant is sufficient to establish inadequate

representation. (*Id*. at 13-14). Finally, SAGA argues it has a continuing interest in defending the

rights of transgender students on campus even after Doe graduates, and it is possible this case

will not conclude by Doe's expected graduation date in May 2021. (Doc. 18 at 14). SAGA

alleges that by intervening in this case, transgender students at Shawnee State will be assured a

voice in this case until it concludes even if Doe's graduation is held to moot the case. (*Id*. at 14-

15).

Plaintiff alleges that the proposed intervenors can meet their burden to demonstrate

inadequate representation under three circumstances, none of which apply here. (Doc. 26 at 9,

citing *Bradley*, 828 F.2d at 1192) (identifying circumstances under which inadequate

representation will be found as collusion between the representative and an opposing party; the

representative in the case has or represents an interest adverse to the proposed intervenor; and the

representative before the court has failed in its fulfillment of his duty). Plaintiff alleges that Doe

and SAGA admit they share the same goal in this litigation with Shawnee State and that

Shawnee State "will defend its authority to compel plaintiff to use state-mandated pronouns."

(*Id*. at 9-10). Plaintiff contends that Doe and SAGA only "speculate" that defendants may

disclaim an affirmative legal obligation to prosecute plaintiff in the future, and they have

articulated nothing more than a disagreement over litigation strategy by acknowledging that at a

minimum, "the parties' arguments are likely to have a different focus." (*Id*. at 10, citing Doc. 18

at 13). Plaintiff contends that a difference in litigation strategy is not sufficient to establish

inadequacy of representation. (*Id*. at 10, citing *Bradley*, 828 F.2d at 1192). Plaintiff argues that

a presumption applies that the current parties are adequate representatives (*Id.* at 10, citing *Michigan*, 424 F.3d at 444), and the proposed intervenors' admission that they share the same goals with defendants in this lawsuit, and that defendants will defend their authority to enforce the challenged policies against plaintiff, does not satisfy their burden to overcome the presumption. (*Id.* at 10).

Defendants disagree that the proposed intervenors' interests are not adequately represented by the parties to the lawsuit. (Doc. 24 at 1-2). They contend that Shawnee State properly enforced the non-discrimination policy at issue, and defendants have moved to dismiss all of plaintiff's claims.

In reply, Doe and SAGA argue that they satisfy their minimal burden to establish inadequate representation of their interests by the parties before the Court. (Doc. 28 at 4). Doe and SAGA state that the discrepancy in the arguments they intend to make as compared to those defendants have made renders this case virtually identical to *Grutter*, where the defendant university's representation was inadequate because the university was unlikely to make an argument that the intervenors intended to make and which would expose the university to liability. (*Id.* at 4-5, citing *Grutter*, 188 F.3d at 401). Doe and SAGA allege they intend to argue that different constitutional provisions or statutes require plaintiff to treat Doe in accordance with her gender identity, an argument Shawnee State is unlikely to make, and that plaintiff's actions implicate Doe's right to keep her transgender status private, a right that belongs to Doe personally. They contend that both Doe and SAGA's transgender members should have the opportunity to assert this privacy interest on their own behalf. Finally, Doe and SAGA argue that plaintiff has not attempted to distinguish the cases involving private versus public entities that they rely on to establish inadequacy of representation.

Doe and SAGA must overcome a presumption of adequate representation in this case because they share the "the same ultimate objective" as defendant Shawnee State. *See Michigan*, 424 F.3d at 443-44. Both the proposed intervenors and Shawnee State share the goal of defeating plaintiff's First Amendment and other constitutional claims arising out of the written warning Shawnee State issued to plaintiff for violating its anti-discrimination policies. The proposed intervenors and Shawnee State each have an interest in defeating plaintiff's claims that Shawnee State's anti-discrimination policies violate plaintiff's constitutional rights on their face and as applied.

Doe and SAGA argue that Shawnee State will not adequately represent their interests because the university has not presented in its motion to dismiss (Doc. 22), and is not likely to make going forward, the same arguments Doe and SAGA will make. (Doc. 18 at 13-14). Doe and SAGA contend that first, they will argue that "discrimination against transgender students violates Title IX," which "requires professors to use pronouns consistent with transgender students' gender identity." (Doc. 28 at 4). Second, Doe and SAGA assert they intend to argue that Doe has the right to be treated in accordance with her gender identity under Title IX, the Equal Protection Clause of the Fourteenth Amendment, and laws prohibiting disability discrimination. (Doc. 18 at 13). They contend this argument is relevant to the First Amendment balancing test and, specifically, to whether Shawnee State has articulated a legitimate basis for its policy. (*Id.*). They allege the argument is also relevant to whether plaintiff's state law claims are barred to the extent they conflict with federal law. (*Id.*). Doe and SAGA assert that Shawnee State may not want to present these arguments in order to limit its liability because the university would be a defendant in any lawsuit involving the treatment of transgender students brought under Title IX, the Equal Protection Clause, or disability discrimination laws. (*Id.*). Doe and

SAGA conclude that at a minimum, the parties' arguments are likely to have a different focus since Shawnee State is a public university while Doe and the members of SAGA are private individuals. (*Id.* at 13-14).

Defendants have filed a motion to dismiss plaintiff's claims (Doc. 22), which sets forth their legal arguments in opposition to plaintiff's claims and indicates the defenses they are likely to raise if this case proceeds past the pleading stage. In its motion to dismiss, Shawnee State does not defend against plaintiff's claims on the ground plaintiff violated Doe's constitutional rights, and Shawnee State does not otherwise defend the rights of Doe and other transgender students which are at issue in this lawsuit. Shawnee State makes no specific mention of Doe's rights as a transgender student in the motion to dismiss. Shawnee State only tangentially references gender identity and the rights of transgender students as a whole under Title IX and Shawnee State's policies. Rather than defend transgender students' rights in the face of plaintiff's challenges to Shawnee State's policies and the written warning he received under the policies, Shawnee State argues that plaintiff did not engage in protected speech, follow university directives, and comply with his obligations as an employee of a public university. Shawnee State characterizes plaintiff's refusal to use pronouns and honorifics to address Doe - the allegedly discriminatory matter at the center of this lawsuit - as the "simple ministerial act of using a 'title' and/or 'pronoun'"; "a simple act of respect" that is "part of Meriwether's responsibilities as a Professor at the University"; "the simple act of the use of titles ('Ms.' or 'Miss') and pronouns ('she/her') [that] relate to his position as a classroom instructor addressing students of the University in that capacity"; "one of the simplest, most ministerial acts possible for a University professor - how to address a student in his classroom"; "part of the simple process of how to address a student of the University" during a University course taught

"pursuant to University curriculum and policy requirements" by a University employee; communication related to "workplace interactions"; "the ministerial act of referring to a student as 'Ms.' or 'she'"; and the "simple act of the use of a title or pronoun during a class discussion." (*Id*. at 18, 19, 26, 30, 31). Shawnee State argues that plaintiff's First Amendment claim should be dismissed because "his refusal to use a pronoun or title in addressing one student in his classroom was not 'speech' protected by the First Amendment, and the University was within its rights to direct him on how to address the student. . . ." (*Id*. at 18). In moving to dismiss plaintiff's religious discrimination claim, Shawnee State characterizes plaintiff's refusal to use female pronouns and honorifics as a choice "not to follow [its] straightforward directives" and a "refus[al] to follow the guidance" of the university, plaintiff's employer. (*Id*. at 25). Shawnee State argues only that the Non-discrimination Policy challenged by plaintiff is a neutral rule of general applicability that is part of its obligations under Title IX and Title VII, not that the policy protects the rights of Doe and other transgender students. (*Id*. at 28-29). Shawnee State characterizes plaintiff's constitutional claims overall as a "difference of opinion" with the university's administration, which it alleges does not rise to the level of a constitutional violation. (*Id*. at 27).

By setting forth proposed arguments which differ significantly from those that Shawnee State has presented and is likely to continue to press if this case proceeds past the pleading stage, Doe and SAGA have overcome the presumption that the parties to the suit adequately represent their interests in this matter. Doe, the transgender student who filed the discrimination complaint which led to plaintiff's written warning, and SAGA, which represents transgender students like Doe, have an interest in insuring that Shawnee State's policies are construed and applied so as to protect their rights as transgender students. They also have an interest in advocating for the

equal treatment of transgender students under Title IX, the Equal Protection Clause, and other potentially applicable anti-discrimination laws. Doe and SAGA's interest in protecting the rights of transgender students, including the right to keep their transgender status private, entails defending those rights in the face of challenges such as plaintiff's lawsuit brought under the First Amendment and other constitutional provisions. Like the intervenors in *Grutter*, Doe and SAGA have articulated specific and reasonable concerns that Shawnee State will not present their relevant defenses under Title IX, the Equal Protection Clause, and other anti-discrimination laws that bar disparate treatment of students solely because they are transgender. *See Grutter*, 188 F.3d at 400. Shawnee State's motion to dismiss validates Doe and Saga's concerns.

Further, Doe and SAGA have shown a reasonable probability that Shawnee State, as a public entity, will emphasize different harms and will not adequately represent the interests of Doe and SAGA as private parties. (Doc. 18 at 13-14, citing *Miller*, 103 F.3d at 1247) ("One would expect that the Chamber [of Commerce], as a target of the statutes' regulations, would harbor an approach and reasoning for upholding the statutes that will differ markedly from those of the state, which is cast by the statutes in the role of regulator."); *Allied Constr. Indus. v. City of Cincinnati*, No. 1:14-cv-1450, 2014 WL 11429028, at *5 (S.D. Ohio Nov. 24, 2014) ("The private economic and employment concerns of Local 265 are likely to predominate its arguments and affect its positions in this matter, whereas those interests are unlikely to be the predominate focus of the City. For that reason, the parties' interests in an appeal of any decision issued in this matter may also differ."); *Orrand v. Hunt Constr. Grp., Inc.*, No. 2:13-cv-481, 2014 WL 3895555, at *5 (S.D. Ohio Aug. 8, 2014) (non-governmental intervenor had private economic concerns that were not shared by the NLRB, which represented and enforced the public interest and had a different perspective than the parties to the action). The arguments Shawnee State

makes in its motion to dismiss address strictures on the speech and conduct of a public employee - plaintiff - in the context of his employment relationship with a public employer - the university. As discussed above, Shawnee State has not raised as a defense to plaintiff's constitutional claims the rights of transgender students under the constitution, the anti-discrimination laws, and the policies the university formulated and enforced in accordance with governing law. Thus, Doe and SAGA are entitled to intervene in this action to protect their private interests which are at stake here.

For these reasons, Doe and SAGA have met their minimal burden to show that Shawnee State will not adequately represent their interests in this action. The proposed intervenors have "articulated specific relevant defenses that the University may not present" and have "presented legitimate and reasonable concerns about whether the University will present particular defenses" of its Non-discrimination Policy. *See Grutter*, 188 F.3d at 401. Shawnee State has not presented and appears unlikely to assert the rights and privacy interests of transgender students under Title IX, the Equal Protection Clause, and other potentially applicable anti-discrimination laws in defense of its interpretation and application of its Non-discrimination Policy. The fourth factor of the Rule 24(a) test is satisfied.

### IT IS THEREFORE ORDERED THAT:

1.    Jane Doe and Sexuality and Gender Acceptance's motion to intervene as defendants in the lawsuit as of right (Doc. 18) is **GRANTED**.

2.    Doe and SAGA are **GRANTED** leave to file the proposed motion to dismiss (Doc. 37).

3.   The stay on briefing of the motions to dismiss (Doc. 41) is **VACATED**.  Plaintiff shall

     have **twenty-one (21) days** from the date of this Order to file a response to the original

     defendants' motion to dismiss (Doc. 36) and **twenty-one (21) days** from the date Doe

     and SAGA file their motion to dismiss to respond to the intervenor-defendants' motion.

Date: _5/9/19_

Karen L. Litkovitz
United States Magistrate Judge