# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NICHOLAS K. MERIWETHER,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　Plaintiff,　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　vs.　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　: Case No. 1:18-cv-753
THE TRUSTEES OF SHAWNEE STATE　　　　　　:
UNIVERSITY, ET AL.　　　　　　　　　　　　: Judge Susan J. Dlott
　　　　　　　　　　　　　　　　　　　　　　: Magistrate Judge Karen L. Litkovitz
　　　　　　Defendants,　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　and　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
JANE DOE and SEXUALITY AND GENDER　　　　:
ACCEPTANCE,　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　Defendant-Intervenors.　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT-INTERVENORS JANE DOE AND SEXUALITY AND GENDER
## ACCEPTANCE'S MOTION TO DISMISS
## PLAINTIFF'S FIRST AMENDED COMPLAINT

Jennifer L. Branch #0038893
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
(513) 621-9100 (tel)
(513) 345-5543 (fax)
Jbranch@gbfirm.com

Shannon P. Minter (admitted *pro hac vice*)
Asaf Orr (admitted *pro hac vice*)
Christopher F. Stoll (admitted *pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street Suite 370
San Francisco, California 94102
(415) 392-6257 (tel)
sminter@nclrights.org
aorr@nclrights.org
cstoll@nclrights.org

Adam G. Unikowsky (admitted *pro hac vice*)
Michael E. Stewart
Jennifer J. Yun
JENNER & BLOCK LLP
1099 New York Avenue, NW #900
Washington, DC 20001
(202) 639-6000 (tel)
(202) 639-6066 (fax)
aunikowsky@jenner.com

Defendant-Intervenors Jane Doe and SAGA move this Court to dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## BACKGROUND

Defendant Shawnee State University ("Shawnee") is a public, four-year college in the University System of Ohio. Am. Compl., Doc. 34, at PageID 1464, ¶ 53. Shawnee enforces written nondiscrimination policies that apply to all Shawnee employees. Am. Compl., Doc. 34, at PageID 1464-1465, ¶¶ 55, 61; Am. Compl. Ex. 1, Doc. 34-1, at PageID 1509-1510; Am. Compl. Ex. 2, Doc. 34-2, at PageID 1511-1512. Among other policies, Shawnee prohibits "Sex and Gender Based Discrimination," including "adverse treatment on based on . . . gender identity," which is defined as treatment that "denies or limits [an] individual's ability to obtain the benefits of Shawnee State's programs or activities." Am. Compl. Ex. 2, Doc. 1-2, at PageID 1522.

Plaintiff Nicholas Meriwether is employed as a professor at Shawnee. Am. Compl., Doc. 34, at PageID 1469-1470, ¶¶ 93-95. Like other employees, he is required to comply with Shawnee's nondiscrimination policy. Am. Compl. Ex. 2, Doc. 34-2, at PageID 1512. In 2016, Plaintiff received guidance that, in order to comply with Shawnee's nondiscrimination policies and its obligations under Title IX, employees must treat transgender students equally, including addressing transgender students in accord with the student's gender identity, and that failure to do so could result in discipline. Am. Compl., Doc. 34, at PageID 1471-1473, ¶¶ 106-112, 114, 124.

On January 9, 2018, Plaintiff began teaching a course in Political Philosophy at Shawnee. Am. Compl., Doc. 34, at PageID 1474, ¶ 125. Among the students in his class was Defendant-Intervenor Jane Doe, Am. Compl., Doc. 34, at PageID 1474, ¶ 128, a transgender woman. During the first class session, Plaintiff referred to Ms. Doe as "sir." Am. Compl., Doc. 34, at PageID 1474, ¶ 128. After class, Ms. Doe approached Plaintiff to inform him of this mistaken gender

1

identification, and to request that Plaintiff refer to her using female honorifics and pronouns. Am. Compl., Doc. 34, at PageID 1475, ¶¶ 140-141. Plaintiff refused to do so. Am. Compl., Doc. 34, at PageID 1475, ¶ 141. In subsequent class periods, Plaintiff singled out Ms. Doe by referring *only* to her by her surname,[1] while continuing to use honorifics for other students whose gender identities matched Plaintiff's assumptions. Am. Compl., Doc. 34, at PageID 1476, ¶¶ 153-154. Despite her distress at being singled out in this stigmatizing manner, Ms. Doe was required to continue answering questions when called upon by Plaintiff. Am. Compl., Doc. 34, at PageID 1474, ¶ 127 (noting that "participation component of the course" requires students to be "prepared to give his or her answers to the assigned study questions when called upon to do so").

Plaintiff's refusal to comply with Shawnee's nondiscrimination policies in his treatment of Ms. Doe ultimately led to formal disciplinary proceedings. Am. Compl., Doc. 34, at PageID 1485-1486, ¶¶ 233, 239. Plaintiff was issued a written warning, and advised to comply with Shawnee's nondiscrimination policies when addressing students. Am. Compl., Doc. 34, at PageID 1487, ¶¶ 246-248. Plaintiff then filed a union grievance against Shawnee, which was denied, Am. Compl., Doc. 34, at PageID 1489, ¶ 264, and this lawsuit followed.

## ARGUMENT

Shawnee's nondiscrimination policies require that when its employees address a student, they respect the student's gender identity. The policy applies to *all* employees, regardless of whether they are professors or not. The policy does not apply to an employee's scholarship nor does it limit any employee's freedom to express views on any subject or to teach any subject. Plaintiff may disagree with this workplace policy, but it does not violate the Constitution. A public

---

[1] Plaintiff did subsequently refer to Ms. Doe as "Mr." Doe in at least one later class period, but alleges this was "inadvertent[]." Am. Compl., Doc. 34, at PageID 1477-1478, ¶ 165.

employer, like a private employer, may insist that its employees adhere to a nondiscrimination policy when undertaking their job-related duties.

## I. Plaintiff Has Not Stated a Claim Under the Free Speech Clause.

Plaintiff brings four free-speech claims: "Retaliation" (Count One), "Content & Viewpoint Discrimination" (Count Two), "Compelled Speech" (Count Three), and "Unconstitutional Conditions" (Count Five). Each claim boils down to the same theory: the Free Speech Clause prevents Shawnee from requiring him to use female pronouns when addressing Ms. Doe.

These claims fail for three independent reasons. First, under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), Shawnee does not violate the Free Speech Clause by requiring its employees to adhere to workplace policies when acting in their capacity as employees. That rule forecloses Plaintiff's free-speech claim: his in-classroom speech while teaching Shawnee students plainly occurs in his capacity as an employee. Second, even for speech made as a citizen rather than an employee, the First Amendment protects public employees' speech only when it addresses a matter of "public concern." *Connick v. Myers*, 461 U.S. 138, 146 (1983). The only speech at issue here—which is solely about how to address a particular student—falls far short of meeting the "public concern" requirement. Third, even if Plaintiff's speech were on an issue of public concern, the First Amendment would permit Shawnee to establish and enforce a nondiscrimination policy to ensure that its transgender students have an equal opportunity to get a university education.

### A. Plaintiff Cannot Base a First Amendment Claim on Speech Made Pursuant to His Official Duties.

*1. A State Employer May Require Its Employee to Adhere to Workplace Rules, Including Those That Affect Work-Related Speech.*

Plaintiff's free-speech claims are precluded by *Garcetti*. In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees

are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. *Garcetti* is controlling here, where Plaintiff's in-class speech referring to a particular student falls squarely within "statements [made] pursuant to [his] official duties" as a Shawnee employee. *Id.* Plaintiff alleges that he "regularly calls on students to answer questions about the assigned readings and to participate in class discussions." Am. Compl., Doc. 34, at PageID 1474, ¶ 126. "To him, using the Socratic method of instruction is fundamental to teaching philosophy." *Id.* Plaintiff's use of male pronouns in addressing Ms. Doe, which led to this dispute, occurred in connection with one such Socratic dialogue. Am. Compl., Doc. 34, at PageID 1474, ¶ 128. Thus, Plaintiff's speech was made in class, in his capacity as a professor. Under *Garcetti*, that resolves this case. When, as here, an employee is "simply performing his or her job duties," there is "no warrant" for a "delicate balancing of the competing interests surrounding the speech and its consequences." *Garcetti*, 547 U.S. at 423. Plaintiff's status as facilitator of classroom discussions "owe[d] its existence to [Plaintiff's] professional responsibilities," and therefore Shawnee's enforcement of a nondiscrimination code placing certain limits on that interaction "does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-22; *see also id.* at 422 (the First Amendment does not give public employees "a right to perform their jobs however they see fit.").

*Garcetti*'s holding that the First Amendment does not generally exempt public employees from having to comply with rules about workplace conduct and speech is particularly compelling here, where Plaintiff exercised authority over Jane Doe as a direct result of his official position as a Shawnee employee. To be clear, *Garcetti* applies even when an employee is not exercising such authority—for instance, in *Garcetti* itself, the plaintiff was a whistleblower, writing a memorandum to get his supervisor's attention. Here, however, Plaintiff *is* exercising authority—

4

making his claim for immunity from workplace rules even weaker. In his capacity as professor, Plaintiff decides which students may speak, what questions they must answer, and how the student's participation will affect the student's grade. Public institutions that confer authority are entitled to regulate the exercise of that authority, including to ensure that students are treated fairly and respectfully and are able to participate in and benefit from their courses. Shawnee employs Plaintiff as a professor and grants the authority to call upon students in class and to grade them on their classroom participation. The Free Speech Clause does not give Plaintiff a right to exercise that authority on behalf of the university in whatever manner he sees fit.

2. *Plaintiff's Role as a Professor Does Not Exempt Him from* Garcetti *or Shawnee's Nondiscrimination Policies.*

Plaintiff's contention that he is exempt from *Garcetti* because he is a professor has no merit. As the Sixth Circuit has explained, public universities may require professors to adhere to university policies regarding in-class instruction without running afoul of the First Amendment. "Academic freedom implicates the freedom of a university to make its own judgments as to education, requiring deference to a university's academic decisions." *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 344 (6th Cir. 2010). "In the context of in-class curricular speech," even "in the university arena," "a teacher's invocation of academic freedom does not warrant judicial intrusion upon an educational institution's decisions." *Id.* (citations and quotation marks omitted). Indeed, a school may go as far as to dismiss a professor based on a professor's teaching methods without implicating the First Amendment. *See id.* (a school "may constitutionally choose not to renew the contract of a nontenured professor when that professor's pedagogical attitude and teaching methods do not conform to institutional standards").

Here, Shawnee is merely requiring that Plaintiff use honorifics consistent with students' gender identity while interacting with them, if he chooses to refer to his students using honorifics.

This requirement applies identically to him as it does to every other Shawnee employee, *see* Am. Compl. Ex. 2, Doc. 34-2, at PageID 1512, and to all official-capacity interactions, not just classroom interactions, *see* Am. Compl., Doc. 34, at PageID 1472, ¶ 108.  Plaintiff alleges that referring to Ms. Doe with female pronouns violates Plaintiff's "sincerely held religious beliefs as a Christian . . . related to gender identity," *id.*, at PageID 1482, ¶ 208, but these allegations are unrelated to his status as a professor.  Campus police officers, secretaries, and custodians may have equally sincere religious objections to referring to students consistent with their gender identity, yet Plaintiff does not appear to dispute that under *Garcetti*, Shawnee can require those employees, while on the job, to adhere to its nondiscrimination policy.  That Plaintiff is a professor does not entitle him to an exemption from Shawnee's requirement that employees refrain from treating students unequally on the basis of their gender identity, including when addressing students in class.

Plaintiff characterizes Shawnee's nondiscrimination policy as an attack on academic freedom, as though Shawnee were seeking to censor his scholarship or freedom to express any views he wishes on gender, transgender issues, or anything else.  *E.g.*, Am. Compl., Doc. 34, at PageID 1481, ¶¶ 202, 204.  But the Complaint alleges no facts that support that assertion.  While Plaintiff's course may be related to "ethics and human nature," Am. Compl., Doc. 34, at PageID 1481, ¶ 202, Plaintiff does not allege that Shawnee has required him to voice, or refrain from voicing, any positions or views on those topics.  Being required to refer to transgender students in a manner consistent with students' gender identity in order to ensure that all students are able to participate in and benefit from their courses does not infringe upon Plaintiff's scholarly freedom, any more than similar rules requiring professors to hold classes on time, post office hours, or avoid subjecting students to harassing speech or behavior.  *See*, *e.g.*, *Johnson Kurek v. Abu-*

*Absi*, 423 F.3d 590, 595 (6th Cir. 2005) ("While the First Amendment may protect Johnson-Kurek's right to express her ideas about pedagogy, it does not require that the university permit her to teach her classes in accordance with those ideas. The freedom of a university to decide what may be taught and how it shall be taught would be meaningless if a professor were entitled to refuse to comply with university requirements whenever they conflict with his or her teaching philosophy.").

Plaintiff cannot characterize this as an academic freedom case merely by alleging that uttering "Ms. Doe" implicitly conveys his views about gender. Shawnee's policy does not restrict Plaintiff's freedom to write scholarly articles about gender or to teach his philosophical views about gender or anything else. Plaintiff cannot credibly claim that there is any scholarly interest in disclosing his views about the gender of a particular student as male or female. Complying with Shawnee's policy does not affect the content of his instruction; it merely requires Plaintiff—while exercising his university-conferred authority—to treat transgender students in accord with their gender identity. Academic freedom does not preclude a public university from requiring professors to adhere to basic norms of civil behavior. *See Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (speech that "was only loosely, if at all, related to academic scholarship . . . does not fall within the realm of speech that might fall outside of *Garcetti*'s reach").

Plaintiff's amended complaint adds allegations that he has "assiduously avoided" discussing issues related to gender identity in his classes as a result of the warning he received. Am. Compl., Doc. 34, at PageID 1492, ¶ 296. Plaintiff now speculates that "any further complaint regarding how he communicates on issues related to gender identity" could result in further disciplinary actions. *Id.* at PageID 1492, ¶ 290. These allegations cannot save his free speech claim. Plaintiff offers no allegations, and his many exhibits do not remotely suggest, that anyone

at Shawnee ever tried to prevent Plaintiff from writing or speaking about gender identity.  To the contrary, as Plaintiff himself alleges, Shawnee merely required him to "refer to students using titles and pronouns that reflect each student's self-asserted gender identity."  *Id.* at PageID 1477, ¶ 164.  To the extent Plaintiff declines to include topics related to transgender issues on his syllabus, that is his personal choice and presents no First Amendment concern.  In any event, Sixth Circuit precedent establishes that the First Amendment does not confer upon professors the right to teach the syllabus of their choosing over a university's objection.  *See Evans-Marshall*, 624 F.3d at 344 (because "[i]t is the educational institution that has a right to academic freedom, not the individual teacher," "a teacher's invocation of academic freedom does not warrant judicial intrusion upon an educational institution's decisions" (quotation marks omitted)).

Accepting Plaintiff's position would have far-reaching implications.  For instance, a professor who believes that women should not be pursuing higher education could refuse to call upon them in class, or call men by their surnames and refer to all women by their first names or simply as "woman."  A professor who believes that married women must be subservient to their husbands could insist on calling all married women by their husband's surnames even if they have not changed their surnames after marriage.  And he could declare that the college is powerless to stop him because such statements "communicate[] his own views on these subjects."  Am. Compl., Doc. 34, at PageID 1481, ¶ 204.  Likewise, a professor hostile to a student's religion could refuse to use names associated with a particular religion or even refer to the student as a "heathen" in class—and declare that the Constitution affords him the right to do so because he personally believes the student to be a heathen.  The Constitution does not require that college classrooms be free from evenhanded applications of nondiscrimination policies that simply seek to ensure that all students are able to participate in and benefit from their courses.

### B. Plaintiff's Speech Was on a Matter of Private Concern.

Plaintiff's claims also fail because referring to a student in order to call upon her in class to answer a question or contribute to the class discussion is not speaking on a "matter[] of public concern." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017). As such, Shawnee may respond to that speech without "intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146.

Speech addresses a matter of public concern if it relates to a "matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (citations and internal quotation marks omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48.

This is a paradigmatic case of speech on a matter of private concern. Plaintiff's speech exclusively involves workplace interactions. It is directed to one person for the limited purpose of informing Ms. Doe that she is being called upon to answer a question—not to express the professor's views on a particular group of people or on anything else. *See* Am. Compl., Doc. 34, at PageID 1480, ¶¶ 193-195 (alleging that "potential violation" of nondiscrimination policy involved only Plaintiff's matter of addressing Ms. Doe individually). It is no more a "matter of public concern" than any other situation in which a public employee addresses a member of the public in the course of the employee's official duties.

Plaintiff insists that the *reason* he referred to Ms. Doe with a male pronoun is that he holds personal views on an issue of public concern. But Plaintiff misunderstands the "public concern" test. The purpose of that test is to encourage discourse on "issues about which information is

needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004). Thus, whether speech is on a matter of "public concern" turns on the *information* that the speech imparts—which requires an analysis of what was *said*, rather than the internal motivations of the speaker. *See id.* at 591 ("the pertinent question is not *why* the employee spoke, but *what* he said," and the argument that "subjective motivations are dispositive when determining whether . . . speech addresses a matter of purely personal concern is in direct conflict with the Supreme Court's holding in *Connick*" (citation omitted)). Thus, a letter to the editor denouncing corruption in government is of "public concern" even if the writer's subjective motivation is to advance his or her career. *See, e.g.*, *Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (statements about public safety were on matters of public concern, even if motivated by plaintiff's own financial losses); *Rodgers v. Banks*, 344 F.3d 587, 600 (6th Cir. 2003) ("Although Plaintiff's underlying motive in writing the memo might have been to complain about incompetent management, our duty is not to discern her underlying motive, but rather to evaluate her point as it is presented in the speech."). Conversely, a statement of private concern is not transformed into a statement of public concern even if it is motivated by broader public considerations. *See, e.g.*, *Nair v. Oakland Cnty. Cmty. Mental Health Auth.*, 443 F.3d 469, 479-80 (6th Cir. 2006) (subjective motivations for authoring letter were irrelevant when letter itself did not touch on issue of public concern).

Thus, the Court must analyze not Plaintiff's personal motives for using male honorifics or calling Ms. Doe by her last name only, but the utterances themselves—*i.e.*, his referring to Ms. Doe as "Mr. Doe" or "Doe." And they do not address a matter of public concern.[2] They tell Ms.

---

[2] Plaintiff's amended complaint adds the conclusory allegation that his "comments about gender identity . . . address matters of public concern." Am. Compl., Doc. 34, at PageID 1481, ¶ 202. But Plaintiff cannot use this allegation to overcome a motion to dismiss, because "[w]hether or not a plaintiff's speech touches on a matter of public concern is a question of law." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 543 (6th Cir. 2012).

Doe a question is coming.  That Plaintiff possesses personal opinions on broader social questions that, if conveyed, might be of "public concern" does not transform his routine honorifics into statements that "enable the members of society to make informed decisions about the operation of their government."  *Farhat*, 370 F.3d at 590.  Indeed Plaintiff's use of pronouns did not convey *any* information of public concern—even his own beliefs about gender—because a reasonable listener would understand the use of female pronouns to reflect nothing more than the ordinary civility that would be expected in any interaction between a professor and a student.  *See, e.g., R.G. & G.R.*, 884 F.3d at 566 n.1 ("We refer to Stephens using female pronouns, in accordance with the preference she has expressed through her briefing to this court.").

Plaintiff's manner of addressing Ms. Doe conveys one additional piece of information: it "outs" Ms. Doe as a transgender woman.  This further confirms that his statement is not on a matter of "public concern."  Whether a person is transgender is the antithesis of information of "public concern"—it is intensely private, personal information, as the Court acknowledged in its Order granting Ms. Doe's motion to proceed pseudonymously.  Order, Doc. 32 at PageID 1081-1082.  There is a fundamental difference between gender as a general matter—a matter of public concern—and a particular person's status as transgender—a matter of private concern.  Conveying the latter information does not transform Plaintiff's speech into information of public concern merely because the speaker is motivated by opinions about gender, any more than publicly disclosing a specific person's cancer diagnosis is a matter of "public concern" because the speaker intends to educate the public that cancer diagnoses are widespread.

If Plaintiff's argument were correct, then public employees could convert any refusal to comply with a workplace policy into speech on a matter of public concern simply by claiming that their violation is intended to "send a message" about some broader issue.  For example, a professor

who believes that second marriages are sinful could claim a free-speech right to refuse to use a student's married name in order to convey that belief.  Or a professor who believes that a particular religion or nationality is "a lie" could claim a free speech right to convey that belief by refusing to refer to a student by a name that signals adherence to that religion or nationality.  Neither the Sixth Circuit nor any other court has adopted such extreme reasoning.

### C. Even Under First Amendment Balancing, Plaintiff's Claim Fails.

Even if Plaintiff were speaking as a citizen rather than as an employee, *and* his statements were on a matter of public concern, his Free Speech claim would fail.  Plaintiff's "interests . . . in commenting upon matters of public concern" do not outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Evans-Marshall*, 624 F.3d at 338 (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).  Here, Shawnee's interest in maintaining its nondiscrimination policy outweighs Plaintiff's interest in addressing Ms. Doe using particular honorifics.

Shawnee has a powerful interest in maintaining its nondiscrimination policy.  Colleges are "legally required to maintain a hostile-free learning environment and must strive to create policies which serve that purpose," and have every right to protect their students' "right to learn in a hostil[ity]-free environment." *Bonnell v. Lorenzo*, 241 F.3d 800, 823-24 (6th Cir. 2001).  "Speech that rises to the level of harassment—whether based on sex, race, ethnicity, or other invidious premise—and which creates a hostile learning environment that ultimately thwarts the academic process, is speech that a learning institution has a strong interest in preventing." *Id.* at 824.

In this case, Title IX[3] requires Shawnee to maintain a nondiscrimination policy that ensures that transgender students are treated in accordance with their gender identity.  Title IX provides

---

[3] Because Shawnee is a public institution, the Equal Protection Clause similarly prohibits discrimination against Jane Doe on account of her gender identity.  *See City of Salem*, 378 F.3d at 577; *Glenn v. Brumby*, 663 F.3d 1312, 1316–

that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A university violates Title IX when its officials in positions of authority "had actual notice of, and [were] deliberately indifferent to, the misconduct." *Mallory v. Ohio Univ.,* 76 F. App'x 634, 638 (6th Cir. 2003); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015). Shawnee would be liable under that standard if it knowingly allowed its employees to discriminate against transgender students.

The Sixth Circuit has held that discrimination against transgender individuals is discrimination "on the basis of sex" for Title VII purposes. *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018) ("discrimination on the basis of transgender and transitioning status violates Title VII."). Title IX similarly prohibits discrimination "on the basis of sex," so discrimination against transgender individuals violates Title IX as well. *See Miles v. N.Y. Univ.*, 979 F. Supp. 248, 250 n.4 (S.D.N.Y. 1997) ("[T]he Title IX term 'on the basis of sex' is interpreted in the same manner as similar language in Title VII"); *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049 (7th Cir. 2017) (school policy that "punishes that individual for his or her gender non-conformance . . . violates Title IX"). Shawnee has a compelling interest in complying with federal nondiscrimination law.

Even if federal law did not require Shawnee to maintain and enforce its nondiscrimination policy, Shawnee has every right to enact a nondiscrimination policy more protective than federal law. Shawnee has a powerful interest in ensuring that its students receive the education they pay for, and it was entitled to conclude that protecting transgender students from discrimination is

---

17 (11th Cir. 2011); *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 873 (S.D. Ohio 2016). The Americans with Disabilities Act may also prohibit such discrimination. *See Tate v. Wexford Health Source Inc.*, No. 3:16-cv-92, 2016 WL 687618, at *5 (S.D. Ill. Feb. 19, 2016).

necessary for those students to learn and thrive.  If Plaintiff's statements undermine Shawnee's mission—ensuring that its students are educated—then the First Amendment allows Shawnee to prioritize its mission and regulate the speech of its employees.  *See Piggee v. Carl Sandburg Coll.*, 464 F.3d 667, 671-72 (7th Cir. 2006) (college had an interest in ensuring that instructors "stay on message" in class and not create environment where student "avoided" instructor and "was unhappy that he still had to go to a class" that instructor taught); *Poulard v. Trs. of Ind. Univ.*, No. 2:16-cv-115, 2018 WL 4680010, at *11 (N.D. Ind. Sept. 28, 2018) (university has "strong interest in eliminating [harassing statements] in order to foster an inclusive learning environment.").[4]

To permit Plaintiff's personal preferences regarding the manner in which he will address students to outweigh Shawnee's interest in nondiscrimination would vitiate any public university's ability to enforce nondiscrimination protections in the classroom.  Plaintiff's position has no limiting principle: if the manner in which professors address individual students in the classroom is exempted from nondiscrimination laws, then a college could not discipline a professor who, based on his sincerely held beliefs, uses derogatory terms to address all nonwhite students, or women, or students from a minority faith, or students on financial aid.  The Sixth Circuit has held that the First Amendment may not "be used as a shield by teachers who choose to use their unique and superior position to sexually harass students secure in the knowledge that *whatever* they say or do will be protected." *Bonnell*, 241 F.3d at 824.  Nor may it be used as a shield by teachers who choose to use their unique and superior positions to discriminate against transgender students.

---

[4] Shawnee similarly has an interest in applying its policy consistently, regardless of Plaintiff's subjective assessment of whether his students experience "anxiety, fear, or intimidation."  Am. Compl., Doc. 34, at PageID 1479, ¶ 181.

**II.    The Free Exercise Clause Does Not Allow Plaintiff to Violate a Neutral, Generally Applicable Rule Not Targeted at Any Religious Beliefs or Practices.**

Plaintiff's Free Exercise claim (Count Four) also fails as a matter of law. Shawnee's nondiscrimination policy is a neutral and generally applicable policy that was applied to Plaintiff's conduct without targeting particular religious practices or views. The nondiscrimination policy therefore did not violate Plaintiff's right to exercise his religion.

An individual's religious beliefs do not "excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate," because "[t]he mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities." *Emp't Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 878-79 (1990) (citation omitted), *superseded in part by statute as stated in Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). Therefore, neutral, generally applicable laws do not violate the Free Exercise Clause unless "the object of [the] law is to infringe upon or restrict practices because of their religious motivation," or if "the purpose of [the] law is the suppression of religion or religious conduct." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 533 (1993). Based on this principle, the Supreme Court in *Smith* found Oregon's ban on the use of a hallucinogen did not infringe Smith's right to exercise religion freely even if he used it for religious reasons because the ban was neutral, generally applicable, and not aimed at religious practices. *Smith*, 494 U.S. at 877-78.

Here, Plaintiff has failed to state a claim that Shawnee's nondiscrimination policy was not neutral, or that the policy was applied to target and suppress his religious beliefs. The nondiscrimination policy is neutral and generally applicable on its face: Shawnee's nondiscrimination policy applies to "all employees, students, visitors, agents, and volunteers," in "all aspects of the University's programs and operations." Am. Compl. Ex. 2, Doc. 34-2, at

15

PageID 1512. The Sixth Circuit's decision in *Kissinger v. Board of Trustees of Ohio State University*, 5 F.3d 177 (6th Cir. 1993), establishes that such policies do not violate the Free Exercise Clause, even if they may burden a particular person's religious beliefs. In *Kissinger*, a veterinary student objected to operating on live animals due to her religious beliefs. The Sixth Circuit found that there was no evidence that the state used its curriculum requirement to "attack or exclude any individual on the basis of his or her religious beliefs." *Id.* at 179. Similarly, Plaintiff fails to allege that Shawnee used the nondiscrimination policy to target his religious beliefs. Shawnee applied its policy without regard to Plaintiff's religion; it is Plaintiff who introduced his religious beliefs as a basis for seeking an exception to the policy. Am. Compl., Doc. 34, at PageID 1469, 1478, 1482, 1485, 1488, ¶¶ 86, 92, 170, 208, 237, 253. Plaintiff's unilateral invocation of his religious beliefs to avoid complying with a generally applicable, neutral policy does not demonstrate improper motivation by *Shawnee*.

Plaintiff alleges that Shawnee's enforcement of its nondiscrimination policy reflects hostility towards his religious beliefs, but his conclusory allegations do not plausibly state a free-exercise claim. First, Plaintiff alleges that Defendant Pauley, the department chair, expressed "hostility" to his religious beliefs. But this discussion occurred in November 2016, well over a year before Ms. Doe even took his class and lodged a Title IX complaint, and even Plaintiff's allegations draw no connection between this alleged conversation and the nondiscrimination policy or his warning for violating it. Am. Compl., Doc. 34, at PageID 1473, ¶¶ 119-121.

Second, Plaintiff alleges that Defendant Bauer expressed hostility towards his religious beliefs when he stated that he would not grant a religious accommodation to Plaintiff because such an accommodation would then be available to any faculty member with sincerely held religious beliefs that may discriminate on the basis of sex or race. Am. Compl., Doc. 34, at PageID 1490-

1491, ¶¶ 279-81.  Despite Plaintiff's allegation to the contrary, Defendant Bauer's statements reaffirmed the fact that the nondiscrimination policy was neutral and generally applicable.  As Defendant Bauer recognized, public officials should not decide which religious beliefs are good and which are bad—such distinctions are repugnant to the Free Exercise Clause, which requires the state to be neutral between religions and "forbids subtle departures from neutrality."  *City of Hialeah,* 508 U.S. at 534.  If Plaintiff was entitled to an exemption from nondiscrimination laws based on his religious beliefs, other professors would be too—even if those professors' religious beliefs mandated other forms of discrimination on the basis of race or sex.  Defendant Bauer's expression of this elementary principle of neutrality did not *violate* the Free Exercise Clause.

Third, Plaintiff alleges that Defendant Bauer laughed when the Union president explained how disciplinary actions against Plaintiff would violate his religious beliefs. Am. Compl., Doc. 34, at PageID 1488, ¶ 258.  Even accepting this factual allegation as true, it is not the basis for a free-exercise claim.  *See A'la v. Cobb*, 208 F.3d 212 (6th Cir. 2000) ("De minimis events simply do not state constitutional claims").

Finally, Plaintiff cannot state a free-exercise claim based on the conclusory allegation that the nondiscrimination policy represents "a system of individualized assessments."  Am. Compl., Doc. 34, at PageID 1498, ¶ 337.  Plaintiff does not allege that Shawnee has ever, or will ever, grant any exemption from its policy that transgender students must be treated in conformance with their gender identity.  *See Kissinger*, 5 F.3d at 179 (finding that plaintiff failed to show that the school had a system of exemptions that allowed students to graduate without completing the required surgical coursework).  To the extent Plaintiff is referring to the fact that Shawnee performs an individualized *investigation* before deciding whether a faculty member has violated university policy, the Free Exercise Clause does not prohibit Shawnee from giving its professors due process.

### III.    Plaintiff's State Free Exercise Claim Must Be Dismissed.

Plaintiff's free exercise claim under Article I, § 7 of the Ohio Constitution (Count Eight) also fails as a matter of law.  First, the state law claim is foreclosed by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984); Def. Mot. to Dismiss, Doc. 22, at PageID 583-584.  Even if *Pennhurst* does not apply, the Court should still decline to exercise its supplemental jurisdiction over this state law claim if all federal law claims are dismissed.  *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." (internal citation omitted)).

It would be particularly appropriate to decline supplemental jurisdiction here, given that no Ohio case has applied Article I, § 7 of the Ohio Constitution in analogous circumstances.  The Ohio Supreme Court has held that a prison guard had the state constitutional right to wear his hair long for religious reasons even if this violates a generally applicable grooming policy.  *Humphrey v. Lane*, 728 N.E.2d 1039, 1043 (Ohio 2000).  In that context, the court applied the rule that "the standard for reviewing a generally applicable, religion-neutral state regulation that allegedly violates a person's right to free exercise of religion is whether the regulation serves a compelling state interest and is the least restrictive means of furthering that interest."  *Id.*  But this case presents a very different scenario.  In *Humphrey*, the plaintiff did his job as dictated by the state—he simply wanted to wear his hair long while doing so.  Here, Plaintiff seeks to discriminate in the *exercise of* his state-conferred authority.  *Supra*, at Part I.A.1.  Thus, Plaintiff is analogous to a prison guard who argues that the state constitution protects his right to discriminate against transgender inmates because this is required by his religious beliefs.  The Ohio Supreme Court should have the chance to consider this unprecedented claim in the first instance.

18

Even if the state-law claim were properly before this Court, it would lack merit.  Even assuming the compelling-state-interest test of *Humphrey* applies here, the state satisfied it as a matter of law: the state has a compelling state interest in preventing discrimination against transgender students, and the nondiscrimination policy is the least restrictive means of achieving that policy.  *Supra*, Part I.C.  Further, even if the enforcement of Shawnee's nondiscrimination policies violated Article I, § 7, the application of Article I, § 7 would be preempted by Title IX.  As explained above, federal law requires Shawnee to maintain a nondiscrimination policy that ensures that transgender students are treated by their professors in accordance with their gender identity.  *Supra*, Part I.C.  Any state law that prevents Shawnee from enforcing Title IX stands as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress," because it is impossible for Shawnee to comply with both federal law (Title IX) and state law (the state Free Exercise Clause).  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000).

## IV.  Plaintiff's Remaining Claims Lack Merit.

***Due Process.***  Plaintiff's due process claim (Count Six) must be dismissed because Shawnee's nondiscrimination policy is not unconstitutionally vague.  The Due Process Clause requires "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson*, 461 U.S. 352, 357 (1983), though it does not require legislating in "encyclopedic terms." *United States v. Jenkins*, 770 F.3d 507, 510 (6th Cir. 2014).

Plaintiff has not plausibly alleged that the nondiscrimination policy is unconstitutionally vague on its face.  The policy is crystal clear: all students, transgender or not, must be treated in accordance with their gender identity.  The policy is also not vague as applied to Plaintiff: Plaintiff's own factual allegations show that Shawnee has clearly communicated what the policy

required multiple times and that Plaintiff was on notice.  In August 2016, over a year before Ms. Doe started taking his class, faculty members of the University were informed that they could face disciplinary action if "they refused to use a student's requested name or pronoun." Am. Compl., Doc. 34, at PageID 1472, ¶ 107.  In October 2016, Defendant Milliken personally informed Plaintiff that the nondiscrimination policies meant that professors must utilize a student's requested pronoun, "regardless of the professor's convictions or views." Am. Compl., Doc. 34, at PageID 1472, ¶ 112.  Defendant Milliken then personally informed Plaintiff that he would be "subject to administrative disciplinary procedures if he refused to use a pronoun that reflects a student's self-asserted gender identity." Am. Compl., Doc. 34, at PageID 16, ¶ 114.  This same interpretation of the policy was communicated to Plaintiff again in 2018, during the disciplinary process.  Am. Compl., Doc. 34, at PageID 1483, ¶ 215.  Thus, the University enforced the policy in a clear, non-arbitrary manner, and Plaintiff was given ample notice as to what it required.

***Equal protection.***  Plaintiff's equal protection claim (Count Seven) must be dismissed because Plaintiff failed to allege any disparate treatment.  "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).  Here, Plaintiff has not alleged that any other professor at the University refused to call on students according to their gender identity but was not disciplined for doing so; nor has Plaintiff alleged that Shawnee failed to discipline other professors at the University who violated the nondiscrimination policy.[5]

## CONCLUSION

Plaintiff's amended complaint should be dismissed in its entirety.

---

[5] Ms. Doe and SAGA adopt the State's arguments regarding Plaintiff's breach of contract claim (Count Nine).

Date: May 10, 2019                              Respectfully Submitted,

                                                /s/ Adam G. Unikowsky
                                                Adam G. Unikowsky (admitted *pro hac vice*)
                                                Michael E. Stewart
                                                Jennifer J. Yun
                                                JENNER & BLOCK LLP
                                                1099 New York Avenue NW, Suite 900
                                                Washington, DC 20001
                                                (202) 639-6000 (tel)
                                                (202) 639-6066 (fax)
                                                aunikowsky@jenner.com

                                                Jennifer L. Branch #0038893
                                                Gerhardstein & Branch Co. LPA
                                                441 Vine Street, Suite 3400
                                                Cincinnati, OH 45202
                                                (513) 621-9100 (tel)
                                                (513) 345-5543 (fax)
                                                Jbranch@gbfirm.com

                                                Shannon P. Minter (admitted *pro hac vice*)
                                                Asaf Orr (admitted *pro hac vice*)
                                                Christopher F. Stoll (admitted *pro hac vice*)
                                                NATIONAL CENTER FOR LESBIAN RIGHTS
                                                870 Market Street Suite 370
                                                San Francisco, California 94102
                                                (415) 392-6257 (tel)
                                                (415) 392-8442 (fax)
                                                sminter@nclrights.org
                                                aorr@nclrights.org
                                                cstoll@nclrights.org

                                                *Attorneys for JANE DOE and SEXUALITY AND*
                                                *GENDER ACCEPTANCE*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 10, 2019, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Asaf Orr
Attorney for Jane Doe and Sexuality
and Gender Acceptance