IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

NICHOLAS K. MERIWETHER,

*Plaintiff,*

*v.*

THE TRUSTEES OF SHAWNEE STATE
UNIVERSITY, *et al.,*

*Defendants.*

Case No: 1:18-cv-00753-SJD

THE HONORABLE SUSAN J. DLOTT

THE HONORABLE KAREN L. LITKOVITZ

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION TO DISMISS
THE FIRST AMENDED VERIFIED COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

    I.    Intervenors do not contest many of Dr. Meriwether's claims. ...................... 3

    II.   Defendants retaliated against Dr. Meriwether for engaging in speech the First Amendment protects. ................................................................................ 3

        A. Dr. Meriwether spoke "as a citizen" for *Garcetti's* "official duties" test does not apply to faculty speech "related to teaching." ............................ 3

        B. Dr. Meriwether spoke on a matter of public concern. .............................. 5

        C. The *Pickering* balancing test favors Dr. Meriwether. ............................. 8

            1. The *Pickering* balancing test generally favors faculty, especially those who speak on matters of public concern. ................................... 8

            2. Intervenors identify no interests that alter the *Pickering* balance. ... 10

    III.  Defendants are trampling Dr. Meriwether's religious freedom under the Free Exercise Clause. ......................................................................................... 13

        A. Defendants wrongly interfere with Dr. Meriwether's right to communicate with others consistent with his faith. ................................ 13

        B. Defendants wrongly require Dr. Meriwether to renounce his religious beliefs to remain a professor in good standing. ....................................... 14

        C. Under *Smith's* neutral and generally applicable test, Defendants' restrictions trigger strict scrutiny. .......................................................... 15

            1. Defendants' restrictions are not neutral. ........................................... 15

            2. Defendants' restrictions are not generally applicable. ...................... 16

        D. Defendants' restrictions violate the hybrid rights doctrine. .................. 17

        E. Defendants' restrictions flunk strict scrutiny. ........................................ 17

    IV.  Defendants enforce overbroad restrictions on faculty speech. ..................... 17

    V.   Defendants enforce an inherently vague policy. ........................................... 18

    VI.  Defendants treat similarly situated professors differently. ......................... 20

CONCLUSION ................................................................................................................. 20

CERTIFICATE OF SERVICE ............................................................................................... 22

TABLE OF AUTHORITIES

**CASES**

*Axson-Flynn v. Johnson,*
  356 F.3d 1277 (10th Cir. 2004) ........................................................................... 17

*Bauer v. Sampson,*
  261 F.3d 775 (9th Cir. 2001) ................................................................................. 9

*Bd. of Educ. of Highlands Local Sch. Dist. v. U.S. Dep't of Educ.,*
  208 F. Supp. 3d 850 (S.D. Ohio 2016) ................................................................ 11

*Bonnell v. Lorenzo,*
  241 F.3d 800 (6th Cir. 2001) ............................................................................... 10

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ............................................................................................ 15

*Brown v. Entm't Merchs. Ass'n,*
  564 U.S. 786 (2011) ............................................................................................ 19

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ...................................................................................... 15, 16

*City of Chi. v. Morales,*
  527 U.S. 41 (1999) ........................................................................................ 18, 19

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ............................................................................................ 20

*Cockrel v. Shelby Cnty. Sch. Dist.,*
  270 F.3d 1036 (6th Cir. 2001) ............................................................................... 9

*Connally v. Gen. Constr. Co.,*
  269 U.S. 385 (1926) ............................................................................................ 20

*Crawford v. Columbus State Cmty. Coll.,*
  196 F. Supp. 3d 766 (S.D. Ohio 2016) .................................................................. 8

*Doe v. Univ. of Cincinnati,*
  872 F.3d 393 (6th Cir. 2017) ............................................................................... 12

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,*
  884 F.3d 560 (6th Cir. 2018) ............................................................................... 11

*Emp't Div., Dep't of Human Res. v. Smith,* 494 U.S. 872 (1990) ................. 13, 14, 17

*Evans-Marshall v. Bd. of Educ., Tipp City Exempted Vill. Sch. Dist.,*
  624 F.3d 332 (6th Cir. 2010) ................................................................................. 4

*Farhat v. Jopke,*
  370 F.3d 580 (6th Cir. 2004) ......................................................................... 5, 6, 8

*Forsyth Cty. v Nationalist Movement,*
   505 U.S. 123 (1992) ........................................................................... 17

*G.G. v. Gloucester Cty. Sch. Bd.,*
   822 F.3d 709 (4th Cir. 2016) ........................................................... 11

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006) ................................................................. 3, 4, 5

*Girl Scouts of Middle Tenn., Inc. v. Girl Scouts of U.S.A.,*
   770 F.3d 414 (6th Cir. 2014) ................................................ 2, 6, 8, 13

*Glen v. Brumby,*
   663 F.3d 1312 (11th Cir. 2011) ...................................................... 11

*Gloucester Cty. Sch. Bd. v. G.G.,*
   137 S. Ct. 1239 (2017) .................................................................. 11

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ...................................................................... 19

*Hardy v. Jefferson Cmty. Coll.,*
   260 F.3d 671 (6th Cir. 2001) ..................................................... 5, 6, 9

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
   565 U.S. 171 (2012) .................................................................. 13, 14

*Hurley v. Irish-Am. Gay, Lesbian, & Bi-Sexual Grp. of Bos.,*
   515 U.S. 557 (1995) ..................................................................... 7, 12

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps.,*
   138 S. Ct. 2448 (2018) ......................................................... 2, 5, 8, 12

*Jenkins v. Rock Hill Local Sch. Dist.,*
   513 F.3d 580 (6th Cir. 2008) ............................................................ 3

*Keyishian v. Bd. of Regents of Univ. of N.Y.,*
   385 U.S. 589 (1967) ..................................................................... 1, 5

*Lane v. Franks,*
   573 U.S. 228 (2014) ...................................................................... 6, 9

*Levin v. Harleston,*
   770 F. Supp. 895 (S.D.N.Y. 1991) .................................................. 9

*Levin v. Harleston,*
   966 F.2d 85 (2d Cir. 1992) ............................................................... 9

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
   138 S. Ct. 1719 (2018) ..................................................... 7, 14, 15, 16

*Matal v. Tam,*
   137 S. Ct. 1744 (2017) .................................................................. 17

*Mayhew v. Town of Smyrna,*
   856 F.3d 456 (6th Cir. 2017) ............................................................ 3

*Mills v. Steger,*
   64 F. App'x 864 (4th Cir. 2003) ....................................................... 9

*Obergefell v. Hodges,*
   135 S. Ct. 2584 (2015) ..................................................................... 7

*Papish v. Bd. of Curators of Univ. of Mo.,*
   410 U.S. 667 (1973) .................................................................... 7, 12

*Parate v. Isibor,*
   868 F.2d 821 (6th Cir. 1989) ........................................................... 4

*Piggee v. Carl Sandburg Coll.,*
   464 F.3d 667 (7th Cir. 2006) ..................................................... 12, 18

*Plyler v. Doe,*
   457 U.S. 202 (1982) ...................................................................... 20

*Poulard v. Trs. of Ind. Univ.,*
   2018 WL 4680010 (N.D. Ind. Sept. 28, 2018) ............................. 12, 13

*R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC,*
   __ U.S. __, 2019 WL 1756679 (Apr. 22, 2019) ............................... 10

*Rodgers v. Banks,*
   344 F.3d 587 (6th Cir. 2003) ........................................................... 8

*Savage v. Gee,*
   665 F.3d 732 (6th Cir. 2012) ........................................................... 4

*Saxe v. State Coll. Area Sch. Dist.,*
   240 F.3d 200 (3d Cir. 2001) ........................................................... 13

*Smith v. City of Salem,*
   378 F.3d 566 (6th Cir. 2004) ......................................................... 11

*Tate v. Wexford Health Source, Inc.,*
   2016 WL 687618 (S.D. Ill. Feb. 19, 2016) ...................................... 11

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
   137 S. Ct. 2012 (2017) ....................................................... 13, 14, 15

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. 489 (1982) ...................................................................... 19

*W. Va. Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ........................................................................ 1

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
   858 F.3d 1034 (7th Cir. 2017) .................................................. 11, 12

iv

*Wittmer v. Phillips 66 Co.*,
  915 F.3d 328 (5th Cir. 2019) ................................................................. 10

*Wooley v. Maynard*,
  430 U.S. 705 (1977) .............................................................................. 7

**OTHER AUTHORITIES**

Rachael Revesz, *University of Michigan Student Changes Name to "His Majesty"*
  *Following New "Inclusive" Pronoun Policy*, INDEP., Sept. 30, 2016,
  https://ind.pn/2H6738q.......................................................................... 19

U.S. Dep'ts of Justice & Educ.,
  *Dear Colleague*, Feb. 22, 2017, https://bit.ly/2JPIKgn ........................... 11

U.S. Dep'ts of Justice & Educ.,
  *Dear Colleague*, May 13, 2016, https://bit.ly/2QnRmes........................... 11

### INTRODUCTION

Intervenors, echoing Defendants,[1] advance the baseless notion that professors have no First Amendment rights when engaged in the teaching that is the hallmark of their calling. Over fifty years ago, the Supreme Court ruled that to "impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967). It recognized the vital need for free, unfettered discussion, particularly in fields like philosophy, "where few, if any, principles are accepted as absolutes." *Id.* But Intervenors and Defendants pretend gender identity is somehow different, that it is an absolute truth, and that they can use government's might to force to all professors to communicate it. Dissent cannot, and will not, be tolerated.

That is, Defendants and Intervenors wrongly insist that the Bill of Rights, "which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). After all, that "fixed star in our constitutional constellation"— identified during World War II when college-age Americans faced dangers far more lethal than ideas they didn't want to hear—remains firmly in place. *Id.* at 642.

Like Defendants, Intervenors buttress their alarming notion with contradictions. They insist that Dr. Meriwether's speech "did not convey *any* information of public concern—even his own beliefs." Def.-Intervenors' Mot. to Dismiss ("Ints.' MTD"), Doc. 44, PageID.1985. But they argue that his speech was "stigmatizing" and demand that he must speak differently to convey "respect [for] the student's gender identity." *Id.*, PageID.1976. But speech cannot communicate both nothing and something. They also say that their dubious interpretations of federal statutes, many of which the federal government has abandoned, trump constitutional rights, *id.*, PageID.1986–87, as if the Supremacy Clause vanished. And they claim that merely hearing speech one does

---

[1]    Dr. Meriwether incorporates by reference his response to Defendants' motion to dismiss. *See* Pl.'s Resp. in Opp. to Defs.' Mot. to Dismiss ("Defs.' MTD Resp."), Doc. 45.

not like is "stigmatizing," *id.*, PageID.1976, while insisting the government may force a philosopher to affirm as true ideas he believes are not (and to do so in public). Yet it is this compelled speech—particularly when it coerces him to betray his religious convictions—that, as the Supreme Court just recognized, is deeply "demeaning." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018).

Nothing Intervenors advance here changes the fact that Dr. Meriwether has more than sufficiently pleaded plausible claims that Defendants violated his constitutional rights. Hence, Intervenors' motion should also be denied.

### ARGUMENT

Intervenors mostly argue the merits and add facts outside the Complaint, which is premature and improper in a motion to dismiss. Worse, they ignore that this Court must "construe the complaint in the light most favorable to [Dr. Meriwether], accept its allegations as true, and draw all reasonable inferences in [his] favor." *Girl Scouts of Middle Tenn., Inc. v. Girl Scouts of U.S.A.*, 770 F.3d 414, 418 (6th Cir. 2014); Pl.'s Resp. to Defs.' Mot. to Dismiss ("Defs' MTD Resp."), Doc. 45, PageID.2006–07. They claim Dr. Meriwether "singled out" Doe by using only his last name, Ints.' MTD, Doc. 44, PageID.1976; yet the Complaint states he offered to do so to "accommodate Doe." Compl. ¶ 157, Doc. 34, PageID.1477; *id.* ¶¶ 161–62 (discussing the "accommodation"). Intervenors may think this was "stigmatizing," Ints.' MTD, PageID.1976, but these are not facts alleged in the Complaint and thus not facts this Court may consider. Intervenors also reference Doe's "distress." *Id.* But the Complaint states he exhibited no such emotions. Compl. ¶ 181, PageID.1479 ("Doe displayed no anxiety, fear, or intimidation when attending class or participating in class discussions."). Instead, he "continued to attend . . . class without incident and frequently contributed to class discussions." *Id.* ¶ 159, PageID.1477; *id.* ¶¶ 176–80, PageID.1479 (detailing same).

Intervenors can dispute the facts later. Here, the only facts that matter are the ones in the Complaint, and those show Dr. Meriwether pleaded plausible claims.

## I. Intervenors do not contest many of Dr. Meriwether's claims.

Intervenors do not specifically address Dr. Meriwether's compelled speech or unconstitutional conditions claims. Nor do they oppose his content and viewpoint discrimination claims. Thus, Intervenors address only a fraction of this case.

## II. Defendants retaliated against Dr. Meriwether for engaging in speech the First Amendment protects.

Intervenors contest only the first element of Dr. Meriwether's First Amendment retaliation claim: that he "engaged in a constitutionally protected activity." *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585 (6th Cir. 2008). But their efforts fail because his speech was related to teaching on "a matter of public concern," and his interest in doing so outweighed Defendants' interest in efficiently providing services. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017).

### A. Dr. Meriwether spoke "as a citizen" for *Garcetti's* "official duties" test does not apply to faculty speech "related to teaching."

Intervenors, like Defendants, argue that "*Garcetti* is controlling here." Ints.' MTD, Doc. 44, PageID.1978. But Intervenors repeat Defendants' errors by ignoring the decades of Supreme Court precedent protecting professors' free speech rights, Defs.' MTD Resp., Doc. 45, PageID.2009–11; how the *Garcetti* Court acknowledged this precedent by refusing to extend its "official duties" test to faculty "speech related to scholarship or teaching," *id.*, PageID.2011; and the federal appellate decisions that refused to apply this test to that kind of faculty speech, *id.*, PageID.2011–13. Hence, for First Amendment purposes, Dr. Meriwether spoke "as a citizen." *Id.*, PageID.2009.

Intervenors actually accentuate why *Garcetti* does *not* apply here. They emphasize how Dr. Meriwether's speech "was made in class, in his capacity as a professor," and "in connection with . . . [a] Socratic dialogue." Ints.' MTD, Doc. 44, PageID.1978. This speech is, by definition, "related to . . . teaching." *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006). Nothing in *Garcetti* (or decisions applying it) authorizes universities to parse a professor's in-class comments, sorting the "educational" from the "ministerial" and having *carte blanche* to punish him for the latter. *Garcetti's* caveat applies not

just to "scholarship or teaching," but to "speech related to scholarship or teaching." *Id.*

Intervenors seek to dodge *Garcetti's* clear holding (and those of multiple appellate courts) by pointing to a professor's grading authority. Ints.' MTD, Doc. 44, PageID. 1978–79. But every professor has this same authority, and the *Garcetti* Court knew this when it protected faculty speech "related to . . . teaching." *Garcetti*, 547 U.S. at 425. Besides, universities have other options for correcting professors who abuse this authority. *See, e.g.*, *Parate v. Isibor*, 868 F.2d 821, 829 (6th Cir. 1989) (holding that a university may change grades but cannot force professors to do so).

Next, Intervenors insist that faculty must be treated just like other employees.[2] Ints.' MTD, Doc. 44, PageID.1979–80. This would be news to the Supreme Court, which exempted "speech related to . . . teaching" from a test that governs other public employees, *Garcetti*, 547 U.S. at 425, to protect the "teaching of a public university professor." *Id.* at 438 (Souter, J., dissenting). Indeed, the Sixth Circuit acknowledged a professor's unique role when teaching by refusing to extend *Garcetti's* caveat to non-professors (*e.g.*, high school teachers) or to professors not engaged in teaching or scholarship. *Evans-Marshall v. Bd. of Educ., Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 343 (6th Cir. 2010); *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012).

Intervenors imply that Dr. Meriwether is asserting a First Amendment academic freedom claim. Ints.' MTD, Doc. 44, PageID.1979; Defs.' MTD, Doc. 36, PageID.1884. Not true. This right's contours are murky at best. *See, e.g.*, *Parate*, 868 F.2d at 826 (noting "academic freedom" refers to "the freedom of the academy" and "the freedom of the individual teacher," "two freedoms [that] are in conflict"). Instead, he asserts his own free speech rights as a professor, rights with a long pedigree of constitutional protection. Defs.' MTD Resp., Doc. 45, PageID.2009–13. When the Complaint refers to his pedagogical approach, it does so to establish that his speech was "related to . . .

---

[2]   Dr. Meriwether takes no position on whether the official duties of "police officers, secretaries, and custodians" are such that Defendants could constitutionally compel them to use identity-based terms.

teaching," *Garcetti*, 547 U.S. at 425, and thus exempt from the "official duties" test.

Last, Intervenors wrongly impute "far-reaching implications" to Dr. Meriwether's position. Ints.' MTD, Doc. 44, PageID.1982. He has shown that the "official duties" test does not apply to his speech "related to . . . teaching." *Garcetti*, 547 U.S. at 425. This simply moves the analysis to the "public concern" step. Numerous circuits have validated his position, without witnessing any of Intervenors' histrionic hypotheticals.[3] Defs.' MTD Resp., Doc. 45, PageID.2011–13.

Instead, Intervenors and Defendants take the "far-reaching" position that faculty speak "as employees" when teaching and have no First Amendment rights, a "totally unpersuasive" argument. *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001). It would allow universities to re-impose loyalty oaths or post monitors in every classroom and then fire professors for anything they say. That is, they seek to impose the very "pall of orthodoxy over the classroom" that the Constitution "does not tolerate." *Keyishian*, 385 U.S. at 603. Thus, their motions should be denied.

**B. Dr. Meriwether spoke on a matter of public concern.**

In insisting that Dr. Meriwether did not address matters of public concern, Intervenors ignore that a teacher's in-class speech presumptively qualifies as such, Defs.' MTD Resp., Doc. 45, PageID.2013–14, as do issues related to gender identity. *Id.*, PageID.2014–15; *Janus*, 138 S. Ct. at 2476 ("[G]ender identity . . . . [is] undoubtedly [a] matter[] of profound 'value and concern to the public.'").

Intervenors seek to constrict "public concern" to things needed "to make informed decisions about the operation of . . . government." Ints.' MTD, Doc. 44, PageID.1984 (quoting *Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004)); *id.*, PageID.1985 (same).

---

[3]     In none of the hypotheticals Intervenors posit, Ints.' MTD, Doc. 44, PageID.1982, 1986, 1988, would the professor be forced to say something he does not believe to be true. Referring to female students by name does not require him to say anything about their decision to attend college. Nor does using their married name opine on the morality of a second marriage. Using names associated with a religion or nationality does not express a view on the validity of either. He does not endorse Islam by calling a student named Mohammed by his name. Nor does he affirm Palestinian nationhood by calling a student named after Yasser Arafat by name. But forcing Dr. Meriwether to refer to males as female forces him to say something he does not believe to be true (*i.e.*, that a man is not really a man).

But the Supreme Court's "broad conception of 'public concern,'" *Hardy*, 260 F.3d at 679, encompasses anything related to a "matter of political, social, or other concern to the community," "the subject of legitimate news interest," or "of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (cleaned up); *Farhat*, 370 F.3d at 589 (same). This easily includes Dr. Meriwether's speech, as the media currently debates not just the general issue of whether men who identify as women should be treated as women, but the specific issue of how to refer to them. Defs.' MTD Resp., Doc. 45, PageID.2014–15 & n.4–6.

Intervenors also try to minimize what Dr. Meriwether is communicating. Ints.' MTD, Doc. 44, PageID.1983 ("It is directed to one purpose for the limited purpose of informing [him] that [he] is being called upon to answer a question—not to express the professor's views. . . ."). This contradicts the Complaint, which states that his language and pronoun use "communicate[] his own views [on gender identity]." Compl. ¶ 204, Doc. 34, PageID.1481; *id.* ¶ 92, PageID.1469. Thus, he has always used sex-based terms. *Id.* ¶¶ 134–35, PageID.1474–75. Here, the facts in the Complaint must be treated as true and construed in his favor. *Girl Scouts*, 770 F.3d at 418. Also, Defendants' demands are not limited to Dr. Meriwether's calling on a student (where the proper term is "you"), but extend to references to a student when talking to others (*e.g.*, in class discussions). Compl. ¶¶ 126, 218, PageID.1474, 1483. So Intervenors and Defendants want to police how he refers to each student when speaking *to* him and *about* him—at any time, in or out of class. Ints.' MTD, PageID.1980.

Intervenors say that Defendants' restrictions do not affect Dr. Meriwether's instruction or scholarship. *Id.*, PageID.1979–82. But the Complaint explains how Defendants punished him for refusing to change the content and viewpoint of his speech when teaching. Defs.' MTD Resp., Doc. 45, PageID.2020–22. It also details how he changed his teaching to avoid these issues, after receiving repeated warnings from people "in the know" that further complaints could cost him his job. Compl. ¶¶

164, 246–49, 263, 287–97, Doc. 34, PageID.1477, 1487, 1489, 1491–93.

Intervenors also insist that Dr. Meriwether sacrifice the very foundation of his teaching: his credibility. They say he could critique gender identity in class, but when referring to a student, he must speak as if it were real. Any student, particularly one skeptical of his views, would see this inconsistency as hypocrisy. If Dr. Meriwether does not live by what he says he believes, he must not really believe it. This hypocrisy would call into question everything else he teaches. This is why the government cannot "require speakers to affirm in one breath that which they deny in the next." *Hurley v. Irish-Am. Gay, Lesbian, & Bi-Sexual Grp. of Bos.*, 515 U.S. 557, 576 (1995).

Intervenors claim that an observer would conclude that Dr. Meriwether was complying with "ordinary civility." Ints.' MTD, Doc. 44, PageID.1985. This wrongly presumes that the perceptions of observers dictate Dr. Meriwether's speech rights. *See generally Wooley v. Maynard*, 430 U.S. 705 (1977) (forcing motorists to display the state motto on their license plate unlawfully compelled speech even though no one would have thought that the motto was their message). It also presumes that such norms exist and that "civility" includes forcing one to utter what he believes not to be true.[4] Defs.' MTD Resp., Doc. 45, PageID.2014–15 & n.7. Regardless, the "dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of conventions of decency."[5] *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973).

Next, Intervenors try to parse Dr. Meriwether's motives and speech. Ints.' MTD, Doc. 44, PageID.1983–85. But the Complaint unequivocally states that he objects to communicating views on gender identity "that he does not believe," Compl. ¶ 92,

---

[4]   That a court used Intervenors' terms does not mean all citizens must follow suit. Ints.' MTD, Doc. 44, PageID.1985. If disagreeing with court rulings on marriage qualify as "decent and honorable" beliefs held "in good faith by reasonable and sincere people," *Obergefell v. Hodges*, 135 S. Ct. 2584, 2594, 2602 (2015), declining to adopt a court's rhetoric on a social issue of more recent vintage does also.

[5]   Nor would it matter if Intervenors suggested the observer would see Dr. Meriwether's speech as complying with University policy. "This argument would justify any law that compelled protected speech. And, this Court has never accepted it." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1744 (2018) (Thomas, J., concurring).

PageID.1469, and that his language "communicates his own views." Compl. ¶ 204, Doc. 34, PageID.1481. This "intent of the speech" and "communicative purpose of the speaker" is central to the "public concern" inquiry. *Farhat*, 370 F.3d at 592. Here, where all inferences must be construed in Dr. Meriwether's favor, this establishes that he addressed matters of public concern. *Girl Scouts*, 770 F.3d at 418.

Last, Intervenors say Dr. Meriwether's speech "outs" Doe. Ints.' MTD, Doc. 44, PageID.1985. Yet again, they contradict the Complaint, which states that "Doe appeared male" when he confronted Dr. Meriwether. Compl. ¶ 131, Doc. 34, PageID. 1474. It is thus Doe who outed himself whenever he referred to himself as female. These facts control here. *Girl Scouts*, 770 F.3d at 418. Plus, it does not matter if his speech had the incidental effect Intervenors claim because only "some portion of the speech" need address a public concern to qualify as such. *Rodgers v. Banks*, 344 F.3d 587, 597 (6th Cir. 2003); *Farhat*, 370 F.3d at 589.

In short, nothing Intervenors say changes the fact that Dr. Meriwether pleaded facts showing that he addressed topics that the Supreme Court has declared to be "undoubtedly" matters of public concern. *Janus*, 138 S. Ct. at 2476.

### C. The *Pickering* balancing test favors Dr. Meriwether.

Dr. Meriwether alleged facts that show "his interest in First Amendment expression outweighed [Defendants'] interest in the efficient operation of his workplace." *Crawford v. Columbus State Cmty. Coll.*, 196 F. Supp. 3d 766, 777 (S.D. Ohio 2016). The Complaint pleads facts showing that his speech did not disrupt his own class, let alone the University, Compl. ¶ 312, Doc. 34, PageID.1495, and that Doe remained in his class and participated frequently, vigorously, and voluntarily. *Id.* ¶¶ 176–83, PageID.1479. Based on those facts, which are all that are relevant here, Intervenors cannot show that the *Pickering* balance weighs against Dr. Meriwether.

### 1. The *Pickering* balancing test generally favors faculty, especially those who speak on matters of public concern.

The *Pickering* balancing test generally favors faculty as a "[u]niversity community

as a whole, is less likely to suffer a disruption in its provision of services as a result of a public conflict" than other public agencies. *Mills v. Steger*, 64 F. App'x 864, 872 (4th Cir. 2003). In one case, a professor used profanity, threats (with violent overtones), and other dehumanizing terms in the campus paper, creating disharmony among colleagues. *Bauer v. Sampson*, 261 F.3d 775, 779–81 (9th Cir. 2001). But the balance still favored him because "it was not necessary that [he] and the administration enjoy a close working relationship requiring trust and respect— indeed anyone who has spent time on college campuses knows that the vigorous exchange of ideas and resulting tension between an administration and its faculty is as much a part of college life as homecoming and final exams." *Id.* at 785.

Similarly, when a professor published "denigrating comments concerning the intelligence and social characteristics of blacks," *Levin v. Harleston*, 966 F.2d 85, 87 (2d Cir. 1992), he so enraged students that they physically disrupted his classes to the point that the university posted security in his classroom. *Id.* at 90; *Levin v. Harleston*, 770 F. Supp. 895, 902–07 (S.D.N.Y. 1991). Even so, there was "no question" that his speech was protected under *Pickering*, *Levin*, 770 F. Supp. at 921, which means the *Pickering* balance weighed in his favor. *Lane*, 573 U.S. at 237. Any discipline based on his speech violated the First Amendment. *Levin*, 966 F.2d at 90.

If *Pickering's* balance favors professors whose speech sparks violence on campus, it certainly favors Dr. Meriwether. As he addressed public concerns, Defendants must make a "particularly strong showing that [his] speech interfered with workplace functioning before taking action." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1053 (6th Cir. 2001). Neither they nor Intervenors can do so as the Complaint pleads facts showing that his speech caused no disruption at all. Compl. ¶¶ 176–83, 312, Doc. 34, PageID.1479, 1495; *Hardy*, 260 F.3d at 680–82 (holding that "Hardy's rights to free speech . . . outweigh the College's interest in limiting that speech" when there was no evidence his speech "impeded [his] proper performance of his daily duties in

the classroom" or "interfered with the regular operation of the schools generally").

Defendants invoke the easily distinguishable *Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001). Ints.' MTD, Doc. 44, PageID.1986. Even Defendant Bauer says Dr. Meriwether did not create a hostile environment. Compl. ¶ 271, Doc. 34, PageID. 1489–90 ("[T]his is not a hostile environment claim."). Also, the *Bonnell* professor frequently used gratuitous profanity (*e.g.*, "f***," "pu***," "cu**") in class, discussed "his own previous sexual experiences," mocked students who expressed offense or disgust, and distributed hundreds of copies of a student's complaint. *Bonnell*, 241 F.3d at 803–05. In contrast, the only person who became belligerent or used profanity in this case is Doe. Compl. ¶¶ 142–43, PageID.1475. Dr. Meriwether has always been respectful of his students and has merely sought to communicate his own views and convictions on public issues that bear upon classic philosophical questions (*e.g.*, who we are as human beings), using language (*i.e.*, titles and pronouns) that could not be further from the profanity and vulgarity present in *Bonnell*. That case thus provides no basis for dismissing this one, especially at this stage.

### 2. Intervenors identify no interests that alter the *Pickering* balance.

Intervenors try to conjure an interest on Defendants' side of the *Pickering* balance by referencing numerous cases and statutes. But none of those arguments suffice.

They invoke Title VII, Ints.' MTD, Doc. 44, PageID.1987, but overlook the uncertainty surrounding their interpretation of it. Only three circuits have adopted anything like it. *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 330 (5th Cir. 2019). For forty years, "every federal circuit to address the issue—including the First through Eleventh Circuits—rejected attempts to construe Title VII to prohibit discrimination on the basis of either sexual orientation or transgender status." *Id.* at 335 (Ho, J., concurring). The Supreme Court will soon weigh in. *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, __ U.S. __, 2019 WL 1756679, *1 (Apr. 22, 2019). Relying on this uncertain body of federal law does not remotely change the *Pickering* balance.

Intervenors also invoke Title IX, Ints.' MTD, Doc. 44, PageID.1987, but find no support there. The Fourth Circuit ruled that Title IX barred a high school from requiring students to use restrooms corresponding to their sex. *G.G. v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016). It deferred to the Department of Education's Title IX interpretation, in a January 2015 letter, that "a school must generally treat transgender students consistent with their gender identity." *Id.* 718–23; *id.* at 724 (noting "a subsequent administration [may] choose to implement a different policy"). In May 2016, the Department issued a Dear Colleague Letter requiring schools to "use pronouns and names consistent with a transgender student's gender identity."[6] After *certiorari* was granted, the Department issued a February 2017 Dear Colleague Letter, where it unequivocally "decided to withdraw and rescind" the "novel" interpretations in its January 2015 and May 2016 letters.[7] Compl. ¶ 106, Doc. 34, PageID.1471–72. The Supreme Court then vacated the Fourth Circuit's decision in light of this letter. *Gloucester Cty. Sch. Bd. v. G.G.*, 137 S. Ct. 1239 (2017). As Title IX does not require school officials to use identity-based pronouns, Defendants have no Title IX-based interest in forcing Dr. Meriwether to use them.

Intervenors fail to cite even a single case where a school has faced liability because employees used sex-based terms. Three of their cases involve suspension or dismissal of transgender employees. *Smith v. City of Salem*, 378 F.3d 566, 568–69 (6th Cir. 2004); *Glen v. Brumby*, 663 F.3d 1312, 1314 (11th Cir. 2011); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 566 (6th Cir. 2018). One addresses medical treatment for transgender inmates. *Tate v. Wexford Health Source, Inc.*, 2016 WL 687618, *1 (S.D. Ill. Feb. 19, 2016). Two involve access to school bathrooms. *Bd. of Educ. of Highlands Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 855–59 (S.D. Ohio 2016); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858

---

[6]   U.S. Dep'ts of Justice & Educ., *Dear Colleague* at 3, https://bit.ly/2QnRmes (last visited May 30, 2019).
[7]   U.S. Dep'ts of Justice & Educ., *Dear Colleague* at 1, https://bit.ly/2JPIKgn (last visited May 30, 2019).

F.3d 1034, 1042 (7th Cir. 2017) (noting pronoun issues were "not part of this appeal"). The rest involve sexual assaults. None suggest that Defendants have a liability-avoiding interest in stopping Dr. Meriwether from using sex-based terms.

Nor did Intervenors provide any support for their notion that Defendants' alleged statute-based interests outweigh Dr. Meriwether's constitutional rights. In fact, the Sixth Circuit has rejected this. *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017) ("[I]nterest in the enforcement of Title IX . . . can never override individual constitutional rights."). Nor have Intervenors shown that these purported interests authorize them to compel speech, an act that is "always demeaning" to the person forced to speak against his conscience. *Janus*, 138 S. Ct. at 2464. Defendants are "not free to interfere with speech for no better reason than promoting an approved messages or discouraging a disfavored one, however enlightened either purpose may strike [them or Intervenors]." *Hurley*, 515 U.S. at 579.

Next, Intervenors say that Defendants can restrict Dr. Meriwether's speech even if federal law does not require it. Ints.' MTD, Doc. 44, PageID.1987. But Defendants cannot override constitutional rights to enforce federal law, eliminate discrimination, or maintain civility on campus. *Doe*, 872 F.3d at 407; *Hurley*, 515 U.S. at 579; *Papish*, 410 U.S. at 670. So they cannot trample those rights just because they want to.

Last, Intervenors claim that Dr. Meriwether's position permits harassment. Ints.' MTD, Doc. 44, PageID.1988. But in imagining that his speech subverts Defendants' educational mission, Intervenors contradict the Complaint, which pleads it did not disrupt a single class. Compl. ¶¶ 176–83, 312, Doc. 34, PageID.1479, 1495. Despite an in-depth, lengthy investigation, there is not the slightest hint that Dr. Meriwether strayed from the curriculum or harassed anyone (including Doe). *Id.* ¶¶ 177–284, PageID.1479–91. Thus, *Piggee v. Carl Sandburg Coll.*, 464 F.3d 667 (7th Cir. 2006), and *Poulard v. Trs. of Ind. Univ.*, 2018 WL 4680010, *1 (N.D. Ind. Sept. 28, 2018), are inapplicable. As the Complaint details, Dr. Meriwether did not say anything

derogatory but simply used sex-based terms when referring to all students. Compl. ¶¶ 134–35, 242, PageID.1474–75, 1486. He readily acknowledges universities can, and even must, punish discrimination and harassment. But they cannot hide behind these concepts in their quest to restrict protected speech (or to compel it). *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) ("There is no categorical 'harassment exception' to the First Amendment's free speech clause."); *Poulard*, 2018 WL 4680010, at *7 (noting that the policy exempted protected speech).

Intervenors fail to prove that Defendants have any interest in restricting Dr. Meriwether's speech, let alone one that overrides his interest in speaking on matters of public concern. Particularly here, when the facts in the Complaint must be accepted as true, there is no way to conclude the *Pickering* balance favors Defendants. *Girl Scouts*, 770 F.3d at 418. Thus, Dr. Meriwether's speech is constitutionally protected.

## III. Defendants are trampling Dr. Meriwether's religious freedom under the Free Exercise Clause.

Dr. Meriwether's right to "free exercise" includes not just the right to *believe*, but the right to *exercise* his faith. It encompasses the right to "profess whatever religious doctrine one desires," *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877 (1990), and to "communicat[e]" these teachings to others, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 199 (2012) (Alito, J., concurring).

### A. Defendants wrongly interfere with Dr. Meriwether's right to communicate with others consistent with his faith.

The *Smith* test traces some of the boundary between government power and free exercise. While Defendants' restrictions are not neutral and generally applicable, *see infra* Argument III.C, the Supreme Court rejected the idea "that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017). Thus, there are a number of instances in which the government cannot use a neutral and generally applicable law to interfere with

13

religious exercise. For example, regardless of what neutral, generally applicable laws might require, government cannot compel clergy "to perform" a same-sex wedding ceremony. *Masterpiece*, 138 S. Ct. at 1727. Nor can it use neutral, generally applicable nondiscrimination laws to interfere with a religious group's selection of its teachers and its ability to operate consistent with its faith. *Hosanna-Tabor*, 565 U.S. at 190.

Notably, *Smith* has never been used to permit government to suppress a religious adherent's pure speech because it dislikes its purpose or message. This makes sense because the freedom to communicate one's beliefs—and to decline to engage in speech that contradicts those beliefs—is a core component of the right to "profess whatever religious doctrine one desires." *Smith*, 494 U.S. at 877. The government cannot interfere with that liberty, even if the tool used is a neutral, generally applicable law.

### B. Defendants wrongly require Dr. Meriwether to renounce his religious beliefs to remain a professor in good standing.

The Free Exercise Clause also prohibits the government from requiring citizens to renounce their religious beliefs to obtain public benefits. Thus, Missouri could not exclude a church-operated preschool from a playground safety grant program because of its religious nature. *Trinity*, 137 S. Ct. at 2025. The Free Exercise Clause barred the government from requiring the preschool "to renounce its religious character in order to participate in an otherwise generally available public benefit program, for which it is fully qualified." *Id.* at 2024. To do so "imposes a penalty on the free exercise of religion that must be subjected to the most rigorous scrutiny." *Id.*

Yet, the Complaint pleads that Defendants punished Dr. Meriwether for expressing his views about human nature through his use of sex-based terms, Compl. ¶¶ 239–40, 246–49, Doc. 34, PageID.1486–87, views that are religious. *Id.* ¶¶ 86–92, PageID.1469. If he continues to do so, he risks suspension or termination. *Id.* ¶¶ 164, 246–49, 263, 287–89, PageID.1477, 1487, 1489, 1491–92. The only way to remove the threat to his job is to renounce his beliefs by expressing ideas that he does not believe

14

and that contradict the teachings of his faith.

Defendants' actions are anathema to the *free exercise* of religion, are "odious to the Constitution," and "cannot stand." *Trinity*, 137 S. Ct. at 2025. That Dr. Meriwether holds views some may disfavor is more, not less, reason to protect his freedoms. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000) ("[T]he fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.").

### C. Under *Smith*'s neutral and generally applicable test, Defendants' restrictions trigger strict scrutiny.

Analyzing Defendants' actions within the confines of *Smith*'s rule of neutrality and general applicability yields the same result. Any government act "that is not neutral" toward religion "or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Such rigorous scrutiny applies here.

### 1. Defendants' restrictions are not neutral.

Defendants failed to act neutrally by displaying hostility to religious people and religious beliefs. *Masterpiece*, 138 S. Ct. at 1729–31; *Lukumi*, 508 U.S. at 534. "The Free Exercise Clause bars even '*subtle* departures from neutrality' on matters of religion," and it applies "upon even *slight* suspicion that . . . state [actions] stem from animosity to religion or distrust of its practices." *Masterpiece*, 138 S. Ct. at 1731 (cleaned up, emphasis added). Where an absence of neutrality boils over into hostility, the government violates the Free Exercise Clause, and courts need not consider the strict scrutiny analysis. *Id.* at 1729–32.

Defendants failed "to proceed in a manner neutral toward and tolerant of [Dr. Meriwether's] religious beliefs." *Id.* at 1731. Defendant Pauley demeaned Christians as being "motivated out of fear," derided their teachings as "harmful," and insisted they should not be allowed to teach the beliefs they hold dear. Compl. ¶¶ 117–22, Doc. 34, PageID.1473. She participated in the disciplinary process, *id.* ¶ 146, PageID.1476,

highlighting Dr. Meriwether's religiously inspired speech. Compl. Ex. 13, Doc. 34-13, PageID.1720; Compl. ¶¶ 86–92, PageID.1469 (noting religious basis). If that weren't enough, Defendant Bauer "openly laughed" after hearing how Dr. Meriwether was being forced to violate his religious beliefs. Compl. ¶¶ 258–59, PageID.1488.

Intervenors try to minimize these facts. Ints.' MTD, Doc. 44, PageID.1990–91. But regardless of when Defendant Pauley made her remarks, a point Intervenors stress, they show hostility toward Dr. Meriwether's religious beliefs. Importantly, nothing suggests she has changed her views, and her remarks explain why she was so eager to see him punished. Similarly, while Defendant Bauer's laugh may not constitute a constitutional violation in isolation, it reveals a hostile mindset. Both are evidence of hostility, and facts that must be construed in Dr. Meriwether's favor at this juncture.

Then the Complaint details how Defendant Bauer refused to accommodate Dr. Meriwether, saying Defendants could not accommodate hypothetical "faculty members with sincerely held religious beliefs that, e.g., one national origin is superior to another national origin, or one sex is inferior to the other sex." Compl. ¶ 279, Doc. 34, PageID.1490. Intervenors piggyback on his reasoning. Ints' MTD, Doc. 44, PageID.1991. This is akin to saying that "religion has been used to justify all kinds of discrimination throughout history." *Masterpiece*, 138 S. Ct. at 1729. Comparing Dr. Meriwether's "invocation of his sincerely held religious beliefs to defenses of [racism] and [sexism] . . . . is inappropriate for [officials] charged with the solemn responsibility of fair and neutral enforcement of" University policies. *Id.* These facts indicate systemic, institutional hostility "inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *Id.* at 1732.

### 2. Defendants' restrictions are not generally applicable.

The protections against "subtle departures from neutrality" also apply in "a system of individualized governmental assessment of the reasons for the relevant conduct," *Lukumi*, 508 U.S. at 535, 537, systems that are not generally applicable.

16

*Smith*, 494 U.S. at 884. Governments establish "a system of individualized exemptions" when they apply "a subjective test" on a "case-by-case basis" to assess if particular conduct is forbidden. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004). One such "highly subjective" and viewpoint-based test is an offensiveness standard. *Matal v. Tam*, 137 S. Ct. 1744, 1756 n.5, 1763 (2017) (plurality).

But the Complaint states facts showing Defendants utilize this very standard. Dr. Meriwether offered to accommodate Doe by using Doe's last name, balancing Dr. Meriwether's need to adhere to his conscience while showing courtesy to Doe. Compl. ¶ 157, Doc. 34, PageID.1477. Defendant Milliken approved this. *Id.* ¶ 158. Had Doe been willing to respect Dr. Meriwether's conscience, the matter would have ended. The only reason it did not was that "Doe was not satisfied with the accommodation." *Id.* ¶ 161. Defendants allowed whether Doe was offended to determine the extent of Dr. Meriwether's free speech rights. This sort of offensiveness standard qualifies as a system of individualized exemptions. Thus, strict scrutiny applies.

### D. Defendants' restrictions violate the hybrid rights doctrine.

Dr. Meriwether pleaded a hybrid rights claim as Defendants' restrictions violate "the Free Exercise Clause in conjunction with . . . the freedom of speech." *Smith*, 494 U.S. at 881; *see supra* Argument II; Defs.' MTD Resp., Doc. 45, PageID.2009–24.

### E. Defendants' restrictions flunk strict scrutiny.

Defendants do not address strict scrutiny. Defs.' MTD, Doc. 36, PageID.1889–90. And Intervenors did not alter the *Pickering* balance, *see supra* Argument II.C.2, which means they also failed to explain how Defendants' restrictions satisfy strict scrutiny, rendering dismissal improper. Compl. ¶¶ 304–05, Doc. 34, PageID.1494.

## IV. Defendants enforce overbroad restrictions on faculty speech.

A policy is unconstitutionally overbroad if it "penalize[s] a substantial amount of [protected] speech," especially when it "delegates overly broad discretion to the decisionmaker." *Forsyth Cty. v Nationalist Movement*, 505 U.S. 123, 129–30 (1992).

Defendants' restrictions do both. *See* Defs.' MTD Resp., Doc. 45, PageID.2021–22.

The Complaint states that Defendants' restrictions sweep broadly, applying to "all interactions professors have with students." Compl. ¶ 83, Doc. 34, PageID.1468. Dr. Poirot said so. *Id.* ¶ 108, PageID.1472. Neither the policies nor the warning confine themselves to the classroom. *Id.* ¶¶ 61–66, 75–83, PageID.1465–68; Compl. Ex. 20, Doc. 34-20, PageID.1771. Defendants even admit it. Defs.' MTD, Doc. 36, PageID. 1888 ("[A] nexus could exist that would allow for the University to reasonably direct him to cease [expression off-campus].").[8] Intervenors do too. Ints.' MTD, Doc. 44, PageID.1980 (noting the restrictions apply to "all official-capacity interactions, not just classroom interactions"). Even the restrictions were confined, a professor's in-class speech is protected. Defs.' MTD Resp., Doc. 45, PageID.2013–14. Hence, Defendants restrict a vast swath of protected speech: any interaction any professor has with any student—in and out of class, on and off campus, on and off the clock.

Defendants latch onto the phrase "plainly legitimate sweep," Defs.' MTD, Doc. 36, PageID.1887. But when restricting or compelling speech, this sweep is very small. They say, without citation, that Titles VII and IX mandate their policies. *Id.*, PageID. 1889. Intervenors try to provide citations. Ints.' MTD, Doc. 44, PageID.1986–88. But this remains far from settled, and no authority suggests that such interests override constitutional rights or justify compelling speech. *See supra* Argument II.C.2.

Because the Complaint pleads facts showing that Defendants' policies and actions restrict a significant amount of protected speech, Dr. Meriwether pleaded plausible claims that they are unconstitutionally overbroad.

## V.  Defendants enforce an inherently vague policy.

Restrictions are vague if they (1) fail to give fair notice of prohibited conduct; (2) lack "explicit standards for those who apply [them]," inviting arbitrary, discriminatory enforcement; and (3) chill constitutional freedoms. *City of Chi. v. Morales*, 527 U.S.

---

[8]   *Piggee*, 464 F.3d 667, did not address speech outside the instructional context.

18

41, 56 (1999); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). "[A] more stringent vagueness test should apply" when policies "interfere[] with the right of free speech." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 793 (2011). Defendants' acts chill expression, Compl. ¶¶ 286–97, Doc. 34, PageID.1491–93, and illustrate the unbridled discretion their policies confer, Defs.' MTD Resp., Doc. 45, PageID.2021–22.

Defendants' policies also fail to give fair notice of what they prohibit. Defendants say Dr. Meriwether received clear guidance, Defs.' MTD, Doc. 36, PageID.1887; Ints.' MTD, Doc. 44, PageID.1993–94, but that is not true. Demanding that professors use identity-based terms does not suffice. Compl. ¶¶ 215, 218, 284, Doc. 34, PageID.1483, 1491. What if a student prefers "your majesty"?[9] What if certain factors change his identity? *Id.* ¶ 70, PageID.1466. Must a professor adjust his speech constantly? What if a student prefers first person pronouns? Must the professor ascribe the student's statements to himself? Presumably limits exist, but Defendants offer no path through the quagmire they created, partly because they do not objectively define gender identity or gender identity discrimination. *Id.* ¶¶ 80–81, PageID.1468.

Defendants put faculty in a catch-22. Their policies mean "[e]very student needs to be treated the same." *Id.* ¶ 216, PageID.1483; Compl. Ex. 27, Doc. 34-27, PageID. 1799 ("Meriwether's differential treatment of the student was a violation. . . ."). And they protect both "sex" and "gender identity." Compl. Ex. 1, Doc. 34-1, PageID.1509. But professors who refer to all students based on their sex will be punished for gender identity discrimination, while those who refer to them based on their gender identity will be treating members of the same sex differently, which is sex discrimination. So no matter what, professors will violate Defendants' policies. That Defendants may choose to punish one group but not the other further highlights the vagueness.

---

[9]  Rachael Revesz, *University of Michigan Student Changes Name to "His Majesty" Following New "Inclusive" Pronoun Policy*, INDEP., Sept. 30, 2016, https://ind.pn/2H6738q (last visited May 31, 2019).

Last, Defendants' restrictions do not naturally flow from their policies, which say nothing about pronouns. Even the federal government concluded that treating students with civility does not require compelling people to use identity-based terms. *See supra* note 7; Compl. ¶ 106, Doc. 34, PageID. 1471–72. Defendants could interpret their policy similarly without changing a single word. Also, their policy (and federal law) require them to accommodate employees' religious convictions. But as the Complaint details, Defendants rejected Dr. Meriwether's proposed accommodation and offered no reasonable alternatives. Compl. ¶¶ 157, 162, 170–71, 209–18, 260–61, 282–84, PageID.1477–78, 1482–83, 1488–89, 1491. When the same policy can mean opposite things, the alleged clarity of Defendants' edicts does not cure the vagueness.

Here, "[professors] of common intelligence must necessarily guess at [the policies'] meaning," and officials will "differ as to [their] application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). Dr. Meriwether's vagueness claim should be not dismissed.

## VI.  Defendants treat similarly situated professors differently.

Dr. Meriwether's equal protection claim rests not on the class of one theory, but on the principles that "all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), and that policies which infringe "personal rights protected by the Constitution" receive "strict scrutiny," *id.* at 440, and are "presumptively invidious." *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982).

Defendants punished Dr. Meriwether for declining to use transgender terms. *See, e.g.*, Compl. ¶¶ 239–40, Doc. 34, PageID.1486. But they do nothing when professors express the opposite viewpoint. This disparate treatment is subject to strict scrutiny, but cannot survive it, *see supra* Argument III.E, rendering dismissal improper.

### CONCLUSION

Dr. Meriwether pleaded facts showing Defendants punished him for expressing religiously-inspired views they did not like on matters of public concern. These facts must be accepted and viewed in his favor. Intervenors' motion should be denied.

Respectfully submitted this 31st day of May, 2019.

*/s/ Travis C. Barham*

DAVID A. CORTMAN*
Georgia Bar No. 188810
TRAVIS C. BARHAM*
Arizona Bar No. 024867
Georgia Bar No. 753251
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

THOMAS W. KIDD, JR.
Ohio Bar No. 0066359
**KIDD & URLING, LLC**
8913 Cincinnati-Dayton Road
West Chester, Ohio 45069
Telephone: (513) 733–3080
Facsimile: (513) 577–7393
tkidd@kiddurlinglaw.com

TYSON C. LANGHOFER*
Arizona Bar No. 032589
JONATHAN M. LARCOMB*
Virginia Bar No. 47274
**ALLIANCE DEFENDING FREEDOM**
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
tlanghofer@ADFlegal.org
jlarcomb@ADFlegal.org

* Admitted *pro hac vice*.

*Attorneys for Plaintiff*

### CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of May, 2019, I filed a true and accurate copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to the following attorneys of record:

> RORY P. CALLAHAN
> Principal Assistant Attorney General
> Employment Law Section
> ANNA M. SEIDENSTICKER
> Principal Assistant Attorney General
> Employment Law Section
> 30 East Broad Street, 23rd Floor
> Columbus, Ohio 43215
> Telephone: (614) 644–7257
> Facsimile: (614) 752–4677
> Rory.Callahan@ohioattorneygeneral.gov
> Anna.Seidensticker@ohioattorneygeneral.gov
> elsreview@ohioattorneygeneral.gov
>
> HANNAH STONEBURNER
> Associate Assistant Attorney General
> Education Section
> 30 East Broad Street, 16th Floor
> Columbus, Ohio 43215
> Telephone: (614) 644–7250
> Facsimile: (614) 644–7634
> Hannah.Stoneburner@ohioattorneygeneral.gov
>
> *Attorneys for Defendants*
>
> ADAM G. UNIKOWSKY
> JENNER & BLOCK LLP
> 1099 New York Avenue, NW
> Suite 900
> Washington, DC 20001
> Telephone: (202) 639–6000
> Facsimile: (202) 639–6066
> aunikowsky@jenner.com
>
> SHANNON P. MINTER
> ASAF ORR
> CHRISTOPHER F. STOLL
> NATIONAL CENTER FOR LESBIAN RIGHTS
> 870 Market Street Suite 370
> San Francisco, California 94102
> Telephone: (415) 392–6257
> Facsimile: (415) 392–8442
> sminter@nclrights.org
> aorr@nclrights.org
> cstoll@nclrights.org

*Attorneys for Proposed Defendant-Intervenors*

Respectfully submitted on this the 31st day of May, 2019.

*/s/ Travis C. Barham*
Travis C. Barham
*Attorney for Plaintiff*

23