## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

NICHOLAS K. MERIWETHER,
    Plaintiffs,

    vs.

THE TRUSTEES OF SHAWNEE
STATE UNIVERSITY, *et al.*,
    Defendants.

Case No. 1:18-cv-753
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Nicholas K. Meriwether, a professor at Shawnee State University (Shawnee State), brings this action against members of the Board of Trustees of Shawnee State and several Shawnee State officials (Shawnee State defendants) alleging (1) violations of his federal civil rights under 42 U.S.C. § 1983, and (2) violations of his rights guaranteed by the Ohio Constitution and common law under the Court's supplemental jurisdiction, 28 U.S.C. § 1367. The Court granted Jane Doe and Sexuality and Gender Acceptance (SAGA) leave to intervene as defendants in the lawsuit. (Doc. 43). This matter is before the Court on the Shawnee State defendants' motion to dismiss the original complaint for failure to state a claim for relief (Doc. 22) and the Shawnee State defendants' motion to dismiss the first amended complaint[1] (Doc. 36), plaintiff's opposing memorandum (Doc. 45), and the Shawnee State defendants' reply in support of the motion (Doc. 47). This matter is also before the Court on the intervenor-defendants' motion to dismiss the first amended complaint (Doc. 44), plaintiff's opposing memorandum (Doc. 46), and the intervenor-defendants' reply in support of the motion (Doc. 48).

---

[1] The operative complaint is the first amended complaint, which has been redacted on the public record. (Doc. 34).

I. **Factual and procedural background**

Plaintiff makes the following factual allegations in the amended complaint. (Doc. 34).
Plaintiff is a resident of Ohio and a professor at Shawnee State, a public university organized and
existing under the laws of Ohio. (*Id.*, ¶¶ 11, 12). He has been employed as a professor by
Shawnee State since 1996, first as an assistant professor, then as an associate professor with a
continuing contract which was the equivalent of tenure, and finally as a full professor. (*Id.*, ¶¶
93-95). He is a "professing evangelical Christian" and member of the Presbyterian Church of
America with sincerely-held religious beliefs about gender, and he does not believe that an
individual's gender can be changed after the moment of conception. Because of his sincerely-
held religious beliefs, he objects to communicating what he believes to be "a University-
mandated ideological message regarding gender identity that he does not believe" and which he
believes "contradicts (and would force him to violate) his sincerely held religious beliefs." (*Id.*,
¶¶ 86-92).

Defendants Francesca Hartop, Joseph Watson, Scott Williams, David Furbee, Sondra
Hash, Robert Howarth, George White, and Wallace Edwards (Trustees) were at all times relevant
to the complaint members of the Board of Trustees (Board) of Shawnee State. They are
responsible for adopting and authorizing the University policies plaintiff challenges; they "have
the responsibility for final policymaking authority for rules and regulations that govern the
University, including the policies governing faculty members"; and they have the authority to
change and enforce the policies challenged in this lawsuit. (*Id.*, ¶¶ 11-15). Plaintiff sues each of
the Trustees in their official capacity. (*Id.*, ¶ 52).

Defendant Jeffrey A. Bauer was the Provost and Vice-President of Academic Affairs at
Shawnee State before September 14, 2018, and he has been Shawnee State's Interim President

since that date. In his current role, Bauer is the chief executive, educational, and administrative officer of Shawnee State charged with oversight of the University and direct oversight of defendants Pierce and Milliken. He authorized and implemented the policies plaintiff challenges in this lawsuit and has final policymaking authority concerning faculty members at Shawnee State. He also approved and ratified Shawnee State officials' application of the challenged policies to plaintiff in a discriminatory and retaliatory fashion. (*Id.*, ¶¶ 19-31).

Defendant Roberta Milliken was at all relevant times the Acting Dean of the College of Arts and Sciences at Shawnee State, whose duties include oversight of plaintiff Meriwether and defendant Jennifer Pauley. Defendant Jennifer Pauley at all relevant times was the Chair of the Department of English and Humanities at Shawnee State, and her duties include overseeing plaintiff. (*Id.*, ¶¶ 32-38). Defendant Tena Pierce was at all relevant times the Title IX[2] Coordinator at Shawnee State whose duties include oversight of the university's Title IX office and compliance efforts. Her duties also include overseeing defendants Douglas Shoemaker and Malonda Johnson, both Deputy Title IX Coordinators at Shawnee State. Defendants Bauer, Milliken, Pauley, Pierce, Shoemaker, and Johnson implemented the policies plaintiff challenges in this lawsuit; each had the authority under the challenged policies to investigate, recommend, and impose disciplinary actions on faculty at Shawnee State; they are responsible for enforcing the policies and applying them to plaintiff; they have failed to recommend any changes to the policies or to the manner of enforcement so as to comply with constitutional mandates; and they have failed to stop Shawnee State officials from applying the policies to faculty, including plaintiff. (*Id.*, ¶¶ 40-51).

---

[2] Title IX, 20 U.S.C. §§ 1681, which applies to Shawnee State, provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . . " 20 U.S.C. § 1681(a).

Plaintiff challenges on their face and as applied policies which were adopted by the Trustee defendants and the Shawnee State Interim President and are binding on University officials.  Plaintiff challenges portions of the "Nondiscrimination Sexual Harassment Policy" (Nondiscrimination Policy), which was approved by the Trustee defendants (Doc. 34, Exh. 1, Policy 5.01REV), and the policy for "Reporting & Investigating Sexual Assault, Sexual Misconduct & Other Forms of Discrimination" (Reporting Policy), which was approved by the Shawnee State President in October of 2016.  (Doc. 34, Exh. 2, Policy 5.01:2).  The Nondiscrimination Policy states that it "serves to ensure that there are University structures and processes in place that prohibit discrimination against any individual because of . . . gender identity. . . ." (*Id.*, Exh. 1 at ¶ 1.2).  The Reporting Policy states that the procedure "serves to implement the investigation and complaint provisions of Policy 5.01 . . . and to ensure that all discrimination complaints received by the University are reviewed and responded to promptly and in a fair and equitable manner." (*Id.*, Exh. 2 at ¶ 1.1).  If the Nondiscrimination Policy is violated, the University "will take steps, whether individual or systemic, to stop the alleged . . . discrimination, prevent its recurrence, eliminate any hostile environment, and remedy the discriminatory effects on the complainant and others, as appropriate." (*Id.*, Exh. 2, ¶ 17.0).  The Reporting Policy defines "Sex and Gender Based Discrimination" as including "[n]egative or adverse treatment based on . . . gender identity . . . [which] denies or limits the individual's ability to obtain the benefits of Shawnee State's programs or activities." (*Id.*, Exh. 2, ¶ 18.3).  The Reporting Policy defines "Gender Identity" as a "person's innermost concept of self as male or female or both or neither - how individuals perceive themselves and what they call themselves." (*Id.*, Exh. 2, ¶ 18.4).  It provides that "[o]ne's gender identity can be the same or different than the sex assigned at birth." (*Id.*, Exh. 2, ¶ 18.4).

4

Plaintiff interprets these policies as leaving Shawnee State professors with two choices in how they refer to their students: (1) "eliminate all sex-based titles and all pronouns when speaking to all students," an option plaintiff describes as "impossible, impractical, and unreasonable given the way professors speak, particularly in classes that feature significant and frequent class discussion"; or (2) "use pronouns that refer to each student's gender identity," even though plaintiff alleges "that gender identity may change from day to day, may change based on which friends the student is with, or may change based on the student's mood, among other possibilities." (*Id.*, ¶ 75).

The Reporting Policy provides that "[s]exual harassment can take two forms - quid pro quo or hostile environment." (*Id.*, Exh. 2, ¶ 18.6.2). "[H]ostile environment in the educational context" encompasses "any situation in which there is harassing conduct that limits, interferes with or denies educational benefits or opportunities, from both a subjective (the complainant's) and an objective (reasonable person's) viewpoint." (*Id.*, Exh. 2, ¶ 18.6.2.2). According to plaintiff, defendants use the definition of "hostile environment" provided in the Reporting Policy when assessing claims of gender identity discrimination, and the "determination of whether an environment is 'hostile' is based on the totality of the circumstances." (*Id.*, ¶¶ 78, 79). The Reporting Policy provides that a full-time regular faculty member who violates Shawnee State's nondiscrimination policies is subject to discipline ranging from a "written warning" to immediate "termination" under the process provided in the collective bargaining agreement (CBA) between Shawnee State and the Shawnee Education Association (SEA/Union). (*Id.*, ¶¶ 84, 85; Ex. 2, ¶ 16.2.1.1; *Id.*, Exh. 4 at 110).

In August 2016, the Union President, Chip Poirot, informed faculty members that they could face disciplinary action by Shawnee State, including suspension or dismissal, if they

"refused to use a [student's] requested name or pronouns." (*Id.*, ¶¶ 106-09; Exh. 5 at 6-7).

Plaintiff contacted defendant Milliken to obtain clarification on gender identity policies, and

Milliken informed plaintiff that he must use a student's preferred pronoun regardless of the

professor's convictions or views on the subject and a professor would be subject to

administrative disciplinary procedures if he refused to use a pronoun that reflected "a student's

self-asserted gender identity." (*Id.*, ¶¶ 110-14). In response to plaintiff's inquiry as to whether

Shawnee State had any policies that outlined how professors "must respond to a student's

demand to use a pronoun that reflects that student's self-asserted gender identity," Milliken

stated it was not necessary for Shawnee State to have such policies because "students have a

right to be referred to by their self-asserted gender identity and faculty must comply or be

disciplined." (*Id.*, ¶¶ 115-16). Milliken also informed plaintiff in November 2016 when he

asked to see any written policies on this subject that "there is no formal policy specific to

transgender students, faculty, or staff" at Shawnee State, but the University "does have a

nondiscrimination policy that includes 'gender identity.' (*See* Policy 5.01 and its reporting

procedure 5.01:02 [*i.e.*, Defendants' *Nondiscrimination Policies*].)" (*Id.*, ¶¶ 123-124, citing Exh.

6 at 1). Also, plaintiff and defendant Pauley discussed issues related to transgenderism and

gender identity around November 3, 2016, and Pauley exhibited hostility toward plaintiff and his

beliefs during the meeting by stating that "adherents to the Christian religion are primarily

motivated out of fear"; "the Christian doctrines regarding hell are harmful and should not be

taught"; "anyone who believes hell exists should not be allowed to teach these doctrines";

"faculty members who adhere to a certain religion should be banned from teaching courses

regarding that religion"; and "the presence of religion in higher education is counterproductive"

because "the purpose of higher education is to liberate students" and "religion oppresses students." (*Id.*, ¶¶ 117-122).

In January 2018, plaintiff returned from a semester-long sabbatical and began teaching Political Philosophy, during which he regularly calls on students to answer questions and participate in class discussion. Students may satisfy the participation component of the course by being prepared to answer assigned study questions when called upon. On January 9, 2018, during the first Political Philosophy class, plaintiff responded to a question from a student, Doe, by saying, "Yes, sir." Plaintiff contends that he responded in this fashion "because Doe is male," "Doe appears male," and plaintiff believed that no one seeing Doe would have assumed that Doe was "biologically female." Plaintiff alleges that since the 1990s he has referred to students by their last names and a title (i.e., "Mr.", "Ms.", Mrs.", "Miss") or as "sir" or "ma'am," and he has always used titles that refer to a student's biological sex, "to foster an atmosphere of seriousness and mutual respect that is befitting the college classroom." Plaintiff alleges that this is an "important pedagogical tool." (*Id.*, ¶¶ 125-139).

After class that day, Doe approached plaintiff, stated that she was transgender ("i.e., that [s]he identified as female"), and demanded that plaintiff refer to her as a woman with feminine titles and pronouns. When plaintiff responded that he was not sure he could comply with Doe's demand and he was "not sure students can dictate how professors must refer to them," Doe "became belligerent, circling around [plaintiff] and getting in his face in a threatening fashion" while telling plaintiff, "Then I guess this means I can call you a cunt." Doe told plaintiff that Doe would see to it that plaintiff would be fired if he did not accede to Doe's demands. Plaintiff reported Doe's conduct to Pauley, who relayed the conversation to the president of the faculty senate, Marc Scott. On January 10, 2018, Scott informed defendant Shoemaker of the matter and

informed him that "a Title IX complaint [by a student] was possible." (*Id.*, Exh. 7). Defendant Shoemaker met with Doe, apprised defendant Milliken of Doe's complaint, and advised Milliken on how to proceed. On the morning of January 11, 2018, Milliken met with plaintiff and advised him "to begin referring to all students by their last names only and to eliminate all sex-based references from his expression." Plaintiff proposed to continue referring to all students except Doe as he had for years and referring to Doe by her last name. Milliken indicated she approved this arrangement, and Doe continued to attend plaintiff's class without incident and to frequently contribute to class discussions. (*Id.*, ¶¶ 140-159).

On January 25, 2018, Milliken informed plaintiff that Doe was not satisfied with plaintiff's solution of referring to Doe by last name only and Doe had threatened to file a Title IX grievance. Defendant Milliken informed plaintiff that he would be in violation of Shawnee State's nondiscrimination policies if he did not comply with Doe's demands. In late January or early February 2018, a Union official and faculty member told plaintiff he could be suspended or dismissed if he continued to use titles and pronouns that did not reflect "each students' [sic] self-asserted gender identity." During class on February 1, 2018, plaintiff inadvertently referred to Doe using the title "Mr." before immediately correcting himself. Plaintiff said something to the effect of, "Mr. Doe - I mean, Doe." In early February 2018, Doe told defendant Pierce that Doe's complaint had not been resolved and Doe "threatened to contact a lawyer. . . ." Defendant Pierce then contacted defendant Shoemaker so that further action could be taken, and defendants ultimately agreed that defendant Milliken should take the next steps. (*Id.*, ¶¶ 160-167).

On February 12, 2018, Milliken followed up with plaintiff on their January 25, 2018 conversation. Plaintiff asked Milliken if it would comply with Shawnee State's nondiscrimination policies to (1) refer to all students "by their self-asserted gender identity," and

(2) include a disclaimer in the syllabus stating that "he was doing so under compulsion and setting forth his personal and religious beliefs about gender identity." Milliken said this approach would violate the policies, and plaintiff responded that he was willing to use Doe's first or last name without titles but he was not willing to refer to Doe as a woman or to stop referring to all other students "by their last names and sex-based titles." (*Id.*, ¶¶ 170-173).

Milliken sent plaintiff a "formal notice" on February 13, 2018, after she had spoken with him several times regarding the informal complaint of a student in his Political Philosophy class, who complained that plaintiff did not address her as "Ms. ___" or "Miss ____" in line with his practice of addressing other female members in the class. (*Id.*, Exh. 9). Milliken wrote in the notice that according to the student, after notifying plaintiff that she identified as female, plaintiff began calling this student by only her surname and he had referred to the student as "he" during one class the prior week. The letter stated that the student had notified the Dean of Students that plaintiff continued to ignore or reject her requests that plaintiff treat her the same as other students who identify as female. Milliken advised plaintiff that "Policy No. 5.01REV . . . has among its purposes the creation of an educational environment that prohibits discrimination on the basis of . . . gender identity," and the letter was a "formal notice that [plaintiff was] expected to comply with Policy No. 5.01REV by treating all students the same, irrespective of their gender identity." The notice informed plaintiff that if there were "future complaints of disparate treatment in violation of this policy, whether involving [Doe] or not, the University may conduct an investigation" and plaintiff "could be subject to informal or formal disciplinary action." (*Id.*).

Milliken then launched a formal investigation pursuant to the CBA on February 16, 2018, and advised plaintiff that she was doing so because she had received another complaint from a student in his Political Philosophy class (Doe). (*Id.*, Exh. 10). Milliken stated that plaintiff had

potentially violated the University's Policy 5.01REV by (1) continuing "to address this student differently than others within the class by calling her by her surname while other students are addressed as Ms. __ or Mr. __," and (2) using a male pronoun when referring to Doe in class. (*Id.*). Milliken informed plaintiff that because the matter involved a potential violation of Policy 5.01REV, Milliken was also directing the complaint to defendant Johnson, the Director of Human Resources, and defendant Shoemaker, the Title IX Coordinator. (*Id.*).

On March 12, 2018, in response to plaintiff's request for clarification of University Policy 5.01REV, Milliken informed plaintiff via email that: "Every student needs to be treated the same in all of your classes. In other words, the policy seeks to ensure that what is done for one student is done for all to avoid issues of discrimination. This regards names, pronoun usage, and most any other matter." (*Id.*, Exh. 11 at 1-2). Plaintiff thus understood Milliken to be indicating that he would be in violation of Shawnee State's nondiscrimination policies "(1) if he referred to Doe using masculine pronouns; or (2) if he stopped using pronouns in reference to Doe but continued to use sex-based pronouns for all other students; or (3) if he referred to transgender students by their name of choice but continued to refer to all other students by their last names and titles (*i.e.*, 'Mr.,' 'Ms.,' 'Miss,' or 'Mrs.')." Plaintiff perceived only two choices if he wanted to comply with the policy: "(1) stop using pronouns altogether. . . .; or (2) use pronouns that refer to each student's self-asserted gender identity. . . ." (*Id.*, ¶¶ 216-218).

Following an investigation by defendants Johnson and Shoemaker, defendant Johnson concluded that plaintiff's "disparate treatment has created a hostile environment" for Doe, thereby violating Shawnee State's Nondiscrimination Policy and Reporting Policy. (*Id.*, ¶¶ 225-226, 230-32; Exh. 13 at 1, 4). Milliken filed a formal charge against plaintiff, asserting that plaintiff's "disparate treatment of the complainant in your class has caused a hostile

environment." (*Id.*, ¶¶ 233-234; Exh. 14). After a formal investigation, Milliken issued a report setting forth her findings and recommending the formal action of a written warning in plaintiff's personnel file. (*Id.*, ¶ 238; Exh. 17 at 1-3). Milliken concluded that because plaintiff "repeatedly refused to change the way he addressed Ms. [Doe] in his class due to his views on transgender people, and because the way he treated Ms. [Doe] was deliberately different than the way he treated others in the class, I found that he effectively created a hostile environment for Ms. [Doe]. This is a direct violation of Policy No. 5.01REV." (*Id.*, Exh. 17 at 2).

On June 14, 2018, defendant Bauer issued the "Provost's Decision on Formal Disciplinary Action," in which he agreed that plaintiff had violated Policy 5.01REV, which states that "Shawnee State is committed to having an educational and working environment for students . . . that is without unlawful or prohibited discrimination and harassment." (*Id.*, Exh. 19). Bauer found that plaintiff had not treated Doe the same as all other students because he "continued to address [Doe] differently from other students based on a trait that is protected under our anti-discrimination policy even after being warned by Dean Milliken that this was a violation of policy." (*Id.*).

On June 22, 2018, Dean Milliken issued a written warning to plaintiff. (*Id.*, ¶ 246; Exh. 20). The Union pursued a grievance on plaintiff's behalf. (*Id.*, Exh. 23). Bauer concluded that plaintiff discriminated against Doe based on gender identity, denied plaintiff's grievance, and adopted the recommended decision in his role as Interim President. (*Id.*, Exh. 27 at 11). A warning letter was placed in plaintiff's personnel file and a copy was provided to plaintiff. (*Id.*, Exh. 20). The letter states in pertinent part:

> Provost Bauer approved this formal disciplinary action that comes as a result of a Title IX investigation and my findings regarding the violation of Shawnee State University's Policy 5:01.

> As [] Policy 5.01 makes clear, Shawnee State is dedicated to providing an educational environment that does not discriminate against any individual due to a variety of traits, including gender identity. Given that you persisted in treating the complainant differently than other students in your class throughout spring term because of her gender identity, you engaged in behavior that is prohibited by the university. . . .

(*Id.*). The warning also cautioned plaintiff against "such behaviors" in the future to avoid further corrective action. (*Id.*). Plaintiff pursued a grievance related to the written warning, which was denied. (*Id.*, ¶¶ 250-270).

As a consequence of the warning letter, plaintiff "has not discussed issues related to gender identity or transgenderism when he otherwise would have done so" for fear he could immediately be suspended without pay or terminated. (*Id.*, ¶¶ 290-91). Plaintiff alleges that as a result, he "cannot address a high profile issue of public concern that has significant philosophical implications (e.g., illustrating how modern society no longer treats the physical body and its purposes and functions as normative for human behavior and examining whether this philosophical shift is well-grounded or beneficial for the individual and society"). Plaintiff claims that the letter of warning in his file will make it difficult, if not impossible, for him to obtain a position "as an adjunct, professor, instructor, consultant, or administrator at another institution once he retires from the University." (*Id.*, ¶¶ 297-298).

Plaintiff asserts a facial challenge to the Nondiscrimination Policy and to the Reporting Policy to the extent they include the term "gender identity." Plaintiff alleges that inclusion of the term "results in vague and overbroad restrictions upon his protected expression and grants Defendants unbridled discretion to restrict (or punish him for) his protected expression, among other constitutional flaws." (*Id.*, ¶ 58). Plaintiff alleges that Shawnee State's policies as they relate to the definition of "gender identity" are vague and subjective and therefore "give professors no notice as to what constitutes gender identity, what constitutes gender identity

12

discrimination, and how to avoid charges of such discrimination." (*Id.*, ¶ 80). Plaintiff further alleges that the policies "provide no objective guidelines, standards, or criteria for University officials to use when deciding what constitutes gender identity or gender identity discrimination, thereby granting those officials unbridled discretion to restrict expression." (*Id.*, ¶ 81). Plaintiff also challenges the provisions of the policies that prohibit and define "gender identity" discrimination as applied to him. (*Id.*, ¶¶ 56, 57). Plaintiff alleges that defendants, by policy and practice, apply Shawnee State's nondiscrimination policies to regulate individual faculty members' expression and professors' interactions with their students both in and outside of the classroom. (*Id.*, ¶¶ 82, 83).

Based on these allegations, plaintiff brings the following claims for relief: (1) retaliation against plaintiff for exercise of his right to freedom of speech in violation of the First Amendment (*Id.*, ¶¶ 308-316); (2) content and viewpoint discrimination in violation of plaintiff's First Amendment rights (*Id.*, ¶¶ 317-327); (3) compelled speech in violation of plaintiff's First Amendment rights (*Id.*, ¶¶ 328-331); (4) violation of plaintiff's First Amendment right to free exercise of his religion (*Id.*, ¶¶ 332-341); (5) violation of plaintiff's right to be free from unconstitutional conditions (*Id.*, ¶¶ 342-347); (6) violation of plaintiff's due process rights under the Fourteenth Amendment (*Id.*, ¶¶ 348-355); (7) violation of plaintiff's right to equal protection of the law under the Fourteenth Amendment (*Id.*, ¶¶ 356-363); (8) violation of plaintiff's rights of conscience and free exercise of religion under the Ohio constitution (*Id.*, ¶¶ 364-369); and (9) breach of contract under Ohio law (*Id.*, ¶¶ 370-375). As relief, plaintiff seeks a declaratory judgment that defendants' nondiscrimination policies and related practices violate plaintiff's rights under the First and Fourteenth Amendments on their face and as applied; a preliminary and permanent injunction prohibiting defendants from enforcing their nondiscrimination policies

to preclude plaintiff "from expressing his views regarding gender identity or to punish him for expressing those views, including addressing and referring to students based on their biological sex"; a preliminary and permanent injunction ordering defendants to "purge [plaintiff's] file of any reference to the punishment they imposed on him for expressing his views regarding gender identity, including the June 22, 2018 written warning"; and plaintiff's reasonable attorney fees and costs under 42 U.S.C. § 1988. (Doc. 34 at pp. 47-48).

## II.    Motions to dismiss

The Shawnee State defendants and intervenor-defendants move to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim for relief. (Docs. 36, 44). They argue that plaintiff has not stated claims for violations of his First Amendment free speech rights under his first, second, third, and fifth claims for relief because plaintiff's "refusal to use a pronoun or title in addressing one student in his classroom was not 'speech' protected by the First Amendment" as a matter of law. (Doc. 36 at 15-21; Doc. 44 at 4). Defendants argue that the alleged speech was a "simple, ministerial act" that was part of plaintiff's employment responsibilities. (Doc. 36 at 15). Defendants argue that plaintiff spoke as a public employee, not as a citizen, and his speech was not on a matter of "public concern"; therefore, plaintiff's speech is not protected under the test of *Garcetti v. Ceballos*, 547 U.S. 410 (2006). (Doc. 36 at 16; Doc. 44 at 4, 10-13, quoting *Connick v. Myers*, 461 U.S. 138, 146-47 (1983)). Defendants argue that even if plaintiff's speech were on a matter of public concern, the *Pickering* balancing test would apply and weighs in favor of Shawnee State's right "to establish and enforce a nondiscrimination policy to ensure that its transgender students have an equal opportunity to get a university

education." (Doc. 44 at 3-15, citing *Pickering v. Bd. of Educ. Of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).[3]

In response, plaintiff contends he has stated a claim for relief under the First Amendment. Plaintiff challenges the Shawnee State defendants' characterization of his use of titles and pronouns as "conduct" or as a "ministerial act," and he argues his language is "speech" that is entitled to First Amendment protection. (Doc. 45 at 19-20). Plaintiff alleges that his "speech" is not public employee speech made as part of his "official duties" that can be regulated under *Garcetti*. (Doc. 45 at 13; Doc. 46 at 9). Instead, plaintiff alleges that he was speaking as a "citizen" because his "speech" is "faculty speech" that is "related to teaching" or to "scholarship or teaching." (Doc. 45 at 13; Doc. 46 at 10).

Plaintiff further alleges that "[i]n-class speech is presumptively a matter of public concern." (Doc. 45 at 17). He alleges that the presumption applies here because his speech involved gender identity, which is a "quintessential public concern." (*Id*. at 18). Plaintiff alleges that based on the allegations of the complaint, the *Pickering* balancing test applies and favors him because he has shown that his interest in First Amendment expression outweighed defendants' interest in the efficient operation of the workplace. (Doc. 46 at 14, citing *Crawford v. Columbus State Community College*, 196 F. Supp. 3d 766, 777 (S.D. Ohio 2016)).

Plaintiff also contends that defendants have taken an "adverse action . . . that would deter a person of ordinary firmness from the exercise" of his free speech rights. (Doc. 45 at 21, quoting *Maben v. Thelen*, 887 F.3d 252, 266 (6th Cir. 2018)). Plaintiff claims that defendants took "disciplinary actions" which they characterized as "formal" by threatening in a written statement that "further corrective actions" would be taken if plaintiff continues to express his

---

[3] The Shawnee State defendants contend it is not necessary to reach the *Pickering* balancing test at this juncture. (Doc. 36 at 17, n.2).

views, and defendants have chilled the exercise of his rights by taking actions that threaten him with the risk of suspension or termination if he does not change his speech. (Doc. 45 at 21-22). Plaintiff alleges that defendants' actions have caused him to avoid discussing gender identity and transgenderism, to steer class discussions away from these topics, and to refuse to address these topics when students have raised them. (*Id*. at 22, citing Doc. 34, ¶¶ 291-97).

## III.    Rule 12(b)(6) standard

Defendants move to dismiss plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the ground the complaint fails to state a claim upon which relief can be granted. (Docs. 36, 44). In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations as true and make reasonable inferences in favor of the non-moving party. *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (citing *Harbin-Bey v. Rutter,* 420 F.3d 571, 575 (6th Cir. 2005)). Only "a short and plain statement of the claim showing that the pleader is entitled to relief" is required. *Id*. (quoting Fed. R. Civ. P. 8(a)(2)). "[T]he statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id*. (quoting *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (internal quotation marks omitted) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Although the plaintiff need not plead specific facts, the "[f]actual allegations must be enough to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Id*. (quoting *Twombly,* 550 U.S. at 555, 570). A plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

The Court "may consider exhibits attached to the complaint, public records, [and] items appearing in the record of the case . . . so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citing *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015)). The Court may also consider documents attached to a Rule 12(b)(6) motion without converting the motion into a summary judgment motion if the attached materials are matters of public record. *McLaughlin v. CNX Gas Co., LLC*, 639 F. App'x 296, 298-99 (6th Cir. 2016) (citing *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007)).

## IV.  Resolution

### A.  Plaintiff's official capacity claims against the Shawnee State officials

The Shawnee State officials contend they should be dismissed as parties from the lawsuit because plaintiff has sued them in their official capacity, meaning the claims brought against them are to be treated as claims against the State of Ohio which are barred by the Eleventh Amendment. (Doc. 36 at 14, citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989); *Hall v. Med. College of Ohio at Toledo*, 742 F.2d 299, 307 (6th Cir. 1984)). Defendants further contend that they must be dismissed from the lawsuit because plaintiff has not alleged facts to show they had any role in violating plaintiff's constitutional rights. (Doc. 36 at 14). They argue that plaintiff has not alleged facts to show they were involved in any of the actions he challenges as violative of his constitutional rights, including developing or instituting the Shawnee State policies at issue, communicating with him about actions under the policies, or carrying out those actions. (*Id.*). Defendants contend that plaintiff alleges only that the individual Trustees have "final policymaking authority for rules and regulations that govern the University" and that the Trustees "have not modified the policies challenged herein," which does

17

not suffice to state a claim for relief against them. (*Id*., citing Doc. 34, ¶¶ 13-18). Defendant

Pauley contends that the Amended Complaint alleges that she "possesses the authority and

responsibility for governing and regulating faculty in the Department of English and Humanities

at the University" and for "overseeing" plaintiff; however, under the CBA, she is a member of

the faculty bargaining unit and not an administrator of University policy who can impose

discipline or materially affect the terms and conditions of plaintiff's employment. (*Id*. at 15,

citing Doc. 34, Exh. 4, Art. 5, § 1.A.3, p. 11; *Id*., Art. 18).

Any form of relief sought against a State in federal court is barred under the Eleventh

Amendment unless the State has waived its sovereign immunity. *See Seminole Tribe of Fla. v.

Fla*., 517 U.S. 44, 58 (1996); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101

(1984); *Hamilton's Bogarts, Inc. v. Mich*., 501 F.3d 644, 654 n.8 (6th Cir. 2007). The State of

Ohio has not constitutionally or statutorily waived its Eleventh Amendment immunity in the

federal courts. *See Johns v. Supreme Court of Ohio,* 753 F.2d 524 (6th Cir. 1985); *State of Ohio

v. Madeline Marie Nursing Homes,* 694 F.2d 449 (6th Cir. 1982).

The Eleventh Amendment bar extends to actions where the State is not a named party but

where the action is essentially one for the recovery of money from the state. *Edelman v. Jordan*,

415 U.S. 651, 663 (1974); *Ford Motor Company v. Dept. of Treasury,* 323 U.S. 459, 464 (1945).

A suit against state officials in their official capacities would, in reality, be a way of pleading the

action against the entity of which the state officials are agents. *Monell v. Dept. of Soc. Services

of City of New York*, 436 U.S. 658, 690 (1978). Thus, actions against state officials in their

official capacities are included in the Eleventh Amendment bar. *Colvin v. Caruso*, 605 F.3d 282,

289 (6th Cir. 2010) (citing *Cady v. Arenac County*, 574 F.3d 334, 344 (6th Cir. 2009) ("[A]n

official-capacity suit against a state official is deemed to be a suit against the State and is thus

barred by the Eleventh Amendment, absent a waiver.") (citation and ellipsis omitted)). A suit in federal court against a State university and its board is treated as a suit against the State. *Hutsell v. Sayre,* 5 F.3d 996, 1002 (6th Cir. 1993).

An exception to this immunity from suit applies if state officials are sued in their official capacities for prospective relief in the form of an injunction. *Ex parte Young,* 209 U.S. 123 (1908). *See also Kentucky v. Graham,* 473 U.S. 159, 169 n.18 (1985) ("In an injunctive or declaratory action grounded on federal law, the State's immunity can be overcome by naming state officials as defendants."). Thus, plaintiff is not barred by the Eleventh Amendment from seeking prospective injunctive relief from the Shawnee State officials in their official capacities.[4]

### B. Plaintiff's First Amendment claims

Plaintiff brings a First Amendment claim under the Free Exercise Clause and four claims premised on his constitutional right to freedom of speech: (1) retaliation, (2) content and viewpoint discrimination, (3) compelled speech, and (4) unconstitutional conditions. (Doc. 34). The Court will initially address plaintiff's retaliation claim alleged in the first count of the complaint.

#### 1. First Amendment retaliation

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). A plaintiff must establish three elements to prevail on a claim of retaliation under the First Amendment: (1) he engaged in speech that was protected under the First Amendment; (2) he suffered an adverse employment action that would deter an individual of "ordinary firmness"

---

[4] Although the Eleventh Amendment would bar compensatory damages against the Shawnee State defendants, it appears that plaintiff does not seek these damages. (*See* Doc. 34 at 47-48).

from engaging in the action; and (3) the adverse action was at least partially motivated by the plaintiff's exercise of his constitutional right. *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.,* 605 F.3d 345, 348 (6th Cir. 2010) (citations omitted); *Evans-Marshall v. Bd. of Educ.,* 624 F.3d 332, 337 (6th Cir. 2010) (citations omitted).

Whether a plaintiff's speech is protected under the First Amendment is a question of law. *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 464 (6th Cir. 2017); *Fox*, 605 F.3d at 350-51 (citations omitted). Speech by a government employee is protected under the First Amendment only if the speech was made "as a citizen," while addressing "a matter of public concern." *Savage v. Gee*, 665 F.3d 732, 738-39 (6th Cir. 2012) (quoting *Connick,* 461 U.S. at 146-47; *Fox,* 605 F.3d at 349). A government employee's speech is made "as a citizen" and is protected under the First Amendment only when the speech is not made "pursuant to [the employee's] duties." *Garcetti,* 547 U.S. at 421. *See also Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Alomari v. Ohio Dept. of Pub. Safety*, 626 F. App'x 558, 567 (6th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 421).

Initially, the Shawnee State defendants appear to dispute whether plaintiff's use of pronouns and titles was "speech" as opposed to "conduct," or a "ministerial act." (*See* Doc. 36 at 15, Doc. 47 at 10-11). Insofar as defendants intend to argue that plaintiff's use of pronouns and male titles is not "speech," the Court rejects defendants' argument. Words - titles and pronouns - that plaintiff spoke in his classroom at Shawnee State are at the heart of this dispute. Defendants have not cited any legal authority that excludes words of this nature from the definition of

"speech" for purposes of the First Amendment. The issue to be resolved is whether this speech is "protected" under the First Amendment in light of the circumstances presented here.

Plaintiff contends that the "public employee" test established in *Garcetti*, 547 U.S. at 425, does not apply to his speech and it is therefore immaterial whether he was speaking pursuant to his "official duties." (Doc. 46 at 9). Plaintiff argues that the Supreme Court in *Garcetti* refused to extend the "official duties" test to "faculty speech related to scholarship or teaching," and that the Supreme Court "exempted 'speech related to . . . teaching'" from the test applicable to other public employees so as "to protect the teaching of a public university professor." (Doc. 46 at 10, quoting *Garcetti*, 547 U.S. at 438). Plaintiff argues that because his "remarks in class to his students are by definition 'related to . . . teaching' and 'classroom instruction,'" *Garcetti's* "official duties" test does not apply. (Doc. 45 at 15; Doc. 46 at 11, citing *Garcetti*, 547 U.S. at 425).

Plaintiff has not accurately characterized the Supreme Court's holding in *Garcetti*. The Supreme Court did not exempt speech related to teaching from the public employee test. The majority acknowledged a concern raised by the dissent about applying *Garcetti's* holding to teachers at public colleges and universities. *Garcetti*, 547 U.S. at 425.[5] But the Supreme Court majority in *Garcetti* expressly declined to decide this issue, stating:

> There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence. *We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.*

---

[5] The concern as framed by Judge Souter in his dissent was: "This ostensible domain beyond the pale of the First Amendment is spacious enough to include even the teaching of a public university professor, and I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write 'pursuant to . . . official duties'." *Garcetti*, 547 U.S. at 438 (Souter, J., dissenting).

*Id.* (emphasis added). Thus, contrary to plaintiff's representation, the Supreme Court in *Garcetti* did not carve out an exception to its holding for "faculty speech" that is "related to teaching" or to "scholarship." (*See* Doc. 45 at 13; Doc. 46 at 10).

Plaintiff also contends that other federal appellate courts have declined to apply *Garcetti's* "official duties" test to faculty speech related to teaching and scholarship. (Doc. 45 at 16, citing *Adams v. Trustees of the U. of N.C.-Wilmington*, 640 F.3d 550, 553 (4th Cir. 2011); *Demers v. Austin*, 746 F.3d 402, 409-10 (9th Cir. 2014); Doc. 46 at 11)). This Court, though, is bound by the holdings of the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit. Neither Court has decided that *Garcetti* does not apply, or that it applies in a different manner, to teachers at public colleges and universities.

Plaintiff contends that the Sixth Circuit has indirectly recognized the unique role a professor plays when teaching by "refusing to extend *Garcetti's* caveat to non-professors (e.g., high school teachers) or to professors not engaged in teaching or scholarship." (Doc. 46 at 10, citing *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 343 (6th Cir. 2010); *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012)). The Sixth Circuit did not indicate in either case, though, that *Garcetti* does not apply to the speech of teachers at public universities and colleges. To the contrary, in *Evans-Marshall,* 624 F.3d 332, the Sixth Circuit rejected the plaintiff's argument to the extent it was based on Judge Souter's dissent in *Garcetti,* noting that the majority in *Garcetti* expressly declined to resolve the implications of the majority decision on academic freedom in public colleges and universities. *Id.* at 343 (citing *Garcetti,* 547 U.S. at 438) (Souter, J., dissenting)). In *Savage,* 665 F.3d at 738-39, the Court rejected the plaintiff's argument that "his speech is excepted from the usual analysis applied to the speech of public employees and is instead protected by the First Amendment," characterizing as dicta

22

*Garcetti's* language that "[t]here is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Id.* (citing *Garcetti*, 547 U.S. at 425).

Thus, neither *Evans-Marshall* nor *Savage* supports plaintiff's argument that speech related to teaching or scholarship is excepted from the usual analysis applied to public employee speech under *Garcetti*. Though university professors do not "leave their First Amendment rights at the campus gates," *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 594 (6th Cir. 2005), "public universities may restrict their employees' speech in a manner that would be impermissible absent the employment relationship." *Smock v. Bd. of Regents of U. of Michigan*, 353 F. Supp. 3d 651, 659 (E.D. Mich. 2018). "[U]niversities may sanction professors 'whose pedagogical attitudes and teaching methods do not conform to institutional standards.'" *Id*. (quoting *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989)). "Although public universities may not force professors to endorse or eschew specific viewpoints, the First Amendment does not bar a public university from requiring that its faculty treat each other and their students with civility." *Id*. at 659-60 (citing *Johnson-Kurek*, 423 F.3d at 596) ("The freedom of a university to decide what may be taught and how it shall be taught would be meaningless if a professor were entitled to refuse to comply with university requirements whenever they conflict with his or her teaching philosophy.").

Thus, the Court is bound to analyze plaintiff's First Amendment retaliation claim under *Garcetti*. The first prong of the inquiry under *Garcetti* as applied here is whether plaintiff's speech was "as a citizen" or was made "pursuant to [plaintiff's] duties" as a professor at Shawnee State. *See Weisbarth*, 499 F.3d at 542 (quoting *Garcetti,* 547 U.S. at 421). To

23

determine whether speech was made pursuant to the employee's official duties, the Court considers the "content and context" of the speech. *Handy-Clay v. City of Memphis, Tenn.,* 695 F.3d 531, 540 (6th Cir. 2012) (citing *Fox*, 605 F.3d at 348). The Sixth Circuit has identified a number of factors that are relevant to this determination, including "the impetus for [plaintiff's] speech, the setting of h[is] speech, the speech's audience, and its general subject matter." *Id.* (quoting *Weisbarth,* 499 F.3d at 546). *See also Holbrook v. Dumas*, 658 F. App'x 280, 288 (6th Cir. 2016). If the plaintiff's speech clearly owed its existence to his responsibilities as a government employee, then his speech was pursuant to his official duties and was not speech made as a citizen. *Holbrook,* 658 F. App'x at 289 (citing *Garcetti*, 547 U.S. at 421-22; *Alomari*, 626 F. App'x at 567-68; *Keeling v. Coffee Cty., Tenn.*, 541 F. App'x 522, 528 (6th Cir. 2013); *Weisbarth*, 499 F.3d at 544).

Plaintiff's speech - i.e., the titles he used to address Doe and the pronouns he used when referring to her - occurred pursuant to his official duties as a professor at Shawnee State. Plaintiff's interactions with Doe happened during a class plaintiff taught at Shawnee State in which Doe was a student and during which plaintiff referred to students by their last names and a title (Mr., Ms., Mrs., Miss) or "sir" or "ma'am," which was his long-standing practice as a teacher and which he considered to be "an important pedagogical tool." (Doc. 34. ¶¶ 126, 128, 129, 133, 139, 159, 176). Plaintiff acknowledges that his speech "'was made in class, in his capacity as a professor,' and 'in connection with . . . [a] Socratic dialogue.'" (Doc. 46 at 9). Plaintiff alleges he called on Doe regularly throughout the semester, and he was investigated because he "continue[d] to address [Doe] differently than others within the class by calling her by her surname while other students are addressed as Ms. __ or Mr. __." (*Id.*, ¶¶ 177, 194; Exh. 10). Plaintiff asserts, "This speech is, by definition, 'related to . . . teaching.'" (Doc. 46 at 9,

citing *Garcetti*, 547 U.S. at 425). Given plaintiff's employment duties (university professor), the setting of plaintiff's speech (a university classroom), the audience (the students in his Political Philosophy class), the impetus for the speech (to address students in a manner that plaintiff considered to be an important pedagogical tool), and the general subject matter of the speech (titles and pronouns for addressing students in his classroom), the Court concludes as a matter of law that plaintiff spoke pursuant to his official duties. *See Weisbarth*, 499 F.3d at 546.

If the Court determines as a matter of law that the plaintiff "spoke pursuant to h[is] employment responsibilities" rather than as a citizen, the plaintiff has not stated a claim for retaliation under the First Amendment and the Court need not inquire into whether the employee's speech touched on a matter of public concern. *Id.* at 544; *Fox*, 605 F.3d at 348 ("even employee speech addressing a matter of public concern is not protected if made pursuant to the employee's official duties."). Because plaintiff's speech was pursuant to his official duties as a public employee, plaintiff was "not speaking as [a] citizen [for] First Amendment purposes, and the Constitution does not insulate [his] communications from employer discipline." *Alomari*, 626 F. App'x at 567 (quoting *Garcetti*, 547 U.S. at 421). Plaintiff has failed to state a claim for retaliation under the First Amendment for this reason.

Even assuming plaintiff was not speaking pursuant to his official duties, plaintiff's in-class speech in not entitled to First Amendment protection unless it touched on a matter of "public concern." Plaintiff argues that "[i]n-class speech is presumptively a matter of public concern" and defendants have not rebutted this presumption, and that "gender identity" is a "quintessential public concern." (Doc. 45 at 17-20; Doc. 46 at 11-14). Plaintiff argues that his speech involved the specific public concern of "whether a male who identifies as female is really a woman." (Doc. 45 at 17, citing *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 462 (6th

Cir. 2017)). Plaintiff argues that the focus of the "public concern" inquiry is the "intent of the speech" and the "communicative purpose of the speaker," and in this case "his language and pronoun use communicate[d] his own views [on gender identity]," including "his religious views on these issues." (Doc. 45 at 18-20, Doc. 46 at 12, citing Doc. 34, ¶¶ 204, 92). Plaintiff alleges that the choice he was given by defendant Milliken to comply with defendants' nondiscrimination policies were that he either (1) stop referring to students by their last names and titles and to stop using pronouns altogether, "thereby altering the pedagogical environment in his classroom"; or (2) use titles and pronouns that refer to each student's self-asserted gender identity, "which would require him to violate his conscience and sincerely held religious beliefs." (Doc. 34, ¶¶ 217, 218).

The Shawnee State defendants and intervenor-defendants contend that plaintiff was speaking as a public employee and his speech involved addressing a particular student, which is not a matter of "public concern" that is protected by the First Amendment as a matter of law. (Doc. 44 at 4, 10-13, quoting *Connick*, 461 U.S. at 146); *see Farhat*, 370 F.3d at 590. Defendants assert that plaintiff has not cited any authority to show his "in-class" speech is protected, and an evaluation of the relevant factors shows that plaintiff's speech is not protected. (Doc. 48 at 4-6).

Plaintiff has not cited any authority that holds "[i]n-class speech is presumptively a matter of public concern." (Doc. 45 at 17-19). The Sixth Circuit in *Evans-Marshall* stated in dicta that it has "said on several occasions" that "[a] teacher's curricular speech . . . *ordinarily* covers these matters." *Id.* at 338-39 (citations omitted) (emphasis added). The Sixth Circuit explained that "[the] essence of a teacher's role is to prepare students for their place in society as responsible citizens, and the teacher that can do that *without* covering topics of public concern is

rare indeed, perhaps non-existent." *Id*. at 339 (internal citation omitted). However, the Court did not find that a presumption applies to any type of in-class speech, curricular or otherwise.

Similarly, the Court in *Hardy v. Jefferson Community College*, 260 F.3d 671, 679 (6th Cir. 2001), stated in dicta that "[b]ecause the essence of a teacher's role is to prepare students for their place in society as responsible citizens, classroom instruction will *often* fall within the Supreme Court's broad conception of 'public concern.'" *Id*. (quotation omitted) (emphasis added). The Court found that the plaintiff's "lecture on social deconstructivism and language, which explored the social and political impact of certain words, clearly meets this criterion . . ." and that "it does relate to matters of overwhelming public concern - race, gender, and power conflicts in our society." *Id*. However, the Court did not find a presumption that such speech relates to a public concern. Indeed, courts have drawn a distinction between speech which relates to curriculum and speech that touches on other matters and found that while teachers "must be given broad discretion to give grades and conduct class discussion based on the content of speech," it is not the role of the courts to "intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Corlett v. Oakland U. Bd. of Trustees*, 958 F. Supp. 2d 795, 808 (E.D. Mich. 2013) (quoting *Settle v. Dickson County Sch. Bd.*, 53 F.3d 152, 154-55 (6th Cir. 1995) (quoting *Epperson v. State of Ark.,* 393 U.S. 97, 104 (1968)). Thus, plaintiff's speech at issue in this case is not entitled to a presumption that it is "a matter of public concern" simply because plaintiff spoke while teaching in a public university classroom.

The Court must therefore consider the allegations of the Amended Complaint to determine whether plaintiff's speech touches on a matter of "public concern" under the First Amendment, which is a question of law. *Handy-Clay,* 695 F.3d at 543. Speech on a "matter of

public concern" is broadly defined as speech that can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick*, 461 U.S. at 146). In making this determination, the Court must consider the "content, form, and context" of the speech in light of all of the circumstances of the speech, including "what was said, where it was said, and how it was said." *Id*. at 453-54. *See also Farhat*, 370 F.3d at 589 (quoting *Connick*, 461 U.S. at 147-48). No one of these three factors is dispositive. *Snyder,* 562 U.S. at 454. The entire speech need not address a matter of public concern, so long as some portion of the speech does. *Farhat*, 370 F.3d at 589 (citing *Connick*, 461 U.S. at 149).

The Sixth Circuit has further refined the "public concern" inquiry by setting forth the following factors that the Court must consider: the "focus" of the speech; the "point of the speech"; the "purpose" to which the employee spoke; and the "intent of the speech" or the "communicative purpose of the speaker." *Farhat*, 370 F.3d at 592 (quoting cases). In determining the "focus" of the speech, "the proper inquiry is *not* what might be 'incidentally conveyed' by the speech." *Id*. (emphasis in the original) (quoting *Rodgers v. Banks*, 344 F.3d 587, 597 (6th Cir. 2003)). Absent unusual circumstances, a public employee's speech dealing with "matters only of personal interest" is not afforded constitutional protection. *Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001) (quoting *Connick*, 461 U.S. at 147). Where the "'focus' or 'point' of the speech advances only a private interest," then "'passing' or 'fleeting' references to an arguably public matter do not elevate the speech to a matter of 'public concern'." *Farhat*, 370 F.3d at 592-93 (collecting cases). *See also Kerr v. Hurd*, 694 F. Supp. 2d 817, 842 (S.D. Ohio 2010) (quoting *Hardy*, 260 F.3d at 678) (quoting in turn *Dambrot v. Cent. Mich. Univ.,* 55 F.3d 1177, 1187 (6th Cir. 1995) (to decide the "public concern" question,

"the court must determine 'the point of the speech in question . . . [because] controversial parts
of speech advancing only private interests do not necessarily invoke First Amendment
protection.'")). However, where the employee speaks as both a citizen and an employee, so that
his speech involves mixed questions of private and public concern, his speech can be protected
"such that 'if any part of an employee's speech, which contributes to the [disciplinary action],
relates to a matter of public concern, the court must conduct a balancing of interests test as set
forth in *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968).'" *Rahn v. Drake Ctr., Inc.,* 31 F.3d 407,
412 (6th Cir. 1994) (internal citation omitted) (citing *Connick,* 461 U.S. at 147) (finding that
speech is not protected "when a public employee speaks not as a citizen upon matters of public
concern, but instead as an employee upon matters only of personal interest"); *Johnson v. Lincoln
U. of Com. System of Higher Educ.*, 776 F.2d 443, 451 (3d Cir. 1985) (though a statement may
evolve from a personal dispute, this "does not preclude some aspect of it from touching upon
matters of public concern")).

The Court concludes as a matter of law that plaintiff's speech did not touch on a matter of
public concern. Broadly speaking, "gender identity," like many other "controversial subjects"
and "sensitive political topics," is "undoubtedly [a] . . . matter[] of profound 'value and concern
to the public.'" *Janus v. Am. Fedn. of State, County, and Mun. Employees, Council 31*, 138 S.
Ct. 2448, 2476 (2018) (quoting *Snyder*, 562 U.S. at 453). But though plaintiff's speech related to
gender identity, it did not implicate the broader social concerns surrounding the issue.

The speech here occurred in the context of plaintiff's employment; it was limited to titles
and pronouns used to address one student in plaintiff's class; the speech was directed to plaintiff
and heard only by her and her fellow students; and absent any further explanation or elaboration,

the speech cannot reasonably be construed as having conveyed any beliefs or stated any facts about gender identity. The focus of the speech was Doe, a student in plaintiff's class who was involuntarily subjected to the speech, and the gender by which plaintiff in his capacity as Doe's teacher chose to identify Doe, over Doe's objection, when calling on Doe to participate in class. According to plaintiff, the purpose of the speech was two-fold. One purpose was to address Doe by a title, as was plaintiff's teaching practice and pedagogical style, when calling on Doe to answer questions and to participate in class discussions, and to refer to Doe during class discussions. The second purpose was to convey plaintiff's personally-held beliefs that Doe was a male because that was Doe's biological gender at birth, and it was not possible for Doe to undergo a change of gender. Plaintiff alleges in the complaint that to use titles and pronouns that refer to each student's self-asserted gender identity "would require him to violate his conscience and sincerely held religious beliefs." (Doc. 34., ¶¶ 92, 217, 218). Plaintiff's speech therefore related to gender identity in the sense that plaintiff refused to address Doe with female titles and pronouns, and the reason for his refusal was his belief that neither Doe nor any other individual could change their gender from birth. This connection between plaintiff's speech and gender identity does not, however, "elevate the speech to a matter of 'public concern'" when the content, context, and form of the speech is considered. *See Farhat*, 370 F.3d at 592-93.

Plaintiff alleges that he was expressing his broader views on gender identity by the way he addressed Doe, but there is no assurance that anyone who heard plaintiff refer to Doe as "he," "sir," or "Mr." would understand that this was his intent given the context and form of plaintiff's speech. Plaintiff does not allege that he explained to students his reasons for referring to Doe as a male or that it would have been appropriate for him to do so in his teaching role. Nor does he allege that any student in the class understood that he was conveying a message through the

manner in which he addressed Doe. Plaintiff's use of male titles or pronouns did not convey a particularized message. His speech cannot be viewed as "inherently expressive" and "protected speech" because the surrounding circumstances show it was unlikely that the message would be understood by those exposed to it as expressing the viewpoint that plaintiff now ascribes to the speech. *Spence v. Washington*, 418 U.S. 405, 410-11 (1974) (citing *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc. (FAIR)*, 547 U.S. 47, 64 (2006)). Thus, plaintiff's use of male pronouns and titles to address and refer to Doe cannot reasonably be construed as conveying *plaintiff's broader beliefs and views* about gender identity.

Moreover, even if plaintiff's motivations were understood, plaintiff's speech did not "serve the purpose of advancing viewpoints . . . which had as their purpose influencing or informing public debate. . . ." *Bonnell*, 241 F.3d at 820 (quoting *Dambrot*, 55 F.3d at 1189). Plaintiff's use of titles and pronouns did not "advance an idea transcending personal interest or opinion which impacts our social and/or political lives." *Id*. By referring to Doe in male terms or by using Doe's last name only, plaintiff admittedly was acting on and conveying his personal beliefs and views about gender identity. Plaintiff was not sharing ideas or inviting discussion but was directing his personal beliefs toward Doe, who objected to his speech, and other members of a captive audience who were not free to leave his class or decline to participate in class. The speech did not take place in the context or a broader discussion, and there was no admitted academic purpose or justification.

Though decided on very different facts, the reasoning of the district court in *Corlett v. Oakland U. Bd. of Trustees*, 958 F. Supp. 2d 795, 809 (E.D. Mich. 2013) is instructive here. In *Corlett*, the Court found that a student's "expressions of lust for" his teacher and his "descriptions of her physical appearance" in his writing assignments, which he entitled "Hot for

31

Teacher," were not entitled to First Amendment protection. *Id*. at 809. The Court distinguished

"[s]elf-expression" from "the expression of ideas or opinions and thus to participation in the

intellectual marketplace." *Id*. (quoting *Brandt v. Bd. of Educ. of City of Chicago,* 480 F.3d 460,

465 (7th Cir. 2007)). The Court explained:

> It matters not whether Plaintiff's [] writings satisfied the legal definition of
> obscenity or sexual harassment. Defendants reasonably could have found his
> writings inappropriate from a student to a teacher (as they certainly would have
> been from a teacher to a student) and punished him accordingly. Perhaps some
> would view Defendants' punishment[6] as disproportionate to Plaintiff's conduct.
> Perhaps, however, Defendants believed the sanctions were necessary to emphasize
> to Plaintiff that, although arguably acceptable in a karaoke bar, certain behaviors
> when directed at female professors, fellow students, or future co-workers are not
> tolerable in a civilized society. Nevertheless, Defendants' reasons for exacting the
> sanctions imposed on Plaintiff are irrelevant, as the Court concludes that his First
> Amendment rights were not violated under the facts alleged. "'Courts do not and
> cannot intervene in the resolution of conflicts which arise in the daily operation of
> school systems and which do not directly and sharply implicate basic constitutional
> values.'" *Settle,* 53 F.3d at 155 (quoting *Epperson,* 393 U.S. at 104).

*Id*. at 809.

As in *Corlett*, plaintiff did not speak on a matter of "public concern" simply by

addressing a student in his class by titles or pronouns that did not accord with the gender by

which the student identified. Plaintiff has not offered a cogent explanation or supporting

authority to show why his speech should be construed as involving a matter of public concern

under these circumstances. Plaintiff's refusal to address a student in class in accordance with the

student's gender identity does not implicate broader societal concerns and the free speech clause

of the First Amendment under the circumstances of this case. Because neither the "official

---

[6] The plaintiff was placed on a disciplinary suspension and then on University disciplinary probation, and he was
barred from having contact with or taking any courses from the teacher while he attended the University. *Id*. at 801.

duties" nor "public concern" prong of the *Garcetti* test is met, plaintiff's First Amendment retaliation claim (First Cause of Action) should be dismissed.[7]

### 2. First Amendment claims for compelled speech, content/viewpoint discrimination, and unconstitutional conditions

Defendants argue that plaintiff's remaining free speech claims must be dismissed whether they are couched as "[c]ompelled [s]peech," "[u]nconstitutional [c]onditions," or "[c]ontent & [v]iewpoint [d]iscrimination." (Doc. 36 at 18-21, 22-23; Doc. 44 at 4). Defendants contend that plaintiff's speech is unprotected, and his First Amendment claim therefore fails no matter how it is styled.

### i. Compelled speech claim

Plaintiff claims that defendants have compelled his speech in violation of his First Amendment rights. (Third Cause of Action). He claims that defendants have punished and threatened to punish him for "refusing to communicate a University-mandated ideological message regarding gender identity both in and out of the classroom," and that defendants have attempted to compel him to communicate "messages about gender identity that he does not hold, that he does not wish to communicate, and that conflict with (and for him to violate) his religious beliefs." (Doc. 34, ¶¶ 328-31).

Defendants argue that plaintiff's "compelled speech" claim fails because plaintiff does not allege that any defendant compelled him to speak. Instead, according to plaintiff's own allegations, defendant Milliken suggested he avoid gender-based terminology to avoid any conflict between his convictions and University policy, and plaintiff could have done so by using only the students' first or last names. (Doc. 36 at 21; Doc. 47 at 17-18; Doc. 48 at 9-10).

---

[7] In light of the Court's findings, the Court need not apply the *Pickering* balancing test under *Garcetti* or address whether plaintiff was subjected to an adverse action so as to satisfy the third prong of his First Amendment retaliation claim.

However, plaintiff rejected the accommodation because "it would undermine the serious pedagogical environment he seeks to create" and he thought it would be impractical or impossible. (Doc. 48 at 9, citing Doc. 34, ¶¶ 154, 155; *see also Id.*, ¶ 156). Defendants contend the First Amendment does not require a public university to permit a professor to teach his classes in accordance with his ideas about pedagogy. (Doc. 48 at 9, citing *Johnson-Kurek*, 423 F.3d at 595). Defendants further allege that even if a compelled speech analysis applied in this case, it would not matter because the result is the same whether plaintiff styles his claim as challenging a restriction on using males titles and pronouns or a requirement that he use female titles and pronouns. (Doc. 48 at 9-10). Defendants contend that the "difference between compelled speech and compelled silence" is of no constitutional significance. (Doc. 48 at 10, quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988)). Defendants further allege that if "the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Id.* (quoting *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2473 (2018). *See also Evans-Marshall*, 624 F.3d at 341 (finding that a teacher could not "respond to a principal's insistence that she discuss certain materials by claiming that it improperly compels speech").

Plaintiff argues that he has stated a claim for violation of his First Amendment rights based on "compelled speech" because his speech is protected. (Doc. 45 at 26-27). He argues that defendants seek to coerce him into betraying his convictions and endorsing ideas he finds objectionable, which is "always demeaning." (Doc. 45 at 27, citing *Janus*, 138 S.Ct. at 2464). He alleges that the alternative defendants gave him, which was to "begin referring to all students by their last names only and to eliminate all sex-based references from his expression," was

unreasonable. (*Id.*, citing Doc. 36; *see* Doc. 34, ¶¶ 153-155; Exh. 17, Dean's May 29, 2018 letter).

"[I]n the context of protected speech, . . . the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say." *Riley*, 487 U.S. at 797. "[F]reedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus*, 138 S.Ct. at 2463. "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Id.* However, if the speech at issue "is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Id.* at 2473.

Plaintiff's claim that his speech was compelled in violation of his First Amendment rights fares no better than his First Amendment retaliation claim. Plaintiff has not alleged that defendants forced him to espouse or express a view that plaintiff disagreed with or found objectionable. Plaintiff does not claim that defendants mandated that he use any particular terms of speech to refer to Doe. To the contrary, plaintiff acknowledges that defendants gave him the option to stop using gender-based titles during class, but plaintiff rejected that option. For the reasons discussed *supra*, plaintiff's use of male titles and pronouns to address Doe did not in and of itself express a belief or an idea and was not "protected" speech. By the same token, defendants' requirement that plaintiff address Doe and the other students in plaintiff's class in a consistent manner, whether by their first or last names only, did not force plaintiff to express a belief on "gender identity" that he did not personally hold or endorse. Defendants did not violate plaintiff's free speech rights under the First Amendment by compelling him to "mouth support"

for a view plaintiff found objectionable. (*See* Doc. 45 at 26). Plaintiff's claim for compelled speech should be dismissed.

### ii. Content and viewpoint discrimination

In addition to claiming that Shawnee State's nondiscrimination policies are unconstitutional as applied to him, plaintiff challenges the policies as overbroad. (Doc. 34, Second Cause of Action, First Amendment - Content and Viewpoint Discrimination). Plaintiff alleges that by "punishing and threatening to punish [him] for expressing his views regarding gender identity both in and out of the classroom," defendants have committed content and/or viewpoint discrimination in violation of the First Amendment. Plaintiff alleges that defendants' nondiscrimination policies give University officials "unbridled discretion" to evaluate the "content and viewpoint of faculty expression to determine whether it constitutes discrimination or harassment and whether it creates a hostile environment." Plaintiff claims that his "expression regarding gender identity" is protected by the First Amendment. Plaintiff alleges that defendants exercised their "unbridled discretion" when they decided to enforce their nondiscrimination policies against him and have threatened to do so again if he continues to express his views. Plaintiff claims that defendants' "enforcement of those policies are [sic] unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech"; the overbreadth "chills the speech of [plaintiff], who seeks to engage in protected expression in his interactions with students on campus and in the classroom"; and defendants have punished plaintiff for allegedly violating the policies by placing a written warning in his personnel file. (*Id.*, ¶¶ 318-27).

Defendants argue that plaintiff's second cause of action fails to state a claim for relief. (Docs. 36, 44). Defendants allege that first, the speech which plaintiff claims is subject to

viewpoint discrimination is not protected under *Garcetti*, and second, the Amended Complaint only generally alleges that the nondiscrimination policies are overbroad. (Doc. 36 at 18-19). Defendants contend that plaintiff has not shown that the nondiscrimination policies were unconstitutionally applied to protected speech because the Amended Complaint focuses only on his classroom interactions with plaintiff. (*Id*. at 19). Further, defendants allege that plaintiff has failed to plausibly allege that the nondiscrimination policies were substantially overbroad on their face as required to state a claim under the First Amendment. (*Id*., citing *Speet v. Schuette*, 726 F.3d 867, 872-73 (6th Cir. 2013) (quoting *Carey v. Wolnitzek*, 614 F.3d 189, 208 (6th Cir. 2010) ("[I]n a facial challenge, a plaintiff must show substantial overbreadth: that the statute prohibits 'a substantial amount of protected speech both in an absolute sense and relative to [the policy's] plainly legitimate sweep[.]'")). Defendants assert that plaintiff has not plausibly alleged that he was subject to potential discipline which occurred outside the University, and even if he did make such a claim, "a nexus could exist that would allow for the University to reasonably direct him to cease discriminatory conduct towards a student." (*Id*. at 20). Defendants argue that the overbreadth doctrine is a "prudential doctrine" which the courts should use to strike down policies "as a last resort," and plaintiff's "difference of opinion" with Shawnee State does not rise to the level of a constitutional claim and does not warrant this exceptional remedy. (*Id*.).

Plaintiff argues in response to defendants' motions to dismiss that defendants' nondiscrimination policies are overbroad because they are not confined to speech in the classroom. (Doc. 46 at 24, citing Doc. 34, ¶¶ 61-66, 75-83; *Id*., Exh. 20). Plaintiff alleges that defendants have conceded in their response that the "University [could] reasonably direct him to cease [expression off-campus]." (*Id.,* citing Doc. 36 at 20). Plaintiff also alleges that the

37

intervenor-defendants have conceded that the requirement that he use honorifics consistent with students' gender identities if he refers to students using honorifics applies "to all official-capacity interactions, not just classroom interactions. . . ." (*Id.*, citing Doc. 44 at 7). Plaintiff contends that while defendants allege that Titles VII and IX mandate that defendants formulate and apply policies restricting or compelling speech (*see* Doc. 44 at 13-15), this proposition is far from settled. (Doc. 46 at 24).

Defendants allege in reply that plaintiff has not stated an overbreadth claim by showing the nondiscrimination policies prohibit a "substantial amount of speech both in an absolute sense and relative to [the policy's] plainly legitimate sweep[.]" (Doc. 47 at 15-17). The intervenor-defendants contend that plaintiff has not cited any case that applies these doctrines to public employee speech, which is not protected under *Garcetti*, and he has not established that Shawnee State's nondiscrimination policies are unconstitutional in any of their applications. (Doc. 48 at 10, n.2).

"University policies designed to discipline speech of students [or staff] may be unconstitutional under the First Amendment if the policy 'is so broad as to chill the exercise of free speech and expression.'" *Winkle v. Ruggieri*, No. 2:12-cv-1079, 2013 WL 230136, at *6 (S.D. Ohio Jan. 22, 2013) (quoting *Dambrot,* 55 F.3d at 1182) (holding that a university's discriminatory harassment policy was unconstitutional on its face). "[T]he Court must consider the amount of speech that the policy proscribes in relation to the policy's 'plainly legitimate sweep.'" *Id.* (quoting *Phelps-Roper v. Strickland,* 539 F.3d 356, 360 (6th Cir. 2008)). In *Winkle*, the Court found that because the college's regulations were "not designed to proscribe or punish speech," there was no foreseeable "danger that the standards will chill speech." *Id.*

A party can challenge an ordinance under the overbreadth doctrine in two types of cases: first, "where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker"; and second, "in cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Id.* (citing cases). In determining whether a regulation sweeps too broadly, the Court must consider the regulation or statute in relation to both the protected and unprotected speech it threatens. *Smock*, 353 F. Supp. 3d at 658 (citing *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)). "A policy will not survive First Amendment scrutiny if it sweeps within its ambit a substantial amount of protected speech along with that which may be legitimately proscribed." *Id.* (citing *NAACP v. Button*, 371 U.S. 415 (1963)).

While a University can lawfully establish an anti-discrimination policy, it cannot establish a policy which has "the effect of prohibiting certain speech because it disagreed with ideas or messages sought to be conveyed. . . . Nor could the University proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people." *Dambrot*, 55 F.3d at 1183 (citing *Doe v. University of Michigan*, 721 F. Supp. 852, 864 (E.D. Mich. 1989)). Where a discriminatory harassment policy on its face "sweeps within its ambit both constitutionally protected activity . . . and unprotected conduct," it is "subject to an overbreadth challenge." *Dambrot,* 55 F.3d at 1183 (citing *Leonardson v. City of E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990)). Thus, in *University of Michigan*, a policy which forbade racist speech that "'[c]reated an intimidating, hostile, or demeaning environment' for university activities" was held to be overbroad where "it applied to students, contained no 'reasonable person standard,' and was aimed at suppressing a particular viewpoint." *Smock*, 353 F. Supp. 3d at 658 (citing *University of Michigan*, 721 F. Supp. 86). The court in *Smock* drew a contrast with the policy

before it, which "applie[d] to faculty, invoke[d] a reasonable person standard, and [was]

viewpoint neutral." (*Id*.). The court found that "[e]ach of these distinctions is critical,"

explaining:

> Universities may undoubtedly hold their faculty to more exacting standards of
> professionalism than the First Amendment would allow for students. *Dambrot v.
> Central Mich. Univ.*, 55 F.3d 1177, 1190 (6th Cir. 1995) (holding that "the
> University has a right to hold [a coach] to a higher standard of conduct than his
> players."); *Parate v. Isibor*, 868 F.2d 821 at 827 (6th Cir. 1989) (holding that
> universities may sanction professors "whose pedagogical attitudes and teaching
> methods do not conform to institutional standards."). As a result, public
> universities may restrict their employees' speech in a manner that would be
> impermissible absent the employment relationship. Though a basketball coach
> may have a right to use racially offensive language in his private capacity, he has
> no such right in his professional capacity. *Id.* at 1183-84 ("An instructor's choice
> of teaching methods does not rise to the level of protected expression."); *see also
> Bonnell v. Lorenzo*, 241 F.3d 800, 820 (6th Cir. 2001) ("Plaintiff may have a
> constitutional right to use words such as 'pussy,' 'cunt,' and 'fuck,' but he does
> not have a constitutional right to use them in a classroom setting where they are
> not germane to the subject matter."). Since university professors enjoy what is in
> effect a captive audience, students lack recourse to the age-old expedient of
> walking away from offensive speech. *Id.*
>
> The policy in dispute is aimed at [] promoting "an environment of trust, openness,
> civility, and respect." . . . These are goals which are acceptable for the
> government as a university employer just as they would be unacceptable for the
> government as a sovereign. *See Bonnell*, 241 F.3d at 823-824 ("[C]olleges and
> Universities are legally required to maintain a hostile-free learning environment
> and must strive to create policies which further that purpose."). Courts have been
> very clear, however, that Professors do not "leave their First Amendment rights at
> the campus gates." *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 594 (6th Cir.
> 2005). As a result, universities must balance their interests in creating a healthy
> academic environment against their professors' traditional academic liberties.
> *Bonnell*, 241 F.3d at 823-824 ("While a professor's rights to academic freedom
> and freedom of expression are paramount in the academic setting, they are not
> absolute to the point of compromising a student's right to learn in a hostile-free
> environment."). The right balance should "nurture and preserve a learning
> environment that is characterized by competing ideas, openly discussed and
> debated." *Id.* (*quoting* Arthur L. Coleman & Jonathan R. Alger, *Beyond Speech
> Codes: Harmonizing Rights of Free Speech and Freedom from Discrimination on
> University Campuses*, 23 J.C. & U.L. 91, 98-99 (1996). This tension is also
> written into the policy [], which places value on both "open discourse and
> exchanges that may cause some of its members to feel uncomfortable" and the
> expectation that its members "engage each other in a professional manner, with

> civility and respect." . . . Civility of discourse and openness of discourse are
> ideals in opposition as much as they are in concert, but the task of calibrating this
> balance is best left to the University. *Parate*, 868 F.2d at 825 ("the administration
> of the university rests not with the courts, but with the administrators of the
> institution."). Courts will only intervene where administrators go too far and
> begin to undermine the First Amendment.

*Smock*, 353 F. Supp. 3d at 659.

To the extent plaintiff challenges defendants' nondiscrimination policies as applied to the

speech for which he was sanctioned, his claim fails. Plaintiff's argument can be summed up as

follows: (1) the nondiscrimination policies are unconstitutional because they are overbroad and

sweep a substantial amount of constitutionally protected speech which occurs outside of the

classroom within their ambit; (2) plaintiff was sanctioned pursuant to the unconstitutionally

broad policies; and (3) because plaintiff's protected speech came within the ambit of the

unconstitutionally broad policies, the sanction imposed pursuant to the policies violated the First

Amendment. However, plaintiff can only demonstrate that he was harmed by application of the

policies to him if his speech was protected. Otherwise, his First Amendment rights were not

violated by application of the policies to his speech. Because plaintiff's speech in this instance

was not protected under the First Amendment, the policies were not applied to him in violation

of his First Amendment rights. *See Dambrot*, 55 F.3d at 1185. Plaintiff has failed to state a

claim under the First Amendment based on defendants' enforcement of allegedly overbroad

policies.

Further, plaintiff has not stated a plausible claim that the Shawnee State

nondiscrimination policies are overbroad on their face. Plaintiff challenges the policies on the

ground they are not limited to classroom interactions, a point that defendants do not dispute.

(Doc. 44 at 6-7; Doc. 46 at 24). Plaintiff's Amended Complaint includes no facts, though, which

suggest that the policies pose a "realistic and credible threat" of "chilling his speech on matters

of *legitimate* political, cultural, and/or social concern" simply because the policies cover behavior and speech that occurs outside the classroom. *See Corlett v. Oakland U. Bd. of Trustees*, 958 F. Supp. 2d 795, 810 n.5 (E.D. Mich. 2013) (emphasis in the original). Even though the nondiscrimination policies are not limited to the classroom, their application *is* limited to "the University programs and operations. . . ." (Doc. 34, Exh. 2, ¶ 2.2); circumstances and events that occur "[o]n property that is owned, leased or managed by the University. . . ." (*Id.*, ¶ 2.1.1); "academic and non-academic University-sponsored events, and activities sponsored or conducted by student organizations"; (*Id.*, ¶ 2.1.2); and events and circumstances "[t]hat occur off-campus when the Title IX Coordinator or other administrator responsible for this procedure determines that the alleged off-campus conduct could reasonably create a hostile environment or be detrimental to the University." (*Id.*, ¶ 2.1.3). The University's interest in promoting "an educational and working environment for students and employees that is without unlawful or prohibited discrimination and harassment" (Doc. 34, Exh. 1) is not limited to the classroom and extends to University sponsored-functions and employees' official duties outside the classroom. The policies are not designed to punish speech or to suppress a particular viewpoint and are viewpoint neutral, *cf. Dambrot*, 55 F.3d at 182, and plaintiff has alleged no facts showing how the policies reach a substantial amount of constitutionally-protected speech.

Thus, plaintiff has not plausibly alleged that Shawnee State's nondiscrimination policies are constitutionally overbroad as applied or on their face. Plaintiff's claim of content and viewpoint discrimination should be dismissed.

### iii. Unconstitutional conditions

Plaintiff's final free speech claim alleges that defendants have subjected him to "unconstitutional conditions." (Fifth Cause of Action). Plaintiff claims that by "conditioning his

status as a professor in good standing . . . and ultimately his employment at the University[] on his willingness to surrender various constitutional rights," defendants have imposed an unconstitutional condition on him in violation of his rights.[8]  (Doc. 34, ¶¶ 342-347).

The Shawnee State defendants argue that plaintiff's "unconstitutional conditions" claim alleged as his fifth claim for relief is derivative of his First Amendment claim and fails because "the ministerial act of referring to a student as 'Ms.' or 'she' or by no sex identifier at all is not First Amendment protected speech," and his employment has not been jeopardized by the written warning.  (*Id*. at 22-23).

Plaintiff cites two cases to support his "unconstitutional conditions" claim: *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), *overruled on other grounds by Rust v. Sullivan*, 500 U.S. 173 (1991), and *Turner Broad. System, Inc. v. F.C.C.*, 512 U.S. 622, 624 (1994).  (Doc. 45 at 28).  Plaintiff alleges that even if he is not entitled to a particular benefit, the government may not deny the benefit to him on a ground that infringes his interest in freedom of speech.  (*Id*., citing *Perry*, 408 U.S. at 597).  He contends that because defendants have punished him for exercising his right to free speech and threaten to do so again, he must surrender his right, which lies at "the heart of the First Amendment," to "decide for himself . . . ideas and beliefs deserving of expression, consideration, and adherence" in order to regain his status as a professor in good standing.  (*Id*., citing *Turner*, 512 U.S. at 624).

The Supreme Court did not mention "unconstitutional conditions" or recognize the validity of such a claim in either the *Perry* or the *Turner* decision.  Plaintiff has not cited any

---

[8] Plaintiff also generally alleges that defendants' nondiscrimination policies and defendants' enforcement of those policies "require faculty members to surrender their constitutionally protected rights to freedom of speech, free exercise of religion, due process, and equal protection to avoid disciplinary actions up to and including termination," and that defendants made clear to him when they enforced their nondiscrimination policies against him that he "can only avoid further disciplinary action if he surrenders" each of these constitutionally protected rights. (Doc. 34, ¶¶ 345-346).  The Court's analysis of plaintiff's claim applies to the alleged potential deprivation of each of these rights.

other authority to show that either the Supreme Court or the Sixth Circuit recognizes an "unconstitutional conditions" claim and, if so, what the elements of the claim are. *But see Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 91 (2d Cir. 2003) (the Second Circuit has explained that the "'doctrine of unconstitutional conditions' holds that the government may not condition certain government benefits on the relinquishment of constitutional rights.'"). Plaintiff has not shown how his claim that he has been denied a benefit or will be denied a benefit on a ground that violates his free speech rights differs in any respect from his First Amendment retaliation claim, which fails for the reasons discussed *supra*. Plaintiff's "unconstitutional conditions" claim should be dismissed.

### 3. First Amendment right to free exercise of religion

Plaintiff claims that defendants have violated and continue to violate his First Amendment right to freely exercise his religion. (Doc. 34, Fourth Cause of Action). Plaintiff alleges that his "views and expression related to gender identity are motivated by his sincerely held religious beliefs," and "[e]xpressing the University's mandated message regarding gender identity would require [plaintiff] to violate his sincerely held religious beliefs." (Doc. 34, ¶¶ 334-335). Plaintiff alleges that defendants violated his right to freely exercise his religion when they applied the nondiscrimination policies to sanction him for "communicating his views on issues related to gender identity and to compel him to communicate views on those same subjects that violate his religious beliefs." (*Id.*, ¶ 340). He alleges that defendants continue to violate his rights by "threatening to punish him if he continues to communicate his beliefs or if he continues to refuse to communicate views on those same subjects that violate his religious beliefs." (*Id.*).

Defendants move to dismiss plaintiff's free exercise claim on the ground Shawnee State's nondiscrimination policies are "neutral and generally applicable policies" that were applied to

plaintiff's conduct without targeting any particular religious practices or views. (Doc. 36 at 23-25; Doc. 44 at 16-18). Defendants argue that plaintiff's factual allegations do not support his claim that they showed "hostility toward his religious beliefs." (Doc. 44 at 17). Further, defendants argue that plaintiff's conclusory allegations that Shawnee State's nondiscrimination policies contain "a system of individualized assessments" are insufficient to show the policies violate his First Amendment rights. (*Id*. at 18).

In response, plaintiff alleges that the "application of a valid and neutral law of general applicability" is not necessarily always constitutional (Doc. 46 at 19, quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2021 n.2 (2017)), and that "there are a number of instances in which the government cannot use a neutral and generally applicable law to interfere with religious exercise." (Doc. 46 at 19-20). Plaintiff alleges as an example that "regardless of what neutral, generally applicable laws might require, [the] government cannot compel clergy 'to perform' a same-sex wedding ceremony." (*Id*. at 20, citing *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719, 1727 (2018)). As another example, plaintiff alleges that the government cannot "interfere with a religious group's selection of its teachers and its ability to operate consistent with its faith." *Id*. (citing *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 565 U.S. 171, 190 (2012)). Plaintiff contends that defendants are "trampling" his religious freedom by denying him the right to "profess whatever religious doctrine" he desires and to "'communicat[e]' these teachings to others." (*Id*. at 19). Plaintiff argues that defendants "wrongly interfere[d] with [his] right to 'communicate with others consistent with his faith.'" (*Id*.). He implies that Shawnee State "suppress[ed]" the "pure speech" of plaintiff - a "religious adherent[]" - simply "because it dislikes its purpose or message." (*Id*. at 20). He also contends he has pled that defendants

punished him "for expressing his views about human nature through his use of sex-based terms," which he alleges are "religious" views. (*Id*., citing Doc. 34, ¶¶ 239-40, 246-49, 86-92). Plaintiff argues that the only possible way he can remove the threat to his job he now faces if he does not change his terminology is "by expressing ideas that he does not believe and that contradict the teachings of his faith." (*Id*. at 20-21).

In reply, defendants argue that although plaintiff relies heavily on *Masterpiece Cakeshop*, 138 S.Ct. at 1727, he fails to allege either of the essential facts that were pivotal in that case: (1) "'disparate consideration of [plaintiff's] case compared to the cases of [any] other [employees]' who are not religious"; and (2) application of the nondiscrimination policies in his specific case based on an anti-religious animus. (Doc. 48 at 11, citing *Masterpiece Cakeshop*, 138 S.Ct. at 1732).

Under the Free Exercise Clause of the First Amendment, "public authorities may enforce neutral and generally applicable rules and may do so even if they burden faith-based conduct in the process." *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012). An individual's religious beliefs do not "excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate" because "[t]he mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities." *Emp't Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 878-79 (1990) (citation omitted), *superseded in part by statute as stated in Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). Therefore, neutral, generally applicable laws do not violate the First Amendment's Free Exercise Clause unless "the object of [the] law is to infringe upon or restrict practices because of their religious motivation," or if "the purpose of [the] law is the suppression of religion or religious conduct." *Church of the*

*Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 533 (1993), *superseded in part by statute as stated in Miller v. Davis,* 123 F. Supp. 3d 924 (E.D. Ky. 2015). Thus, permitting secular but not religious exemptions to an anti-discrimination policy, and "failing to apply the policy in an even-handed, much less a faith-neutral, manner to the plaintiff," implicates First Amendment concerns. *Ward*, 667 F.3d at 739.

The Sixth Circuit has applied a three-part analysis to determine whether application of a statute or policy violates an individual's right to freely exercise his religion: (1) whether the statute or policy was generally applicable; (2) whether the statute or policy was aimed at particular religious practices; and (3) whether the policy contained "a system of particularized exemptions." *Kissinger v. Bd. of Trustees of Ohio State U., College of Veterinary Med.*, 5 F.3d 177, 179 (6th Cir. 1993) (citing *Smith,* 494 U.S. at 877-78). This analysis is not altered where a plaintiff's free exercise claim implicates other constitutional rights, such as freedom of speech. *Id*. "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece Cakeshop,* 138 S.Ct. at 1731 (quoting *City of Hialeah,* 508 U.S. at 540).

Here, plaintiff has not alleged facts stating a claim for relief under the Free Exercise Clause based on Shawnee State's application of its nondiscrimination policies, which prohibit plaintiff from referring to Doe in accordance with her self-identified gender. First, Shawnee State's nondiscrimination policies are neutral and generally applicable on their face. The nondiscrimination policies apply to "all employees, students, visitors, agents, and volunteers" in "all aspects of the University's programs and operations." (Doc. 34, Exh. 2).

47

Second, plaintiff has not alleged facts which, when accepted as true and construed in his favor, suggest that the nondiscrimination policies were aimed at his particular religious practices or beliefs, or that they targeted particular religious practices or views as applied. Plaintiff alleges that defendants demonstrated hostility to his religious beliefs at various times, but he has not alleged facts to show defendants generated or enforced Shawnee State's nondiscrimination policies based on hostility to his religious beliefs. First, plaintiff alleges that during a discussion with defendant Pauley in November 2016 on transgender issues, Pauley made comments that were critical of Christianity and Christian doctrines regarding hell. (*See* Doc. 34, ¶¶ 117-122). However, plaintiff draws no connection between Pauley's comments about Christianity and Christian doctrine and the issues surrounding the manner in which plaintiff addressed Doe. Pauley's comments were not contemporaneous with the decision to apply the policies to plaintiff but occurred more than one year earlier, and plaintiff does not allege that Pauley was involved in the decision to apply the policies to him. Rather, plaintiff alleges that defendant Milliken was the University official who informed plaintiff that he "must utilize a student's preferred pronoun," interpreted the nondiscrimination policies with reference to his situation, threatened him with disciplinary action, and ultimately issued him a written warning for violating the policies. (Doc. 34, ¶¶ 112, 169-171, 174-175, 185-87, 212, 215-216, 233, 246).

Further, plaintiff alleges that defendant Bauer showed hostility toward his religious beliefs in the grievance decision by refusing to make an exception to the nondiscrimination policies and grant plaintiff an accommodation. Plaintiff alleges that Bauer concluded he could not grant plaintiff's request because Shawnee State could possibly employ faculty members with sincerely-held, albeit racist or sexist, religious beliefs and those employees would likewise feel entitled to an exception, which Shawnee State would ostensibly be required to accommodate.

(Doc. 34, ¶¶ 279-81; Exh. 27 at 13). Bauer stated in his grievance decision that he would not grant plaintiff an exception because making an exception to accommodate an individual's religious beliefs under the nondiscrimination policies would violate the policies. (Doc. 34, Exh. 27 at 13). He explained that while the nondiscrimination policies do "not require such individuals to change their sincerely held beliefs or adopt different beliefs," they do require employees to "not single out in a negative way individuals whose traits they hold in lower regard because of religious beliefs" and to refrain from conduct or speech that "would not promote equal opportunity in the classroom." Defendant Bauer's expressed intention to apply the policies in a neutral manner, without making an exception that would allow plaintiff or any other employee to discriminate against individuals under the nondiscrimination policies, does not support plaintiff's claim that Shawnee State's nondiscrimination policies were aimed at him in order to suppress his religious beliefs and practices.

Third, plaintiff alleges that Dr. Poirot, the head of the Union Grievance Committee, prepared a summary of an August 22, 2018 "Level 2" meeting held with Bauer and plaintiff in which "Dr. Poirot noted that [d]efendant Bauer 'openly laughed'" as "Dr. Poirot outlined the religious beliefs that [plaintiff] and his church hold and how [d]efendants' disciplinary actions would force [plaintiff] to violate those teachings." (Doc. 34, ¶¶ 256-259, citing Exh. 24 at 1).[9] However, plaintiff's characterization of the summary is not entirely accurate. Poirot wrote in his summary of the meeting that "*[a]t one point* [Bauer] openly laughed at the presentation," which covered considerably more than plaintiff's religious beliefs and church teachings on transgenderism. (Doc. 34, Exh. 24 at 1). Poirot wrote in his summary that he discussed or attempted to discuss "what [he] viewed as flaws in the investigation," "the academic freedom

---

[9] The Exhibit is an unsigned summary of a meeting which Shawnee State voluntarily agreed to hold with Poirot and plaintiff. (Doc. 34, Exh. 24).

and religious discrimination aspects," "how the issue of transgenderism is controversial in society," "the teachings of [plaintiff's] church, the Presbyterian Church of America," and how "in [plaintiff's] view, he was being compelled to affirm a position that neither he nor his denomination believes." (*Id*.). Thus, the allegations of the complaint, construed together with the summary of the meeting, do not permit a reasonable inference that Bauer showed hostility to plaintiff's religious beliefs by laughing at one point during the August 22, 2018 meeting.

Further, even assuming that Bauer laughed at Poirot's discussion of plaintiff's religious beliefs and the impact of the disciplinary proceedings on those beliefs, Bauer's conduct is insufficient to support a finding that the nondiscrimination policies were aimed at plaintiff's religious beliefs. The meeting with Bauer occurred after Milliken had initiated disciplinary proceedings against plaintiff and had issued a written warning to him under the nondiscrimination policies. There is no allegation that Milliken harbored any animus toward plaintiff's religious beliefs. Nor has plaintiff made any other allegations to show that Bauer targeted plaintiff for application of the nondiscrimination policies based on his religious beliefs. Thus, Bauer's conduct does not support a finding that the nondiscrimination policies were aimed at plaintiff and applied to him based on hostility to plaintiff's religious beliefs.

Finally, plaintiff has not alleged facts to show that the nondiscrimination policies contain a "a system of individualized exemptions." Under the First Amendment, a law that "appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions or worse is a veiled cover for targeting a belief or a faith-based practice, . . . satisfies the First Amendment only if it 'advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests.'" *Ward*, 667 F.3d at 738 (quoting *City of Hialeah,* 508 U.S. at 546). The Sixth Circuit in *Ward* held that the "ad hoc application of the anti-discrimination policy" in

that case, which "seem[ed] to permit referrals for secular - indeed mundane - reasons, but not for faith-based reasons," stood in marked contrast to a university policy that was applied to all graduating students. *Ward*, 667 F.3d at 739-40 (citing *Kissinger*, 5 F.3d 177). The Court stated: "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 740 (citing *Smith,* 494 U.S. at 884; *Lukumi Babalu,* 508 U.S. at 537). Plaintiff has not alleged any facts to support his conclusory allegation that Shawnee State's Policies "contain a system of individualized assessments." (*See* Doc. 34 at ¶ 337). Plaintiff has not established this element of his free exercise claim.

Plaintiff alleges that defendants were hostile to his religious beliefs, but he has not stated a claim for relief under the Free Exercise Clause. His factual allegations fail to show that Shawnee State's nondiscrimination policies were anything but neutral, generally applicable policies without a system of ad hoc exemptions. Plaintiff's factual allegations do not support a claim that the policies were formulated or applied to target certain religious beliefs, or that defendants targeted and suppressed plaintiff's religious beliefs by applying the nondiscrimination policies to him. *Cf. Kissinger v. Board of Trustees of Ohio State University*, 5 F.3d 177, 179 (6th Cir. 1993) (holding on summary judgment that a policy did not violate the Free Exercise Clause, even if it may burden a particular person's religious beliefs, where there "was no evidence that the state used its curriculum requirement to 'attack or exclude any individual on the basis of his or her religious beliefs.'"). Plaintiff's free exercise claim (Count Four) fails as a matter of law.

### C. Fourteenth Amendment right to due process

Plaintiff alleges that defendants have violated and continue to violate plaintiff's right to due process of law under the Fourteenth Amendment by punishing and threatening to punish him under vague and overbroad policies for his expression in and out of the classroom. (Doc. 34, ¶ 349). Plaintiff contends that the nondiscrimination policies violate his due process rights because they are unconstitutionally vague. (Doc. 46 at 23-24). Plaintiff alleges that the nondiscrimination policies (1) do not give fair notice of the kind of conduct they prohibit, in part because they do not objectively define "gender identity" or "gender identity discrimination"; (2) they lack explicit standards for individuals who apply the standards, inviting arbitrary and discriminatory enforcement; and (3) they chill constitutional freedoms. (Doc. 46 at 24-25, 29). Plaintiff alleges that defendants have engaged in viewpoint discrimination by "punishing him for expressing a viewpoint [on gender identity] they disliked" based on "vague and ephemeral" standards. (Doc. 45 at 25-26). Plaintiff specifically contends that the nondiscrimination policies give defendants "unbridled discretion" to restrict certain faculty speech by using "an imprecise, subjective, and indefinite definition of gender identity," and to proceed based on whether a student is offended by the speech. (*Id.*). Plaintiff contends that the policies' "highly subjective" and "viewpoint-based" standard violates the First Amendment, which mandates "narrow, objective, and definite standards," and he has sufficiently alleged that defendants "punished him due to the viewpoints he expressed using the vast discretion their policies afforded." (*Id.* at 26).

Defendants argue that plaintiff has not sufficiently alleged that Shawnee State's policies are unconstitutionally overbroad and vague. (Doc. 36 at 23-24). Defendants contend that plaintiff's in-class speech was not protected under *Garcetti*, and plaintiff has not pointed to any other speech covered by the nondiscrimination policies to support his claim that the policies are

unconstitutionally broad. (*Id.* at 23). Thus, defendants contend that plaintiff has not shown that the policies are "substantially overbroad" on their face. (*Id.* at 23-34, citing *Speet*, 726 F.3d at 872-73) (citations omitted); *Carey v. Wolnitzek*, 614 F.3d 189, 208 (6th Cir. 2010)). Defendants argue that plaintiff's allegations as to how the policies were actually applied to him do not support a claim that the nondiscrimination policies are unconstitutionally vague because they either "(1) deny fair notice of the standard of conduct applicable"; or (2) "constitute 'an unrestricted delegation of power,' inviting 'arbitrary, discriminatory, and overzealous enforcement.'" (Doc. 36 at 24, citing *Leonardson*, 896 F.2d at 196).

The intervenor-defendants move to dismiss plaintiff's due process claim on the ground the nondiscrimination policies are not unconstitutionally vague on their face. (Doc. 44 at 20). They allege that to satisfy due process requirements, the policies need only provide "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." (*Id.*, quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). They contend that Shawnee State's policies pass constitutional muster because the policies clearly require that "all students, transgender or not, must be treated in accordance with their gender identity." (Doc. 44 at 20). They further argue that the policies did not violate plaintiff's due process rights as applied to him because the facts he has alleged show Shawnee State clearly gave plaintiff notice of what the policies required. (*Id.* at 20-21, citing Doc. 34, ¶¶ 107, 112, 114, 215).

"A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982). The Sixth Circuit has defined vagueness as follows.

> A vague ordinance denies fair notice of the standard of conduct to which a citizen
> is held accountable. At the same time an ordinance is void for vagueness if it is an
> unrestricted delegation of power, which in practice leaves the definition of its terms
> to [its enforcers], and thereby invites arbitrary, discriminatory and overzealous
> enforcement.

*Smock,* 353 F. Supp. 3d at 660 (quoting *Dambrot,* 55 F.3d at 1183-1184).

In analyzing a facial vagueness challenge, the Court must first consider whether the

ordinance reaches a substantial amount of constitutionally-protected conduct. *Village of*

*Hoffman Estates,* 455 U.S. at 494-95. "[A]ssuming the enactment implicates no constitutionally

protected conduct, [a court] should uphold the challenge only if the enactment is impermissibly

vague in all of its applications." *Id.* "Vague laws are disfavored because they: (1) do not 'give

the person of ordinary intelligence a reasonable opportunity to know what is prohibited;' (2) do

not provide explicit standards for those who enforce the law, leading to arbitrary and

discriminatory enforcement; and (3) may inhibit the exercise of basic First Amendment

freedoms." *Gaughan v. City of Cleveland*, 212 F. App'x 405, 409 (6th Cir. 2007) (quoting

*Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972)). An ordinance is void for vagueness

"if its prohibitions are not clearly defined." *Id.* (quoting *Grayned*, 408 U.S. at 108). "[A] law is

impermissibly vague if it 'denies fair notice of the standard of conduct for which the citizen is to

be held accountable,'" or "gives enforcement officials 'an unrestricted delegation of power

which leaves the definition of its terms to [them].'" *Id*. (quoting *Am.-Arab Anti-Discrimination*

*Comm. v. City of Dearborn,* 418 F.3d 600, 608-09 (6th Cir. 2005)). "A vague law impermissibly

delegates basic policy matters to" decisionmakers "on an *ad hoc* and subjective basis, with the

attendant dangers of arbitrary and discriminatory applications." *Id*.

"A University policy is impermissibly vague where it provides no principle for

distinguishing between sanctionable speech and protected speech." *Smock*, 353 F. Supp. 3d at

660 (citing *Doe*, 721 F. Supp. at 866). A "reasonable person standard" provides an objective standard to guide faculty members. *Id.* (quoting *Gaughan*, 212 F. App'x at 412-13) (when applied to qualifying offensive speech, the "reasonable person standard" provides "an objective standard against which the ordinance can be enforced."). Further, examples of the type of speech or conduct that is prohibited can serve to give notice of what is expected of an individual under a policy. *Id.* A reasonableness standard, in conjunction with decision-making responsibility shared among peers, vitiates the concern that those charged with enforcing the policy can act with unbridled discretion. *Id.*

Plaintiff has not alleged facts to support his claim that the nondiscrimination policies violate his due process rights as applied to him, and the documentation attached to the Amended Complaint shows that plaintiff received fair notice that his conduct violated the policies. The nondiscrimination policies prohibit "Sex and Gender Based Discrimination" which the Reporting Policy defines as:

> Negative or adverse treatment based on sex (including sexual harassment, sexual violence, sexual misconduct, relationship violence (domestic violence or dating violence) or stalking), gender, gender identity, sexual orientation, or pregnancy, and the treatment denies or limits the individual's ability to obtain the benefits of Shawnee State's programs or activities.

(Doc. 34, Exh. 2, ¶ 18.3). The Reporting Policy defines "Gender Identity" as follows:

> A person's innermost concept of self as male or female or both or neither - how individuals perceive themselves and what they call themselves. One's gender identity can be the same or different than the sex assigned at birth.

(*Id.*, Exh. 2, ¶ 18.4). Although plaintiff alleges that these provisions do not give fair notice of what they prohibit, plaintiff's Amended Complaint shows he had ample notice that: (1) the nondiscrimination policies require professors to address and refer to students by pronouns and titles consistent with their gender identities; and (2) using male pronouns and titles to address

and refer to Doe, and addressing and referring to Doe in a different manner than he addressed and referred to other students in his class, did not comply with the nondiscrimination policies.

The Amended Complaint sets forth the actual notice plaintiff received informing him that addressing and referring to a student by a pronoun or title that did not conform to the student's gender identity was prohibited. (Doc. 34). In August 2016, Union President Poirot sent plaintiff an email regarding a recent "Dear Colleague" letter, and he also sent emails informing faculty members they could face disciplinary action from Shawnee State if they "refused to use a [student's] requested name or pronoun," and that these restrictions could apply outside the classroom. (Doc. 34, ¶¶ 106-107; Exh. 5). Poirot also informed faculty members during a presentation on these issues that they could be suspended or dismissed if they did not comply with these requirements. (*Id.*, ¶ 109). Next, Milliken met with plaintiff on October 27, 2016 to answer questions he had posed to her regarding "what University policies required of faculty on issues related to gender identity," and Milliken informed plaintiff that he "must utilize a student's preferred pronoun, regardless of what pronoun the student requested he use and regardless of the professor's convictions or views on the subject." (*Id.*, ¶¶ 110-112). Defendant Milliken advised plaintiff that a professor would be subject to administrative disciplinary procedures if he refused to use a pronoun that reflects a student's self-asserted gender identity. (*Id.*, ¶ 114). Milliken then informed plaintiff on November 7, 2016 that the nondiscrimination policies included "gender identity." (*Id.*, ¶ 124). Subsequently, on January 11, 2018, Milliken advised plaintiff to refer to students by their last names only and "to eliminate all sex-based references from his expression." (*Id.*, ¶ 154). Milliken explicitly advised plaintiff on January 25, 2018, that it was not acceptable for him to refer to Doe by only her surname and to address all other students with titles, and if he did not comply with Doe's demands to stop this practice

plaintiff would be in violation of the nondiscrimination policies. (*Id.*, ¶¶ 162-163). In late January or early February 2018, a faculty member/Union official told plaintiff he could be suspended or dismissed if he refused to "refer to students using titles and pronouns that reflect each student's self-asserted gender identity." (*Id.*, ¶ 164). At a February 12, 2018 follow-up meeting, plaintiff asked Milliken to clarify "what would be allowed under" the nondiscrimination policies. (*Id.*, ¶¶ 168-170). Milliken rejected plaintiff's proposal at that time (1) that plaintiff refer to students by their self-asserted gender identity, and (2) that he include a disclaimer in his syllabus that "he was doing so under compulsion and setting forth his personal and religious beliefs about gender identity." (*Id.*, ¶ 170). Plaintiff explained to Milliken that he was willing to refer to Doe by her legal first or last name without using any titles, but "he was not willing to refer to Doe as a woman (i.e., with feminine titles or pronouns)" and to "stop referring to all other students by their last names and sex-based titles." (*Id.*, ¶¶ 171-172). Milliken responded, "Well, you know what this means," which plaintiff interpreted as a threat of disciplinary action against him under the nondiscrimination policies. (*Id.*, ¶¶ 174-175).

On February 13, 2016, Milliken sent plaintiff a letter which outlined her position on the matter and which stated the letter was "a formal notice that you are expected to comply with Policy No. 5.01REV by treating all students the same, irrespective of their gender identity." (*Id.*, ¶ 185; Exh. 9). Milliken also advised plaintiff as follows:

> Should there be future complaints of disparate treatment in violation of this policy, whether involving the student referred to above or not, the University may conduct an investigation in accordance with University policies and the faculty collective bargaining agreement. If such an investigation substantiates a complaint, you could be subject to informal or formal disciplinary action.

(*Id.*, Exh. 9). On February 16, 2018, Milliken sent plaintiff a letter notifying him that Milliken was initiating a formal investigation pursuant to the CBA regarding a potential violation of

Policy 5.01REV, which addresses unlawful discrimination and harassment. (Doc. 34, Exh. 27 at 18). Milliken explained that a formal investigation was being launched due to allegations that plaintiff continued to treat Doe differently than other students in the class by calling Doe only by her surname while addressing other students as "Mr. ___" or "Ms. ___," and plaintiff had used a male pronoun to refer to Doe in class on February 15.

Plaintiff acknowledges that Milliken worked with him to find a resolution to the issue that was acceptable to plaintiff and which did not treat Doe differently, and plaintiff made clear to University officials in a March 12, 2018 letter that he knew the reason for the formal investigation under the CBA; however, he refused to refer to plaintiff with feminine titles and pronouns after he was notified that he was in violation of University policies. (Doc. 34, Exh. 27 at 19-20). Plaintiff received clear notice and knew before Milliken's investigation and the written warning that his use of male titles and pronouns, and subsequently his use of Doe's surname only, to address Doe violated Policy 5.01REV. Plaintiff has not stated a claim that the nondiscrimination policies are unconstitutionally vague on the ground he did not receive fair notice of their provisions as applied to him.

Plaintiff also claims that the nondiscrimination policies are vague because defendants have unbridled discretion to apply the policies to a "wide variety of constitutionally protected expression" in the future. (Doc. 34, ¶¶ 353-355). Plaintiff alleges because he now has a warning letter in his personnel file, he could immediately be suspended without pay or terminated if he discusses "substantively [sic] issues related to gender identity and transgenderism"; thus, he has "assiduously avoided" discussing these issues and "has steered class discussions to avoid them." (*Id.*, ¶¶ 290-97). However, plaintiff has not explained why a warning letter based on his interactions with Doe would prevent him from discussing gender identity and transgenderism as

58

plaintiff alleges. There is a distinction between refusing to acknowledge the gender by which an individual student identifies and a discussion of substantive issues surrounding the topic of gender identity. A reasonable person would discern this difference and would not be chilled by the terms of a policy preventing *discrimination* against transgender individuals from discussing gender identity and transgenderism issues in a broader context. Plaintiff's avowed fear of engaging in protected speech related to these matters is not reasonably attributable to unconstitutionally vague policy terms. Plaintiff's due process claim should be dismissed.

### D. Equal Protection claim

Plaintiff claims that defendants have violated his equal protection rights by punishing him for "expressing his views regarding gender identity both in and out of the classroom when they would not punish [similarly-situated] professors who express opposite views on the same subjects." (Doc. 34, ¶¶ 357, 358). Plaintiff claims that defendants do not take "disciplinary action against professors who support and endorse the concepts of gender identity, but they take disciplinary action against professors, like [plaintiff], who refuse to endorse those concepts." (*Id.*, ¶ 359). Plaintiff claims that defendants' nondiscrimination policies and related practices are underinclusive because they prohibit some expression while allowing equally harmful expression. (*Id.*, ¶ 362). Plaintiff alleges that defendants deprived him of his right to equal protection of the law under the Fourteenth Amendment by applying their nondiscrimination policies and related practices to him "in a discriminatory and unequal manner"; that is, defendants "grant[ed] other professors the right to express their views on issues related to gender identity while denying that right to [plaintiff]." (*Id.*, ¶ 363). Plaintiff alleges that defendants "discriminated intentionally" against his First Amendment rights and Fourteenth Amendment due process rights, so "discriminatory intent is presumed." (*Id.*, ¶ 360). Plaintiff asserts that the nondiscrimination policies "burden [his] fundamental rights, target a suspect class (i.e., religion), and have no rational basis." (*Id.*, ¶ 361).

Defendants argue that plaintiff's equal protection claim must be dismissed because plaintiff brings his claim under a "class of one" theory, which is not recognized in the public employment context. (Doc. 36 at 25, quoting *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 598 (2008)). Defendants also contend that plaintiff cannot bring an equal protection claim under a disparate treatment theory because first, he has essentially restated his First Amendment claims (Doc. 36 at 25), and second, plaintiff does not allege that any other professor refused to treat a student in accordance with their gender identity or engaged in similar conduct and was not disciplined for doing so. (Doc. 44 at 21).

The "class-of-one theory of equal protection – which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review" – is not properly applied in the public employment context. *Engquist*, 553 U.S. at 605. Therefore, plaintiff fails to state a claim for relief for a denial of equal protection under a "class-of-one" theory. In any event, plaintiff does not allege any facts to show that Shawnee State failed to apply its nondiscrimination policies in a like manner to professors bound by the policies. Plaintiff has not alleged that the University declined to discipline any other professors at the University who violated the gender identity provisions of the nondiscrimination policies. Thus, even assuming the class-of-one theory applied in this context, plaintiff has not stated a claim for relief under that theory.

Further, plaintiff has not alleged facts which, if accepted as true, support an equal protection claim under the disparate treatment theory. "[T]he Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently." *Id*. at 605. The Equal Protection Clause "protects against arbitrary classifications, and requires that similarly situated persons be treated equally." *Jackson v. Jamrog,* 411 F.3d 615, 618 (6th Cir. 2005). "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is

determined by the classification used by government decision-makers." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).

Plaintiff has not alleged facts showing that defendants have applied Shawnee State's nondiscrimination policies differently to distinct classes of people. Plaintiff alleges he is similarly situated to other professors at the University, and he alleges disparate treatment based upon his refusal to "endorse" concepts of "gender identity." In other words, he alleges he is being disciplined for not endorsing concepts of gender identity while other professors who do acknowledge the concept are not disciplined. However, plaintiff is not similarly situated to individuals who do *not* violate the nondiscrimination policies. Individuals who comply with antidiscrimination policies and those who do not (i.e., plaintiff) comprise distinct classes of individuals for purposes of an equal protection analysis. To state a claim for an equal protection violation, plaintiff must allege that professors who violated the terms of the nondiscrimination policies by refusing to refer to students by pronouns and titles consistent with their gender identities (for example, for non-religious reasons) were, unlike plaintiff, not disciplined. Plaintiff's equal protection claim is essentially a re-packaging of his First Amendment challenges, which for the reasons discussed above, fail to state a claim for relief. Because there is no plausible allegation of disparate treatment, plaintiff fails to state an equal protection claim.

### E. State law claims

Plaintiff brings his state law claims under the Court's supplemental jurisdiction. (Counts Eight, Nine). When a district court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331, the court "may decline" to exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *Kuivila v. City of Conneaut*, 430 F. App'x 402, 404 (6th Cir. 2011). Whether to do so is within the district court's discretion. *Id*. (citing *Carlsbad Technology, Inc. v. HIF Bio, Inc.,* 556 U.S. 635, 639 (2009)). In

light of the undersigned's recommendation that all federal claims should be dismissed for failure to state a claim for relief, the Court should decline to exercise supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## IT IS THEREFORE RECOMMENDED THAT:

1.  The Shawnee State defendants' motion to dismiss the original complaint (Doc. 22) be **DENIED** as moot.

2.  The Shawnee State defendants and defendant-intervenors' motions to dismiss the amended complaint (Docs. 36, 44) be **GRANTED** and this action be **DISMISSED**.

Date: 9/5/19

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

NICHOLAS K. MERIWETHER,                          Case No. 1:18-cv-753
    Plaintiffs,                              Dlott, J.
                                                  Litkovitz, M.J.

    vs.

THE TRUSTEES OF SHAWNEE
STATE UNIVERSITY, *et al.*,
    Defendants.

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).