## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO

NICHOLAS K. MERIWETHER,

*Plaintiff,*

*v.*

THE TRUSTEES OF SHAWNEE STATE UNIVERSITY, *et al.,*

*Defendants.*

Case No: 1:18-cv-00753-SJD

THE HONORABLE SUSAN J. DLOTT

THE HONORABLE KAREN L. LITKOVITZ

## PLAINTIFF'S OBJECTIONS TO THE REPORT & RECOMMENDATION

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ......................................................................................................... 1

STANDARD OF REVIEW ............................................................................................. 4

ARGUMENT ............................................................................................................... 5

I.   The Report errs by reaching the merits and failing to construe the
     Complaint in Dr. Meriwether's favor. ................................................................ 5

     A.   The Report errs by framing this case as a dispute over pedagogy
          when, according to the Complaint, it is really about compelled
          ideological conformity. ............................................................................. 5

     B.   The Report errs by concluding Dr. Meriwether discriminated. ................. 7

          1.   Dr. Meriwether did not violate Defendants' *Nondiscrimination
               Policies.* ......................................................................................... 7

               a.   Dr. Meriwether did not create a hostile environment. ............... 8

               b.   Dr. Meriwether did not deny any educational benefits. ........... 8

          2.   Dr. Meriwether did not violate federal law. ................................. 10

               a.   Dr. Meriwether did not create a hostile environment. ........... 10

               b.   Dr. Meriwether did not discriminate based on sex because
                    recognizing biology is not bigotry. ......................................... 12

     C.   The Report errs by finding that Dr. Meriwether's speech was not
          sufficiently expressive. ............................................................................ 13

     D.   The Report errs by minimizing the scope and effect of Defendants'
          restrictions on faculty speech. ................................................................ 16

II.  The Report errs by recommending that Dr. Meriwether's First
     Amendment retaliation claim be dismissed. ..................................................... 18

     A.   The Report errs by concluding that the First Amendment does not
          protect Dr. Meriwether's speech. ........................................................... 18

          1.   For purposes of *Garcetti*, Dr. Meriwether spoke "as a citizen"
               because the "official duties" test does not apply to faculty speech
               "related to teaching." ................................................................... 19

               a.   The *Garcetti* Court refused to extend the "official duties" test
                    to faculty speech "related to teaching." ................................. 19

               b.   In so doing, the *Garcetti* Court implicitly reaffirmed the First
                    Amendment's longstanding protection for faculty speech. ........... 22

c. Federal appellate courts interpreting *Garcetti* have ruled that the "official duties" test does not apply to faculty speech "related to teaching."................................................................24

d. Sixth Circuit's rulings show *Garcetti's* "official duties" test does not apply to faculty speech "related to teaching."................25

e. Courts in the Sixth Circuit have held *Garcetti's* "official duties" test does not apply to faculty speech "related to teaching."............27

f. The content and context of Dr. Meriwether's speech show he spoke "as a citizen."................................................................28

2. Dr. Meriwether spoke on a matter of public concern. ..........................30

a. The Report errs by concluding that Dr. Meriwether's speech on gender identity did not address a public concern.....................30

i. Per the Supreme Court, gender identity is a public concern. .31

ii. The current gender identity debate—in law, politics, media, and culture—shows that this issue is a public concern. ...........32

b. The Report errs by treating Dr. Meriwether's pure speech as symbolic speech. ................................................................34

c. The Report errs by disputing that a professor's in-class speech is, except in rare cases, a matter of public concern. ......................35

d. The Report errs by treating Dr. Meriwether's students as a captive audience................................................................37

e. The content, form, and context of Dr. Meriwether's speech shows he was speaking on a matter of public concern. .................38

B. The Report does not address the other elements of Dr. Meriwether's First Amendment retaliation claim................................................................42

III. The Report errs by recommending that Dr. Meriwether's content and viewpoint discrimination claims be dismissed.......................................................43

A. The Report errs by never addressing how Defendants review and seek to alter the content of faculty speech.......................................................44

B. The Report errs by never addressing how Defendants seek to silence certain viewpoints of faculty speech.................................................................45

C. The Report errs by concluding that Defendants do not have unbridled discretion to regulate faculty speech................................................................46

IV. The Report errs by recommending that Dr. Meriwether's compelled speech claim be dismissed. ................................................................48

V. The Report errs by recommending that Dr. Meriwether's unconstitutional conditions claim be dismissed. .................................................. 51

VI. The Report errs by recommending that Dr. Meriwether's Free Exercise claim be dismissed. ......................................................................................... 52

    A. The Report errs by failing to consider recent developments in free exercise jurisprudence. .................................................................................. 53

        1. The Report errs by ignoring how Defendants interfere with Dr. Meriwether's right to communicate consistent with his faith. .......... 53

        2. The Report errs by ignoring how Defendants require Dr. Meriwether to renounce his religious beliefs to remain a professor in good standing. .................................................................................... 54

    B. The Report errs by concluding that Defendants' restrictions satisfy *Smith's* neutral and generally applicable test. ................................................ 55

        1. Defendants' restrictions are not neutral. ........................................... 55

        2. Defendants' restrictions are not generally applicable. ........................ 59

    C. The Report errs by ignoring the hybrid rights doctrine. ........................... 60

    D. Due to these errors, the Report never applies strict scrutiny, which Defendants' restrictions fail. .................................................................... 60

VII. The Report errs by recommending that Dr. Meriwether's overbreadth claim be dismissed. ......................................................................................... 61

VIII. The Report errs by recommending that Dr. Meriwether's vagueness claim be dismissed. ......................................................................................... 62

IX. The Report errs by recommending that Dr. Meriwether's equal protection claim be dismissed. .............................................................. 65

CONCLUSION ............................................................................................................. 66

CERTIFICATE OF SERVICE ...................................................................................... 68

TABLE OF AUTHORITIES

CASES

*Adams v. Trs. of Univ. of N.C.-Wilmington*,
  640 F.3d 550 (4th Cir. 2011) ..................................................... 19, 24, 25

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) ................................................................ 50

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................. 5

*Axson-Flynn v. Johnson*,
  356 F.3d 1277 (10th Cir. 2004) ................................................. 60

*Bd. of Cty. Comm'rs, Wabaunsee Cty. v. Umbehr*,
  518 U.S. 668 (1996) ................................................................ 52

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................. 5, 40, 55, 59

*Black v. Zaring Homes, Inc.*,
  104 F.3d 822 (6th Cir. 1997) .................................................... 11

*Blau v. Fort Thomas Pub. Sch. Dist.*,
  401 F.3d 381 (6th Cir. 2005) .................................................... 35

*Bonnell v. Lorenzo*,
  241 F.3d 800 (6th Cir. 2001) ............................................ 20, 36, 41, 42

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000) ................................................................ 55

*Brown v. Entm't Merchs. Ass'n*,
  564 U.S. 786 (2011) ................................................................ 63

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ................................................................. 12

*Burnett v. Tyco Corp.*,
  203 F.3d 980 (6th Cir. 2000) ................................................... 10

*C.E.F. of N.J., Inc. v. Stafford Twp. Sch. Dist.*,
  386 F.3d 514 (3d Cir. 2004)................................................ 45, 46

*Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*,
  131 F.3d 564 (6th Cir. 1997) ................................................... 42

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) .......................................................... 55, 59

*City of Chi. v. Morales*,
  527 U.S. 41 (1999) .......................................................... 63, 65

iv

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)................................................................................ 66

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988) ............................................................................... 46

*Cockrell v. Shelby Cty. Sch. Dist.*,
   270 F.3d 1036 (6th Cir. 2001) ...................................................... 20, 32

*Condon v. Wolfe*,
   310 F. App'x 807 (6th Cir. 2009) ....................................................... 35

*Connally v. Gen. Constr. Co.*,
   269 U.S. 385 (1926) ............................................................................... 65

*Connick v. Myers*,
   461 U.S. 138 (1983) ....................................................................... 19, 20

*Corlett v. Oakland Univ. Bd. of Trs.*,
   958 F. Supp. 2d 795 (E.D. Mich. 2013) ................................. 37, 41, 62

*Crawford v. Columbus State Cmty. Coll.*,
   196 F. Supp. 3d 766 (S.D. Ohio 2016) ............................................. 42

*Cressman v. Thompson*,
   798 F.3d 938 (10th Cir. 2015) ........................................................... 35

*Curry v. Nestle USA, Inc.*,
   2000 WL 1091490 (6th Cir. Jul. 27, 2000)....................................... 11

*Dambrot v. Cent. Mich. Univ.*,
   55 F.3d 1177 (6th Cir. 1995) ................................................. 36, 45, 62

*Dambrot v. Cent. Mich. Univ.*,
   839 F. Supp. 477 (E.D. Mich. 1993) ................................................. 48

*Davis v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999) .............................................................................. 11

*DeJohn v. Temple Univ.*,
   537 F.3d 301 (3d Cir. 2008)................................................................ 11

*Demers v. Austin*,
   746 F.3d 402 (9th Cir. 2014) ............................................................. 25

*Doe v. Miami Univ.*,
   882 F.3d 579 (6th Cir. 2018) ............................................................. 11

*Doe v. Univ. of Mich.*,
   721 F. Supp. 852 (E.D. Mich. 1989) ................................................. 61

*Emp't Div., Dep't of Human Res. v. Smith*,
   494 U.S. 872 (1990) ........................................................... 52, 54, 59, 60

*Epperson v. Arkansas,*
    393 U.S. 97 (1968) ................................................................................................ 37

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975) .............................................................................................. 38

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.,*
    2008 WL 2987174 (S.D. Ohio Jul. 30, 2008)................................................... 22, 25

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.,*
    428 F.3d 223 (6th Cir. 2005) .................................................................................. 36

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.,*
    624 F.3d 332 (6th Cir. 2010) ....................................... 21, 25, 26, 27, 31, 37

*Faragher v. City of Boca Raton,*
    524 U.S. 775 (1998) .............................................................................................. 10

*Farhat v. Jopke,*
    370 F.3d 580 (6th Cir. 2004) ....................................................................... 31, 32, 39

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ...................................................................... 2, 8, 12, 64

*Forsyth Cty. v. Nationalist Movement,*
    505 U.S. 123 (1992) ...................................................................... 44, 46, 48, 61

*Fox v. Traverse Area Pub. Schs. Bd. of Educ.,*
    605 F.3d 345 (6th Cir. 2010) .................................................................................. 29

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) ....................................................................................... 13, 50

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,*
    23 F.3d 1071 (6th Cir.1994) .................................................................................. 52

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ............................................................ 19, 20, 21, 22, 25, 28

*Girl Scouts of Middle Tenn., Inc. v. Girl Scouts of U.S.A.,*
    770 F.3d 414 (6th Cir. 2014)..3, 5, 7, 10, 14, 16, 17, 29, 30, 40, 42, 45, 46, 48, 51, 56, 66

*Givhan v. W. Line Consol. Sch. Dist.,*
    439 U.S. 410 (1979) .............................................................................................. 39

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) .............................................................................................. 63

*Gunasekera v. Irwin,*
    551 F.3d 461 (6th Cir. 2009) ................................................................................... 5

*Handy-Clay v. City of Memphis,*
    695 F.3d 531 (6th Cir. 2012) ............................................... 28, 29, 30, 39, 42

*Hardy v. Jefferson Cmty. Coll.*,
    260 F.3d 671 (6th Cir. 2001) .............................................. 20, 30, 36, 37, 39, 40, 66

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) ............................................................................ 10, 11, 12, 13

*Healy v. James*,
    408 U.S. 169 (1972) ........................................................................................ 29, 39

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012) ........................................................................................ 52, 53, 54

*Hurley v. Irish-Am. Gay, Lesbian, & Bi-Sexual Grp. of Bos.*,
    515 U.S. 557 (1995) ........................................................................................ 6, 35, 50

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019) .................................................................................... 47, 60

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps.*,
    138 S. Ct. 2448 (2018) .................................................................... 31, 41, 43, 48, 49

*Jenkins v. Rock Hill Local Sch. Dist.*,
    513 F.3d 580 (6th Cir. 2008) .......................................................................... 18

*Johnson v. Lincoln Univ.*,
    776 F.2d 443 (3d Cir. 1985) ............................................................................ 29

*Johnson-Kurek v. Abu-Absi*,
    423 F.3d 590 (6th Cir. 2005) ...................................................................... 4, 26, 27

*Kastl v. Maricopa Cty. Cmty. Coll. Dist.*,
    2004 WL 2008954 (D. Ariz. Jun. 3, 2004) ........................................................ 31

*Kerr v. Hurd*,
    694 F. Supp. 2d 817 (S.D. Ohio 2010) ...................................... 22, 25, 27, 28, 32, 39

*Keyishian v. Bd. of Regents of Univ. of N.Y.*,
    385 U.S. 589 (1967) .................................................... 4, 22, 23, 24, 29, 36, 37, 41

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ........................................................................................ 63, 64

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013) ........................................................................................ 52

*Lane v. Franks*,
    573 U.S. 228 (2014) ........................................................................................ 30, 31, 32

*Leary v. Daeschner*,
    349 F.3d 888 (6th Cir. 2003) .......................................................................... 43

*Lee v. York Cty. Sch. Div.*,
    484 F.3d 687 (4th Cir. 2007) .......................................................................... 21

*Lozar v. Birds Eye Foods, Inc.*,
  678 F. Supp. 2d 589 (W.D. Mich. 2009) .................................................. 5

*Maben v. Thelen*,
  887 F.3d 252 (6th Cir. 2018) ................................................................ 43

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018) ............................................... 53, 55, 56, 58, 59

*Matal v. Tam*,
  137 S. Ct. 1744 (2017) ............................................................ 1, 47, 60

*Matwyuk v. Johnson*,
  22 F. Supp. 3d 812 (W.D. Mich. 2014) ................................................ 46

*Mayhew v. Town of Smyrna*,
  856 F.3d 456 (6th Cir. 2017) ...................................................... 19, 30

*McGlone v. Bell*,
  681 F.3d 718 (6th Cir. 2012) ................................................................ 5

*McNea v. Garey*,
  434 F. Supp. 95 (N.D. Ohio 1976) ...................................................... 35

*Meritor Savings Bank, FSB v. Vinson*,
  477 U.S. 57 (1986) ...................................................................... 10, 13

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974) ............................................................................ 50

*Morris v. Oldham Cty. Fiscal Court*,
  201 F.3d 784 (6th Cir. 2000) .............................................................. 11

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977) ............................................................................ 19

*Nguyen v. I.N.S.*,
  533 U.S. 53 (2001) ...................................................................... 13, 50

*Nuchols v. Berrong*,
  141 F. App'x 451 (6th Cir. 2005) .......................................................... 5

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015) .......................................................................... 1

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998) .......................................................... 10, 12, 13, 50

*Papelino v. Albany Coll. of Pharm.*,
  633 F.3d 81 (2d Cir. 2011) .................................................................. 12

*Papish v. Bd. of Curators of Univ. of Mo.*,
  410 U.S. 667 (1973) ............................................................................ 38

*Parate v. Isibor,*
   868 F.2d 821 (6th Cir. 1989) ........................................................ 49

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
   551 U.S. 701 (2007) ................................................................... 26

*Perry v. McGinnis,*
   209 F.3d 597 (6th Cir. 2000) ........................................................ 43

*Perry v. Sindermann,*
   408 U.S. 593 (1972) ............................................................... 51, 52

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,*
   391 U.S. 563 (1968) ................................................................... 19

*Plyler v. Doe,*
   457 U.S. 202 (1982) ................................................................... 66

*Price-Waterhouse v. Hopkins,*
   490 U.S. 228 (1989) .................................................... 12, 13, 49, 50

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ............................... 44

*R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC,*
   __ U.S. __, 2019 WL 1756679 (Apr. 22, 2019) ................................ 33

*R.S.W.W., Inc. v. City of Keego Harbor,*
   397 F.3d 427 (6th Cir. 2005) ........................................................ 52

*Rankin v. McPherson,*
   483 U.S. 378 (1987) .............................................................. 20, 39

*Reed v. Town of Gilbert,*
   135 S. Ct. 2218 (2015) .......................................................... 44, 62

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
   487 U.S. 781 (1988) .............................................................. 44, 50

*Rodgers v. Banks,*
   344 F.3d 587 (6th Cir. 2003) .................................................. 20, 31

*Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.,*
   605 F.3d 703 (9th Cir. 2010) .................................................. 31, 38

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) .............................................................. 45, 62

*Savage v. Gee,*
   665 F.3d 732 (6th Cir. 2012) .................................................... 4, 26

*Scarborough v. Morgan Cty. Bd. of Educ.,*
   470 F.3d 250 (6th Cir. 2006) ........................................................ 31

*Sessions v. Dimaya,*
    138 S. Ct. 1204 (2018) ............................................................... 63

*Settle v. Dickson Cty. Sch. Bd.,*
    53 F.3d 152 (6th Cir. 1995) ....................................................... 37

*Shelton v. Tucker,*
    364 U.S. 479 (1960) ................................................................... 22

*Shuttlesworth v. City of Birmingham,*
    394 U.S. 147 (1969) ............................................................. 46, 47

*Smock v. Bd. of Regents of Univ. of Mich.,*
    353 F. Supp. 3d 651 (E.D. Mich. 2018) ......................... 28, 47, 50

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ......................................... 30, 31, 32, 34, 38

*Southworth v. Bd. of Regents of Univ. of Wis. Sys.,*
    307 F.3d 566 (7th Cir. 2002) ..................................................... 46

*Spence v. Washington,*
    418 U.S. 405 (1974) ................................................................... 35

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) ............................................................. 22, 23

*Texas v. Johnson,*
    491 U.S. 397 (1989) ................................................................... 35

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) ............................................................... 4, 36

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S. Ct. 2012 (2017) ..................................................... 53, 54, 55

*Tumminello v. Father Ryan High Sch., Inc.,*
    678 F. App'x 281 (6th Cir. 2017) .............................................. 12

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ................................................................... 51

*United States v. Davis,*
    139 S. Ct. 2319 (2019) ............................................................... 63

*United States v. Stevens,*
    559 U.S. 460 (2010) ................................................................... 65

*United States v. Virginia,*
    518 U.S. 515 (1996) ............................................................. 13, 50

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ................................................................... 63

*W. Va. Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) .......................................................... 31, 48, 50

*Ward v. Polite*,
   667 F.3d 727 (6th Cir. 2012) ................................................... 38

*Wieman v. Updegraff*,
   344 U.S. 183 (1952) ........................................................ 22, 23, 66

*Winkle v. Ruggieri*,
   2013 WL 230136 (S.D. Ohio Jan. 22, 2013) ......................... 62

*Wittmer v. Phillips 66 Co.*,
   915 F.3d 328 (5th Cir. 2019) ............................................. 33, 34

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ......................................................... 48, 49

STATUTES

20 U.S.C. § 1681(a) ............................................................... 12

42 U.S.C. § 2000e-2(a)(1) ...................................................... 12

OTHER AUTHORITIES

12 Leading Scholars, *Philosophers Should Not Be Sanctioned Over
   Their Positions on Sex and Gender*, INSIDE HIGHER ED., Jul. 22, 2019,
   https://bit.ly/2M7mRt1 ...................................................... 1, 2

4 OXFORD ENGLISH DICTIONARY (2d ed. 1989) ......................... 12

AFP, *UK Transgender Man Who Gave Birth Is His Child's Mother: Court*,
   YAHOO NEWS, Sept. 25, 2019, https://yhoo.it/2nfoyua ........... 34

Aimee Lewis, *Transgender Man Who Gave Birth Loses Court Battle to Be
   Registered as Father*, CNN, Sept. 25, 2019, https://cnn.it/2nSQnc8 ........ 33

Alan McLaughlin, *Word War, World War*, PUB. DISCOURSE, Sept. 15, 2019,
   https://bit.ly/2nbWs38 ....................................................... 33

Allahpundit, *Biden: In Prison, Your Gender Should Be What You
   Say It Is, Not What the Prison Says It Is*, HOT AIR, Sept. 23, 2019,
   https://bit.ly/2m8XsVz ...................................................... 32, 33

Andrew Sullivan, *The Nature of Sex*,
   INTELLIGENCER MAGAZINE, Feb. 1, 2019, https://nym.ag/2D2r5w9 ........ 33

Anthony Esolen, *Pronouns, Ordinary People, and the War over Reality*,
   PUB. DISCOURSE, Oct. 13, 2016, https://bit.ly/2Z6gaut ........... 33

Campaign for Am. Principles Ky.,
   *Track*, https://bit.ly/2njWu8T ............................................. 32

Colleen Flaherty, *The Trans Divide: The Disagreement Over Scholarly Debate about Gender Identity Rages On*,
INSIDE HIGHER ED, Jul. 19, 2019, https://bit.ly/2OARfim ...................................... 1

Daniel Moody, *Why You Shouldn't Use Transgender Pronouns*,
FEDERALIST, Oct. 18, 2016, https://bit.ly/2XGU8i6 ................................. 33

Graham Hillard, *Conservatives Shouldn't Use Transgender Pronouns*,
NAT'L REV., Apr. 4, 2019, https://bit.ly/2WMINM6 ................................. 33

Hannah Sparks, *Trans Man Who Gave Birth Can't Be 'Dad' on Birth Certificate*,
N.Y. POST, Sept. 26, 2019, https://bit.ly/2nkq0vb ................................. 33

Izzy Lyons, *Transgender Man Who Gave Birth Loses High Court Battle to Make His Child the First in the UK without a Mother*,
THE TELEGRAPH, Sept. 25, 2019, https://bit.ly/2mPAsL5...................................... 33

Jessica Chasmar, *Sen. Elizabeth Warren Adds Preferred Pronouns 'She/Hers' to Twitter Bio*,
WASH. POST, Jul. 19, 2019, https://bit.ly/2nRickZ................................. 34

Letter from U.S. Dep't of Educ. Office for Civil Rights to Roger G. Brooks,
Aug. 7, 2019, https://bit.ly/2m8DmL7................................. 32

Libby Emmons, *Tennis Legend Martin Navratilova Under Fire for Saying Only Women Should Compete in Women's Sports*,
FEDERALIST, Feb. 22, 2019, https://bit.ly/2SfvpxH................................. 32

Marianne Garvey, *Sam Smith's Preferred Gender Pronouns Are They/Them*,
CNN, Sept. 13, 2019, https://cnn.it/2AFZrEw......................................... 34

Michael Booker, *Why I Don't Use Female Pronouns for My Transgender Brother*,
FEDERALIST, Sept. 11, 2017, https://bit.ly/2fik536 ................................. 33

Pat Eaton-Robb, *Transgender Sprinters Finish 1st, 2nd at Connecticut Girls Indoor Track Championships*,
WASH. TIMES, Feb. 24, 2019, https://bit.ly/2SWcInW............................................. 32

Peter Hanson, *We Spoke with This Former Olympian about Transgender Athletes. Here's What She Said*,
DAILY CALLER, Sept. 19, 2019, https://bit.ly/2m0QDVC ...................................... 32

*R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*,
*Amicus* Br. of Free Speech Advocates, https://bit.ly/2lFA1Tl.............................. 34

*R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*,
*Amicus* Br. of Scholars in Philosophy, Theology, Law, Politics, History, Literature, and the Sciences, https://bit.ly/2ptpz2Y ............................................. 33

*R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*,
Br. for the Petitioner, https://bit.ly/2nRmvNb ...................................... 34

Rachael Revesz, *University of Michigan Student Changes Name to*
*"His Majesty" Following New "Inclusive" Pronoun Policy*,
INDEP., Sept. 30, 2016, https://ind.pn/2H6738q .............................................. 59, 65

RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1966) ................................. 12

Rich Lowry, *In Defense of Women's Sports*,
NAT'L REV., Mar. 5, 2019, https://bit.ly/2C7mdpJ .................................................. 32

Rod Dreher, *The Totalitarian 'They,'*
THE AM. CONSERVATIVE, Jul. 13, 2019, https://bit.ly/30KBoi0 ............................ 33

Supreme Court of the United States,
Oral Argument Calendar for the Session Beginning Oct. 7, 2019,
https://bit.ly/2nM22Jw ................................................................................................. 33

Tyler O'Neil, *Trans 'Woman' Demolishes World Records; Olympian*
*Decries 'Pointless, Unfair Playing Field,'*
PJ MEDIA, Apr. 29, 2019, https://bit.ly/30J1Fib .................................................... 32

WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE (1964) ............. 12

## RULES

FED. R. CIV. P. 72 ............................................................................................................. 4

FED. R. CIV. P. 8 ............................................................................................................... 5

## INTRODUCTION

Our society is currently debating what it means to be male and female. Is sex binary, biological, and fixed at birth? Or is it fluid and based upon feelings or cultural attitudes? In short, are men who identify as female really women (and *vice versa*)? This debate impacts virtually every academic discipline (*e.g.*, science, medicine, law, religion), but the relationship between body and mind is inherently a philosophical question. So it is no surprise philosophers are opining on this very important debate.

Unfortunately, even in philosophical circles (as elsewhere), one side is attempting to end the debate by silencing the other side. A feminist philosopher argued that men who identify as women are still men and women will get hurt if we pretend otherwise. A philosophy graduate student took umbrage; insisted that any speech that does not assume "people are the gender that they say they are . . . is oppressive, regressive, and harmful"; and demanded that philosophical organizations "deplatform" those who differ by rejecting their articles and cancelling their presentations. Two groups declared that promoting ideas they label "hateful" "is not covered under free speech."[1]

Actually, it is. Sadly, they refuse to admit these are "decent and honorable" beliefs held "in good faith by reasonable and sincere people." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2594, 2602 (2015). Even so, "the proudest boast of our free speech jurisprudence is that we protect the freedom to express the thought that we hate." *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017). Quickly, twelve leading philosophers from universities around the world—including Dr. Peter Singer, the Princeton philosopher famous for advocating infanticide—defended and reiterated these basic principles.[2]

These leading scholars defended the right of philosophy professors to express "skepticism about the concept of gender identity" and "opposition to replacing biological sex with gender identity in institutional policymaking," views that "cannot

---

[1] Colleen Flaherty, *The Trans Divide: The Disagreement Over Scholarly Debate about Gender Identity Rages On*, INSIDE HIGHER ED, Jul. 19, 2019, https://bit.ly/2OARfim (last visited Oct. 3, 2019).
[2] 12 Leading Scholars, *Philosophers Should Not Be Sanctioned Over Their Positions on Sex and Gender*, INSIDE HIGHER ED., Jul. 22, 2019, https://bit.ly/2M7mRt1 (last visited Oct. 3, 2019).

reasonably be regarded as . . . hate speech." They opposed censuring or deplatforming those who defend these views because that would "violate the fundamental academic commitment to free inquiry" and "threaten[] the ability of philosophers to engage with the issues of the day." After all, "[p]olicy makers and citizens are currently confronting such metaphysical questions about sex and gender as What is a man? . . . What makes someone female?" Philosophers can and should contribute to this debate, but that cannot occur if there are "narrow constraints on the range of views receiving serious consideration." This is why "[a]cademic freedom, like freedom of thought more broadly, should be restricted only with the greatest caution, if ever."[3]

Defendants have raised the stakes of this second debate dramatically. No longer are just censuring and deplatforming in academic journals and conferences at issue. No, they punished a philosophy professor for speaking these ideas. If he continues, they have threatened to punish him again, very possibly via suspension or firing.

What did Dr. Meriwether say? He just spoke the same way that untold millions have for millennia, referring to men as men and women as women. Out of courtesy and at Doe's request, he changed this slightly, referring to Doe by Doe's last name, avoiding pronouns, and using sex-based pronouns when they were unavoidable or inadvertent. That is, he followed the Supreme Court's example. *Farmer v. Brennan*, 511 U.S. 825 (1994) (referring to transgender inmate as "petitioner" and avoiding pronouns); *id.* at 852 (Blackmun, J., concurring) (referring to the male inmate using masculine pronouns). It was this utterly innocuous, accommodating expression that offended Doe and caused Defendants to punish Dr. Meriwether.

The Report and Recommendation, Doc. 49, PageID.2095, wrongly urges this Court to join the censors and strip all university faculty of their cherished, historically protected constitutional rights. In so doing, it makes very dubious findings that fail to "construe the complaint in the light most favorable to [Dr. Meriwether], accept its

---

[3]   *Id.* (covering entire paragraph).

allegations as true, and draw all reasonable inferences in [his] favor." *Girl Scouts of Middle Tenn., Inc. v. Girl Scouts of U.S.A.*, 770 F.3d 414, 418 (6th Cir. 2014).

The Report insists that pure speech—the utterance of words—is not expressive. Yet, while Dr. Meriwether's speech supposedly communicates nothing of any broader significance, those same words, due to the ideas they express, create a hostile environment and constitute discrimination. Both cannot be true.

The Report insists that Dr. Meriwether remains free to air his views on gender identity and should not fear doing so. Yet, when he expressed them via sex-based terms, Defendants demanded a fundamental reordering of English grammar because one student was offended at this acknowledgement of the basic, biological, binary reality of sex. They even ban Dr. Meriwether from stating his views in a disclaimer in a syllabus most students will likely never read. Yet, the Report says he—after being punished for this understated expression—should somehow feel free to critique transgender ideology in a longer, more comprehensive manner in the same classroom. Doing so subtly via pronouns discriminates and creates a hostile environment. But the Report insists there is no reason he cannot openly expose the philosophical flaws of the same ideology, argue that gender identity is a construct with no basis in reality, and explain why reordering thought and language to deny the reality that humans are either male or female harms society in general and even those who identify as something other than their biological sex. R. & R., Doc. 49, PageID.2152–53. This makes no sense, and it does not accept the facts in the Complaint, as this Court must.

The Report insists a university can tell its professors, "You must speak this way or that way," to advance its preferred ideology (not its preferred pedagogy). One option forces Dr. Meriwether to communicate views he does not hold; the other prevents him from speaking consistent with his philosophical and religious beliefs and imposes a linguistic androgyny foreign to antidiscrimination law. But somehow the Report concludes this does not compel speech or violate his religious freedom.

3

The Report maintains that universities can impose requirements that, on their face, restrict a professor's off-campus speech, at least any off-campus speech that officials later, in their unbridled discretion, determine to be "detrimental." Yet, the Report found these restrictions are not overbroad or vague.

Most disturbingly, the Report concludes all professors have no First Amendment rights. When they *are not* teaching or engaged in scholarship, their speech is part of their "official duties." *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012). When they *are*, their speech is also part of their "official duties." R. & R., Doc. 49, PageID.2118–19. Either way, it is all unprotected, leaving them all in a most precarious position. If they do not speak and write, they can be fired for not doing their jobs. If they do, they can also be fired for doing their jobs. "Publish or perish" is now "publish and perish." Their only job security, if you can call it that, is saying only those things that administrators, including those decades in their future, are guaranteed to like.

This is foreign to the Constitution. Professors do not "leave their First Amendment rights at the campus gates." *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 594 (6th Cir. 2005) (paraphrasing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). That amendment prohibits universities (and Defendants) from casting "a pall of orthodoxy over the classroom" and "impos[ing] any strait jacket upon the intellectual leaders in our colleges and universities," as both "would imperil the future of our Nation." *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967).

Given the Report's many flaws, this Court should reject its recommendations and deny the two motions to dismiss.

### STANDARD OF REVIEW

Under FED. R. CIV. P. 72(b)(2), Dr. Meriwether submits his objections to the Magistrate Judge's Report and Recommendation. Thus, this Court "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." FED. R. CIV. P. 72(b)(3). After this *de novo* review, it should deny the two motions

to dismiss as Dr. Meriwether pleaded more than ample facts to state claims for relief.

After all, a "motion to dismiss . . . is disfavored, especially when one's civil rights are at stake." *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012). Thus, they are "rarely granted." *Nuchols v. Berrong*, 141 F. App'x 451, 453 (6th Cir. 2005). They "turn purely on legal issues, not an assessment of the evidence." *Lozar v. Birds Eye Foods, Inc.*, 678 F. Supp. 2d 589, 597 (W.D. Mich. 2009). So "even if it strikes a savvy judge that actual proof of those facts is improbable," dismissal is improper. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

FED. R. CIV. P. 8(a)(2) just requires "a short and plain statement . . . showing that [Dr. Meriwether] is entitled to relief." He "need only give [Defendants] fair notice of what the . . . claim[s] [are] and the grounds upon which [they] rest[]." *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (cleaned up). Dr. Meriwether's Complaint does this, "raise[s] [his] right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and creates more than an "inference" that Defendants are liable, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Hence, the pending motions should be denied.

ARGUMENT

## I. The Report errs by reaching the merits and failing to construe the Complaint in Dr. Meriwether's favor.

### A. The Report errs by framing this case as a dispute over pedagogy when, according to the Complaint, it is really about compelled ideological conformity.

The Report speaks as if this is a dispute over pedagogical techniques, quoting cases about a university's curriculum, *see, e.g.*, R. & R., Doc. 49, PageID.2117–21, 2124–26, and focusing on Dr. Meriwether's in-class formality, *see, e.g.*, *id.*, PageID. 2118–19, 2123–24. But this case is about none of that. It is about mandated ideological conformity. It is about an arm of the state, Shawnee State University, trying to compel a professor to mouth support for its preferred ideology and then punishing him when he declined to go along. These are the facts in the Complaint, which must be taken as true and in Dr. Meriwether's favor. *Girl Scouts*, 770 F.3d at 418.

No one doubts that Dr. Meriwether taught the assigned curriculum, not even after numerous administrators, including Defendants, spent months scrutinizing him and his teaching. Indeed, discussing gender identity is germane to his classes, as the Complaint states that it is among the issues that naturally arise in them, Compl. ¶¶ 219–94, Doc. 34 PageID.1483–92, seeing as he teaches on topics like "ethics, religion, . . . political theory," "and social and political philosophy," *id.* ¶¶ 98–99, PageID.1470.

Nor are Defendants punishing Dr. Meriwether for his formality. Yes, he refers to students in a formal fashion, which he sees as "an important pedagogical tool." *Id.* ¶¶ 134, 136–39, PageID.1474–75. But the Complaint states he offered to modify this. First, he offered to stop using titles for Doe, "to accommodate Doe by referring to him by his last name." *Id.* ¶ 157, PageID.1477. Later, he inquired about doing so for all students. *Id.* ¶¶ 210–11, PageID.1482. Both times, he offered to avoid using pronouns for Doe. *Id.* ¶¶ 157, 214, PageID.1477, 1482; Ex. 11, Doc. 34-11, PageID.1707. Defendants rejected both offers, saying both would violate their policies. Compl. ¶¶ 162, 212–15, PageID.1482–83. So he asked if he could use identity-based terms, as they demand, but note that "he was doing so under compulsion and set[] forth his personal and religious beliefs about gender identity" in "a disclaimer in his syllabus." *Id.* ¶ 170, PageID.1478; *id.* ¶ 260, PageID.1488. Defendants rejected this three times, saying it would violate their policies.[4] *Id.* ¶¶ 171, 261, 282, PageID.1478, 1488–91.

Why did they say this? Because Dr. Meriwether would not refer to a man who identifies as a woman as a woman. *See, e.g.*, *id.* ¶¶ 172–75, PageID.1478. He believes that human beings are created either male or female, that this sex is fixed and immutable, and that our biology (not feelings) determine who we really are. *Id.* ¶¶ 89, 242, PageID.1469, 1486. Transgenderism insists feelings dictate who we are. *See,*

---

[4]   Even if Defendants had permitted the disclaimer, this would not immunize their actions and policies because the government cannot "require speakers to affirm in one breath that which they deny in the next." *Hurley v. Irish-Am. Gay, Lesbian, & Bi-Sexual Grp. of Bos.*, 515 U.S. 557, 576 (1995). But their refusal to permit this less direct communication demonstrates their censorious zealotry.

*e.g.*, *id.* ¶¶ 64–72, PageID.1465–66. The Complaint says he has always used sex-based terms, *id.* ¶¶ 133, 135, PageID.1474–75, as this "communicates his own views on [gender identity]," *id.* ¶ 204, PageID.1481; *id.* ¶ 310, PageID.1495 ("[He] communicated his views regarding transgenderism through his choice of titles and pronouns[.]").

But rather than let this debate unfold in the classroom, the vaunted marketplace of ideas, Defendants interpreted (actually, misinterpreted) their policies to declare that the traditional, reality-reflecting, and (outside of academia and a few other elite circles) still unquestioned use of masculine and feminine terms (even pronouns) to refer to a person's sex constitutes discrimination and creates a hostile environment. *See infra* Argument I.B. So they demanded that he either use identity-based terms or eliminate all references to any individual's sex from his speech (which would require eliminating all personal pronouns). *See, e.g.*, Compl. ¶¶ 154, 216–18, PageID.1476, 1483. Under no circumstances will they let Dr. Meriwether express his views.

That is why they punished Dr. Meriwether and why, per the Complaint, which must be accepted, this case was filed. The Report errs in failing to recognize this.

### B. The Report errs by concluding Dr. Meriwether discriminated.

As the Report recounts, Defendants insist Dr. Meriwether's speech represents discrimination and creates a hostile environment. R. & R., Doc. 49, PageID.2105–06. It accepts this conclusion uncritically. *See, e.g.*, *id.*, PageID.2155 (ruling he "is not similarly situated to individuals who do *not* violate the nondiscrimination policies"). This fails to construe the Complaint in Dr. Meriwether's favor, as must be done here, *Girl Scouts*, 770 F.3d at 418, because the Complaint states he never discriminated.

### 1. Dr. Meriwether did not violate Defendants' *Nondiscrimination Policies*.

Defendants define "'gender based discrimination' to include '[n]egative or adverse treatment based on . . . gender identity . . . [which] denies or limits the individual's ability to obtain the benefits of Shawnee State's programs or activities." Compl. ¶ 63, Doc. 34, PageID.1465 (quoting Ex. 2 ¶ 18.3, Doc. 34-2, PageID.1522). This includes a

hostile environment component, which they define to include "'any situation in which there is harassing conduct that limits, interferes with or denies education benefits and opportunities, from both a subjective (the complainant's) and an objective (reasonable person's) viewpoint.'" *Id.* ¶ 77, PageID.1467–68 (quoting Ex. 2 ¶ 18.6.2.2). This is the policy they used to punish Dr. Meriwether, but he never violated its terms.

### a. Dr. Meriwether did not create a hostile environment.

Defendants repeatedly said Dr. Meriwether created a "hostile environment," *id.* ¶¶ 230, 234, 239, PageID.1485–86, but they never explained how using sex-based terms across the board and accommodating Doe would offend a reasonable person. The Complaint states this is what Dr. Meriwether proposed and Defendant Milliken initially accepted. *Id.* ¶¶ 157–58, PageID.1477; *accord id.* ¶¶ 172–73, PageID.1478. Obviously, it offended Doe. *Id.* ¶¶ 161, 166, PageID.1477–78. But unless it would also offend a reasonable person, no hostile environment exists.

Dr. Meriwether's approach mimicked the Supreme Court. In *Farmer*, 511 U.S. 825, the majority opinion referred to the transgender inmate (who was born male and identified as female) as "Petitioner" and avoided using pronouns, though it used them for others. *See, e.g.*, *id.* at 834 (referring to generic inmate as "he"); *id.* at 843, 847 (same for generic prison official). The concurrence referred to the inmate using masculine pronouns. *Id.* at 852 (Blackmun, J., concurring) ("Despite his overtly feminine characteristics, and his previous segregation at a different federal prison . . . , prison officials . . . housed him . . . ."). So the Supreme Court used a gender-neutral title (akin to using someone's last name), avoided pronouns, and used biological pronouns when necessary. A reasonable person could not possibly find virtually the same language so offensive as to create a hostile environment.

### b. Dr. Meriwether did not deny any educational benefits.

Later, Defendants latched onto "disparate treatment." Compl. ¶¶ 230, 234, 239, Doc. 34, PageID.1485–86; Ex. 27, Doc.34-27, PageID.1799. But Defendants' policies

8

do not prohibit differential treatment (or even hostile environments), except when they deny, limit, or interfere with educational benefits. *Id.* ¶ 63, PageID.1465.

The Complaint details how Defendants never identified any "benefits" Dr. Meriwether's speech endangered. Defendant Milliken found he violated these policies without specifying what benefits were denied or limited. *Id.* ¶ 239, PageID.1486. Dr. Meriwether wrote Defendant Bauer, noting "Doe's 'access to educational benefits and opportunities was never jeopardized.'" *Id.* ¶ 243 (quoting Ex. 18, Doc. 34-18, PageID. 1766). But Defendant Bauer went along with Defendant Milliken without specifying any benefits denied or limited. Ex. 19, Doc. 34-19, PageID.1770. Their warning letter said nothing on the subject. Ex. 20, Doc. 34-20, PageID.1771. When denying the grievance, Defendant Bauer "never explained how Dr. Meriwether's expression 'denie[d] or limit[ed] [Doe's] ability to obtain the benefits of Shawnee State's programs or activities." Compl. ¶ 277, Doc. 34, PageID.1490. So despite months of investigation, Defendants could not identify any benefits Dr. Meriwether's speech jeopardized.

This is because Doe's benefits were never lost or limited. Per the Complaint, after the confrontation, "Doe continued to attend Dr. Meriwether's Political Philosophy class without incident and frequently contributed to class discussions, often one to three times or more per class period." *Id.* ¶ 159, PageID.1477. For the rest of the semester, Doe "remained in Dr. Meriwether's Political Philosophy Class," *id.* ¶ 176, PageID.1479; "participate[d] in class discussions on the same basis as any other student," *id.* ¶ 177; did so "frequently" and "express[ed] freely his views on whatever topic the class was discussing," *id.* ¶ 178; "volunteered to speak in class and express his views, even when it was not his turn to answer the assigned study question," *id.* ¶ 179; and "participated in class discussions more than was required and as much as (if not more than) any other student," *id.* ¶ 180. Indeed, "Doe displayed no anxiety, fear, or intimidation when attending class or participating in class discussions." *Id.* ¶ 181. In the end, "Dr. Meriwether awarded Doe a high grade . . . , reflecting his very

good work in the class and his frequent participation." *Id.* ¶ 182.

The Complaint states: "Doe was never denied any of the benefits of Dr. Meriwether's Political Philosophy class." *Id.* ¶ 183. These facts control here. *Girl Scouts*, 770 F.3d at 418. Thus, Dr. Meriwether never violated Defendants' policies, whether under a hostile environment or disparate treatment theory.

### 2. Dr. Meriwether did not violate federal law.

Defendants insist their policies simply mirror Titles VII and IX, Defs.' Mot. to Dismiss ("MTD"), Doc. 36, PageID.1895, 1888, as do Intervenors, Ints.' MTD, Doc. 44, PageID.1987. Even viewed through this lens, Dr. Meriwether did nothing wrong.

### a. Dr. Meriwether did not create a hostile environment.

Titles VII and IX prohibit creating hostile environments due to sex. The Supreme Court has set standards to prevent this "from expanding into a general civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive— is beyond Title VII's purview.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). So "'mere utterance of an . . . epithet which engenders offensive feelings . . . ,' does not . . . implicate Title VII." *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (same for "simple teasing, offhand comments, and isolated incidents").

Thus, the Sixth Circuit has ruled many demeaning, belittling remarks and actions do not create hostile environments. One supervisor placed a pack of cigarettes inside an employee's bra strap, handed her a cough drop saying that she had "lost [her] cherry," and made a vulgar remark about her Christmas sweater. *Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000). Yet, this was not "sufficiently pervasive to create a hostile work environment." *Id.* at 984. Another "frequently told jokes with sexual overtones, once referred to plaintiff as 'Hot Lips,' and several times made

comments about [her] state of dress," before offering to improve her evaluation if she performed sexual favors. *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000). Once again, this did "not . . . create an objectively hostile environment." *Id.* at 790. Another workplace was so permeated with sexual innuendo that the magistrate judge described it as "an atmosphere of a grade school level fascination with women's body parts combined within [sic] denigrating comments about women." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823–25 (6th Cir. 1997). Yet, the Sixth Circuit deemed it nothing "more than 'merely offensive.'" *Id.* at 826 (quoting *Harris*, 510 U.S. at 21). Elsewhere, supervisors referred to a female employee as a "f***ing b****h" in front of other employees, asked if it was "her time of the month," and chastised her for returning to work after having a baby. *Curry v. Nestle USA, Inc.*, 2000 WL 1091490, *3–4 (6th Cir. Jul. 27, 2000). Even this was not enough. *Id.* at *4. Dr. Meriwether's speech—the use or non-use of "Mr." and "Ms.," "he" and "she"—does not begin to approach these remarks that did not violate Title VII.

For Title IX, the Supreme Court has set similar standards for hostile environments due to sex. *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018) ("A Title IX hostile-environment claim is analogous to a Title VII hostile-environment claim."). A "plaintiff must establish sexual harassment . . . that is so severe, pervasive, and objectively offensive . . . that the victim students are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). The hostility must be severe and pervasive, to the complainant *and* the reasonable person. *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir. 2008) (striking university sexual harassment policy lacking *Davis* elements).

But Dr. Meriwether never created a hostile environment. *See supra* Argument I.B.1.a–b. Doe continued to attend class and participated freely and frequently in it, Compl. ¶¶ 159, 176–82, Doc. 34, PageID.1477, 1479, without losing any benefits. *Id.* ¶ 183, PageID.1479. Dr. Meriwether mirrored language used by the Supreme Court.

11

*Farmer*, 511 U.S. 825. A reasonable person would not find this commonplace language offensive. And it is far less severe and pervasive than the demeaning jokes, remarks, and conduct the Sixth Circuit ruled do not violate federal law.

### b. Dr. Meriwether did not discriminate based on sex because recognizing biology is not bigotry.

Titles VII and IX also prohibit discrimination "on the basis of" or "because of" sex. 20 U.S.C. § 1681(a); 42 U.S.C. § 2000e-2(a)(1). "'[A] Title IX sex discrimination claim requires the same kind of proof required in a Title VII sex discrimination claim.'" *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 284 (6th Cir. 2017) (quoting *Papelino v. Albany Coll. of Pharm.*, 633 F.3d 81, 89 (2d Cir. 2011)).

"Discriminate" means to make a difference in treatment or favor on a class or group basis.[5] It can also mean just noticing differences, such as to discriminate the individual voices in the choir.[6] Because Title VII says "discriminate against," it refers to the former—making an adverse distinction.[7] "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). "No one doubts that the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006). To discriminate, someone "must do or fail to do something . . . . There must be some specific external act, more than a mental act." *Price-Waterhouse v. Hopkins*, 490 U.S. 228, 262 (1989) (O'Connor, J., concurring) (quoting Senator Case).

Dr. Meriwether never took any action that disadvantaged Doe. The Complaint

---

[5] *See, e.g.*, *Discriminate*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 411 (1966) ("to make a distinction in favor of or against a person or thing on the basis of the group, class, or category to which the person or thing belongs"); *Discriminate*, WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE 648 (1964) ("to make a difference in treatment or favor on a class or categorical basis").

[6] *Discriminate*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 411 (1966) ("to note or observe a difference; distinguish accurately").

[7] 4 OXFORD ENGLISH DICTIONARY 757–58 (2d ed. 1989) (first defining "to discriminate" as "to make or constitute a difference" and first defining to "discriminate against" as "to make an adverse distinction").

states that he always treated Doe fairly, allowing him to participate in class as much as (if not more than) other students and giving him the good grade his performance merited. *See supra* Argument I.B.1.b. True, Doe objected to his speech. Compl. ¶ 161, Doc. 34, PageID.1477. But "'mere utterance of an . . . epithet which engenders offensive feelings'"—and Dr. Meriwether's speech is hardly an epithet—"does not . . . implicate Title VII" or Title IX. *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 67).

Titles VII and IX do not prohibit Dr. Meriwether from acknowledging "in a perfectly neutral and nondiscriminatory fashion" a person's sex. *Price-Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring). After all, a person's "sex . . . is an immutable characteristic." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). The "[p]hysical differences between men and women . . . are enduring" and "remain cause for celebration." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Merely acknowledging this basic biological distinction is neither "a gender based stereotype" nor discrimination. *Nguyen v. I.N.S.*, 533 U.S. 53, 68 (2001). Failing to do so "risks making the guarantee of equal protection superficial, and so disserving it." *Id.* at 73.

All Dr. Meriwether did was acknowledge, in an innocuous way that English-speakers have done for ages, the basic biological distinction between men and women. As federal law "requires neither asexuality nor androgyny in the workplace" or on campus, *Oncale*, 523 U.S. at 81, he did nothing wrong. The Report errs by failing to note this and instead interpreting the Complaint's facts against him, not in his favor.

### C. The Report errs by finding that Dr. Meriwether's speech was not sufficiently expressive.

The Report strangely found that Dr. Meriwether's verbal speech did not express a message. *See, e.g.*, R. & R., Doc. 49, PageID.2125 ("Plaintiff's use of male titles or pronouns did not convey a particularized message," and thus "cannot be viewed as 'inherently expressive' and 'protected speech[.]'"); *id.*, PageID.2123 ("[I]t did not implicate the broader social concerns surrounding [gender identity]."); *id.*, PageID.

13

2124–25 (doubting a listener would understand it to be communicating views). But it admits Dr. Meriwether "was . . . conveying his personal beliefs and views about gender identity." *Id.*, PageID.2125. The Complaint breaks this tie, establishing that he expressed a message, a fact that must be accepted. *Girl Scouts*, 770 F.3d at 418.

Per the Complaint, Dr. Meriwether's speech communicates his views on gender identity: that sex is binary, fixed from conception, and immutable; and that to "affirm as true ideas and concepts that are not true" is wrong. Compl. ¶¶ 86–90, Doc. 34, PageID.1469. He has always spoken consistent with those beliefs. *Id.* ¶¶ 134–35, PageID.1474–75. When teaching, "he presents his own views on . . . issues [discussed in class] and communicates consistently with them." *Id.* ¶ 2, PageID.1458. When referring to students, he "communicates his own views on [gender identity.]"[8] *Id.* ¶ 204, PageID.1481; *id.* ¶ 310, PageID.1495 ("Dr. Meriwether communicated his views on transgenderism through his choice of titles and pronouns[.]"). Thus, he declined to speak as Defendants and Doe demanded because to do so would "communicate views regarding human nature and gender identity that he does not hold, that he does not wish to communicate, and that would contradict (and force him to violate) his sincerely held Christian beliefs." *See, e.g.*, *id.* ¶¶ 3, 92, PageID.1458, 1469.

The Complaint states that, even in 2016, Defendants knew that a professor's choice of pronouns and related terms communicates views on gender identity. Defendant Milliken told Dr. Meriwether in 2016 that he "must utilize a student's preferred pronouns, . . . regardless of the professor's convictions or views on the subject." *Id.* ¶ 112, PageID.1472. Why? Because Defendant Milliken (and the other Defendants) insisted that professors convey a message that "students have a right to be referred to by their self-asserted gender identity." *Id.* ¶ 116, PageID.1473.

---

[8]   The Report characterizes this as "addressing" a student. *See, e.g.*, R. & R., Doc. 49, PageID.2119. But Dr. Meriwether explored dropping titles (just for Doe and altogether), arrangements Defendants rejected. *See supra* Argument I.A. So the issue is not how he addresses Doe, in which case he would use "Doe" or "you." It is how he must refer to Doe (or similar students) when speaking to others.

14

The Complaint states that Doe knew that Dr. Meriwether's speech conveyed a message. When Doe "approached Dr. Meriwether," "stated . . . that he identified as female," and "demanded that Dr. Meriwether refer to him as a woman," *id.* ¶ 140, PageID.1475, he did so because he recognized that Dr. Meriwether's simple, "Yes, sir," expressed a message, *id.* ¶ 128, PageID.1474. Doe demanded that he convey a different message: one affirming Doe's gender identity. When Dr. Meriwether politely declined, Doe "became belligerent, circling around Dr. Meriwether and getting in his face in a threatening manner"; resorted to expletives; and threatened to get him fired. *Id.* ¶¶ 141–44. This was not because Dr. Meriwether's speech communicated *nothing* (as the Report concludes). Rather, it demonstrates that Dr. Meriwether's speech communicated his disagreement with transgender ideology, something Doe found objectionable. That Doe objected to Dr. Meriwether's proposed accommodation only underscores that Doe recognized that Dr. Meriwether's speech communicated his views on the broader gender identity issue. *Id.* ¶¶ 157, 161, 166, PageID.1477–78.

In the disciplinary process, everyone knew Dr. Meriwether's speech conveyed a message. Defendant Milliken quickly said it violated the *Nondiscrimination Policies*. *Id.* ¶ 163, PageID.1477. Just expressing his views via disclaimer would do so. *Id.* ¶¶ 170–71, 260–61, 282, PageID.1478, 1488–89, 1491. So would dropping all titles but using sex-based pronouns for everyone except Doe. *Id.* ¶¶ 212–15, PageID.1482–83. Defendant Johnson said his speech "created a hostile environment" and constituted discrimination, *id.* ¶ 230, PageID.1485, something Defendant Milliken echoed, *id.* ¶ 234, and later adopted, *id.* ¶ 239, PageID.1486. She admitted Dr. Meriwether's speech reflected "his views on transgender people." *Id.* Defendant Bauer repeatedly agreed it represented discrimination. *Id.* ¶¶ 244, 264, 270, 276, 278, PageID.1487, 1489–90.

The Report cannot have it both ways. Speech that says nothing cannot discriminate or create a hostile environment. Those things arise only if the speech says something. Dr. Meriwether's statements about his speech, Doe's reaction to it, and Defendants'

zeal to punish him for it all confirm that it did just that. The Report ignores these facts and fails to view them in Dr. Meriwether's favor. *Girl Scouts*, 770 F.3d at 418.

### D. The Report errs by minimizing the scope and effect of Defendants' restrictions on faculty speech.

The Report minimizes how Defendants' restrictions impact faculty speech, by minimizing their scope (*i.e.*, their off-campus reach) and by dismissing their real-world impact on class discussions. Thus, it contradicts the facts in the Complaint and fails to take the reasonable inferences from them in Dr. Meriwether's favor. *Id.*

First, the Report minimizes any impact Defendants' policies (as interpreted and enforced) could have on Dr. Meriwether's off-campus speech. R. & R., Doc. 49, PageID. 2135–36 (claiming the Complaint "includes no facts . . . which suggest . . . a 'realistic and credible threat' of 'chilling his speech . . .' simply because the policies cover . . . speech that occurs outside the classroom"). But the next sentence quotes Defendants' policies, which by their terms, extend to "events and circumstances '[t]hat occur off-campus when the Title IX Coordinator or other administrator responsible for this procedure determines that the alleged off-campus conduct could reasonably create a hostile environment or be detrimental to the University.'" *Id.*, PageID.2136 (quoting Ex. 2 ¶ 2.1.3, Doc. 34-2, PageID.1512). Defendants interpreted and enforced this policy to punish Dr. Meriwether, saying his speech created a hostile environment. *See supra* Argument I.B. The policy's terms specifically encompass anything off-campus that administrators later determine creates a hostile environment or is otherwise detrimental. Hence, the policy itself, but especially in the context of this case, shows that Dr. Meriwether faces a realistic threat of being punished for off-campus speech.

If Dr. Meriwether saw Doe in the grocery store and remarked to a fellow customer, "He is my student," Doe would find this offensive. After all, the offensiveness has to do with the views expressed, not where they are expressed. And to Defendants, this creates a hostile environment. *See supra* Argument I.B. Similarly, if Dr. Meriwether

were asked to teach his and his church's beliefs regarding gender identity off-campus, one issue that would naturally arise is how a Christian should refer to transgender individuals, so as to be loving without affirming a false idea. Compl. ¶¶ 90–91, Doc. 34, PageID.1469. If he were to explain his views and a transgender student were there, the student could get offended, complain to administrators, and they would then be empowered to punish speech they already deemed to create a hostile environment.

But we need not rely on hypotheticals, for here, the facts in the Complaint and the inferences from them (taken in Dr. Meriwether's favor) control. *Girl Scouts*, 770 F.3d at 418. The Complaint states Defendants apply their policies to off-campus speech. Those policies "regulate all interactions professors have with students, whether in the classroom or out of it." Compl. ¶ 83, PageID.1468. Dr. Poirot said Defendants' "restrictions . . . could apply outside the classroom." *Id.* ¶ 108, PageID.1472 (citing Ex. 5, Doc. 34-5, PageID.1696–97). "Outside the classroom" includes off-campus. Defendants' written warning did not confine itself to in-class (or on-campus) speech. *Id.* ¶¶ 246–49, PageID.1487; Ex. 20, Doc.34-20, PageID.1771. In fact, everyone admits the restrictions are "not limited to classroom interactions." R. & R., Doc. 49, PageID. 2135; Defs.' MTD, Doc. 36, PageID.1888; Ints.' MTD, Doc. 44, PageID.1980. By not accepting these facts, the Report errs. *Girl Scouts*, 770 F.3d at 418.

Second, the Report dismisses the effect Defendants' restrictions have on in-class speech. R. & R., PageID.2152–53 ("[P]laintiff has not explained why a warning letter based on his interactions with Doe would prevent him from discussing gender identity and transgenderism" or would stop "a discussion of substantive issues surrounding the topic of gender identity."). This simply ignores the facts in the Complaint.

The Complaint details how Defendants punished Dr. Meriwether for using sex-based terminology, concluding that this innocuous, common expression created a hostile environment and constituted discrimination. *See supra* Argument I.B. Dr. Meriwether offered to accommodate Doe by using his last name. Later, he explored

17

eliminating titles altogether and using sex-based pronouns for everyone except Doe. But Defendants said both would violate their policies. After this, he inquired about speaking as Defendants demanded but noting his beliefs in a disclaimer. But Defendants repeatedly rejected this. *See supra* Argument I.A.

Given that all of these comparatively subtle avenues for expressing his views are off-limits, Dr. Meriwether could not possibly think he was free to critique transgender ideology in a more comprehensive fashion. If using "he" and "she," "Mr." and "Ms." created a hostile environment, critiquing the entire notion of gender identity as a social construct (and a false one at that) would do the same. So would an extended lecture on the folly of inverting the English language to use identity-based terms, the absurdity of the avalanche of recently-invented identity-based pronouns, and the impossibility of expecting third parties to keep track of gender identity when it is invisible and can fluctuate so easily. Compl. ¶¶ 66–77, Doc. 34, PageID.1466–67. If just refusing to refer to a man as a woman created a hostile environment, so would explaining at length why men who claim to be women (and *vice versa*) are wrong, why their beliefs do not reflect reality, and why their preferences should not dictate the terms of discussion. By ignoring this reality (or by refusing to take these obvious inferences in Dr. Meriwether's favor), the Report errs.

## II. The Report errs by recommending that Dr. Meriwether's First Amendment retaliation claim be dismissed.

Dr. Meriwether pleaded First Amendment retaliation because (1) he "engaged in a constitutionally protected activity" and (2) suffered "adverse action" that (3) "was motivated at least in part as a response to the exercise of [his] constitutional rights." *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585–86 (6th Cir. 2008). The Report addresses only the first of these elements. R. & R., Doc. 49, PageID.2127 n.7.

### A. The Report errs by concluding that the First Amendment does not protect Dr. Meriwether's speech.

Dr. Meriwether's speech is protected because, for First Amendment purposes, he

was speaking (1) "as a citizen" (because his speech was related to teaching), (2) on "a matter of public concern," and (3) his interest in speaking outweighed the University's interest "in promoting the efficiency of [its] public services." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017). The Report errs by ruling against Dr. Meriwether on the first two points. R. & R., PageID.2113–27.

### 1. For purposes of *Garcetti*, Dr. Meriwether spoke "as a citizen" because the "official duties" test does not apply to faculty speech "related to teaching."

When public employees speak "pursuant to their official duties," they are typically "not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). But this "official duties" test does not apply to faculty speech that is "related to . . . teaching." *Id.* at 425. Thus, for First Amendment purposes, Dr. Meriwether spoke "as a citizen." *See, e.g.*, *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 564–65 (4th Cir. 2011) (concluding that, because the "official duties" test does not apply to speech related to teaching, a professor's speech "was clearly that of a citizen" (*i.e.*, "that of a public employee, speaking as a citizen")). By rejecting this protection for faculty speech, the Report not only errs but also adopts a position that eliminates all First Amendment protections for university professors.

### a. The *Garcetti* Court refused to extend the "official duties" test to faculty speech "related to teaching."

Three decisions lay out the modern public employee speech doctrine. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 571–74 (1968); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–87 (1977); *Connick v. Myers*, 461 U.S. 138, 142–54 (1983). It "balance[s] . . . the interest of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Under this *Connick-Pickering* test, employees could speak (1) "as a citizen on matters of public concern" or (2) "as an employee on matters of only personal interest" (*i.e.*, private concern). *Connick*, 461 U.S. at 147.

19

Thus, this test focused on the public-versus-private concern distinction. Right after laying out this test, *Connick* assesses, not the role in which the employee spoke, but "whether [her] speech addresse[d] a matter of public concern." *Id.* The "threshold question" for applying *Pickering's* balancing test was "whether the speech may be fairly characterized as constituting speech on a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987). So the protected speech inquiry consisted of just two elements. *See, e.g.*, *Cockrell v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001) ("To demonstrate that she was engaging in constitutionally protected speech, Cockrel must show that her speech touched on matters of public concern, and that her interest in commenting on matters of public concern . . . outweigh[s] the interest of the State . . . in promoting the efficiency of [its] public services . . . ."); *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (same); *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 678 (6th Cir. 2001) (same); *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (describing the public concern issue, not the citizen-employee distinction, as the "threshold inquiry"). The "key question is not whether a person was speaking in his role as an employee or a citizen, but whether the employee's speech in fact touches on matters of public concern." *Cockrel*, 270 F.3d at 1052.

In 2006, the Supreme Court unveiled a new test, separating "as a citizen" from "on a matter of public concern." Under this new test, when public employees speak "pursuant to their official duties," they are typically "not speaking as citizens for First Amendment purposes," and the First Amendment does not protect their speech. *Garcetti*, 547 U.S. at 421. Now, the protected speech inquiry consists of three steps: (1) as a citizen or employee, (2) public or private concern, and (3) *Pickering's* balancing test. Now, employees can speak in four ways, not two:

| Pre-*Garcetti* Possibilities | Post-*Garcetti* Possibilities |
|---|---|
| 1. As a citizen on a public concern.<br>2. As an employee on a private concern. | 1. As a citizen on a public concern.<br>2. As a citizen on a private concern.<br>3. As an employee on a public concern.<br>4. As an employee on a private concern. |

20

The Sixth Circuit recognized *Garcetti* "established a new threshold requirement": was "the speech . . . pursuant to the claimant's official duties"? *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 343 (6th Cir. 2010).

Facing this new test, Justice Souter sounded an alarm. Under it, the "ostensible domain beyond the pale of the First Amendment is spacious enough to include even the teaching of a public university professor." *Garcetti*, 547 U.S. at 438 (Souter, J., concurring). He "hope[d] that [the] majority did not mean to imperil First Amendment protection . . . in public colleges and universities, whose teachers necessarily speak and write 'pursuant to their official duties.'" *Id.* (Souter, J., concurring).

Responding, the majority recognized "expression related to academic scholarship or classroom instruction implicates additional constitutional interests" above and beyond the "customary employee-speech jurisprudence." *Id.* at 425. So it declined to extend the "official duties" test to faculty: "We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.*

The Report claims Dr. Meriwether mischaracterized *Garcetti*. R. & R., Doc. 49, PageID.2115 (parsing "exempt[ing] speech related to teaching" and "declin[ing] to address the issue"). But the Report mischaracterizes Dr. Meriwether. *See, e.g.*, Defs.' MTD Resp., Doc. 45, PageID.2011 (noting *Garcetti* "refused to extend" and "declined to extend the new 'official duties' test"). Also, this is a distinction without a difference. In *Garcetti*, the Court unveiled a new test for assessing when public employee speech is protected, and it did not decide whether that test applied to only one group of public employees: university professors. Thus, until the Supreme Court decides that this "new threshold requirement" *does* apply to them, *Evans-Marshall*, 624 F.3d at 343, the *status quo ante* continues and the "official duties" test does not apply. *See, e.g.*, *Lee v. York Cty. Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007) (ruling that because the "Court explicitly did not decide whether this analysis [*i.e.*, the official duties test]

would apply in the same manner to a case involving speech related to teaching," "we continue to apply the *Pickering-Connick* standard"); *Kerr v. Hurd*, 694 F. Supp. 2d 817, 843 (S.D. Ohio 2010) (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 2008 WL 2987174, *8 (S.D. Ohio Jul. 30, 2008)) ("Based on the explicit caveat in the majority opinion of *Garcetti* that the Court's decision therein did not necessarily apply . . . to a case involving speech related to scholarship or teaching, . . . . absent Sixth Circuit or further Supreme Court guidance to the contrary, this Court will continue to apply the traditional *Pickering-Connick* approach to cases involving in-class speech by primary and secondary public school teachers.").

Thus, the Report errs by concluding that *Garcetti's* "official duties" test applies to faculty engaged in teaching. R. & R., Doc. 49, PageID.2117–18.

### b. In so doing, the *Garcetti* Court implicitly reaffirmed the First Amendment's longstanding protection for faculty speech.

When Justice Souter sounded his faculty-speech alarm in *Garcetti*, he referenced the Supreme Court's long history of protecting professors. *Garcetti*, 547 U.S. at 438–39 (Souter, J., concurring) (quoting *Keyishian*, 385 U.S. at 603; *Shelton v. Tucker*, 364 U.S. 479, 487 (1960); *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)). By declining to extend the "official duties" test to faculty speech related to teaching or scholarship, the *Garcetti* Court left these well-established precedents intact. *Id.* at 425 (referring to the cases Justice Souter cited). The Report does not even mention these decisions but adopts a position that would effectively overturn them.

For almost seven decades, the Supreme Court has recognized that public school teachers—especially professors—play a special role in our nation and must be free to speak consistently with their views. Indeed, "[t]o regard teachers—in our entire educational system, from the primary grades to the university—as the priests of our democracy is therefore not to indulge in hyperbole." *Wieman v. Updegraff*, 344 U.S. 183, 196–97 (1952) (Frankfurter, J., concurring). Given their vital role, "[t]hey must

22

have the freedom of responsible inquiry . . . into the meaning of social and economic ideas, into the checkered history of social and economic dogma." *Id.* But under the Report's reasoning, this inquiry is just a function of their official duties and beyond the First Amendment's protection. R. & R., Doc. 49, PageID.2117–19.

Six decades ago, a professor was punished for refusing to answer questions about his Marxist views. *Sweezy*, 354 U.S. at 238–45. The Supreme Court reversed, saying: "The essentiality of freedom in the community of American universities is almost self-evident." *Id.* at 250. This rests on professors' free speech: "No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Id.* "Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.* When the government inquired into the contents of his lectures, this "unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression." *Id.* But to the Report, these lectures and this scholarship are just part of his official duties and beyond the reach of the First Amendment. R. & R., PageID.2117–19.

A decade later, the Supreme Court voided a statute barring employment of any person who "'advocates, advises or teaches the doctrine' of forceful overthrow of government" because it could "prohibit the employment of one who merely advocates the doctrine in the abstract," such as a "teacher who informs his class about the precepts of Marxism or the Declaration of Independence" or who "writ[es] articles" on the subject. *Keyishian*, 385 U.S. at 599–600, 602. The Court's concerns were amplified because the university conducted an "*annual review* of every teacher to determine whether any utterance or act of his, *inside the classroom or out*, came within the sanctions of the laws." *Id.* at 602 (emphasis added). This would "stifle 'that free play

23

of the spirit which all teachers ought especially to cultivate and practice.'" *Id.* at 601. The Court recognized professors, like Dr. Meriwether, have First Amendment rights over their *teaching and scholarship* and that universities may not enforce policies that infringe upon these "precious freedoms" in or out of the classroom. *Id.* at 603. But the Report concluded that a professor's teaching, his "official duties," is bereft of constitutional protection. R. & R., Doc. 49, PageID.2117–19.

By ignoring this precedent, which the *Garcetti* Court acknowledged and respected, the Report errs. This Court should rule that the "official duties" test does not apply to professors' speech related to teaching, like Dr. Meriwether's.

### c. Federal appellate courts interpreting *Garcetti* have ruled that the "official duties" test does not apply to faculty speech "related to teaching."

Given *Garcetti's* historically mindful caveat, federal appellate courts have refused to apply the "official duties" test to faculty speech related to teaching and scholarship. The Report dismisses this precedent as non-binding. *Id.*, PageID.2116. True enough. But it represents the studied opinions of Article III jurists who voted in two 3–0 decisions to reverse the position the Report adopts. Notably, neither Defendants, nor Intervenors, nor the Magistrate Judge cited any cases holding otherwise.

When a district court ruled that a professor's off-campus speech became part of his "official duties" because it was mentioned in his promotion papers, the Fourth Circuit reversed. *Adams*, 640 F.3d at 553–55, 561. It ruled "*Garcetti* would not apply in the academic context of a public university as represented by the facts of this case." *Id.* at 562. While it "may apply" to faculty when "declaring or administering university policy," it does *not* when they are engaged in "teaching and scholarship." *Id.* at 563. Otherwise, "many forms of public speech or service a professor engaged in during his employment" would be "beyond the reach of First Amendment protection." *Id.* at 564. "That would not appear to be what *Garcetti* intended, nor is it consistent with our long-standing recognition that no individual loses his ability to speak as a

private citizen by virtue of public employment." *Id.* And though the professor's speech did not occur in class or involve his students, it was still "related to scholarship and teaching," *Garcetti*, 547 U.S. at 425, and thus, *Pickering*, not the "official duties" test, applied, *Adams*, 640 F.3d at 564–65. The same should be true here, seeing as Dr. Meriwether spoke to students in class, Compl. ¶¶ 125–39, 165, Doc. 34, PageID.1474–75, 1477–78, as even the Report acknowledges, R. & R., Doc. 49, PageID.2118–19.

The Ninth Circuit agrees. *Demers v. Austin*, 746 F.3d 402, 409–10 (9th Cir. 2014). It recognized that "teaching and academic writing are at the core of the official duties of teachers and professors" and "a special concern of the First Amendment." *Id.* at 411. "[I]f applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court." *Id.* Thus, "*Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher or professor." *Id.* at 412. That speech is instead "protected under the First Amendment, using the analysis established in *Pickering*." *Id.*

### d. Sixth Circuit's rulings show *Garcetti's* "official duties" test does not apply to faculty speech "related to teaching."

Contrary to the Report, R. & R., PageID.2116–17, the Sixth Circuit has recognized *Garcetti's* "explicit caveat" for professors' "speech related to scholarship or teaching." *Kerr*, 694 F. Supp. 2d at 843. In fact, it has done so at least twice.

A high school did not renew a teacher's contract after she assigned and made available some controversial books. *Evans-Marshall*, 624 F.3d at 334–36. The district court refused to apply the "official duties" test due to *Garcetti's* "explicit caveat." *Evans-Marshall*, 2008 WL 2987174, at *8. The Sixth Circuit ruled she satisfied *Pickering* but could not "overcome *Garcetti*." *Evans-Marshall*, 624 F.3d at 338–40. Then it discussed *Garcetti's* caveat. It noted *Garcetti's* majority had "disclaimed any intent to resolve the point." *Id.* at 343. But it ruled: "*Garcetti's* caveat offers no refuge

to Evans-Marshall." *Id.* Why? "She is not a teacher at a 'public college[]' or 'university' and thus falls outside of the group the dissent wished to protect," academic freedom applies to universities more than high schools, and "'constitutional rules applicable in higher education do not necessarily apply in primary and secondary schools.'" *Id.* at 344 (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 724–25 (2007)). So if *Garcetti's* caveat does not apply to a K–12 teacher because she is not a professor, then it should apply to professors, like Dr. Meriwether.

Later, a university's librarian faced opposition after recommending some books for a freshman reading program. *Savage*, 665 F.3d at 735–36. After applying the "official duties" test, *id.* at 738, the Sixth Circuit discussed *Garcetti's* caveat. The Report latches onto the term "dicta." R. & R., PageID.2116. Of course, *Garcetti's* caveat was dicta in a case about an assistant district attorney. But it is critical to the key question in *Savage* and here: Does the "official duties" test apply to university faculty? There, the Sixth Circuit ruled the caveat did not apply (and the "official duties" test did) because the librarian's "speech . . . was not related to classroom instruction and was only loosely, if at all, related to academic scholarship." *Savage*, 665 F.3d at 739. But if *Garcetti's* caveat did not apply because the librarian's speech was not "related to scholarship and teaching," it should apply to Dr. Meriwether, whose speech was. Compl. ¶¶ 133–39, 155–56, Doc. 34, PageID.1474–77; *accord* Defs.' MTD Br., Doc. 36, PageID.1888 (Dr. Meriwether's speech "occurred during [his] class, during a course . . . , in a University classroom . . . ."); R. & R., Doc. 49, PageID.2118–19.

*Johnson-Kurek*, 423 F.3d 590, on which the Report relies, R. & R., PageID.2117, does not change this. In fact, it says nothing about the "official duties" test because it came down eight months before *Garcetti*. But it does not give universities *carte blanche* in all matters they deem pedagogical. *Johnson-Kurek*, 423 F.3d at 594 ("[T]here are limits to the extent to which a university may require a professor to endorse actively the university's decisions about pedagogy."). It simply involved a professor

26

who refused to identify clearly her expectations of students. And it took pains to note that the professor "was not required to communicate the ideas . . . of others as if they were her own." *Id.* at 595. Yet here, Dr. Meriwether is being required to communicate a University-mandated message as his own, and Defendants will not even let him issue a written disclaimer to distance himself from it. *See supra* Argument I.A.

### e. Courts in the Sixth Circuit have held *Garcetti's* "official duties" test does not apply to faculty speech "related to teaching."

Not only has the Sixth Circuit not applied the "official duties" test to faculty speech "related to . . . teaching," but one court in this circuit refused to do so. The Report relies on *Kerr*, 694 F. Supp. 2d 817, for the "public concern" issue, R. & R., Doc. 49, PageID.2122, but ignores its holding that the "official duties" test does not apply to faculty, including an obstetrics professor whose teaching varied from the curriculum.

First, *Kerr* relies on the district court's analysis in *Evans-Marshall*. *Kerr*, 694 F. Supp. 2d at 843. The Sixth Circuit later clarified that *Garcetti's* caveat does not apply to K–12 teachers. *Evans-Marshall*, 624 F.3d at 342; *see supra* Argument II.A.1.d.

But *Kerr* then went further: "Even without this binding [though later reversed] precedent, this Court would find an academic exception to *Garcetti*" because one is "important to protecting First Amendment values." *Kerr*, 694 F. Supp. 2d at 843–44. It explained that universities "should be the active trading floors in the marketplace of ideas." *Id.* at 844. It cited the "disastrous impact on Soviet agriculture from Stalin's enforcement of Lysenko biology orthodoxy" as a warning to those, like Defendants, "who would discipline university professors for not following the 'party line.'" *Id.* So it ruled that at "least where, as here, the expressed views are well within the range of accepted . . . opinion, they should certainly receive First Amendment protection, particularly at the university level." *Id.* And it warned against manipulating the term "accepted . . . opinion." *Id.* at 844 n. 11. Dr. Kerr was punished for advocating vaginal over Cesarean delivery. Here, Dr. Meriwether's views about human nature far more

27

easily qualify as falling "within the range of accepted . . . opinion" and protected expression, *id.* at 844, as the twelve philosophers attest. *See supra* Introduction.

The Report invokes *Smock v. Bd. of Regents of Univ. of Mich.*, 353 F. Supp. 3d 651 (E.D. Mich. 2018). R. & R., Doc. 49, PageID.2117. But *Smock* says nothing about "official duties." It dismissed the professor's First Amendment retaliation claim solely because her remarks about her personal sexual behavior were, unsurprisingly, "not [a] public concern." *Smock*, 353 F. Supp. 3d at 661. The Report focuses on "pedagogical attitudes" and "institutional standards," R. & R., PageID.2117, but these must be balanced "against . . . professors' traditional academic liberties." *Smock*, 353 F. Supp. 3d at 659. But if the "official duties" test applies, no balance is needed because faculty speak as employees when they teach and have no First Amendment protection. *Garcetti*, 547 U.S. at 421. The Report focuses on treating "students with civility." R. & R., PageID.2117. But the Complaint states Dr. Meriwether treated Doe with utmost civility (even when Doe did not reciprocate), as he does for all students. Compl. ¶¶ 140–44, Doc. 34, PageID.1475. He proposed multiple ways to accommodate Doe. *See supra* Argument I.A. He just declined to endorse all ideologies. *Smock* confirms that Defendants cannot force him "to endorse or eschew specific viewpoints," *Smock*, 353 F. Supp. 3d at 559, which is what they are doing, *see infra* Argument III–IV.

### f. The content and context of Dr. Meriwether's speech show he spoke "as a citizen."

Applying the "official duties" test, the Report assesses the "content and context" of Dr. Meriwether's speech. R. & R., PageID.2117–19. Relevant factors include "'the impetus for [his speech], the setting of [his] speech, the speech's audience, and its general subject matter.'" *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012). The Report misapplies these considerations to conclude his speech was not constitutionally protected. R. & R., PageID.2119, 2126–27.

The Report correctly notes Dr. Meriwether's setting was "a university classroom."

*Id.*, PageID.2119. But it fails to see the constitutional significance of this setting, treating it as if it were just any other government workplace. *See Johnson v. Lincoln Univ.*, 776 F.2d 443, 453–54 (3d Cir. 1985) (noting need to view "context" with the unique attributes of the academic environment in mind). That "classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Keyishian*, 385 U.S. at 603). It is not an "enclave[] immune from the sweep of the First Amendment," *id.*—though this is precisely the effect of extending the "official duties" test to university faculty when they teach.

The Report notes Dr. Meriwether's audience was his students, R. & R., Doc. 49, PageID.2119, but ignores the import of this. If the "statements were made to individuals 'up the chain of command,'" they more likely constitute the speaker's "official duties." *Handy-Clay*, 695 F.3d at 540; *Fox v. Traverse Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010). Dr. Meriwether spoke to his students, not his superiors. Thus, this factor reinforces that his speech was not part of his "official duties."

In assessing the impetus and content of Dr. Meriwether's speech, the Report errs factually, failing to construe the facts and inferences in his favor. *Girl Scouts*, 770 F.3d at 418. His impetus was not "to address students in a manner [he] considered to be an important pedagogical tool." R. & R., PageID.2119. His topic was not just "addressing students." *Id.* True, he created formality in his classroom via last names and titles. But the Complaint states he offered to change this for Doe and explored doing so for all students. Defendants rejected both. Thus, Dr. Meriwether is not being punished for refusing to change his classroom formality. *See supra* Argument I.A. He is being punished for refusing to stop using the sex-based terms that express his views on gender identity (by adopting either identity-based or androgynous terms). *See supra* Argument I.C. So the impetus for and the content of the speech are, per the Complaint, the same: "communicat[ing] his own views on [gender identity]." Compl. ¶ 204, Doc. 34, PageID.1481; *id.* ¶ 310, PageID.1495 ("Dr. Meriwether communicated

his views regarding transgenderism through his choice of titles and pronouns[.]"). These facts control here, *Girl Scouts*, 770 F.3d at 418, especially when the Complaint details how everyone involved in this push for identity-based terms understood these terms sent a message about transgenderism, *see supra* Argument I.C.

Also, in assessing Dr. Meriwether's subject, the Report errs legally. It is supposed to determine if "the content . . . is nothing more than the quintessential employee beef: management has acted incompetently." *Handy-Clay*, 695 F.3d at 540 (cleaned up). It never considered this—perhaps because it is so clear that Dr. Meriwether's speech had *nothing* to do with his superiors, which confirms he addressed a public concern.

\* \* \*

Neither the Supreme Court nor the Sixth Circuit has extended the "official duties" test to professors' speech "related to scholarship and teaching." Several appellate courts and even district courts in the Sixth Circuit have held that it does not, given the history of First Amendment protection for faculty. The Report errs by applying that test anyway to Dr. Meriwether and in how it did so. This Court should conclude that, for First Amendment purposes, Dr. Meriwether spoke "as a citizen."

### 2. Dr. Meriwether spoke on a matter of public concern.

Next, the Report concluded that Dr. Meriwether did not address "a matter of public concern," *Mayhew*, 856 F.3d at 462, when he expressed his views on whether a male who identifies as female is really a woman, R. & R., Doc. 49, PageID.2119–27. But Supreme Court and Sixth Circuit precedent demonstrate this is simply wrong.

### a. The Report errs by concluding that Dr. Meriwether's speech on gender identity did not address a public concern.

The Supreme Court has a "broad conception of 'public concern.'" *Hardy*, 260 F.3d at 679. It includes anything that "can be fairly considered as relating to any matter of political, social, or other concern to the community," "is a subject of legitimate news interest," or "of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up); *Lane v. Franks*, 573 U.S. 228, 241

30

(2014) (cleaned up); *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004).[9] Dr. Meriwether's speech on gender identity generally, and on how to refer to transgender individuals specifically, easily fits within this category.

### i. Per the Supreme Court, gender identity is a public concern.

The Supreme Court ruled that "gender identity" is "undoubtedly [a] matter[] of profound 'value and concern to the public.'" *Janus v. Am. Fed'n of State, Cty., & Mun. Emps.*, 138 S. Ct. 2448, 2476 (2018). It did so while listing the "controversial subjects" public employee unions can address. *Id.* When it listed "sexual orientation and gender identity," it cited an article on how to teach LGBT issues in first grade. *Id.* at 2476 n.20. Even before *Janus*, the Sixth Circuit recognized this when it ruled that a high school principal's "speech on his religious views and on homosexuality are matters of public concern." *Scarborough*, 470 F.3d at 256; *Kastl v. Maricopa Cty. Cmty. Coll. Dist.*, 2004 WL 2008954, *9 (D. Ariz. Jun. 3, 2004) (finding transgender professor's "expression of her gender and change of gender" was a matter of public concern).

So, teachers and principals can speak about LGBT issues at the K–12 level, where academic freedom protections are less robust. *Evans-Marshall*, 624 F.3d at 344. University faculty have no less freedom. After all, speech on these topics "'occupies the highest rung of the hierarchy of First Amendment values' and merits 'special protection.'" *Janus*, 138 S. Ct. at 2476 (quoting *Snyder*, 562 U.S. at 452). And the First Amendment has long protected professors. *See supra* Argument II.A.1.b. Especially on hotly debated issues, they must remain free to express their views. The "freedom to differ is not limited to things that do not matter much" but extends "to things that touch the heart of the existing order." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010) ("Without the right to stand against society's most strongly-held convictions,

---

[9]    In contrast, matters of private concern involve "no public issue," *Snyder*, 562 U.S. at 453, and are "only of personal interest," *Scarborough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 256 (6th Cir. 2006), such as "internal personnel disputes or complaints about an employer's performance," *Rodgers*, 344 F.3d at 596. Dr. Meriwether's speech does not fit this description.

the marketplace of ideas would decline into a boutique of the banal, as the urge to censor is greatest where debate is most disquieting and orthodoxy most entrenched.").

### ii. The current gender identity debate—in law, politics, media, and culture—shows that this issue is a public concern.

Matters of "public concern" represent a broad category—anything "relating to any matter of political, social, or other concern to the community," "is a subject of legitimate news interest," or "of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453 (cleaned up); *Lane*, 573 U.S. at 241 (cleaned up); *Farhat*, 370 F.3d at 589. Thus, the Sixth Circuit has surveyed the media, community groups, and political leaders to see if the topic at issue "has made news" or "has become an issue of contentious political . . . debate." *Cockrell*, 270 F.3d at 1051; *Kerr*, 694 F. Supp. 2d at 842–43 (surveying media on obstetrical techniques). By this standard, Dr. Meriwether's speech on whether a male who identifies as female is (and should be referred to as) female easily addresses a "public concern."

Debate on these issues is unfolding in law, politics, and culture. Many, including Martina Navratilova and Olympians Sharron Davies and Rebecca Dussault, argue that men who identify as women should not be allowed to compete against women athletically.[10] The U.S. Department of Education is investigating whether treating these men as women violates the rights of female athletes.[11] This issue was recently raised in Kentucky's gubernatorial race.[12] Former Vice President Biden, in his presidential campaign, said male inmates who identify as female should be treated as female.[13] Others, like Andrew Sullivan, detail how transgenderism undermines

---

[10] *See, e.g.*, Libby Emmons, *Tennis Legend Martin Navratilova Under Fire for Saying Only Women Should Compete in Women's Sports*, FEDERALIST, Feb. 22, 2019, https://bit.ly/2SfvpxH; Pat Eaton-Robb, *Transgender Sprinters Finish 1st, 2nd at Connecticut Girls Indoor Track Championships*, WASH. TIMES, Feb. 24, 2019, https://bit.ly/2SWcInW; Rich Lowry, *In Defense of Women's Sports*, NAT'L REV., Mar. 5, 2019, https://bit.ly/2C7mdpJ; Tyler O'Neil, *Trans 'Woman' Demolishes World Records; Olympian Decries 'Pointless, Unfair Playing Field*,*'* PJ MEDIA, Apr. 29, 2019, https://bit.ly/30J1Fib; Peter Hanson, *We Spoke with This Former Olympian about Transgender Athletes. Here's What She Said*, DAILY CALLER, Sept. 19, 2019, https://bit.ly/2m0QDVC. (Last visited Oct 3, 2019).
[11] Letter from U.S. Dep't of Educ. Office for Civil Rights to Roger G. Brooks, Aug. 7, 2019, https://bit.ly/2m8DmL7 (last visited Oct. 3, 2019).
[12] Campaign for Am. Principles Ky., *Track*, https://bit.ly/2njWu8T (last visited Oct. 3, 2019).
[13] Allahpundit, *Biden: In Prison, Your Gender Should Be What You Say It Is, Not What the Prison*

feminism and homosexuality.[14] In philosophy, some demand that those who differ with transgenderism be banned from professional publications and conferences. But twelve leading philosophers defended the right to disagree on these issues of "great importance" and to express views like Dr. Meriwether's. *See supra* Introduction.

This issue even divides federal appellate courts. *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 330 (5th Cir. 2019) (detailing the circuit conflict regarding Title VII, sexual orientation, and gender identity). Next week,[15] the Supreme Court will hear oral arguments in a case all about whether a man who identifies as a woman should be treated as a woman under Title VII. *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, __ U.S. __, 2019 WL 1756679, *1 (Apr. 22, 2019). Philosophers, among other scholars, have highlighted the significant metaphysical issues at stake in this case.[16]

This debate does not just involve what the Report dismisses as "the broader social concerns surrounding the issue." R. & R., Doc. 49, PageID.2123. It also involves the precise issue for which Dr. Meriwether is being punished: Should we refer to men who identify as women as women? Many commentators have explained, some from personal experience, why we should not.[17] England's High Court just ruled, in a decision that attracted significant media interest, that a woman who identifies as a man could not be called her child's father on the birth certificate.[18] Senator Warren,

---

*Says It Is*, HOT AIR, Sept. 23, 2019, https://bit.ly/2m8XsVz (last visited Oct. 3, 2019).

[14] Andrew Sullivan, *The Nature of Sex*, INTELLIGENCER MAGAZINE, Feb. 1, 2019, https://nym.ag/2D2r5w9 (last visited Oct. 3, 2019).

[15] Supreme Court of the United States, Oral Argument Calendar for the Session Beginning Oct. 7, 2019, https://bit.ly/2nM22Jw (last visited Oct. 3, 2019) (listing oral argument date as October 8, 2019).

[16] *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC, Amicus* Br. of Scholars in Philosophy, Theology, Law, Politics, History, Literature, and the Sciences, https://bit.ly/2ptpz2Y (last visited Oct. 3, 2019).

[17] *See, e.g.*, Daniel Moody, *Why You Shouldn't Use Transgender Pronouns*, FEDERALIST, Oct. 18, 2016, https://bit.ly/2XGU8i6; Michael Booker, *Why I Don't Use Female Pronouns for My Transgender Brother*, FEDERALIST, Sept. 11, 2017, https://bit.ly/2fik536; Graham Hillard, *Conservatives Shouldn't Use Transgender Pronouns*, NAT'L REV., Apr. 4, 2019, https://bit.ly/2WMINM6; Rod Dreher, *The Totalitarian 'They,'* THE AM. CONSERVATIVE, Jul. 13, 2019, https://bit.ly/30KBoi0; Anthony Esolen, *Pronouns, Ordinary People, and the War over Reality*, PUB. DISCOURSE, Oct. 13, 2016, https://bit.ly/2Z6gaut; Alan McLaughlin, *Word War, World War*, PUB. DISCOURSE, Sept. 15, 2019, https://bit.ly/2nbWs38. (Last visited Oct. 3, 2019.)

[18] *See, e.g.*, Aimee Lewis, *Transgender Man Who Gave Birth Loses Court Battle to Be Registered as Father*, CNN, Sept. 25, 2019, https://cnn.it/2nSQnc8; Izzy Lyons, *Transgender Man Who Gave Birth Loses High Court Battle to Make His Child the First in the UK without a Mother*, THE TELEGRAPH, Sept. 25, 2019, https://bit.ly/2mPAsL5; Hannah Sparks, *Trans Man Who Gave Birth Can't Be 'Dad' on Birth Certificate*, N.Y. POST, Sept. 26, 2019, https://bit.ly/2nkq0vb; AFP, *UK Transgender Man Who*

in her presidential campaign, made news by publicizing her preferred pronouns, as have former Secretary Castro and Mayor de Blasio.[19] So did singer Sam Smith.[20] And Supreme Court advocates are explaining why they, like Dr. Meriwether, do not use feminine pronouns to refer to a male employee who identifies as female.[21]

"[T]his debate . . . affects virtually every school, college, dormitory, athletic activity, and locker room in America." *Wittmer*, 915 F.3d at 337–38 (Ho, J., concurring). If reporters, courts, lawyers, politicians, scholars, and commentators are opining on how we should refer to transgender individuals, if courts (including the Supreme Court) are deciding whether their biology or identity dictates what they are, then these issues qualify as "matters of public concern." *Snyder*, 562 U.S. at 453. The Report ignored this line of argument, an error this Court should not repeat.

### b. The Report errs by treating Dr. Meriwether's pure speech as symbolic speech.

The Report avoided *Janus* and this cultural debate, saying "there is no assurance" anyone understood Dr. Meriwether was expressing a message on these issues. R. & R., Doc. 49, PageID.2124. This ignores the Complaint, which details how Defendants knew in 2016 that Dr. Meriwether was expressing his views, how Doe understood immediately Dr. Meriwether was communicating views that Doe found objectionable, and how everyone involved in the disciplinary process did too. Speech can only create a hostile environment if it expresses a message. The Report errs by not taking these facts and the inferences from them in Dr. Meriwether's favor. *See supra* Argument I.C.

---

*Gave Birth Is His Child's Mother: Court*, YAHOO NEWS, Sept. 25, 2019, https://yhoo.it/2nfoyua. (Last visited Oct. 3, 2019.)

[19] *See, e.g.*, Jessica Chasmar, *Sen. Elizabeth Warren Adds Preferred Pronouns 'She/Hers' to Twitter Bio*, WASH. POST, Jul. 19, 2019, https://bit.ly/2nRickZ (last visited Oct. 3, 2019).

[20] *See, e.g.*, Marianne Garvey, *Sam Smith's Preferred Gender Pronouns Are They/Them*, CNN, Sept. 13, 2019, https://cnn.it/2AFZrEw (last visited Oct. 3, 2019).

[21] *See, e.g.*, *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, Br. for the Petitioner at 8 n.3, https://bit.ly/2nRmvNb ("Out of respect for Stephens and following this Court's lead in *Farmer* v. *Brennan*, 511 U.S. 825 (1994), Harris tries to avoid use of pronouns and sex-specific terms when referring to Stephens. When such terms must be used, Harris uses sex-based language consistent with Title VII's meaning."); *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, *Amicus* Br. of Free Speech Advocates at 2–3, https://bit.ly/2lFA1Tl (arguing in the "Note on Terminology" that to "refer to Respondent Stephens with female pronouns is to prejudge a basic question at issue, namely, whether Stephens, despite his biology, is actually female"). (Last visited Oct. 3, 2019.)

The Report says Dr. Meriwether "did not convey a particularized message" likely to be understood. R. & R., Doc. 49, PageID.2125 (citing *Spence v. Washington*, 418 U.S. 405, 410–11 (1974)). But *Spence* says nothing about whether speech addresses a public concern. It only determines whether conduct (*e.g.*, affixing a peace sign to the flag) is symbolic speech. It applied its "particularized message" analysis only because "appellant did not . . . articulate his views through printed or spoken words." *Spence*, 418 U.S. at 409; *Texas v. Johnson*, 491 U.S. 397, 403–04 (1989) (describing *Spence* as applying to "expressive conduct," not "the spoken or written word"); *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388 (6th Cir. 2005) ("To bring a free-speech claim regarding actions rather than words, claimants must [satisfy *Spence*].").

Dr. Meriwether's speech constitutes "[w]ords . . . that [he] spoke," R. & R., PageID. 2114. The "communication of ideas . . . by speaking or writing" is pure speech. *McNea v. Garey*, 434 F. Supp. 95, 109 n.18 (N.D. Ohio 1976). "The Supreme Court has recognized a clear distinction between symbolic speech and pure speech." *Cressman v. Thompson*, 798 F.3d 938, 960 (10th Cir. 2015) (citing *Johnson*, 491 U.S. at 406). *Spence's* "particularized message" test applies only to symbolic speech.[22] "'Pure speech' activities are rigorously protected regardless of meaning." *Id.* at 951. Indeed, "the First Amendment protection afforded to pure speech is not tethered to whether it conveys any particular message—*i.e.*, the speech at issue could mean different things to different people." *Id.* at 961–62. Hence, the listener's reaction to Dr. Meriwether's message or even failure to understand that message has no bearing on whether his speech addressed a matter of public concern.

### c. The Report errs by disputing that a professor's in-class speech is, except in rare cases, a matter of public concern.

The Report objects to Dr. Meriwether arguing that a professor's "[i]n-class speech

---

[22] Also, the Supreme Court "subsequently minimized the 'particularized message' requirement." *Condon v. Wolfe*, 310 F. App'x 807, 819–20 (6th Cir. 2009). "[A] narrow, succinctly articulable message is not a condition of constitutional protection." *Hurley*, 515 U.S. at 569. Otherwise, it "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Id.*

is presumptively a matter of public concern." R. & R., Doc. 49, PageID.2120. But in light of Sixth Circuit law, this amounts to little more than quibbling over semantics.

In a K–12 teacher case, the Sixth Circuit noted:  "the Supreme Court has never removed in-class speech from its *presumptive place* within the ambit of the First Amendment." *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 229 (6th Cir. 2005) (emphasis added). For "almost 50 years" before *Tinker*, the Court "unmistakabl[y]" held "teachers do not shed their constitutional rights to freedom of speech and expression at the schoolhouse gate." *Id.* (quoting *Tinker*, 393 U.S. at 503). "The assumption that the Court would draw a distinction between the schoolhouse gate and the doors of the classroom is counterintuitive." *Id.* It follows that in-class speech presumptively addresses public concerns, as otherwise it is not protected. If this was true in K–12, it is all the more so at universities, where the "classroom is peculiarly the marketplace of ideas." *Keyishian*, 385 U.S. at 603.

In a faculty-speech case, the Sixth Circuit observed: "Because the essence of a teacher's role is to prepare students for their place in society as responsible citizens, classroom instruction will often fall within the Supreme Court's broad conception of 'public concern.'" *Hardy*, 260 F.3d at 679. Does this mean every word a professor ever utters in class is automatically protected? Of course not. *Hardy* notes that profanity—whether gratuitous and "not germane to the subject matter" or "motivational"—is not protected. *Id.* (citing & quoting *Bonnell*, 241 F.3d 800; *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995)). But these exceptions do not change the fact that the professor's role, combined with the "broad conception of public concern," increases the chances that his speech qualifies as such. *Id.* Even when a professor's "in-class speech does not itself constitute pure public debate," it is still protected if it "relate[s] to matters of overwhelming public concern—race, gender, and power conflicts in our society." *Id.* This covers Dr. Meriwether, who addressed gender. Thus, "the argument that teachers have no First Amendment rights when teaching or that the government

36

can censor teacher speech without restriction, is totally unpersuasive" and "fantastic." *Id.* at 680. As faculty only have these rights when they address public concerns, a professor's in-class speech generally addresses matters of public concern.

Later, the Sixth Circuit again held a "teacher's curricular speech . . . ordinarily covers" matters of public concern. *Evans-Marshall*, 624 F.3d at 339. Given that the "essence of a teacher's role is to prepare students for their place in society," "the teacher that can do that *without* covering topics of public concern *is rare indeed, perhaps non-existent.*" *Id.* (second emphasis added).

The Report disputes this, relying on cases that have nothing to do with the public concern analysis. R. & R., Doc. 49, PageID.2121. *Corlett v. Oakland Univ. Bd. of Trs.*, 958 F. Supp. 2d 795 (E.D. Mich. 2013), involves student discipline (not faculty speech) and simply establishes that a student's lust for his professor is not a matter of public concern. But Dr. Meriwether's speech does not even remotely resemble that speech. *Settle v. Dickson Cty. Sch. Bd.*, 53 F.3d 152 (6th Cir. 1995), involves a K–12 student and a grading dispute, said nothing about public concern, and had nothing to do with the teacher's free speech. In the sentences before and after those the Report quotes, *Epperson v. Arkansas*, 393 U.S. 97 (1968), reaffirms that courts "have not failed to apply the First Amendment's mandate in our education system . . . to safeguard the . . . freedom of speech" because it "'does not tolerate laws that cast a pall of orthodoxy over the classroom.'" *Id.* at 104–05 (quoting *Keyishian*, 385 U.S. at 603). This bolsters the idea that a professor's in-class speech is presumptively protected.

Hence, the Sixth Circuit has repeatedly ruled that a teacher's or professor's in-class speech "presumptively," "ordinarily," "often," or "with rare (if any) exceptions" receives First Amendment protection, and thus, addresses matters of public concern.

### d. The Report errs by treating Dr. Meriwether's students as a captive audience.

The Report describes Dr. Meriwether's students as "a captive audience." R. & R.,

Doc. 49, PageID.2125; *id.*, PageID.2124 ("Doe . . . was involuntarily subjected to the speech[.]"). There are no facts in the Complaint to support this. Instead, it states Doe confronted Dr. Meriwether on the first day of class, Compl. ¶¶ 128, 140–44, Doc. 34, PageID.1474–75, well before any drop-add period ended. The Sixth Circuit agrees. For it ruled "university students . . . are not forced to be there." *Ward v. Polite*, 667 F.3d 727, 734 (6th Cir. 2012). If that was true of a graduate student in the final stages of her master's degree program, it is all the more true of undergraduates.

The Report hints Defendants could punish Dr. Meriwether because "captive" Doe "objected to his speech." R. & R., PageID.2125; *id.*, PageID.2124 (same). But "much that we encounter offends our . . . political and moral sensibilities." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975). Yet, "the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Id.* Put simply, "dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of conventions of decency." *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). "Colleges and universities . . . have historically fostered th[e] exchange [of ideas]. But that role . . . will not survive if certain points of view may be declared beyond the pale." *Rodriguez*, 605 F.3d at 708.

### e. The content, form, and context of Dr. Meriwether's speech shows he was speaking on a matter of public concern.

The Report says none of Dr. Meriwether's speech addressed a public concern after reviewing its "content, form, and context" (*i.e.*, "what was said, where it was said, and how it was said"). R. & R., PageID.2122–27 (quoting *Snyder*, 562 U.S. at 453–54). But in applying these factors, it errs again by ignoring the Complaint, failing to view the facts in Dr. Meriwether's favor, and failing to consider factors precedent deems critical.

The Report recites the Sixth Circuit's factors: the "focus," "point," and "intent" of the speech, along with the "purpose" or "communicative purpose of the speaker." *Id.*,

PageID.2122 (quoting *Farhat*, 370 F.3d at 592). But it ignored how the Sixth Circuit applied them. *Farhat*, 370 F.3d at 593 ("[T]he primary 'focus,' 'point,' or 'communicative purpose' of Appellant's letters was his own personal 'beef' with the union and the school district concerning his deteriorating job situation[.]"). So these factors are akin to asking if the employee is raising "nothing more than the quintessential employee beef: management has acted incompetently." *Handy-Clay*, 695 F.3d at 540 (cleaned up). Dr. Meriwether did not complain about his superiors. He expressed his views on a hotly-debated cultural issue, as one would expect in a political philosophy class.

The Report frames the context as "plaintiff's employment." R. & R., Doc. 49, PageID. 2123. But the college classroom is not the typical government office. It is "is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180. A professor's speech there *at least* "often" addresses public concerns. *Hardy*, 260 F.3d at 679; *see supra* Argument II.A.2.c.

The Report notes Dr. Meriwether spoke only to his students. R. & R., PageID.2123. But a professor does "not have [to] publish[] his thoughts" for them to address a public concern. *Kerr*, 694 F. Supp. 2d at 842–43. Freedom of speech "is not lost to the public employee who arranges to communicate his views privately . . . rather than to spread his views before the public." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 416–17 (1979); *Rankin*, 483 U.S. at 386 n.11 ("The private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern.").

On content, the Report faults Dr. Meriwether for not explaining the message he communicated via sex-based terms. R. & R., PageID.2123–24. But per the Complaint, he faced discrimination and harassment complaints the first week of class. Compl. ¶¶ 128, 150–53, Doc. 34, PageID.1474, 1476. This hardly encouraged in-class elaboration. *See supra* Argument I.D. He did explain in the disciplinary process. *See, e.g.*, Compl. ¶¶ 206–11, PageID.1482; Ex. 11, Doc. 34-11, PageID.1707; Ex. 12, Doc. 34-12, PageID. 1710, 1714. Legally, it does not matter if students fully comprehended why he said what he said. *See supra* Argument II.A.2.b. But the Complaint still details facts

showing Defendants and Doe fully understood all along that he was disagreeing with transgender ideology. *See supra* Argument I.C. On a motion to dismiss, these facts must be taken in Dr. Meriwether's favor. *Girl Scouts*, 770 F.3d at 418.

The Report asserts that Dr. Meriwether "was not sharing ideas," R. & R., Doc, 49, PageID. 2125, or stating "any facts about gender identity." *Id.*, PageID.2124. Yet in the preceding sentence, it notes that he "admittedly was . . . conveying personal beliefs and view about gender identity." *Id.* Both cannot be true. Regardless, the Complaint says that when he uses sex-based terms, he "communicates his own views on [gender identity.]" Compl. ¶ 204, Doc. 34, PageID.1481; *id.* ¶ 310, PageID.1495 (same). It details how Doe objected to a simple, "Yes, sir," because he identified as female, and this statement, especially when Dr. Meriwether declined to use feminine terms, communicated views or facts about gender identity with which Doe disagreed. *Id.* ¶¶ 128, 140–44, PageID.1474–75. And administrators also understood that Dr. Meriwether was communicating ideas about gender identity, *see supra* Argument I.C, a matter of public concern, *see supra* Argument II.B.2.a. On a motion to dismiss, a "savvy judge" cannot disregard these facts. *Twombly*, 550 U.S. at 556.

The Report faults Dr. Meriwether for not "inviting discussion." R. & R., PageID. 2125. But a professor's "in-class speech does not itself [have to] constitute pure debate" to address a matter of public concern. *Hardy*, 260 F.3d at 671. There, addressing gender sufficed, *id.*, and Dr. Meriwether did just that.

The Report describes Dr. Meriwether's purpose as maintaining in-class formality (*i.e.*, his "pedagogical style") and expressing his views about Doe's sex (*i.e.*, "Doe's biological gender at birth"). R. & R., PageID.2124. But the Complaint details how Dr. Meriwether offered to change his classroom's formality by dropping titles for Doe and later explored doing so for all students. By offering to avoid pronouns for Doe, he offered to say nothing at all about Doe's sex or gender identity. Defendants rejected these proposals, insisting he refer to Doe as female or treat everyone as androgynous,

*see supra* Argument I.A, something even federal law does not require, *see supra* Argument I.B.2. Dr. Meriwether simply sought to "communicate[] his own views," Compl. ¶¶ 204, 310, Doc. 34, PageID.1481, 1495, and avoid communicating views he does not hold and that violate his conscience, *id.* ¶¶ 92, 217–18 PageID.1469, 1483.

The Report also claims Dr. Meriwether's speech "did not 'serve the purpose of advancing viewpoints . . . which had as their purpose influencing or informing public debate.'" R. & R., Doc. 49, PageID.2125 (quoting *Bonnell*, 241 F.3d at 820). But when a professor expresses his views on an issue of public debate (*e.g.*, gender identity, *Janus*, 138 S. Ct. at 2476) to his students, he influences or informs them regardless of their views. That is why professors are "the intellectual leaders in our colleges and universities." *Keyishian*, 385 U.S. at 603. Perhaps this is why the Report admits Dr. Meriwether was "conveying his personal beliefs and views about gender identity," R. & R., PageID.2124, a matter of public concern, *see supra* Argument II.B.2.a.

Also, the Report reads *Bonnell* selectively. It quotes language about the professor's gratuitous, non-germane profanity. *Bonnell*, 241 F.3d at 818–21. Dr. Meriwether never engaged in any profanity (much less the lascivious expression in *Corlett*, 958 F. Supp. 2d 795). But the *Bonnell* professor also distributed in class a redacted copy of the sexual harassment complaint against him. *Bonnell*, 241 F.3d at 805–06. The Sixth Circuit ruled "it is well-settled that allegations of sexual harassment . . . are matters of public concern." *Id.* at 812. It did not matter that the professor was the target, not the complainant. *Id.* at 813. Hence, the facts giving rise to that complaint addressed a matter of public concern. *Id.* And so do the facts giving rise to the discrimination and harassment charges against Dr. Meriwether.

Last, the Report suggests that Dr. Meriwether did not address a matter of public concern because he simply wanted to express "his personal beliefs and views." R. & R., PageID.2125; *id.*, PageID.2124 ("[His] purpose was to convey [his] personally-held beliefs[.]"). This adopts the position that Dr. Meriwether's allegedly personal motives

for speaking control the public concern analysis. Not only does this fail to view the facts in Dr. Meriwether's favor, *Girl Scouts*, 770 F.3d at 418, but it is also contrary to law. "The argument that an individual's *personal* motives for speaking may dispositively determine whether that individual's speech addresses a matter of *public* concern is plainly illogical and contrary to the broader purposes of the First Amendment." *Handy-Clay*, 695 F.3d at 544 (quoting *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 574 (6th Cir. 1997)); *accord Bonnell*, 241 F.3d at 813.

* * *

In sum, the Complaint states that Dr. Meriwether communicated his views on gender identity, a topic the Supreme Court has stated is a public concern, as the debate over it confirms. He did so orally, rendering his expression pure speech. He did so in a classroom, a place where a professor's speech addresses, with perhaps rare exceptions, matters of public concern. Hence, he addressed a matter of public concern.

## B. The Report does not address the other elements of Dr. Meriwether's First Amendment retaliation claim.

Having decided Dr. Meriwether did not speak "as a citizen" or "on a matter of public concern," the Report recommends dismissing his retaliation claim without assessing the remaining elements. R. & R., Doc. 49, PageID.2126–27 & n.7.

On *Pickering's* balancing test, Dr. Meriwether alleged facts that show "his interest in First Amendment expression outweighed [Defendants'] interest in the efficient operation of his workplace." *Crawford v. Columbus State Cmty. Coll.*, 196 F. Supp. 3d 766, 777 (S.D. Ohio 2016). The Complaint states that his speech did not disrupt his own class, let alone the University, Compl. ¶ 312, Doc. 34, PageID.1495, and that Doe remained in his class and participated frequently, vigorously, and voluntarily. *Id.* ¶¶ 176–83, PageID.1479. *See also* Defs.' MTD Resp., Doc. 45, PageID.2016–17; Ints.' MTD Resp., Doc. 46, PageID.2041–46. Besides, once speech clears the "as a citizen" and "public concern" hurdles, "it is not easy to imagine a situation in which a public

42

employer has a legitimate need to demand that its employees recite words with which they disagree." *Janus*, 138 S. Ct. at 2473. Thus, Dr. Meriwether's speech is protected.

On adverse action, all Dr. Meriwether has to do is plead facts showing something more than a *de minimis* (*i.e.*, inconsequential) violation. *Maben v. Thelen*, 887 F.3d 252, 266 (6th Cir. 2018). For "[o]nly *de minimis* violations should be dismissed as a matter of law; in general, the adverseness question should survive the pleading stage." *Id.* The Complaint states that he received a written warning (*i.e.*, reprimand), threatening "further corrective actions." Compl. ¶ 248, Doc. 34, PageID.1487. It also states that he has repeatedly been warned of suspension without pay or termination if he does not change his speech. *Id.* ¶¶ 164, 246–49, 263, 287–89, PageID.1477, 1487, 1489, 1491–92. This constitutes an "adverse action . . . that would deter a person of ordinary firmness from the exercise of the right at stake." *Maben*, 887 F.3d at 266. *See also* Defs.' MTD Resp., Doc. 45, PageID.2017–19.

Causation is a factual issue, *Leary v. Daeschner*, 349 F.3d 888, 898 (6th Cir. 2003), "normally reserved for the jury." *Perry v. McGinnis*, 209 F.3d 597, 604 n.4 (6th Cir. 2000). The Complaint states Defendants punished Dr. Meriwether because he would not refer to Doe as female. Compl. ¶¶ 239–40, 246–49, PageID.1486–87. So he stated a plausible First Amendment retaliation claim that should not be dismissed.

### III. The Report errs by recommending that Dr. Meriwether's content and viewpoint discrimination claims be dismissed.

The Report dedicates seven pages to content and viewpoint discrimination, but discusses only overbreadth (with a passing reference to unbridled discretion). R. & R., Doc. 49, PageID.2130–36. In so doing, it sidesteps Dr. Meriwether's claims: that Defendants reviewed and sought to alter the content of his speech, tried to silence his viewpoint, and exercised their unbridled discretion in the process. Compl. ¶¶ 318–20, 326, PageID.1496; Defs.' MTD Resp., Doc. 45, PageID.2019–22. This is troubling, seeing as Defendants cannot limit even unprotected speech in content- or viewpoint-

based ways. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381–96 (1992).

### A. The Report errs by never addressing how Defendants review and seek to alter the content of faculty speech.

A policy or action is "content based if [it] applies to particular speech because of the topic discussed or the idea or message expressed," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015), or "alters the content of the speech," *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). Defendants' policies regulate faculty speech in exactly these prohibited ways. Compl. ¶¶ 82–83, Doc. 34, PageID.1468.

This case arose due to the content of Dr. Meriwether's speech (*i.e.*, declining to refer to Doe as female). *Id.* ¶¶ 125–44, PageID.1474–75. He did so to avoid expressing ideas about human nature he does not believe and instead to "communicate[] his own views." *Id.* ¶¶ 92, 204, 310, PageID.1469, 1481, 1495. Defendant Milliken pressured him to change the way he addressed students, *id.* ¶ 54, PageID.1476, stating he must change to comply with Defendants' policies, *id.* ¶¶ 162–63, 168–75, PageID.1477–78, because his speech violated them, *id.* ¶¶ 186–87, PageID.1480, Compl. Ex. 9, Doc. 34-9, PageID.1702. She formally investigated him for this speech. Compl. ¶¶ 194–95, PageID.1480. She and others even mandated how he must change his speech. *Id.* ¶¶ 212–18, 269–84, PageID.1482–83, 1489–91. She cited the content of his speech (*i.e.*, "repeatedly refus[ing] to change the way he addressed [Doe]") as violating Defendants' policies and meriting a written warning, *id.* ¶¶ 239–40, PageID.1486, an act other Defendants affirmed, *id.* ¶¶ 244–45, 264, 270, PageID.1487, 1489. So they punished him "because of . . . the idea or message [he] expressed," *Reed*, 135 S. Ct. at 2227, and tried to alter his speech, *Riley*, 487 U.S. at 795.

Also, the Complaint states that Defendants punished Dr. Meriwether due to one student's complaints. Compl. ¶¶ 149–53, 160–63, PageID.1476–77. But a "[l]istener's reaction to speech is not a content-neutral basis for regulation." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). It's a heckler's veto.

These facts, taken as true, *Girl Scouts*, 770 F.3d at 418, show Defendants punished Dr. Meriwether due to the content of his speech. The Report errs by ignoring this.

### B. The Report errs by never addressing how Defendants seek to silence certain viewpoints of faculty speech.

Viewpoint discrimination occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject"—that is, "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). If Dr. Meriwether had expressed a different viewpoint on gender identity, they never would have punished him. If he self-censored, they would have left him alone. *See supra* Argument III.A; *see also supra* Argument I.A, C. But he expressed a viewpoint they disliked, and they punished him. Thus, they violated this "axiomatic" First Amendment principle. *Rosenberger*, 515 U.S. at 828–29.

The way Defendants punished Dr. Meriwether after Doe objected to his speech highlights the problem. Per the Complaint, when Doe initially objected, Compl. ¶¶ 128–32, 140–44, Doc. 34, PageID.1474–75, Defendants told him to change his speech in a way that would communicate a different view, *id.* ¶ 154, PageID.1476. After initially accepting Dr. Meriwether's proposed accommodation, *id.* ¶¶ 157–58, PageID. 1477, Defendants reversed course because "Doe was not satisfied," *id.* ¶¶ 161–62. Disciplinary action began because Doe complained again and "threatened to contact a lawyer." *Id.* ¶¶ 166–75, PageID.1478. The only reason Doe objected to (and Defendants thus tried to silence) Dr. Meriwether's speech was the views he expressed. *See supra* Argument I.C. Thus, they violated the First Amendment. *Dambrot*, 55 F.3d at 1183 (ruling universities "cannot . . . establish an anti-discrimination policy which had the effect of prohibiting certain speech because it disagree with the ideas or messages sought to be conveyed . . . [or] because [the speech] was found to be offensive, even gravely so, by large numbers of people"); *accord C.E.F. of N.J., Inc. v.*

*Stafford Twp. Sch. Dist.*, 386 F.3d 514, 527 (3d Cir. 2004) (Alito, J.) ("To exclude a group simply because it is controversial or divisive is viewpoint discrimination. A group is controversial or divisive because some take issue with its viewpoint.").

Dr. Meriwether pleaded facts that, taken as true, show Defendants punished him due to his viewpoints. *Girl Scouts*, 770 F.3d at 418. The Report errs by ignoring this.

### C. The Report errs by concluding that Defendants do not have unbridled discretion to regulate faculty speech.

Also, the "First Amendment prohibits the vesting of . . . unbridled discretion in a government official." *Forsyth Cty.*, 505 U.S. at 133; *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969). Rules that do so are deemed viewpoint-based. *See, e.g.*, *Southworth v. Bd. of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002) ("[T]he prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement."); *Matwyuk v. Johnson*, 22 F. Supp. 3d 812, 824–25 (W.D. Mich. 2014) (finding language granting unbridled discretion to be viewpoint based); *see, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988) (noting vague criteria allow decisions based on "the content of the speech or viewpoint of the speaker"). If they involve the "appraisal of facts, the exercise of judgment, and the formation of an opinion," the danger of censorship is too great to be permitted. *Forsyth Cty.*, 505 U.S. at 131. Instead, rules must "contain narrow, objective, and definite standards to guide" officials. *Shuttlesworth*, 394 U.S. at 150–51.

As the Complaint states, Defendants' policies grant officials unbridled discretion by including the imprecise, subjective, and indefinite class of gender identity. Compl. ¶ 58, Doc. 34, PageID.1465; *see, e.g.*, *id.* ¶ 64 ("[A] person's innermost concept of self as male or female or both or neither—how individuals perceive themselves and what they call themselves."); *id.* ¶ 66, PageID.1466. As they state, each person can identify as "neither woman or man, both woman and man, somewhere in between, or in some combination." *Id.* ¶ 68. That identity is not visible and can change based on "mood

46

swings" or "which friend you're with." *Id.* ¶¶ 69–70. With uncertainty comes varying pronouns, *id.* ¶¶ 72–74, PageID.1466–67, which the Complaint states Defendants require professors to use, *id.* ¶ 112, PageID.1472; *id.* ¶ 195, PageID.1480. Thus, the number of permutations facing a professor is staggering and may fluctuate from day to day. Punishing faculty under a restriction this ephemeral ignores the First Amendment's mandate for "narrow, objective, and definite standards." *Shuttlesworth*, 394 U.S. at 150–51. Worse yet, Defendants decide how to proceed based on whether a student is offended, Compl. ¶¶ 161, 166, Doc. 34, PageID.1477–78, a standard that is "highly subjective" and viewpoint-based. *Matal*, 137 S. Ct. at 1756 n.5, 1763 (plurality); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) ("[A] law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment.").

The Report quotes a case assessing a "reasonable person" standard. R. & R., Doc. 49, PageID.2133–35 (quoting *Smock*, 353 F. Supp. 3d at 658). But Dr. Meriwether did not challenge this standard, which Defendants effectively deleted here. *See supra* Argument I.B. He challenges "the inclusion of 'gender identity' . . . because this . . . grants Defendants unbridled discretion to restrict (or punish him for) his protected expression." Compl. ¶ 58, Doc. 34, PageID.1465. A "reasonable person" standard does nothing to cure the subjectivity and transience of "gender identity."

The Report highlights more unbridled discretion. R. & R., Doc. 49, PageID.2136. Defendants' policies, as everyone acknowledges, *id.*, PageID.2135, extend beyond the classroom. In fact, they extend to "events and circumstances '[t]hat occur off-campus when the Title IX Coordinator or other administrator . . . determines that the alleged off-campus conduct could reasonably create a hostile environment or be detrimental to the University.'" *Id.*, PageID.2136 (quoting Ex. 2 ¶ 2.1.3, Doc. 34-2, PageID.1512). As "he" and "she" can create a hostile environment to Defendants (who ignore their policies, *see supra* Argument I.B.1), University officials have complete discretion to review anything faculty say off campus once someone complains and to punish them.

47

Nor can Defendants evade this doctrine by saying they did not abuse their discretion. They punished Dr. Meriwether for alleged discrimination under their policies. Just the *potential* for such abuse condemns their policies. *Forsyth Cty.*, 505 U.S. at 133 n.10 ("[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so."). But they ignored the very terms of their policies and imposed an androgyny requirement that appears nowhere in their policies or federal law. *See supra* Argument I.B. So when it comes to silencing speech they do not like, nothing stops them. This Court should not "entrust the guardianship of the First Amendment to the tender mercies of [their Title IX] officer." *Dambrot v. Cent. Mich. Univ.*, 839 F. Supp. 477, 482 n.7 (E.D. Mich. 1993).

\* \* \*

Dr. Meriwether pleaded facts showing Defendants reviewed and sought to change the content of his speech. The Complaint details how they punished him for the viewpoints he expressed, using the unbridled discretion inherent in their policies. These facts must be viewed in Dr. Meriwether's favor, *Girl Scouts*, 770 F.3d at 418, and the Report errs by sidestepping—and still recommending dismissing—them.

## IV. The Report errs by recommending that Dr. Meriwether's compelled speech claim be dismissed.

For decades, it has been clear that the state cannot "force[] an individual . . . to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). This is the "fixed star in our constitutional constellation." *Barnette*, 319 U.S. at 642. "Compelling individuals to mouth support for views they find objectionable"—as Defendants do here— "violates that cardinal constitutional command." *Janus*, 138 S. Ct. at 2463.

Dr. Meriwether explained his views on gender identity and Defendants' demands,

both in this case, Compl. ¶¶ 89–92, Doc. 34, PageID.1469, and to Defendants, *see, e.g.*, *id.* ¶¶ 206–11, 237, PageID.1482, 1485–86; Ex. 12, Doc. 34-12, PageID.1710–11, 1714; Ex. 18, Doc. 34-18, PageID.1766. Yet they punished him for refusing to express their preferred message. *See, e.g.*, Compl. ¶¶ 239–40, PageID.1486 (faulting him for "repeatedly refus[ing] to change the way he addressed [Doe]"). If he does not say what they want, they threaten "further corrective actions," *id.* ¶ 248, PageID.1487, including possible suspension without pay or dismissal, *id.* ¶¶ 251, 263, 287–90, PageID.1487, 1489, 1491–92. They seek to "coerce [him] into betraying [his] convictions" and endorsing objectionable ideas, which is "always demeaning." *Janus*, 138 S. Ct. at 2464.

The Report insists that Dr. Meriwether's speech is not protected. R. & R., Doc. 49, PageID.2129 (referencing "official duties"). But it is. *See supra* Argument II. If merely displaying a license plate is protected speech that cannot be compelled, *Wooley*, 430 U.S. at 715, being forced to utter ideologically freighted words to an audience must also be protected. If a professor's grades cannot be compelled, *Parate v. Isibor*, 868 F.2d 821, 827–30 (6th Cir. 1989), neither can his speech to students. And since it is protected, "[Defendants] have [no] legitimate need to demand that [Dr. Meriwether] recite words with which [he] disagree[s]." *Janus*, 138 S. Ct. at 2473.

The Report highlights the "choices" Defendants presented. R. & R., PageID.2129. But when the government says, "You must speak this way or that way," it is still compelling speech, especially when, as here, either option conveys a message. The Complaint states Defendants demanded that Dr. Meriwether use identity-based or androgynous terms for all students. *See, e.g.*, Compl. ¶¶ 210–18, PageID.1482–83. Identity-based terms would affirm that people are however they identify, a view he does not hold. *Id.* ¶¶ 217–18. Androgynous terms would prohibit him from expressing views he does hold—that people are male or female and that this fixed sex is what is real. *Id.* ¶ 89, PageID.1469. He could not acknowledge "in a perfectly neutral and nondiscriminatory fashion" a person's sex, something Titles VII and IX permit. *Price-*

*Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring). He would be barred from acknowledging an "immutable characteristic," *Frontiero*, 411 U.S. at 686, the "enduring" distinction between men and women that "remain[s] cause for celebration." *Virginia*, 518 U.S. at 533. He would have to speak as if "our most basic biological differences" were suspect, off-limits, and *verboten*, which they are not. *Nguyen*, 533 U.S. at 73. As federal law "requires neither asexuality nor androgyny," *Oncale*, 523 U.S. at 81, Defendants cannot compel him to communicate it either.

It matters not whether Defendants' "options" are framed as, "Speak this way or that way," or as, "Speak this way or stay silent." For in the compelled speech context, "the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley*, 487 U.S. at 796–97. And "public universities may not force professors to endorse or eschew specific viewpoints," which is exactly what Defendants' "options" entail. *Smock*, 353 F. Supp. 3d at 659.

After all, these "choices" exist in all compelled speech claims. The Barnettes could have left the public schools to avoid the mandatory Pledge of Allegiance. *Barnette*, 319 U.S. at 650 (Frankfurter, J. dissenting) (noting it applied only to "those who choose to attend the public schools"). The *Miami Herald* could have stopped criticizing candidates to avoid the "right of reply" statute. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 244 (1974). The parade organizers in *Hurley* could have cancelled the parade to evade the public accommodations statute. *Hurley*, 515 U.S. at 560–61. Various HIV/AIDS organizations could have continued their work without seeking the federal funding that required them to condemn prostitution. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 208 (2013). But these options did not condemn their compelled speech claims. Even the option of forming an affiliate to espouse the mandated message did not change the analysis. *Id.* at 219 ("If the affiliate is distinct from the recipient, the arrangement does not afford a means for the

*recipient* to express *its* beliefs. If the affiliate is more clearly identified with the recipient, the recipient can express those beliefs only at the price of evident hypocrisy."). Hence, Defendants' "options" do not undermine Dr. Meriwether's compelled speech claim, and the Report errs by concluding otherwise.

## V. The Report errs by recommending that Dr. Meriwether's unconstitutional conditions claim be dismissed.

Even if a person is not entitled to a particular benefit, the government "may not deny [it] to [him] on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Here, Defendants punished Dr. Meriwether for exercising his right to free speech (among others), and they threaten to do so again unless he changes his speech. Compl. ¶¶ 239–40, 248, Doc. 34, PageID.1486–87. The only way he can avoid this is to surrender his right, which lies at "the heart of the First Amendment," to "decide for himself . . . the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). These facts must be taken as true, *Girl Scouts*, 770 F.3d at 418, and they establish that Dr. Meriwether pleaded a plausible unconstitutional conditions claim.

The Report claims that neither *Perry* nor *Turner* "recognize the validity of such a claim." R. & R., Doc. 49, PageID.2137. *Turner* summarizes the right that lies "at the heart of the First Amendment," the right Defendants insist Dr. Meriwether sacrifice. *Turner*, 512 U.S. at 622. *Perry* outlines the doctrine, noting that if the government "could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Perry*, 408 U.S. at 597. And of particular importance here, *Perry* applied this doctrine to reverse summary judgment granted to a university that punished a professor for saying things administrators did not like. *Id.* at 598.

The Report doubts that "the Supreme Court or the Sixth Circuit recognizes an

'unconstitutional conditions' claim." R. & R., Doc. 49, PageID.2138. The Supreme Court often articulates this doctrine. *See, e.g.*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) ("We have said in a variety of contexts that 'the government may not deny a benefit to a person because he exercises a constitutional right.'"); *Bd. of Cty. Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 674 (1996) ("[O]ur modern 'unconstitutional conditions' doctrine holds that the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit."). And *Perry* is the prototypical example of it. *See, e.g.*, *Koontz*, 570 U.S. at 604 ("In *Perry* . . . , we held that a public college would violate a professor's freedom of speech if it declined to renew his contract because he was an outspoken critic of the college's administration."); *Umbehr*, 518 U.S. at 674–75 (discussing *Perry*, 408 U.S. at 597).

The Sixth Circuit is no different. "[A] state actor cannot constitutionally condition the receipt of a benefit . . . on an agreement to refrain from exercising one's constitutional rights . . . ." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1077 (6th Cir. 1994). What kind of claim is this? An "unconstitutional conditions claim." *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005). Like the Supreme Court, the Sixth Circuit roots this claim in *Perry*. *Id.* (quoting *Perry*, 408 U.S. at 597); *G & V Lounge*, 23 F.3d at 1077 (same).

Dr. Meriwether pleaded plausible unconstitutional conditions claim—his speech or his job—which both the Supreme Court and Sixth Circuit recognize.

## VI. The Report errs by recommending that Dr. Meriwether's Free Exercise claim be dismissed.

Dr. Meriwether's right to "free exercise" includes not just the right to *believe*, but the right to *exercise* his faith. It encompasses the right to "profess whatever religious doctrine one desires," *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877 (1990), and to "communicat[e]" these teachings to others, *Hosanna-Tabor Evangelical*

*Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 199 (2012) (Alito, J., concurring). The Complaint details how Defendants punished Dr. Meriwether for (and prohibit him from) communicating his religious views on gender identity. The Report errs by concluding this claim "fails as a matter of law." R. & R., Doc. 49, PageID.2145.

### A. The Report errs by failing to consider recent developments in free exercise jurisprudence.

Dr. Meriwether invoked the recent developments in free exercise jurisprudence. *See* Ints.' MTD Resp., Doc. 46, 2046–48. The Report mentions but never analyzes these arguments, skipping to the *Smith* test. R. & R., PageID.2139–40. It relies, with one passing exception, on no cases more recent than 2012. *Id.* In so doing, it errs.

### 1. The Report errs by ignoring how Defendants interfere with Dr. Meriwether's right to communicate consistent with his faith.

The *Smith* test traces some of the boundary between government power and free exercise. While Defendants' restrictions are not neutral or generally applicable, *see infra* Argument VI.B, the Supreme Court rejected the idea "that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017). In many instances, the government cannot use a neutral, generally applicable law to interfere with religious exercise. Regardless of what neutral, generally applicable laws might require, it cannot compel clergy "to perform" a same-sex wedding. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018). Nor can it use neutral, generally applicable nondiscrimination laws to interfere with a religious group's selection of its teachers and its ability to operate consistent with its faith. *Hosanna-Tabor*, 565 U.S. at 190.

Notably, *Smith* has never been used to permit government to suppress a religious adherent's pure speech because it dislikes its purpose or message. This makes sense because the freedom to communicate one's beliefs—and to decline to engage in speech that contradicts those beliefs—is a core component of the right to "profess whatever

religious doctrine one desires." *Smith*, 494 U.S. at 877. The government cannot interfere with that liberty, even if the tool used is a neutral, generally applicable law.

Yet, this is what Defendants are doing. The Complaint details Dr. Meriwether's religious beliefs and how he communicates them. Compl. ¶¶ 86–92, 134–35, 204, 310, Doc. 34, PageID.1469, 1474–75, 1481, 1495. It states how Defendants punished him for "refusing to change" that message. *See, e.g.*, *id.* ¶ 239, PageID.1486; *see also supra* Argument III.A. They mandated he use identity-based terms (which violates his religious beliefs) or androgynous ones (which bars him from expressing them). *See supra* Argument IV. They even banned him from professing his views via disclaimer. *See supra* Argument I.A. Either way, this violates his right to "profess whatever religious doctrine [he] desires," *Smith*, 494 U.S. at 877, and to "communicat[e]" these views to others, *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring).

### 2. The Report errs by ignoring how Defendants require Dr. Meriwether to renounce his religious beliefs to remain a professor in good standing.

The Free Exercise Clause also prohibits the government from requiring citizens to renounce their religious beliefs to obtain public benefits. Thus, Missouri could not exclude a church-operated preschool from a playground safety grant program because of its religious nature. *Trinity*, 137 S. Ct. at 2025. The Free Exercise Clause barred the government from requiring the preschool "to renounce its religious character in order to participate in an otherwise generally available public benefit program, for which it is fully qualified." *Id.* at 2024. To do so "imposes a penalty on the free exercise of religion that must be subjected to the most rigorous scrutiny." *Id.*

The Complaint pleads that Defendants punished Dr. Meriwether for expressing his religious views about human nature via sex-based terms, Compl. ¶¶ 86–92, 239–40, 246–49, Doc. 34, PageID.1486–87, 1469. If he continues, he risks suspension or termination. *Id.* ¶¶ 164, 246–49, 263, 287–89, PageID.1477, 1487, 1489, 1491–92. The only way to remove the threat to his job is to renounce his beliefs by expressing ideas

that he does not believe and that contradict his faith.

Defendants' actions are anathema to the *free exercise* of religion, are "odious to the Constitution," and "cannot stand." *Trinity*, 137 S. Ct. at 2025. That Dr. Meriwether holds views some may disfavor is more, not less, reason to protect his freedoms. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000) ("[T]he fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.").

### B. The Report errs by concluding that Defendants' restrictions satisfy *Smith's* neutral and generally applicable test.

The Report also errs by failing to conclude that *Smith*'s "neutral and generally applicable" rule yields the same result. R. & R., Doc. 49, PageID.2140–45. Any government act "that is not neutral" toward religion "or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Such rigorous scrutiny applies here.

### 1. Defendants' restrictions are not neutral.

Defendants failed to act neutrally by displaying hostility to religious people and their beliefs. *Masterpiece*, 138 S. Ct. at 1729–31; *Lukumi*, 508 U.S. at 534. "The Free Exercise Clause bars even '*subtle* departures from neutrality' on matters of religion," and it applies "upon even *slight* suspicion that . . . state [actions] stem from animosity to religion or distrust of its practices." *Masterpiece*, 138 S. Ct. at 1731 (cleaned up, emphasis added). Where a lack of neutrality boils over into hostility, the government violates this clause, and courts need not consider strict scrutiny. *Id.* at 1729–32.

The Report faults Dr. Meriwether for not showing that Defendants "generated or enforced" their policies "based on hostility to his religious beliefs." R. & R., PageID. 2142. Of course, that is an issue for discovery. All Dr. Meriwether needs to do here is "raise a reasonable expectation that discovery will reveal evidence" of it. *Twombly*, 550 U.S. at 556. And the Complaint does so. Dr. Meriwether has taught at Shawnee State since 1996, Compl. ¶ 93, Doc. 34, PageID.1469, and until 2018, was never

disciplined, *id.* ¶ 105, PageID.1471. Throughout that time, he referred to students the same way. *Id.* ¶¶ 133–35, PageID.1474–75. Defendants first tried to alter this in 2016. *Id.* ¶¶ 106–24, PageID.1471–73. Though their policies already included gender identity, they had not interpreted them to mandate that professors use identity-based terminology. *Id.* ¶ 124, PageID.1473. If this interpretive shift simply reflected the federal government's guidance, Defendants should have reverted to their original policy position when the federal government "decided to withdraw and rescind" this guidance. *Id.* ¶ 106, PageID.1471–72. But they did not. Instead, when Dr. Meriwether's situation arose, they misinterpreted their policies to target expression that did not violate the policies' terms. *See supra* Argument I.B.1.

Regardless, Defendants failed "to proceed in a manner neutral toward and tolerant of [Dr. Meriwether's] religious beliefs." *Masterpiece*, 138 S. Ct. at 1731. Defendant Pauley demeaned Christians as being "motivated out of fear," derided their teachings as "harmful," and insisted they should not be allowed to teach the beliefs they hold. Compl. ¶¶ 117–22, Doc. 34, PageID.1473. She participated in the disciplinary process, *id.* ¶ 146, PageID.1476, highlighting Dr. Meriwether's use of sex-based terms, Ex. 13, Doc. 34-13, PageID.1720, terms that reflect and express his religious beliefs, Compl. ¶¶ 86–92, PageID.1469 (noting religious basis); *id.* ¶¶ 204, 310, PageID.1481, 1495 (noting his use of them communicates his beliefs).

The Report minimizes these facts, R. & R., Doc. 49, PageID.2142, rather than construing them and their inferences in Dr. Meriwether's favor, *Girl Scouts*, 770 F.3d at 418. True, Defendant Pauley said this "more than a year" before Dr. Meriwether's punishment. R. & R., Doc. 49, PageID.2142. But she did so while "discuss[ing] issues related to transgenderism and gender identity," Compl. ¶ 117, PageID.1473, on the heels of the 2016 debate over how professors must refer to transgender individuals, *id.* ¶¶ 106–16, PageID.1471–73. Nothing suggests her views have changed at all.

The Report states Defendant Pauley was not involved in the discipline. R. & R.,

PageID.2142. The Complaint says she was. She reported Dr. Meriwether to Dr. Scott. Compl. ¶ 146, Doc. 34, PageID.1476. In the process, she highlighted Dr. Meriwether's use of sex-based terms. Ex. 13, Doc. 34-13, PageID.1720. Doubtlessly, Dr. Meriwether's dean and chair (*i.e.*, Defendants Milliken and Pauley) conferred about him during the months that the disciplinary process consumed. That is a matter for discovery, but the Complaint plausibly states that she was involved, and it must be taken as true.

The Report finds "no connection" between Defendant Pauley's comments and the speech for which Dr. Meriwether was punished. R. & R., Doc. 49, PageID.2142. But there are many. If she has such contempt for basic Christian beliefs like the doctrine of hell, Compl. ¶ 119, PageID.1473, she likely has the same disdain for other Christian beliefs, especially those counter to the prevailing winds of academia (*e.g.*, those on gender identity). If she has such disdain for Christians as to generalize that they are "primarily motivated out of fear" and that their religion (even if among others) "oppresses students" and is "counterproductive," *id.* ¶¶ 118, 121, this impacted her decision to report Dr. Meriwether. If she feels free to say that Christians should not be allowed to teach Christian doctrines she deems "harmful," *id.* ¶¶ 119–20, it is reasonable to infer she acted on her beliefs when reporting a Christian professor for expressing his Christian beliefs when the opportunity arose.

Defendant Bauer—who reviewed Dr. Meriwether's punishment three times—also expressed hostility toward his religious beliefs. As provost, he heard about how this punishment imperiled Dr. Meriwether's "ability to live consistent with his sincerely held religious convictions." *Id.* ¶¶ 255–56, PageID.1488. He reacted by "repeatedly interrupting Dr. Poirot, clearly indicating that he had no interest hearing Dr. Meriwether's grievance." *Id.* ¶ 257. When Dr. Poirot mentioned the burden on Dr. Meriwether's religious beliefs, Defendant Bauer "openly laughed." *Id.* ¶ 258. The Complaint plausibly states this "displayed open hostility towards Dr. Meriwether and his religious beliefs." *Id.* ¶ 259. "[T]hroughout the meeting," he "was so uncooperative

that Dr. Poirot 'was not able to present the grievance.'" *Id.* ¶ 262, PageID.1489.

The Report also minimizes these facts, quibbling over when he laughed. R. & R., Doc. 49, PageID.2143. In so doing, it loses sight of the forest for the trees. Defendant Bauer's behavior throughout the meeting—from the interruptions, to the disinterest, to the laugh—displayed hostility. All of the issues Dr. Poirot raises were facets of one topic: Defendants' attempt to force Dr. Meriwether to violate his religious beliefs by punishing him if he did not. All of this context must be considered and viewed in Dr. Meriwether's favor. If a union representative concluded Defendant Bauer's actions rendered the meeting futile, Compl. ¶ 262, Doc. 34, PageID.1489, the hostility had to be palpable. And even if it does not violate the Constitution by itself, it reveals a hostile mindset, which is evidence of at least "subtle departures from neutrality," *Masterpiece*, 138 S. Ct. at 1731, especially when viewed in Dr. Meriwether's favor.

Next, the Report suggests Defendant Bauer's hostility does not matter because Defendant Milliken imposed the punishment. R. & R., PageID.2144. Not so. The Complaint says Defendant Milliken "recommended punishing Dr. Meriwether by issuing a written warning." Compl. ¶ 240, Doc. 34, PageID.1486; Ex. 17, Doc. 34-17, PageID.1742 ("I propose the formal action of a written warning[.]"). To whom did she make this recommendation? "Provost Jeff Bauer." Ex. 17, PageID.1741. Defendant Bauer then "agreed with Defendant Milliken" and "approved her recommended disciplinary action," asking her "to 'provide [him] with a letter of warning.'" Compl. ¶ 245, PageID.1487. Indeed, it was Bauer who "formally notified Dr. Meriwether" of the warning letter. *Id.* ¶ 249. Moreover, his hostility at the August 22nd meeting has everything to do with his decision to deny the grievance then under discussion.

On Defendant Bauer's second round of review, the Complaint details how he refused to accommodate Dr. Meriwether, saying Defendants could not accommodate hypothetical "faculty members with sincerely held religious beliefs that, e.g., one national origin is superior to another national origin, or one sex is inferior to the other

sex." Compl. ¶ 279, Doc. 34, PageID.1490. This is akin to saying "religion has been used to justify all kinds of discrimination throughout history." *Masterpiece*, 138 S. Ct. at 1729. Comparing Dr. Meriwether's "invocation of his sincerely held religious beliefs to defenses of [racism] and [sexism] . . . . is inappropriate for [officials] charged with the solemn responsibility of fair and neutral enforcement of" University policies. *Id.*

The Report characterizes this as stating an "intention to apply the policies in a neutral manner." R. & R., Doc. 49, PageID.2143. But neutrality hinges on an absence of hostility, and to the Supreme Court, the comparisons Defendant Bauer put in writing evidence hostility. *Masterpiece*, 138 S. Ct. at 1729. This is especially true here, given his prior hostility. So this evidence with all plausible inferences, taken in Dr. Meriwether's favor, at least supports a "*slight* suspicion that [Defendant Bauer's actions] stem from animosity to religion or distrust of its practices." *Id.* at 1731.

Dr. Meriwether pleaded facts that indicate institutional hostility "inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *Id.* at 1732. As departures from this neutrality need only be "slight," *id.* at 1731, this evidence at least "raise[s] a reasonable expectation that discovery will reveal evidence of" more hostility. *Twombly*, 550 U.S. at 556.

### 2. Defendants' restrictions are not generally applicable.

The ban on "subtle departures from neutrality" also applies in "a system of individualized governmental assessment of the reasons for the relevant conduct," *Lukumi*, 508 U.S. at 535, 537, which is not generally applicable, *Smith*, 494 U.S. at 884.

The Report dismisses this argument, demanding proof of explicit or past exemptions. R. & R., Doc. 49, PageID.2145. This is another matter for discovery. But exemptions simply *must* exist. Otherwise, Defendants would force professors to refer to a student who demanded it as "Your Majesty,"[23] particularly if he announced that

---

[23]  Rachael Revesz, *University of Michigan Student Changes Name to "His Majesty" Following New "Inclusive" Pronoun Policy*, INDEP., Sept. 30, 2016, https://ind.pn/2H6738q (last visited Oct. 3, 2019).

he identifies as "regagender." Based on Defendants' policies, which state that "gender identity is internal," there is no way to brush this demand off as absurd. A student could similarly identify as "juragender" and demand to be called "Your Honor." At some point, Defendants will find a way to dismiss what they deem to be mockery of their policies, and that will prove the rule is not generally applicable.

The Report ignores how governments can establish "a system of individualized exemptions" when they apply "a subjective test" on a "case-by-case basis" to assess if particular conduct is forbidden. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004). One such "highly subjective" and viewpoint-based test is an offensiveness standard. *Matal*, 137 S. Ct. at 1756 n.5, 1763 (plurality); *Iancu*, 139 S. Ct. at 2301 ("disfavoring 'ideas that offend' discriminates based on viewpoint").

The Complaint states facts showing Defendants utilize this very standard. Dr. Meriwether offered to use Doe's last name, balancing Dr. Meriwether's need to adhere to his conscience while showing courtesy to Doe. Compl. ¶ 157, Doc. 34, PageID.1477. Defendant Milliken approved this. *Id.* ¶ 158. Had Doe been willing to respect Dr. Meriwether's conscience, the matter would have ended. The only reason it did not was that "Doe was not satisfied with the accommodation." *Id.* ¶ 161. Defendants allowed Doe's offense to curb Dr. Meriwether free speech rights. This offensiveness standard qualifies as a system of individualized exemptions, and the Report errs by failing to address this. Thus, strict scrutiny applies.

### C. The Report errs by ignoring the hybrid rights doctrine.

Dr. Meriwether pleaded a hybrid rights claim as Defendants' restrictions violate "the Free Exercise Clause in conjunction with . . . the freedom of speech." *Smith*, 494 U.S. at 881; *see supra* Argument II–IV; Defs.' MTD Resp., Doc. 45, PageID.2009–24; Ints.' MTD Resp., Doc. 46, PageID.2036–46. The Report errs by ignoring this claim.

### D. Due to these errors, the Report never applies strict scrutiny, which Defendants' restrictions fail.

Since *Pickering's* balancing test favors Dr. Meriwether, *see supra* Argument II.B,

Defendants' restrictions cannot satisfy strict scrutiny, rendering dismissal improper. Compl. ¶¶ 304–05, Doc. 34, PageID.1494. The Report errs by not considering this.

## VII. The Report errs by recommending that Dr. Meriwether's overbreadth claim be dismissed.

A policy is unconstitutionally overbroad if it "penalize[s] a substantial amount of [protected] speech" or "delegates overly broad discretion." *Forsyth Cty.*, 505 U.S. at 129–30. Defendants' restrictions definitely do the latter. *See supra* Argument III.C.

The Complaint states Defendants' restrictions also "sweep[] too broadly, *Forsyth Cty.*, 505 U.S. at 130, applying to "all interactions professors have with students." Compl. ¶ 83, PageID.1468. Dr. Poirot said so. *Id.* ¶ 108, PageID.1472. Neither the policies nor the warning confine themselves to the classroom. *Id.* ¶¶ 61–66, 75–83, PageID.1465–68; Ex. 20, Doc. 34-20, PageID.1771. Defendants and Intervenors admit it. Defs.' MTD, Doc. 36, PageID.1888; Ints.' MTD, Doc. 44, PageID.1980. The Report even highlights the policy language that gives Defendants authority to punish "off-campus" speech whenever they deem it to be "detrimental to the University." R. & R., Doc. 49, PageID.2136; *accord supra* Argument I.D. Even if the restrictions were confined, a professor's in-class speech is ordinarily or often (if not presumptively) protected. *See supra* Argument II.A.2.c. Hence, Defendants restrict a vast swath of protected speech: any interaction any professor has with any student—in and out of class, on and off campus, on and off the clock.

The Report recommends dismissing Dr. Meriwether's as-applied claim because his "speech . . . was not protected under the First Amendment." R. & R., PageID.2135. In reaching this conclusion, the Report errs. *See supra* Argument II.

The Report defends this restriction by pointing to how *Smock* distinguished the policy deemed overbroad in *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989): the *Doe* policy "applied to students, contained no 'reasonable person' standard, and was aimed at suppressing a particular viewpoint"; the *Smock* policy "applies to

61

faculty, invokes a reasonable person standard, and is viewpoint neutral." R. & R., Doc. 49, PageID.2133–34. Here, the policy is not viewpoint neutral. *See supra* Argument III.B–C. The Report declares it is, R. & R., PageID.2136, but it never engages Dr. Meriwether's arguments. *See supra* Argument III. Plus, the "reasonable person" standard is the component Defendants effectively deleted to punish Dr. Meriwether. *See supra* Argument I.B.1.a, I.B.2.a. So *Smock* does not save Defendants' policies.

The Report concludes Defendants' policies are not overbroad in part because they are not "designed to punish speech." R. & R., PageID.2136 (citing *Dambrot*, 55 F.3d at 1182); *id.*, PageID.2132 (quoting *Winkle v. Ruggieri*, 2013 WL 230136, *6 (S.D. Ohio Jan. 22, 2013)). But the Supreme Court later ruled that the government's intent does not matter. This policy is facially viewpoint-based at least due to the discretion it confers. *See supra* Argument III.C. As viewpoint discrimination is but "an egregious form of content discrimination," *Rosenberger*, 515 U.S. at 829, it is also facially content based. And a "law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 135 S. Ct. at 2228.

The Report again invokes *Corlett*, 958 F. Supp. 2d at 810. R. & R., PageID.2136. But that case's overbreadth analysis rested on the fact that the student did "not allege any facts . . . to suggest that [the policy at issue] . . . has been interpreted to reach constitutionally protected conduct." *Corlett*, 958 F. Supp. 2d at 811. Dr. Meriwether has. *See supra* Argument II; *accord supra* Argument I.D.

The Complaint pleads facts showing that Defendants' policies and actions restrict a significant amount of protected speech, and nothing the Report says changes this. Dr. Meriwether pleaded plausible claims that they are unconstitutionally overbroad.

## VIII. The Report errs by recommending that Dr. Meriwether's vagueness claim be dismissed.

Restrictions are vague if they (1) fail to give fair notice of prohibited conduct; (2)

lack "explicit standards for those who apply [them]," inviting arbitrary, discriminatory enforcement; and (3) chill constitutional freedoms. *City of Chi. v. Morales*, 527 U.S. 41, 56 (1999); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). "[A] more stringent vagueness test should apply" when policies "interfere[] with the right of free speech." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 793 (2011) (same).

This doctrine prevents the government from defining misconduct expansively, and then letting enforcers determine who really should be punished. *Kolender v. Lawson*, 461 U.S. 352, 358 n.7 (1983). It is problematic when a legislature "hand[s] responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges," *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019), "leaving to them the job of shaping a vague statute's contours through their enforcement decisions," *Sessions v. Dimaya*, 138 S. Ct. 1204, 1228 (2018) (Gorsuch, J., concurring). It is far more so when this power is left to far less accountable university administrators.

Defendants' actions enforcing their policies have chilled expression. Compl. ¶¶ 286–97, Doc. 34, PageID.1491–93. This is an entirely natural result. *See supra* Argument I.D. Those same acts also illustrate the unbridled discretion their policies confer. *See supra* Argument III.C; *accord supra* Argument I.B (noting how Defendants ignored policies). Hence, their policies are vague.

Defendants' policies also fail to give fair notice of what they prohibit and require. After all, they say nothing about pronouns. From at least 1996 to 2016, they did not require professors to use identity-based terms. Dr. Meriwether never did and was never disciplined. Compl. ¶¶ 93, 105, 133–35, PageID.1469, 1471, 1474–75. Yet the policies included gender identity for some of that time. *Id.* ¶ 124, PageID.1473. But in 2016, suddenly those same policies mandated professors use identity-based terms. *Id.* ¶¶ 116, 124. And Defendants did not even change a single word. When the same language can mean opposite things, it does not give fair notice.

63

Defendants' policies also fail to give fair notice because the terms of those policies can apparently be ignored at will. Defendants punished Dr. Meriwether for creating a hostile environment though there is no way his speech—mirroring the Supreme Court's, *Farmer*, 511 U.S. 825—would offend a reasonable person. *See supra* Argument I.B.1.a. They punished him for "disparate treatment" without ever showing that any benefits were lost. *See supra* Argument I.B.1.b. Also, their policies (and federal law) require them to accommodate employees' religious convictions. But per the Complaint details, they rejected accommodations and offered none. Compl. ¶¶ 157, 162, 170–71, 209–18, 260–61, 282–84, Doc. 34, PageID.1477–78, 1482–83, 1488–89, 1491. But in each situation, the "inconvenient" policy language conveniently disappeared. Well, that disappearing language also destroys any fair notice.

Faculty like Dr. Meriwether find themselves in a catch-22 that illustrates the vagueness inherent in Defendants' policies. According to Defendants, those policies mean "[e]very student needs to be treated the same." *Id.* ¶ 216, PageID.1483; Ex. 27, Doc. 34-27, PageID.1799 ("Meriwether's differential treatment of the student was a violation . . . ."). And they protect both "sex" and "gender identity." Ex. 1, Doc. 34-1, PageID.1509. But professors who refer to all students based on their sex will be punished for gender identity discrimination, while those who refer to them based on their gender identity will be treating members of the same sex differently, which is sex discrimination. So, no matter what, professors will violate Defendants' policies. Defendants then get to decide who they want to punish and who they don't, which is exactly what the vagueness doctrine prohibits. *Kolender*, 461 U.S. at 358 n.7.

The Report disregards this vagueness by referencing the "reasonable person" standard, R. & R., Doc. 49, PageID.2148–49, the conveniently disappearing provision. *See supra* Argument I.B. It does nothing to clarify the inherent ambiguity and subjectivity surrounding "gender identity." Compl. ¶¶ 58, 64–74, PageID.1465–67.

The Report insists Dr. Meriwether received clear guidance, R. & R., PageID.2149–

52, but that is not true. Demanding that professors use identity-based terms does not suffice. Compl. ¶¶ 215, 218, 284, Doc. 34, PageID.1483, 1491. What if a student prefers "Your Majesty"? Revesz, *supra* note 23. What if his identity changes? *Id.* ¶ 70, PageID. 1466. Must a professor adjust constantly? What if a student prefers first-person pronouns? Must the professor ascribe the student's statements to himself? Limits must exist, but Defendants offer no path through the quagmire they created, partly because they do not objectively define gender identity or gender identity discrimination. *Id.* ¶¶ 80–81, PageID.1468. Indeed, it would be impossible to do so, and certainly not without creating conflict with the sex discrimination provisions.

Even if it were true, it would not matter. The government cannot outlaw doing "bad stuff," and then defeat vagueness claims by saying, "We clearly told that guy that *x* constituted 'bad stuff.'" Chicago once had a loitering statute that only applied after police issued a warning (*i.e.*, a "dispersal order"). *Morales*, 527 U.S. at 57 (plurality). But the statute was still vague as that warning did not give advanced notice of what was prohibited. *Id.* at 59 ("Because an officer may issue an order only after prohibited conduct has already occurred, it cannot provide the kind of advance notice that will protect the putative loiterer from being ordered to disperse."). Likewise, Defendants' instructions "cannot retroactively give adequate warning of the boundary between the permissible and the impermissible." *Id.* The Constitution "protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

Here, "[professors] of common intelligence must necessarily guess at [the policies'] meaning," and officials will "differ as to [their] application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). Dr. Meriwether's vagueness claim should be not dismissed.

## IX. The Report errs by recommending that Dr. Meriwether's equal protection claim be dismissed.

Despite the Report, Dr. Meriwether never invoked the "class of one" theory. R. &

R., Doc. 49, PageID.2154. Instead, he relies on this principle: "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "[C]lassifications that . . . impinge upon the exercise of a 'fundamental right'" are "treated as presumptively invidious," *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982), and receive "strict scrutiny," *Cleburne*, 473 U.S. at 440.

Defendants' policies and actions have impinged on Dr. Meriwether's fundamental rights (*e.g.*, free speech, free exercise). *See supra* Argument II–VIII. To use his free speech right as an example, he cannot express his views, *see, e.g.*, Compl. ¶¶ 239–40, Doc. 34, PageID.1486, while others can express the opposite views. He is being compelled to say something he does want to say; others are not. So, he is being treated differently, though they are all similarly situated as they exercise the same right.

The Report derides this, saying those "who comply . . . and those who do not . . . comprise different classes." R. & R., PageID.2155. This makes the policy self-justifying for equal protection purposes and ignores the Supreme Court's instructions that classifications which limit constitutional rights deserve strict scrutiny. Hence, strict scrutiny applies, and the Report errs by not so concluding.

## CONCLUSION

At every step of every claim, the Report fails to view the facts in the Complaint and the inferences from them in Dr. Meriwether's favor. *Girl Scouts*, 770 F.3d at 418. Often, it ignores his arguments and claims completely. Time and time again, it misinterprets or misapplies the law, even in ways that would eliminate all free speech protection for Justice Frankfurter declared the "priests of our democracy," *Wieman*, 344 U.S. at 196 (Frankfurter, J., concurring), and embraces arguments the Sixth Circuit declared "totally unpersuasive" and "fantastic," *Hardy*, 260 F.3d at 680. In the process, it fails to see that Dr. Meriwether has pleaded plausible claims for relief. Its recommendations should be rejected, and the two motions to dismiss denied.

Respectfully submitted this 3rd day of October, 2019.

*/s/ Travis C. Barham*

DAVID A. CORTMAN*
Georgia Bar No. 188810
TRAVIS C. BARHAM*
Arizona Bar No. 024867
Georgia Bar No. 753251
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

THOMAS W. KIDD, JR.
Ohio Bar No. 0066359
**KIDD & URLING, LLC**
8913 Cincinnati-Dayton Road
West Chester, Ohio 45069
Telephone: (513) 733–3080
Facsimile: (513) 577–7393
tkidd@kiddurlinglaw.com

TYSON C. LANGHOFER*
Arizona Bar No. 032589
JONATHAN M. LARCOMB*
Virginia Bar No. 47274
**ALLIANCE DEFENDING FREEDOM**
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
tlanghofer@ADFlegal.org
jlarcomb@ADFlegal.org

\* Admitted *pro hac vice.*

*Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of October, 2019, I filed a true and accurate copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to the following attorneys of record:

> RORY P. CALLAHAN
> Principal Assistant Attorney General
> Employment Law Section
> ANNA M. SEIDENSTICKER
> Principal Assistant Attorney General
> Employment Law Section
> 30 East Broad Street, 23rd Floor
> Columbus, Ohio 43215
> Telephone: (614) 644–7257
> Facsimile: (614) 752–4677
> Rory.Callahan@ohioattorneygeneral.gov
> Anna.Seidensticker@ohioattorneygeneral.gov
> elsreview@ohioattorneygeneral.gov
>
> HANNAH STONEBURNER
> Associate Assistant Attorney General
> Education Section
> 30 East Broad Street, 16th Floor
> Columbus, Ohio 43215
> Telephone: (614) 644–7250
> Facsimile: (614) 644–7634
> Hannah.Stoneburner@ohioattorneygeneral.gov
>
> *Attorneys for Defendants*
>
> ADAM G. UNIKOWSKY
> JENNER & BLOCK LLP
> 1099 New York Avenue, NW
> Suite 900
> Washington, DC 20001
> Telephone: (202) 639–6000
> Facsimile: (202) 639–6066
> aunikowsky@jenner.com
>
> SHANNON P. MINTER
> ASAF ORR
> CHRISTOPHER F. STOLL
> NATIONAL CENTER FOR LESBIAN RIGHTS
> 870 Market Street Suite 370
> San Francisco, California 94102
> Telephone: (415) 392–6257
> Facsimile: (415) 392–8442
> sminter@nclrights.org
> aorr@nclrights.org

cstoll@nclrights.org

*Attorneys for Proposed Defendant-Intervenors*

Respectfully submitted on this the 3rd day of October, 2019.

*/s/ Travis C. Barham*
Travis C. Barham
*Attorney for Plaintiff*