# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NICHOLAS K. MERIWETHER,                  :
                                         :
      Plaintiff,                       :
                                         :
        vs.                          :
                                         :  Case No. 1:18-cv-753
THE TRUSTEES OF SHAWNEE STATE            :
UNIVERSITY, ET AL.                       :  Judge Susan J. Dlott
                                         :  Magistrate Judge Karen L. Litkovitz
      Defendants                      :
                                         :
       and                         :
                                         :
JANE DOE and SEXUALITY AND GENDER        :
ACCEPTANCE,                              :
                                         :
      Proposed Defendant-Intervenors.  :
.                                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT-INTERVENORS JANE DOE AND SEXUALITY AND GENDER ACCEPTANCE'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION

Jennifer L. Branch #0038893
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
(513) 621-9100 (tel)
(513) 345-5543 (fax)
Jbranch@gbfirm.com

Shannon P. Minter (admitted *pro hac vice*)
Asaf Orr (admitted *pro hac vice*)
Christopher F. Stoll (admitted *pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street Suite 370
San Francisco, California 94102
(415) 392-6257 (tel)
sminter@nclrights.org
aorr@nclrights.org
cstoll@nclrights.org

Adam G. Unikowsky (admitted *pro hac vice*)
Michael E. Stewart
Jennifer J. Yun
JENNER & BLOCK LLP
1099 New York Avenue, NW #900
Washington, DC 20001
(202) 639-6000 (tel)
(202) 639-6066 (fax)
aunikowsky@jenner.com

Defendant-Intervenors Jane Doe and Sexuality and Gender Acceptance ("SAGA") respectfully request that this Court adopt the Report & Recommendation ("Report" or "R&R") and dismiss the First Amended Complaint ("Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6).

The issue in this case is whether a public employer may require its employees to adhere to nondiscrimination policies requiring equal treatment of transgender students when undertaking their job-related duties. Shawnee's nondiscrimination policies, which apply to all Shawnee staff, seek to ensure that all students have an equal opportunity to participate in and benefit from courses and other school activities.

Plaintiff claims a constitutional right to be exempt from complying with those neutral and generally applicable policies. *See* Pl.'s Objections to the Report & Recommendation ("Pl. Obj."), Doc. 53, at PageID 2267-78. Magistrate Judge Litkovitz correctly determined that no such constitutional right exists. The Report correctly found that Shawnee's nondiscrimination policies, and its enforcement of those policies, did not interfere with Plaintiff's rights either under the First Amendment or under the Due Process and Equal Protection Clauses.

Plaintiff asserts that the Report failed to accept all of the allegations in the complaint as true. Plaintiff also assails virtually every aspect of the Magistrate Judge's legal analysis. None of Plaintiff's arguments are persuasive. The Report carefully evaluated all of Plaintiff's many allegations and correctly concluded that none had legal merit.

## I. The Report Accurately Construed All of the Allegations in Plaintiff's Complaint.

Plaintiff raises a number of objections to the Report's "construction" of the allegations of his complaint. Contrary to Plaintiff's argument, the Report accurately construed all of Plaintiff's allegations and correctly held that those allegations, taken as true, failed to state a constitutional claim as a matter of law.

1

At the motion to dismiss stage, a court must take the plaintiff's factual allegations as true—not the plaintiff's legal theories. *See Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275-76 (6th Cir. 2010) (court need not "accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." (quotation marks omitted)). Plaintiff claims that the Magistrate Judge disregarded his factual allegations, but in fact, the Magistrate Judge correctly assumed that all of Plaintiff's factual allegations were true. Plaintiff simply disagrees with the legal inferences the Magistrate Judge drew from those facts.

Plaintiff identifies four purported examples of factual allegations that the Magistrate Judge failed to credit. None is valid. First, Plaintiff claims that "[t]he Report errs by framing this case as a dispute over pedagogy." Pl. Obj., Doc. 53, at PageID 2265-67. Instead, Plaintiff claims, this is "about mandated ideological conformity." *Id.* at PageID 2265. These are rhetorical arguments about how the law should be applied; they are not well-pleaded factual allegations.

Second, Plaintiff claims that "[t]he Report errs by concluding Dr. Meriwether discriminated," both within the meaning of Shawnee's policy and within the meaning of federal law. *Id.* at PageID 2267. But there is no dispute that Plaintiff used male honorifics and pronouns in class to refer to Ms. Doe. Whether that conduct rises to the level of "discrimination" under federal or state law is a legal inference to be drawn from the undisputed facts.

Moreover, Plaintiff's insistence that he complied with federal antidiscrimination laws misunderstands the posture of this case. Jane Doe is not suing Plaintiff for discrimination. Rather, Shawnee is enforcing a policy it voluntarily adopted. Even if Plaintiff's conduct did not violate antidiscrimination law, nothing in any antidiscrimination law prohibits a university from adopting a policy more protective of students than the legal minimum prescribed by that law. The question

in this case is not whether Plaintiff's conduct is "discrimination," but whether the First Amendment prevents an employer from setting policies governing how their employees communicate while performing their job.

Plaintiff's third argument is that "[t]he Report errs by finding that Dr. Meriwether's speech was not sufficiently expressive," *id.* at PageID 2273. Again, however, the content of Dr. Meriwether's utterances is undisputed. Dr. Meriwether alleges that the University seeks to prevent him from using male honorifics pronouns to describe Ms. Doe, but he does not allege that the University seeks to prevent him from making broader statements about gender identity. Based on those factual allegations, the Report reached the legal conclusion that Plaintiff's statements cannot be "reasonably construed as conveying plaintiff's broader beliefs and views about gender identity." R&R, Doc. 49 at PageID 2125 (emphases omitted). Nowhere did the Report ever question Plaintiff's subjective motives for using male pronouns to describe Ms. Doe; rather, it simply conducted a legal analysis and held that a professor's use of male honorifics and pronouns in class, without more, does not rise to the level of protected speech under the First Amendment.

Finally, Plaintiff claims that the Report "errs by minimizing the scope and effect of Defendants' restrictions on faculty speech." Pl. Obj., Doc. 53, at PageID 2276. Plaintiff speculates that Shawnee might restrict his speech at the "grocery store" or prevent him from critiquing "the absurdity of the avalanche of recently-invented identity-based pronouns." *Id.* at PageID 2277. But Plaintiff does not allege that these events have actually occurred; nor are there non-conclusory factual allegations showing a risk that they will occur. Plaintiff's argument is not a factual argument; rather, it is a policy argument about the asserted *legal* implication of a ruling in Shawnee's favor. The Court may appropriately evaluate that legal argument at the motion to dismiss stage.

## II. The Report Correctly Concluded That the First Amendment Does Not Protect Plaintiff's Speech.

Plaintiff was a public employee speaking in his official capacity when he refused to address Ms. Doe by the appropriate honorifics and pronouns, as required by Shawnee's policy. The Report correctly recognized that the First Amendment inquiry ends there: the First Amendment does not protect speech made by public employees pursuant to their official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "[E]mployees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit." *Id.* at 422. And even if his speech were not pursuant to his official duties, it would be protected only if it were on a matter of public concern. The Magistrate Judge correctly concluded that "outing" Ms. Doe as a transgender woman to her fellow students in class was not a matter of "public concern." Finally, even if Plaintiff was *not* speaking pursuant to his official duties and *was* speaking on a matter of public concern, his speech would still be unprotected under *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968).

### A. *Garcetti* Forecloses Plaintiff's Claim.

There can be no serious dispute that Plaintiff addressed Ms. Doe in the course of his employment—he is a college professor, and his statements to Ms. Doe occurred during classroom instruction. Plaintiff thus stakes his case on the position that there should be an exception to *Garcett* for statements by college professors in class. That position is incorrect.

Under Sixth Circuit precedent, the First Amendment does not prevent a public university from requiring its employees—including professors—to adhere to the university's policies and academic decisions when speaking as a public employee. Rather, "[w]hile the First Amendment may protect [a professor's] right to express her ideas about pedagogy, it does not require that the

university permit her to teach her classes in accordance with those ideas." *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 595 (6th Cir. 2005); *see also Bonnell v. Lorenzo*, 241 F.3d 800, 823-24 (6th Cir. 2001). "Academic freedom implicates the freedom of a university to make its own judgments as to education, requiring deference to a university's academic decisions." *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 344 (6th Cir. 2010) (internal quotation marks omitted). "In the context of in-class curricular speech," even "in the university arena . . . a teacher's invocation of academic freedom does not warrant judicial intrusion upon an educational institution's decisions." *Id.*

Of particular relevance here, the Sixth Circuit, and courts within the circuit, have repeatedly held that the Free Speech Clause does not limit a university's ability to enforce standards of professionalism and civility, including in the context of teaching. *See*, *e.g.*, *Johnson-Kurek*, 423 F.3d at 594-95 (disciplining a professor for refusing to clearly communicate course requirements to students); *Bonnell*, 241 F.3d at 823-24 (suspending a professor for repeatedly using expletives and degrading language even though the language was used to further academic discussion); *Smock v. Bd. of Regents of Univ. of Mich.*, 353 F. Supp. 3d 651, 659-60 (E.D. Mich. 2018) (disciplining a professor for making sexually inappropriate comments and jokes during discussions with graduate students she supervised). Shawnee's nondiscrimination policies set the standards and expectations of professionalism and civility within the Shawnee community, along with the many other policies that cover employee conduct. Here, those policies require Plaintiff to treat all students equally, including by referring to students based on their gender identity. As previously noted, that requirement applies to all Shawnee employees, students, and visitors. *See* Am. Compl. Ex. 2, Doc. 34-2, at PageID 1512.

The Report faithfully followed those principles. It concluded that no Sixth Circuit decision "supports plaintiff's argument that speech related to teaching or scholarship is excepted from the usual analysis applied to public employee speech under *Garcetti*." R&R, Doc. 49, at PageID 2117. Applying *Garcetti*, the Report therefore concluded that Plaintiff's free speech claim failed. "Plaintiff's speech—*i.e.*, the titles he used to address Doe and the pronouns he used when referring to her—occurred pursuant to his official duties as a professor at Shawnee State." *Id.* at PageID 2118. "Given plaintiff's employment duties (university professor), the setting of plaintiff's speech (a university classroom), the audience (the students in his Political Philosophy class), the impetus for the speech (to address students in a manner that plaintiff considered to be an important pedagogical tool), and the general subject matter of the speech (titles and pronouns for addressing students in his classroom), the Court concludes as a matter of law that plaintiff spoke pursuant to his official duties." *Id.* at PageID 2119.

Plaintiff's efforts to cast doubt on this straightforward application of binding precedent lack merit. The Supreme Court cases that Plaintiff relies on, *see* Pl. Obj., Doc. 53, at PageID 2282-83, are far afield. In *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), a professor was subpoenaed by the state Attorney General to testify about his classroom lectures; when he refused to answer questions, he was jailed. The Supreme Court held that his incarceration violated the Due Process Clause. In *Keyishian v. Board of Regents of University of New York*, 385 U.S. 589 (1967), the Supreme Court invalidated a state statute requiring university employees to sign loyalty oaths that they were not Communist Party members. Neither case implicated the issue here—whether a public employer (here, the University) could enact and enforce standards of workplace conduct for its employees. *Garcetti*, as interpreted by the Sixth Circuit, resolves that question in Shawnee's favor.

Plaintiff relies on two out-of-circuit cases, but neither endorses his proposed categorical exception to *Garcetti* for college professors. In *Adams v. Trustees of the University of North Carolina-Wilmington*, 640 F.3d 550 (4th Cir. 2011), a professor was denied a promotion based on speech that was concededly *not* conducted pursuant to the professor's job duties and was concededly protected by the First Amendment. *Id.* at 561. In *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014), the professor alleged that he was retaliated against for publicly circulating a proposal that "would have substantially altered the nature of what was taught at the school, as well as the composition of the faculty that would teach it." *Id.* at 415. Nothing in these cases suggests that *Garcetti* does not apply to a professor's speech *to students in class*. In any event, as the Magistrate Judge observed, "[t]his Court, though, is bound by the holdings of the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit. Neither Court has decided that *Garcetti* does not apply, or that it applies in a different manner, to teachers at public colleges and universities." R&R, Doc. 49, at PageID 2116.

Further, unlike in *Adams* and *Demers*, this case involves an across-the-board non-discrimination policy that applies identically to Plaintiff as to any other employee. Plaintiff does not appear to dispute that a challenge to the non-discrimination policy brought by any other employee—even another employee with the identical philosophical and religious views as Plaintiff—would be barred by *Garcetti*. Plaintiff's status as a university professor should not lead to a different result. Plaintiff invokes the banner of academic freedom, but he is perfectly entitled to publish articles on whatever he wishes, and teach students whatever he wishes. He must merely abide by an even-handed and uniform nondiscrimination policy designed to ensure that all students are able to participate in and benefit from their courses. Nothing in the First Amendment requires exempting professors from such policies.

### B. Plaintiff's Free-Speech Claims Do Not Meet the Public Concern Requirement.

Because Plaintiff's speech referring Ms. Doe was part of his official duties, there is no need to consider whether that speech is about a matter of public concern. Nonetheless, as the Report correctly concluded, Plaintiff's speech did not touch on a matter of public concern. "The linchpin of the [public-concern] inquiry is . . . the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1189 (6th Cir. 1995); *see also Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004). This requires courts to assess the information conveyed by the at-issue speech, regardless of the speaker's motivations for the speech. *See Farhat*, 370 F.3d at 591-92 (holding that "the pertinent question is not *why* the employee spoke, but *what* he said," and the argument that "subjective motivations are dispositive when determining whether . . . speech addresses a matter of purely personal concern is in direct conflict with the Supreme Court's holding in *Connick*" (citation omitted)).

Here, there is no dispute as to "*what* he said": "Mr. Doe" or "Doe." The specific words used by Plaintiff indicated nothing more than an invitation to Ms. Doe to engage in the class discussion. Those words fail to convey any "information . . . needed or appropriate to enable the members of society to make informed decisions [on matters of public concern]," *Farhat*, 370 F.3d at 590, or "contribut[e] to the civic discourse," *Garcetti*, 547 U.S. at 422; *cf. Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001) (use of sexist language during a lecture exploring social and political impact of that language related to matter of public concern where the "speech was limited to an academic discussion of the words in question"). Plaintiff's subjective *motivation* for using "Mr." in front of "Doe"—or otherwise calling on her differently from her classmates— does not transform it into protected speech.

8

Plaintiff insists that "gender identity is a public concern." Pl. Obj., Doc. 53, at PageID 2291-2294. The Report did not conclude otherwise. To the contrary, it agreed that "[b]roadly speaking," "gender identity" is "undoubtedly a matter of profound value and concern to the public." R&R, Doc. 49, at PageID 2123 (brackets and ellipses omitted). Rather, it correctly held that "though plaintiff's speech related to gender identity, it did not implicate the broader concerns surrounding the issue" because the "focus of the speech was Doe." *Id.* at PageID 2123-24. Plaintiff may be correct that "opining on how we should refer to transgender individuals" may be an issue of public concern, Pl. Obj., Doc. 53, at PageID 2294, but Plaintiff was not offering any general opinions on pronoun use; rather, he was simply trying to get Ms. Doe's attention.

Plaintiff offers two theories for transforming the phrase "Mr. Doe" into a matter of public concern. First, he argues that his use of male pronouns in addressing Ms. Doe implicitly conveys his attitudes about transgender people. But such "'fleeting' references to an arguably public matter do not elevate the speech to a matter of 'public concern.'" *Farhat*, 370 F.3d at 592. As the Report correctly explained, "Plaintiff does not allege that he explained to students his reasons for referring to Doe as a male or that it would have been appropriate for him to do so in his teaching role." R&R, Doc. 49 at PageID 2124. Rather, he simply said "Mr. Doe" in the context of a class discussion. Under those circumstances, the message would not have been "understood by those exposed to it"—the students who happened to be within earshot—"as expressing the viewpoint that plaintiff now ascribes to the speech." *Id.* at PageID 2125.

Second, Plaintiff insists that in-class speech is "presumptively a matter of public concern." Pl. Obj., Doc. 53, at PageID 2295-97. The Report, however, correctly explains that the Sixth Circuit has never imposed any such "presumption." R&R, Doc. 49 at PageID 2120-21. Moreover, any such presumption would be overcome in this case, when Plaintiff's statements were not

9

actually part of the course curriculum, but merely consisted of an effort to alert a student that he was going to ask a question.

### C. Even If Plaintiff's Speech Were Subject to the *Pickering* Test, He Would Fail to State a First Amendment Claim.

The Magistrate Judge correctly ruled that Plaintiff's First Amendment claim must be dismissed on two alternative grounds: Plaintiff's speech was employee speech under *Garcetti*, and speech on a matter of private concern under *Connick*. But even if Plaintiff's speech was *not* employee speech and *was* on a matter of public concern, Plaintiff's claim would still fail. Plaintiff's "interests . . . in commenting upon matters of public concern" do not outweigh "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Evans-Marshall*, 624 F.3d at 338 (quoting *Pickering*, 391 U.S. at 568).

The University has a strong interest in ensuring students will be free to take courses of their choice without fear of discrimination. Even if a transgender student were interested in Plaintiff's teaching and scholarship, the student would be very unlikely to take Plaintiff's course if the student knew that Plaintiff would insist on "outing" the student as transgender every time Plaintiff called the student's name. Plaintiff's own allegations make clear that Plaintiff's conduct was very upsetting to Ms. Doe. *See* Am. Compl., Doc. 34, at PageID 1475, ¶¶ 140-44 (describing verbal altercation that resulted when Plaintiff would not agree to use female honorifics for Ms. Doe in future class sessions). Shawnee reasonably concluded that its nondiscrimination policy would protect other students as well.

It is important to recognize that Plaintiff was in a position of *authority* over Ms. Doe. He controlled the Socratic Dialogue; he decided who would speak and when; he decided Ms. Doe's grades. Having given that authority to Plaintiff, Shawnee should be permitted to ensure that Plaintiff exercises that authority in a nondiscriminatory manner. Plaintiff claims that there "are no

facts in the Complaint to support" that Plaintiff's students were a "captive audience," because a student could always have dropped the course.  Pl. Obj., Doc. 53, at PageID 2297-98.  This misses the point: a student in class is not like a citizen listening to someone professing ideas from a soapbox.  While in class, the professor controls classroom discussion.  When Plaintiff calls on Ms. Doe, Ms. Doe has to answer the question—or she risks getting a lower grade.  Recognizing that point, Shawnee has a strong interest in ensuring that professors address students in conformance with the students' gender identity.

In contrast to Shawnee's interests outlined above, Plaintiff's side of the *Pickering* balance is all but empty.  Shawnee's policy does not prohibit Plaintiff from commenting on matters of public concern—whether on his own time, or as part of his writing and publishing as an academic employed by Shawnee. The policy demands only that Plaintiff *manage his classroom* in the manner that the university considers most pedagogically appropriate. Plaintiff thus still enjoys the "opportunities to contribute to public debate" that *Pickering* is intended to preserve. *Pickering*, 391 U.S. at 572-73.  Shawnee' interests easily outweigh Plaintiff's interests in refusing to comply with the university's nondiscrimination policy.

### D.  Plaintiff's Remaining Free-Speech Claims Fail as a Matter of Law.

***Content/Viewpoint Discrimination.***  Plaintiff's allegation that Shawnee engaged in content and viewpoint discrimination fails in light of *Garcetti*.  The whole point of *Garcetti* is that a public employer may regulate what its employees say while at work.  On the facts of *Garcetti* itself, a deputy district attorney allegedly experienced retaliation after writing a memo expressing concerns about an ongoing criminal prosecution and recommending it be dismissed.  547 U.S. at 414.  The Supreme Court held that the memo was unprotected speech.  *Id.* at 425-26.  Accepting the attorney's allegations as true, his employer retaliated against him based on the content of the memo and the viewpoint expressed therein—*i.e.*, that the criminal prosecution should be dismissed.  No

retaliation would have occurred if the attorney had lauded the criminal prosecution. Nevertheless, because the district attorney was speaking in the course of his official duties, his speech was unprotected. The same reasoning forecloses Plaintiff's claim here.

Plaintiff cites no authority supporting a contrary conclusion. Plaintiff cites *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995). Pl. Obj., Doc. 53, at PageID 2308. But in that case, the court *upheld* the termination of a university coach who was fired under the college's nondiscrimination policy for using a racial slur. 55 F.3d at 1181. Plaintiff relies on a different portion of the opinion finding a nondiscrimination policy overbroad in a separate challenge brought by college students—not by the coach. *Id.* at 1179-80, 1185.

Plaintiff also contends that Shawnee has "unbridled discretion to regulate faculty speech." Pl. Obj., Doc. 53, at PageID 2306. That contention lacks merit. Shawnee has a written nondiscrimination policy that specifies the circumstances in which it is applied. *See* Report, Doc. 49, at PageID 2136 (citing Am. Compl. Ex. 2, Doc. 34-2, at PageID 1511-12). Contrary to Plaintiff's assertion, Shawnee officials do not have "complete discretion to review anything faculty say off campus once someone complains and to punish them." Pl. Obj., Doc. 53, at PageID 2308. Rather, Shawnee's policy extends to "University sponsored-functions and employees' official duties outside the classroom." Report, Doc. 49, at PageID 2136. And Shawnee's policy does not give it discretion to "[r]eview anything faculty say," but instead requires all employees to use appropriate pronouns and honorifics to address students while the employees are engaged in official duties.

**Compelled Speech.** Plaintiff's compelled speech claim lacks merit for two reasons. First, as the Report correctly held, Shawnee did not actually compel any speech: "plaintiff acknowledges that defendants gave him the option to stop using gender-based titles during class, but plaintiff

rejected that option." R&R, Doc. 49, at PageID 2129. Plaintiff responds that "[a]ndrogynous terms would prohibit him from expressing views he does hold—that people are male or female and that this fixed sex is what is real." *Id*. at PageID 2309. But Plaintiff does not allege that he has a moral or religious objection to using, for instance, students' first names rather than their last names. Rather, Plaintiff's complaint is that he is "prohibit[ed]" from using male pronouns and honorifics to describe Ms. Doe. *Id*. Thus, in reality, Plaintiff's claim is not that he is compelled to use speech he disbelieves in, but that his speech is restricted—a claim that fails for the reasons explained above.

Second, even if Shawnee did compel Plaintiff to use appropriate pronouns and honorifics for Ms. Doe, an employer may compel official employee speech, just as it may prohibit official employee speech: "[I]f the speech in question is part of an employee's official duties, the employer may insist that the employee *deliver* any lawful message." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2473 (2018) (emphasis added)). Thus, Shawnee does not violate the First Amendment by requiring professors to treat transgender students in a manner consistent with the student's gender identity.

***Unconstitutional conditions*.** The Report correctly concluded that Plaintiff's unconstitutional conditions claim was derivative of his free speech claim: "Plaintiff has not shown how his claim that he has been denied a benefit or will be denied a benefit on a ground that violates his free speech rights differs in any respect from his First Amendment retaliation claim." R&R, Doc. 49, at PageID 2138. Plaintiff does not meaningfully engage with this conclusion. Instead, he cites cases from other areas of law holding that the government may not deny benefits to persons because they exercise their constitutional rights. Pl. Obj., Doc. 53, at PageID 2311-12. However, as the Report correctly concluded, Plaintiff's speech was unprotected, and therefore did not

constitute as an exercise of constitutional rights. As such, the unconstitutional conditions doctrine does not apply because Shawnee did not condition any benefit on the exercise of any right.

*Overbreadth.* The Report exhaustively analyzed and rejected Plaintiff's First Amendment claim based on overbreadth. As the Report correctly explained, Plaintiff's argument depends on the premise that his *protected* speech "came within the ambit of the unconstitutionally overbroad policies." R&R, Doc. 49, at PageID 2135. But "plaintiff can only demonstrate that he was harmed by application of the policies to him if his speech was protected"—which it was not. *Id.* The Report also, alternatively, concluded that "plaintiff has not stated a plausible claim that the Shawnee State nondiscrimination policies are overbroad on their face." *Id.* Although the policies are "not limited to classroom interactions," they apply only to "University sponsored-functions," and "plaintiff has alleged no facts showing how the policies reach a substantial amount of constitutionally-protected speech." *Id.* at PageID 2136. Plaintiff's arguments on overbreadth are largely a reprise of his remaining First Amendment arguments, and they fail for the same reason. Pl. Obj., Doc. 53, at PageID 2321-22.

### III. The Report Correctly Rejected Plaintiff's Free Exercise Claim.

In rejecting Plaintiff's Free Exercise claim, the Report applied well-settled law. As the Report correctly held, an "individual's religious beliefs do not 'excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate' because '[t]he mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities.'" R&R, Doc. 49, at PageID 2141 (quoting *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878-79 (1990) (citation omitted)). Shawnee's policies are "neutral and generally applicable on their face," applying to all employees, students, and visitors of all faiths. *Id.* at PageID 2141.

Contrary to Plaintiff's arguments, no case post-dating *Smith* overrules *Smith*'s binding and dispositive holding. This case is not comparable to *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), in which Missouri facially discriminated against a church by excluding it from a benefits program because it was a church. Here, Plaintiff's religion played no role in any decision by the University. Likewise, this case is unlike *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018), when the adjudicators openly made comments on the record that were hostile to the litigant's religious beliefs. And unlike in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), this case does not involve an effort by the government to decide who a church's ministers will be. Plaintiff also asserts that *Smith* does not apply to nondiscrimination policies that regulate government employees' official speech in class, Pl. Obj., Doc. 53, at PageID 2313-14, but cites no authority or reasoned basis for this proposition.

Nor has Plaintiff rebutted the Report's conclusion that Shawnee's policy is neutral and generally applicable. As the Report correctly found, there are no well-pleaded allegations that "the nondiscrimination policies were aimed at his particular religious practices or beliefs, or that they targeted particular religious practices or views as applied." R&R, Doc. 49, at PageID 2142. Plaintiff's objections focus on his allegations regarding Pauley and Bauer, Pl. Obj., Doc. 53, at PageID 2318-19, but the Report addressed and rejected those allegations in exhaustive detail. Plaintiff alleges that Pauley made critical comments about Christian doctrine in an unrelated context a year earlier. As the Report correctly concluded, this is an insufficient basis for alleging that the application of that policy was the product of anti-Christian discrimination. R&R, Doc. 49, at PageID 2142. This is especially true given that Pauley did not apply the policy; while Plaintiff adverts to Pauley's alleged peripheral connection to Shawnee's decision, Plaintiff's assertion that

Pauley's allegedly anti-Christian views influenced Shawnee's conduct is pure speculation. As for Bauer, Plaintiff assails him for laughing (one time), interrupting others, and showing "disinterest." Pl. Obj., Doc. 53, at PageID 2318. Plaintiff, however, does not allege that Bauer ever made a single statement showing any hostility toward religion whatsoever. If interruptions and chuckles were enough to state a constitutional claim, no claim could ever be dismissed.

Equally unpersuasive is Plaintiff's claim that the policy is not "generally applicable." The Report accurately concludes that Plaintiff has not alleged that any exemption has ever been granted. R&R, Doc. 49, at PageID 2145. Plaintiff does not dispute the point; instead, he asserts that "exemptions simply *must* exist" (emphasis in original) and infers that this is a "matter for discovery." Pl. Obj., Doc. 53, at PageID 2319. But a plaintiff must state a claim in order to get to discovery. In the absence of any factual accusations that Shawnee's policy is not generally applicable, Plaintiff has not stated a claim that Shawnee's policy is not generally applicable.

## IV. The Report Correctly Concluded That Plaintiff's Remaining Claims Should Be Dismissed.

*Due Process.* Shawnee's nondiscrimination policies are not unconstitutionally vague. The Due Process Clause requires "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson*, 461 U.S. 352, 357 (1983), though it does not require legislating in "encyclopedic terms." *United States v. Jenkins*, 770 F.3d 507, 510 (6th Cir. 2014) (quotation marks and alteration omitted). Shawnee's policy complies with that standard. As the Report explained, Plaintiff had "ample notice that: (1) the nondiscrimination policies require professors to address and refer to students by pronouns and titles consistent with their gender identities; and (2) using male pronouns and titles to address and refer to Doe, and addressing and referring to Doe in a different manner than he addressed and referred to other students in his class, did not comply

with the nondiscrimination policies." R&R, Doc. 49, at PageID 2149-50. Among other things, Plaintiff himself alleges that he personally received explicit notice from university officials as to the university's policy on multiple occasions, which the Report carefully catalogues. *Id.* at PageID 2150-52.

Plaintiff contends that the policy *itself* does not give adequate notice that professors must use appropriate pronouns and honorifics when addressing transgender students. Pl. Obj., Doc. 53, at PageID 2323-24. Any confusion Plaintiff may have had on this score was fully resolved by the University's repeated and explicit statements to him that addressing Ms. Doe with male pronouns and honorifics violated Shawnee's policy. Plaintiff expresses uncertainty as to whether the policy would require a professor to use phrases such as "Your Majesty." *Id.* at PageID 2325. Nothing in the policy, however, suggests professors are required to use such phrases. Rather, the policy serves the narrow purpose of ensuring that professors treat transgender students in accord with their gender identity.

Elsewhere in Plaintiff's brief, as part of his First Amendment claim, Plaintiff insists that "gender identity" is "imprecise, subjective, and indefinite." *Id.* at PageID 2306. However, there is no imprecision or confusion as to Ms. Doe's gender identity. Any confusion that Plaintiff may have had was resolved when Ms. Doe informed him of her gender identity. Plaintiff does not allege that Shawnee disciplines its employees who *unintentionally* use the incorrect pronoun or honorific. Rather, Shawnee applied its policy in this case only after Plaintiff insisted on using male pronouns and honorifics while fully aware of Ms. Doe's gender identity.

More generally, numerous state statutes prohibit discrimination based on gender identity. *See, e.g.*, Human Rights Campaign, *State Maps of Laws & Policies*, https://www.hrc.org/state-maps (explaining that 21 states and the District of Columbia have passed laws prohibiting

employment discrimination based on gender identity, and that 15 states and the District Columbia have passed laws prohibiting gender identity discrimination in educational settings); *see also* N.M. Stat. Ann. § 28-1-2(q) (definition of gender identity in state antidiscrimination law using language similar to Shawnee's policy); R.I. Gen. Laws Ann. § 28-5-6 (same). The Sixth Circuit has prohibited discrimination on based of gender identity as a form or sex discrimination for over 15 years. *See Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004). No court has ever held that the term "gender identity" is unconstitutionally vague.

     ***Equal Protection.*** The Report correctly rejected Plaintiff's class-of-one equal protection claim. As the Report correctly explained, Plaintiff does not allege that other professors who violated the nondiscrimination policy were *not* disciplined. R&R, Doc. 49, at PageID 2154-55 ("Plaintiff has not alleged facts showing that defendants have applied Shawnee State's nondiscrimination policy differently to distinct classes of people."). Rather, his claim boils down to the theory that he is disciplined while other professors, who comply with the nondiscrimination policy, are not. But Plaintiff is not similarly situated to those other professors—they comply with the policy, and he does not. *Id.* In reality, Plaintiff's claim is a challenge to the nondiscrimination policy, not to unequal treatment. As such, it is "essentially a re-packaging of his First Amendment challenges." *Id.* at PageID 2155. Plaintiff essentially concedes this point; he alleges that "[h]e is being compelled to say something he does not want to say; others are not." Pl. Obj., Doc. 53, at PageID 2326. As such, his equal protection argument boils down to the claim that he is being unconstitutionally compelled to speak. As shown above, he is not.

## CONCLUSION

     This Court should adopt Magistrate Judge Litkovitz's Report & Recommendation in full and dismiss Plaintiff's amended complaint in its entirety.

Date: November 14, 2019

Respectfully Submitted,

/s/ Adam G. Unikowsky
Adam G. Unikowsky (admitted *pro hac vice*)
Michael E. Stewart
Jennifer J. Yun
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
(202) 639-6000 (tel)
(202) 639-6066 (fax)
aunikowsky@jenner.com

Jennifer L. Branch #0038893
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
(513) 621-9100 (tel)
(513) 345-5543 (fax)
Jbranch@gbfirm.com

Shannon P. Minter (admitted *pro hac vice*)
Asaf Orr (admitted *pro hac vice*)
Christopher F. Stoll (admitted *pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street Suite 370
San Francisco, California 94102
(415) 392-6257 (tel)
(415) 392-8442 (fax)
sminter@nclrights.org
aorr@nclrights.org
cstoll@nclrights.org

*Attorneys for JANE DOE and SEXUALITY AND GENDER ACCEPTANCE*

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 14, 2019, a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Adam Unikowsky
Attorney for Jane Doe & Sexuality
and Gender Acceptance