# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  March 26, 2021

Ms. Deborah Ann Ausburn
Taylor, English Duma
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339

Mr. Travis C. Barham
Alliance Defending Freedom
1000 Hurricane Shoals Road, N.E., Suite D-1100
Lawrenceville, GA 30043

Mr. Gerard V. Bradley
University of Notre Dame Law School
3156 Eck Hall
Notre Dame, IN 46556

Ms. Jennifer L. Branch

Mr. Alphonse A. Gerhardstein
Friedman, Gilbert & Gerhardstein
441 Vine Street
Suite 3400
Cincinnati, OH 45202

Mr. Matthew J. Burkhart
Gallagher & Kavinsky
8740 Orion Place
Suite 200
Columbus, OH 43240

Mr. John J. Bursch
Ms. Kristen K. Waggoner
Alliance Defending Freedom
440 First Street, N.W., Suite 600
Washington, DC 20001

Ms. Jennifer C. Chavez
12728 Feldon Street
Silver Spring, MD 20906

Mr. David Andrew Cortman
Alliance Defending Freedom
1000 Hurricane Shoals Road, N.E.
Suite D-1100
Lawrenceville, GA 30043

Mr. Paul R. Kerridge
Keating, Muething & Klekamp
1 E. Fourth Street
Suite 1400
Cincinnati, OH 45202

Mr. Thomas W. Kidd Jr.
8913 Cincinnati-Dayton Road
West Chester, OH 45069-3131

Mr. Tyson Charles Langhofer
Alliance Defending Freedom
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147

Mr. Gary McCaleb
11990 Glodia Drive
Flagstaff, AZ 86004

Mr. Shannon Price Minter
Mr. Asaf Orr
Mr. Christopher F. Stoll
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102

Mr. Christopher L. Thacker
Billings Law Firm
145 Constitution Street
Lexington, KY 40391

Adam G. Unikowsky
Jenner & Block
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001

Randall L. Wenger
Independence Law Center
23 N. Front Street
Harrisburg, PA 17101

        Re:  Case No. 20-3289, *Nicholas Meriwether v. Francesca Hartop, et al*
              Originating Case No. : 1:18-cv-00753

Dear Counsel,

    The court today announced its decision in the above-styled case.

    Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                        Yours very truly,

                        Deborah S. Hunt, Clerk

                        Cathryn Lovely
                        Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0071p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NICHOLAS K. MERIWETHER,

*Plaintiff-Appellant,*

*v.*

No. 20-3289

FRANCESCA HARTOP, JOSEPH WATSON, SCOTT WILLIAMS, DAVID FURBEE, SONDRA HASH, ROBERT HOWARTH, GEORGE WHITE, and WALLACE EDWARDS, Trustees of Shawnee State University, in their official capacities; JEFFREY A. BAUER, ROBERTA MILLIKEN, JENNIFER PAULEY, TENA PIERCE, DOUGLAS SHOEMAKER, and MALONDA JOHNSON, in their official capacities,

*Defendants-Appellees,*

JANE DOE; SEXUALITY AND GENDER ACCEPTANCE,

*Intervenors-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:18-cv-00753—Susan J. Dlott, District Judge.

Argued: November 19, 2020

Decided and Filed: March 26, 2021

Before: McKEAGUE, THAPAR, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** John J. Bursch, ALLIANCE DEFENDING FREEDOM, Washington, D.C., for Appellant. Paul R. Kerridge, KEATING MUETHING & KLEKAMP PLL, Cincinnati, Ohio, for Shawnee State Appellees. Adam G. Unikowsky, JENNER & BLOCK LLP, Washington, D.C., for Intervenor Appellees. **ON BRIEF:** John J. Bursch, Kristen K. Waggoner, ALLIANCE DEFENDING FREEDOM, Washington, D.C., David A. Cortman, Travis C. Barham,

ALLIANCE DEFENDING FREEDOM, Lawrenceville, Georgia, Thomas W. Kidd, Jr., KIDD & URLING, LLC, West Chester, Ohio, Tyson C. Langhofer, ALLIANCE DEFENDING FREEDOM, Ashburn, Virginia, for Appellant. Paul R. Kerridge, KEATING MUETHING & KLEKAMP PLL, Cincinnati, Ohio, for Shawnee State Appellees. Adam G. Unikowsky, JENNER & BLOCK LLP, Washington, D.C., Jennifer L. Branch, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Shannon P. Minter, Asaf Orr, Christopher F. Stoll, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco, California, for Intervenor Appellees. Deborah A. Ausburn, TAYLOR ENGLISH DUMA LLP, Atlanta, Georgia, Christopher L. Thacker, BILLINGS LAW FIRM, PLLC, Lexington, Kentucky, Gary S. McCaleb, Flagstaff, Arizona, Matthew J. Burkhart, GALLAGHER KAVINSKY & BURKHART LPA, Columbus, Ohio, Jennifer C. Chavez, Washington, D.C., Randall L. Wenger, INDEPENDENCE LAW CENTER, Harrisburg, Pennsylvania, Gerard V. Bradley, UNIVERSITY OF NOTRE DAME, Notre Dame, Indiana, for Amici Curiae.

————————

## OPINION

————————

THAPAR, Circuit Judge. Traditionally, American universities have been beacons of intellectual diversity and academic freedom. They have prided themselves on being forums where controversial ideas are discussed and debated. And they have tried not to stifle debate by picking sides. But Shawnee State chose a different route: It punished a professor for his speech on a hotly contested issue. And it did so despite the constitutional protections afforded by the First Amendment. The district court dismissed the professor's free-speech and free-exercise claims. We see things differently and reverse.

### I.

The district court decided this case on a motion to dismiss, so we construe the complaint in the light most favorable to the plaintiff. That means we must accept the complaint's factual allegations as true and draw all reasonable inferences in Meriwether's favor. *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). Under this standard, we must reverse the district court's dismissal unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Guzman v. U.S. Dep't of Homeland Sec.*, 679 F.3d 425, 429 (6th Cir. 2012)).

A.

Nicholas Meriwether is a philosophy professor at Shawnee State University, a small public college in Portsmouth, Ohio. Shawnee State began awarding bachelor's degrees just thirty years ago. And for twenty-five of those years, Professor Meriwether has been a fixture at the school. He has served in the faculty senate, designed a bachelor's degree program in Philosophy and Religion, led study-abroad trips, and taught countless students in classes ranging from Ethics to the History of Christian Thought. Up until the incident that triggered this lawsuit, Meriwether had a spotless disciplinary record.

Professor Meriwether is also a devout Christian. He strives to live out his faith each day. And, like many people of faith, his religious convictions influence how he thinks about "human nature, marriage, gender, sexuality, morality, politics, and social issues." R. 34, Pg. ID 1469. Meriwether believes that "God created human beings as either male or female, that this sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." *Id.* He also believes that he cannot "affirm as true ideas and concepts that are not true." *Id.* Being faithful to his religion was never a problem at Shawnee State. But in 2016, things changed.

At the start of the school year, Shawnee State emailed the faculty informing them that they had to refer to students by their "preferred pronoun[s]." *Id.* at 1471–72. Meriwether asked university officials for more details about the new pronoun policy, and the officials confirmed that professors would be disciplined if they "refused to use a pronoun that reflects a student's self-asserted gender identity." *Id.* at 1472. What if a professor had moral or religious objections? That didn't matter: The policy applied "regardless of the professor's convictions or views on the subject." *Id.*

When Meriwether asked to see the revised policy, university officials pointed him to the school's existing policy prohibiting discrimination "because of . . . gender identity." R. 34-1, Pg. ID 1509. That policy applies to all of the university's "employees, students, visitors, agents and volunteers"; it applies at both academic and non-academic events; it applies on all university

property (including classrooms, dorms, and athletic fields); and it sometimes applies off campus. R. 34-2, Pg. ID 1511–12.

Meriwether approached the chair of his department, Jennifer Pauley, to discuss his concerns about the newly announced rules. Pauley was derisive and scornful. Knowing that Meriwether had successfully taught courses on Christian thought for decades, she said that Christians are "primarily motivated out of fear" and should be "banned from teaching courses regarding that religion." R. 34, Pg. ID 1473. In her view, even the "presence of religion in higher education is counterproductive." *Id.*

Meriwether continued to teach students without incident until January 2018. On the first day of class, Meriwether was using the Socratic method to lead discussion in his course on Political Philosophy. When using that method, he addresses students as "Mr." or "Ms." He believes "this formal manner of addressing students helps them view the academic enterprise as a serious, weighty endeavor" and "foster[s] an atmosphere of seriousness and mutual respect." *Id.* at 1475. He "has found that addressing students in this fashion is an important pedagogical tool in all of his classes, but especially in Political Philosophy where he and [the] students discuss many of the most controversial issues of public concern." *Id.* In that first class, one of the students Meriwether called on was Doe. According to Meriwether, "no one . . . would have assumed that [Doe] was female" based on Doe's outward appearances. *Id.* at 1474. Thus, Meriwether responded to a question from Doe by saying, "Yes, sir." *Id.* This was Meriwether's first time meeting Doe, and the university had not provided Meriwether with any information about Doe's sex or gender identity.

After class, Doe approached Meriwether and "demanded" that Meriwether "refer to [Doe] as a woman" and use "feminine titles and pronouns." *Id.* at1475. This was the first time that Meriwether learned that Doe identified as a woman. So Meriwether paused before responding because his sincerely held religious beliefs prevented him from communicating messages about gender identity that he believes are false. He explained that he wasn't sure if he could comply with Doe's demands. Doe became hostile—circling around Meriwether at first, and then approaching him in a threatening manner: "I guess this means I can call you a cu--." *Id.* Doe promised that Meriwether would be fired if he did not give in to Doe's demands.

Meriwether reported the incident to senior university officials, including the Dean of Students and his department chair, Jennifer Pauley. University officials then informed their Title IX office of the incident. Officials from that office met with Doe and escalated Doe's complaint to Roberta Milliken, the Acting Dean of the College of Arts and Sciences.

Dean Milliken went to Meriwether's office the next day. She "advised" that he "eliminate all sex-based references from his expression"—no using "he" or "she," "him" or "her," "Mr." or "Ms.," and so on. *Id.* at 1476–77. Meriwether pointed out that eliminating pronouns altogether was next to impossible, especially when teaching. So he proposed a compromise: He would keep using pronouns to address most students in class but would refer to Doe using only Doe's last name. Dean Milliken accepted this compromise, apparently believing it followed the university's gender-identity policy.

Doe continued to attend and participate in Meriwether's class. But Doe remained dissatisfied and, two weeks into the semester, complained to university officials again. So Dean Milliken paid Meriwether another visit. This time, she said that if Meriwether did not address Doe as a woman, he would be violating the university's policy.

Soon after, Meriwether accidentally referred to Doe using the title "Mr." before immediately correcting himself. Around this time, Doe again complained to the university's Title IX Coordinator and threatened to retain counsel if the university didn't take action. So Dean Milliken once again came to Meriwether's office. She reiterated her earlier demand and threatened disciplinary action if he did not comply.

Trying to find common ground, Meriwether asked whether the university's policy would allow him to use students' preferred pronouns but place a disclaimer in his syllabus "noting that he was doing so under compulsion and setting forth his personal and religious beliefs about gender identity." R. 34, Pg. ID 1478. Dean Milliken rejected this option out of hand. She insisted that putting a disclaimer in the syllabus would itself violate the university's gender-identity policy.

During the rest of the semester, Meriwether called on Doe using Doe's last name, and "Doe displayed no anxiety, fear, or intimidation" while attending class. *Id.* at 1477–79. In fact,

Doe excelled and participated as much or more than any other student in the course.  At the end of the semester, Meriwether awarded Doe a "high grade."  *Id.* at 1479.  This grade reflected Doe's "very good work" and "frequent participation in class discussions."  *Id.*

B.

As the semester proceeded, Meriwether continued to search for an accommodation of his personal and religious views that would satisfy the university.  But Shawnee State was not willing to compromise.  After Dean Milliken's final meeting with Meriwether, she sent him a formal letter reiterating her demand:  Address Doe in the same manner "as other students who identify themselves as female."  R. 34-9, Pg. ID 1702.  The letter said that if Meriwether did not comply, "the University may conduct an investigation" and that he could be subject to "informal or formal disciplinary action."  *Id.*

Then, just a few days later—and without waiting for a response from Meriwether—Milliken announced that she was "initiating a formal investigation."  R. 34-10, Pg. ID 1703.  She claimed that she was doing so because she received "another complaint from a student in [Meriwether's] class."  *Id.*  The complaint was again from Doe.  When Meriwether again asked whether an accommodation might be possible given his sincerely held beliefs, Milliken shot him down.  She said he had just two options:  (1) stop using *all* sex-based pronouns in referring to students (a practical impossibility that would also alter the pedagogical environment in his classroom), or (2) refer to Doe as a female, even though doing so would violate Meriwether's religious beliefs.

Dean Milliken referred the matter to Shawnee State's Title IX office.  Over the coming months, the university's Title IX staff conducted a less-than-thorough investigation.  They interviewed just four witnesses—Meriwether, Doe, and two other transgender students.  They did not ask Meriwether to recommend any potential witnesses.  And aside from Doe and Meriwether themselves, none of the witnesses testified about a single interaction between the two.

Shawnee State's Title IX office concluded that "Meriwether's disparate treatment [of Doe] ha[d] created a hostile environment" in violation of the university's nondiscrimination

policies.  R. 34-13, Pg. ID 1719.  Those policies prohibit "discrimination against any individual because of . . . gender identity."  R. 34-1, Pg. ID 1509.  They define gender identity as a "person's innermost concept of self as male or female or both or neither."  R. 34-2, Pg. ID 1522. And they define a hostile educational environment as "any situation in which there is harassing conduct that limits, interferes with or denies educational benefits or opportunities, from both a subjective (the complainant's) and an objective (reasonable person's) viewpoint."  *Id.* at 1522–23.  The Title IX report concluded that because Doe "perceives them self as a female," and because Meriwether has "refuse[d] to recognize" that identity by using female pronouns, Meriwether engaged in discrimination and "created a hostile environment."  R. 34-13, Pg. ID 1719.  The report did not mention Meriwether's request for an accommodation based on his sincerely held religious beliefs.

After the Title IX report issued, Dean Milliken informed Meriwether that she was bringing a "formal charge" against him under the faculty's collective bargaining agreement. R. 34-14, Pg. ID 1731.  She then issued her own report setting forth her findings:  "Because Dr. Meriwether repeatedly refused to change the way he addressed [Doe] in his class due to his views on transgender people, and because the way he treated [Doe] was deliberately different than the way he treated others in the class, . . . he effectively created a hostile environment for [Doe]."  R. 34-17, Pg. ID 1742.  Milliken's whole explanation of how Meriwether violated university policy spanned just one paragraph.  *Id.* (final paragraph).  Finally, to create a "safe educational experience for all students," Dean Milliken concluded that it was necessary to discipline Meriwether.  *Id.*  She recommended placing a formal warning in his file.

Provost Jeffrey Bauer was tasked with reviewing Milliken's disciplinary recommendation before it was imposed.  Meriwether wrote Provost Bauer a letter stating that he treated Doe exactly the same as he treated all male students; that he began referring to Doe without pronouns and by Doe's last name as an accommodation to Doe; and that Doe's "access to educational benefits and opportunities was never jeopardized."  R. 34-18, Pg. ID 1766.  Meriwether further explained that he could not use female pronouns to refer to Doe due to his "conscience and religious convictions."  *Id.*  He asked Provost Bauer to allow "reasonable minds . . . to differ" on this "newly emerging cultural issue."  *Id.*  Provost Bauer rejected Meriwether's request, stating

that he "approve[d] Dean Milliken's recommendation of formal disciplinary action." R. 34-19, Pg. ID 1770. Bauer did not address Meriwether's arguments to the contrary, nor did he grapple with Meriwether's request for a religious accommodation.

Shawnee State then placed a written warning in Meriwether's file. The warning reprimanded Meriwether and directed him to change the way he addresses transgender students to "avoid further corrective actions." R. 34-20, Pg. ID 1771. What does "further corrective actions" mean? Suspension without pay and termination, among other possible punishments. R. 34-4, Pg. ID 1646; *see also* R. 34, Pg. ID 1487.

## C.

The Shawnee State faculty union then filed a grievance on Meriwether's behalf. It asked the university to (1) vacate the disciplinary action, and (2) allow Meriwether to keep speaking in a manner consistent with his religious beliefs.

Provost Bauer, who had already rejected Meriwether's claim once, was tasked with deciding the grievance. A union representative, Dr. Chip Poirot, joined Meriwether to present the grievance at a hearing. From the outset, Bauer exhibited deep hostility. He repeatedly interrupted the representative and made clear that he would not discuss the academic freedom and religious discrimination aspects of the case. The union representative tried to explain the teachings of Meriwether's church and why Meriwether felt he was being compelled to affirm a position at odds with his faith. At one point during the hearing, Provost Bauer "openly laughed." R. 34-24, Pg. ID 1780. Indeed, Bauer was so hostile that the union representative "was not able to present the grievance." *Id.* at 1780–81. Bauer denied the grievance.

The next step in Shawnee State's grievance process involved an appeal to the university's president. In a twist of fate, the president turned out to be Bauer. Shortly after Provost Bauer denied the grievance, he was appointed interim university president. Bauer designated two of his representatives, Shawnee State's Labor Relations Director and General Counsel, to meet with Meriwether and Poirot on his behalf.

The officials agreed with the union that Meriwether's conduct had not "created a hostile educational environment." R. 34-27, Pg. ID 1799. But they recommended ruling against Meriwether anyway. This was, they said, not a hostile-environment case; instead, it was a "differential treatment" case. *Id.* This change in theory contradicted the Title IX investigation and Dean Milliken's disciplinary recommendation (which Provost Bauer approved)—both of which accused Meriwether of violating university policy by "creat[ing] a hostile environment for [Doe]." R. 34-13, Pg. ID 1719; R. 34-17, Pg. ID 1741–42. The officials justified the university's refusal to accommodate Meriwether's religious beliefs by equating his views to those of a hypothetical racist or sexist. R. 34, Pg. ID 1490; R. 34-27, Pg. ID 1799. Since the university would not accommodate religiously motivated racism or sexism, it ought not accommodate Meriwether's religious beliefs. Bauer adopted his representatives' findings and denied the grievance again.

That was the end of the grievance process at Shawnee State. Because Meriwether now fears that he will be fired or suspended without pay if he does not toe the university's line on gender identity, he alleges he cannot address "a high profile issue of public concern that has significant philosophical implications." R. 34, Pg. ID 1492–93. He steers class discussions away from gender-identity issues and has refused to address the subject when students have raised it in class. The warning letter in Meriwether's file will also make it "difficult, if not impossible," for him to obtain a position at another institution once he retires from Shawnee State. *Id.* at 1493.

D.

Out of options at Shawnee State, Meriwether filed this lawsuit. He alleged that the university violated his rights under: (1) the Free Speech and Free Exercise Clauses of the First Amendment; (2) the Due Process and Equal Protection Clauses of the Fourteenth Amendment; (3) the Ohio Constitution; and (4) his contract with the university.

The district court referred the case to a magistrate judge. Doe and an organization, Sexuality and Gender Acceptance, then moved to intervene, and the magistrate granted their motion. Next, the defendants and intervenors filed separate motions to dismiss under Rule

12(b)(6). The magistrate recommended dismissing all of Meriwether's federal claims and declining to exercise supplemental jurisdiction over his state-law claims. Meriwether then objected to the magistrate's report and recommendation. But the district court adopted it in full.

Meriwether now appeals the district court's decision, except for its dismissal of his equal-protection claim. We first address Meriwether's free-speech claim before turning to his free-exercise and due-process claims.

## II.

"Universities have historically been fierce guardians of intellectual debate and free speech." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 761 (6th Cir. 2019). But here, Meriwether alleges that Shawnee State's application of its gender-identity policy violated the Free Speech Clause of the First Amendment. The district court rejected this argument and held that a professor's speech in the classroom is never protected by the First Amendment. We disagree: Under controlling Supreme Court and Sixth Circuit precedent, the First Amendment protects the academic speech of university professors. Since Meriwether has plausibly alleged that Shawnee State violated his First Amendment rights by compelling his speech or silence and casting a pall of orthodoxy over the classroom, his free-speech claim may proceed.

## A.

### 1.

Start with the basics. The First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Thus, the government "may not compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). When the government tries to do so anyway, it violates this "cardinal constitutional command." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018).

It should come as little surprise, then, "that prominent members of the founding generation condemned laws requiring public employees to affirm or support beliefs with which they disagreed." *Id.* at 2471 & n.8 (citing examples including Thomas Jefferson, Oliver

Ellsworth, and Noah Webster). Why? Because free speech is "essential to our democratic form of government." *Id.* at 2464. Without genuine freedom of speech, the search for truth is stymied, and the ideas and debates necessary for the continuous improvement of our republic cannot flourish. *See id.*

Courts have often recognized that the Free Speech Clause applies at public universities. *See, e.g.*, *Ward v. Polite*, 667 F.3d 727, 732–33 (6th Cir. 2012). Thus, the state may not act as though professors or students "shed their constitutional rights to freedom of speech or expression at the [university] gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Government officials violate the First Amendment whenever they try to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," and when they "force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

To be sure, free-speech rules apply differently when the government is doing the speaking. And that remains true even when a government employee is doing the talking. Thus, in *Garcetti v. Ceballos*, the Supreme Court held that normally "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421 (2006).

### 2.

Here, the threshold question is whether the rule announced in *Garcetti* bars Meriwether's free-speech claim. It does not.

*Garcetti* set forth a general rule regarding government employees' speech. But it expressly declined to address whether its analysis would apply "to a case involving speech related to scholarship or teaching." 547 U.S. at 425; *see also Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 563 (4th Cir. 2011) ("The plain language of *Garcetti* thus explicitly left open the question of whether its principles apply in the academic genre where issues of 'scholarship or teaching' are in play."). Although *Garcetti* declined to address the question, we can turn to the Supreme Court's prior decisions for guidance. Those decisions have

"long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003).

Start with *Sweezy v. New Hampshire*. 354 U.S. 234 (1957) (plurality opinion). During the McCarthy era, New Hampshire instituted a loyalty program "to eliminate 'subversive persons' among government personnel." *Id.* at 236. The state legislature authorized the Attorney General to become a "one-man legislative committee" and take appropriate action if he found that a person was "subversive." *Id.* at 236–37. When the Attorney General questioned public university professor Paul Sweezy, he declined to reveal the contents of a lecture he had delivered to "100 students in [a] humanities course." *Id.* at 243. The Attorney General then had the court hold him in contempt. *Id.* at 244–45. The case ultimately made its way to the Supreme Court, which held that a legislative inquiry into the contents of a professor's lectures "unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression." *Id.* at 250. The Court explained that it "could not be seriously debated" that a professor's "right to lecture" is protected by the Constitution. *Id.* at 249–50. And it emphasized "[t]he essentiality of freedom in the community of American universities." *Id.* at 250. When the state targets professors' academic freedom rather than protects it, scholarship, teaching, and education "cannot flourish." *Id.*; *see also id.* at 262 (Frankfurter, J., concurring in result) ("Political power must abstain from intrusion into this activity of freedom . . . except for reasons that are exigent and obviously compelling.").

A decade later, in a case involving a similar New York law banning "subversive" activities, the Supreme Court affirmed that the Constitution protects "academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). It characterized academic freedom as "a special concern of the First Amendment" and said that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.* After all, the classroom is "peculiarly the 'marketplace of ideas.'" *Id.* And when the state stifles a professor's viewpoint on a matter of public import, much more than the professor's rights are at stake. Our nation's future "depends upon leaders trained through wide exposure to [the] robust exchange of ideas"—not through the

"authoritative" compulsion of orthodox speech. *Id.* (citation omitted); *accord Sweezy*, 354 U.S. at 249–50 (plurality opinion) ("To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.").

Together, *Sweezy* and *Keyishian* establish that the First Amendment protects the free-speech rights of professors when they are teaching. *See also Healy v. James*, 408 U.S. 169, 180–81 (1972) ("[W]e break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom."); *Tinker*, 393 U.S. at 506 ("First Amendment rights . . . are available to teachers[.]").

As a result, our court has rejected as "totally unpersuasive" "the argument that teachers have no First Amendment rights when teaching, or that the government can censor teacher speech without restriction." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001). And we have recognized that "a professor's rights to academic freedom and freedom of expression are paramount in the academic setting." *Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001); *see Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1188–89 (6th Cir. 1995).[1] Simply put, professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship. *See Hardy*, 260 F.3d at 680.

In reaffirming this conclusion, we join three of our sister circuits: the Fourth, Fifth, and Ninth. In *Adams v. Trustees of the University of North Carolina–Wilmington*, the Fourth Circuit held that *Garcetti* left open the question whether professors retained academic-freedom rights under the First Amendment. 640 F.3d at 562. It concluded that the rule announced in *Garcetti* does not apply "in the academic context of a public university." *Id.*; *see also Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007). The Fifth Circuit has also held that the speech of public university professors is constitutionally protected, reasoning that "academic freedom is a special concern of the First Amendment." *Buchanan v. Alexander*, 919 F.3d 847, 852–53 (5th Cir. 2019) (quotation omitted) (analyzing the claim under the *Pickering-Connick* framework).

---

[1]Shawnee State and the intervenors suggest that our decision in *Evans-Marshall v. Board of Education of Tipp City* is to the contrary. 624 F.3d 332 (6th Cir. 2010). Not so. There, we held that "the First Amendment does not extend to the in-class curricular speech of teachers in primary and secondary schools." *Id.* at 334. We distinguished college and university professors and made clear that our holding was limited to schoolteachers. *Id.* at 343–44.

Likewise, the Ninth Circuit has recognized that "if applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court." *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014). Thus, it held that "*Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor." *Id.* at 412.

One final point worth considering: If professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity. A university president could require a pacifist to declare that war is just, a civil rights icon to condemn the Freedom Riders, a believer to deny the existence of God, or a Soviet émigré to address his students as "comrades." That cannot be. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe" such orthodoxy. *Barnette*, 319 U.S. at 642.

3.

Shawnee State and the intervenors raise several arguments in response.

*First*, they suggest that we ought not apply the Supreme Court's academic-freedom cases that preceded *Garcetti*. But our job as lower court judges is to apply existing Supreme Court precedent unless it is expressly overruled. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). And here, the Supreme Court has not overruled its academic-freedom cases. "It is not our prerogative to set this binding precedent aside." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017). Nor is it our prerogative to cast aside our holding "that a teacher's in-class speech deserves constitutional protection." *Hardy*, 260 F.3d at 680. *Garcetti* expressed no view on this issue and even recognized that "expression related to . . . classroom instruction" might not fit within the Court's "customary employee-speech jurisprudence." *Garcetti*, 547 U.S. at 425. Thus, we remain bound by prior Supreme Court and Sixth Circuit precedent in this area.

*Second*, they argue that even if there is an academic-freedom exception to *Garcetti*, it does not protect Meriwether's use of titles and pronouns in the classroom. As they would have it, the use of pronouns has nothing to do with the academic-freedom interests in the substance of

classroom instruction.  But that is not true.  Any teacher will tell you that choices about how to lead classroom discussion shape the *content* of the instruction enormously.  That is especially so here because Meriwether's choices touch on gender identity—a hotly contested matter of public concern that "often" comes up during class discussion in Meriwether's political philosophy courses.  R. 34, Pg. ID 1492; *see Janus*, 138 S. Ct. at 2476 (describing gender identity as a "controversial [and] sensitive political topic[] . . . of profound value and concern to the public" (cleaned up)).

By forbidding Meriwether from describing his views on gender identity even in his syllabus, Shawnee State silenced a viewpoint that could have catalyzed a robust and insightful in-class discussion.  Under the First Amendment, "the mere dissemination of ideas . . . on a state university campus may not be shut off in the name alone of 'conventions of decency.'"  *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam).  Rather, the lesson of *Pickering* and the Court's academic-freedom decisions is that the state may do so only when its interest in restricting a professor's in-class speech outweighs his interest in speaking.

Remember, too, that the university's position on titles and pronouns goes both ways.  By defendants' logic, a university could likewise *prohibit* professors from addressing university students by their preferred gender pronouns—no matter the professors' own views.  And it could even impose such a restriction while denying professors the ability to explain to students why they were doing so.  But that's simply not the case.  Without sufficient justification, the state cannot wield its authority to categorically silence dissenting viewpoints.  *See Keyishian*, 385 U.S. at 602–03; *Sweezy*, 354 U.S. at 250–51 (plurality opinion); *Wieman v. Updegraff*, 344 U.S. 183, 195–96 (1952) (Frankfurter, J., concurring); *Barnette*, 319 U.S. at 639; *see also Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 835–36 (1995).

Thus, the academic-freedom exception to *Garcetti* covers all classroom speech related to matters of public concern, whether that speech is germane to the contents of the lecture or not.  The need for the free exchange of ideas in the college classroom is unlike that in other public workplace settings.  And a professor's in-class speech to his students is anything but speech by an ordinary government employee.  Indeed, in the college classroom there are three critical interests at stake (all supporting robust speech protection):  (1) the students' interest in receiving

informed opinion, (2) the professor's right to disseminate his own opinion, and (3) the public's interest in exposing our future leaders to different viewpoints.  *See Lane v. Franks*, 573 U.S. 228, 236 (2014); *Sweezy*, 354 U.S. at 250 (plurality opinion).  Because the First Amendment "must always be applied 'in light of the special characteristics of the . . . environment' in the particular case," *Healy*, 408 U.S. at 180 (alteration in original) (quoting *Tinker*, 393 U.S. at 506), public universities do not have a license to act as classroom thought police.  They cannot force professors to avoid controversial viewpoints altogether in deference to a state-mandated orthodoxy.  Otherwise, our public universities could transform the next generation of leaders into "closed-circuit recipients of only that which the State chooses to communicate."  *Tinker*, 393 U.S. at 511.  Thus, "what constitutes a matter of public concern and what raises academic freedom concerns is of essentially the same character."  *Dambrot*, 55 F.3d at 1188.

Of course, some classroom speech falls outside the exception:  A university might, for example, require teachers to call roll at the start of class, and that type of non-ideological ministerial task would not be protected by the First Amendment.  Shawnee State says that the rule at issue is similarly ministerial.  But as we discuss below, titles and pronouns carry a message.  The university recognizes that and wants its professors to use pronouns to communicate a message:  People can have a gender identity inconsistent with their sex at birth.  But Meriwether does not agree with that message, and he does not want to communicate it to his students.  That's not a matter of classroom management; that's a matter of academic speech.

*Finally*, defendants argue that academic freedom belongs to public universities, not professors.  But we've held that university professors "have . . . First Amendment rights when teaching" that they may assert against the university.  *Hardy*, 260 F.3d at 680; *see Bonnell*, 241 F.3d at 823.  So this arguments fails.

## B.

Although *Garcetti* does not bar Meriwether's free-speech claim, that is not the end of the matter.  We must now apply the longstanding *Pickering-Connick* framework to determine whether Meriwether has plausibly alleged that his in-class speech was protected by the First Amendment.  *See Hardy*, 260 F.3d at 678 (taking this approach in an academic-speech case);

*Adams*, 640 F.3d at 564 (same); *Buchanan*, 919 F.3d at 853 (same); *Demers*, 746 F.3d at 412–13 (same).  Under that framework, we ask two questions:  First, was Meriwether speaking on "a matter of public concern"?  *Connick v. Myers*, 461 U.S. 138, 146 (1983).  And second, was his interest in doing so greater than the university's interest in "promoting the efficiency of the public services it performs through" him?  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

1.

To determine whether speech involves a matter of public concern, we look to the "content, form, and context of a given statement, as revealed by the whole record."  *Connick*, 461 U.S. at 147–48.  When speech relates "to any matter of political, social, or other concern to the community," it addresses a matter of public concern.  *Id.* at 146.  Thus, a teacher's in-class speech about "race, gender, and power conflicts" addresses matters of public concern.  *Hardy*, 260 F.3d at 679.  A basketball coach using racial epithets to motivate his players does not.  *Dambrot*, 55 F.3d at 1190.  "The linchpin of the inquiry is, thus, for both public concern and academic freedom, the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives."  *Id.* at 1189.

Meriwether did just that in refusing to use gender-identity-based pronouns.  And the "*point* of his speech" (or his refusal to speak in a particular manner) was to convey a message.  *Id.* at 1187.  Taken in context, his speech "concerns a struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes."  Professors' Amicus Br. at 1.  That is, his mode of address *was* the message.  It reflected his conviction that one's sex cannot be changed, a topic which has been in the news on many occasions and "has become an issue of contentious political . . . debate."  *See Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1051 (6th Cir. 2001).

From courts to schoolrooms this controversy continues.  Recently, the Fifth Circuit rejected an appellant's motion to be referred to by the appellant's preferred gender pronouns—over an "emphatic[] dissent."  *United States v. Varner*, 948 F.3d 250, 254, 261 (5th Cir. 2020).  And, on the other side, a Texas high school generated controversy when it permitted

its students to display preferred gender pronouns on their online profiles.[2]  Further examples abound.  In short, the use of gender-specific titles and pronouns has produced a passionate political and social debate.  All this points to one conclusion:  Pronouns can and do convey a powerful message implicating a sensitive topic of public concern.

The history of pronoun usage in American discourse underscores this point.  Following the 1745 publication of Anne Fisher's *A New Grammar*, the "idea that *he*, *him* and *his* should go both ways caught on and was widely adopted."[3]  But in the latter half of the twentieth century, gendered pronouns became imbued with new meaning.  The feminist movement came to view the generic use of masculine pronouns as "a crucial mechanism for the conceptual invisibility of women."  Carol Sanger, *Feminism and Disciplinarity:  The Curl of the Petals*, 27 Loy. L.A. L. Rev. 225, 247 n.87 (1993).  It regarded the "generic masculine pronoun" as rooted in "pre-existing cultural prejudice" and subtly "influencing our perceptions and recirculating the sexist prejudice."  Deborah Cameron, *Feminism and Linguistic Theory* 137 (2d ed. 1992); *see also* Susan A. Speer, *Gender Talk:  Feminism, Discourse and Conversation Analysis* 2–3 (2005).  As a result, "feminist attempts at language reform" served as a means for "sensitiz[ing] individuals to ways in which language is discriminatory towards women."  Susan Ehrlich & Ruth King, *Gender-based language reform and the social construction of meaning*, 3 Discourse & Soc'y 151, 156 (1992).  To the feminist cause, pronouns mattered.

And history tends to repeat itself.  Never before have titles and pronouns been scrutinized as closely as they are today for their power to validate—or invalidate—someone's perceived sex or gender identity.  Meriwether took a side in that debate.  Through his continued refusal to address Doe as a woman, he advanced a viewpoint on gender identity.  *See Dambrot*, 55 F.3d at 1189.  Meriwether's speech manifested his belief that "sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires."  R. 34, Pg. ID 1469.  The "focus," "point," "intent," and "communicative purpose" of

---

[2]Alexandra Cronin, *Controversy Sparks over Frisco Transgender Students' Right to Choose Preferred Pronouns*, LOCAL PROFILE (Sept. 28, 2020), https://localprofile.com/2020/09/28/frisco-transgender-students-preferred-pronouns/.

[3]Patricia T. O'Conner & Stewart Kellerman, *All-Purpose Pronoun*, N.Y. TIMES MAG. (July 21, 2009), https://www.nytimes.com/2009/07/26/magazine/26FOB-onlanguage-t html.

the speech in question was a matter of public concern.  *Farhat v. Jopke*, 370 F.3d 580, 592 (6th Cir. 2004) (citations omitted).

And even the university appears to think this pronoun debate is a hot issue.  Otherwise, why would it forbid Meriwether from explaining his "personal and religious beliefs about gender identity" in his syllabus?  R. 34, Pg. ID 1478, 1488–91.  No one contests that what Meriwether proposed to put in his syllabus involved a matter of public concern.  *See Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 253, 256 (6th Cir. 2006) (holding that "intended speech" which the plaintiff was later "unable" to make "touched on a matter of public concern").  In short, when Meriwether waded into the pronoun debate, he waded into a matter of public concern.

2.

Because Meriwether was speaking on a matter of public concern, we apply *Pickering* balancing to determine whether the university violated his First Amendment rights.  This test requires us "to arrive at a balance between the interests of the [professor], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  391 U.S. at 568.  Here, that balance favors Meriwether.

Start with Meriwether's interests.  We begin with "the robust tradition of academic freedom in our nation's post-secondary schools."  *Hardy*, 260 F.3d at 680; *see also Keyishian*, 385 U.S. at 603 ("Our Nation is deeply committed to safeguarding academic freedom[.]").  That tradition alone offers a strong reason to protect Professor Meriwether's speech.  After all, academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."  *Keyishian*, 385 U.S. at 603.  And the First Amendment interests are especially strong here because Meriwether's speech also relates to his core religious and philosophical beliefs.  Finally, this case implicates an additional element: potentially compelled speech on a matter of public concern.  And "[w]hen speech is compelled . . . additional damage is done."  *Janus*, 138 S. Ct. at 2464.

Those interests are powerful.  Here, the university refused even to permit Meriwether to comply with its pronoun mandate while expressing his personal convictions in a syllabus

disclaimer. That ban is anathema to the principles underlying the First Amendment, as the "proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (plurality opinion) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). Indeed, the premise that gender identity is an idea "embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000).

And this is particularly true in the context of the college classroom, where students' interest in hearing even contrarian views is also at stake. "Teachers and students must always remain free to inquire, to study and to evaluate, [and] to gain new maturity and understanding." *Sweezy*, 354 U.S. at 250 (plurality opinion); *see also Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994) (noting that "the efficient provision of services" by a university "actually depends, to a degree, on the dissemination in public fora of controversial speech implicating matters of public concern").

On the other side of the ledger, Shawnee State argues that it has a compelling interest in stopping discrimination against transgender students. It relies on *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.* in support of this proposition. 884 F.3d 560 (6th Cir. 2018). But *Harris* does not resolve this case. There, a panel of our court held that an employer violates Title VII when it takes an adverse employment action based on an employee's transgender status. *Id.* at 571, 591.[4] The panel did not hold—and indeed, consistent with the First Amendment, could not have held—that the government always has a compelling interest in regulating employees' speech on matters of public concern. Doing so would reduce *Pickering* to a shell. And it would allow universities to discipline professors, students, and staff any time their speech might cause offense. That is not the law. *See Street v. New York*, 394 U.S. 576, 592 (1969) ("[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."). Purportedly neutral non-discrimination policies cannot be used to

---

[4]Title VII differs from Title IX in important respects: For example, under Title IX, universities must consider sex in allocating athletic scholarships, 34 C.F.R. § 106.37(c), and may take it into account in "maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Thus, it does not follow that principles announced in the Title VII context automatically apply in the Title IX context.

transform institutions of higher learning into "enclaves of totalitarianism." *Tinker*, 393 U.S. at 511.

Turning to the facts, the university's interest in punishing Meriwether's speech is comparatively weak. *See Hardy*, 260 F.3d at 680–81. When the university demanded that Meriwether refer to Doe using female pronouns, Meriwether proposed a compromise: He would call on Doe using Doe's last name alone. That seemed like a win-win. Meriwether would not have to violate his religious beliefs, and Doe would not be referred to using pronouns Doe finds offensive. Thus, on the allegations in this complaint, it is hard to see how this would have "create[d] a hostile learning environment that ultimately thwarts the academic process." *Bonnell*, 241 F.3d at 824. It is telling that Dean Milliken at first approved this proposal. And when Meriwether employed this accommodation throughout the semester, Doe was an active participant in class and ultimately received a high grade.

As we stated in *Hardy*, "a school's interest in limiting a teacher's speech is not great when those public statements 'are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally.'" 260 F.3d at 681 (quoting *Pickering*, 391 U.S. at 572–73). The mere "fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508. At this stage of the litigation, there is no suggestion that Meriwether's speech inhibited his duties in the classroom, hampered the operation of the school, or denied Doe any educational benefits. *See Bonnell*, 241 F.3d at 824. Without such a showing, the school's actions "mandate[] orthodoxy, not anti-discrimination," and ignore the fact that "[t]olerance is a two-way street." *Ward*, 667 F.3d at 735. Thus, the *Pickering* balance strongly favors Meriwether.

Finally, Shawnee State and the intervenors argue that Title IX compels a contrary result. We disagree. Title IX prohibits "discrimination under any education program or activity" based on sex. 20 U.S.C. § 1681(a). The requirement "that the discrimination occur 'under any education program or activity' suggests that the behavior [must] be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999); *see Pahssen v. Merrill Cmty. Sch. Dist.*,

668 F.3d 356, 362 (6th Cir. 2012).  But Meriwether's decision not to refer to Doe using feminine pronouns did not have any such effect.  As we have already explained, there is no indication at this stage of the litigation that Meriwether's speech inhibited Doe's education or ability to succeed in the classroom.  *See* 20 U.S.C. § 1681(a); *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018) (holding that a Title IX hostile-environment claim requires that one's "educational experience [be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive so as to alter the conditions of the victim's educational environment" (cleaned up)).  Bauer even admitted that Meriwether's conduct "was not so severe and pervasive that it created a hostile educational environment."  R. 34-27, Pg. ID 1799.  Thus, Shawnee State's purported interest in complying with Title IX is not implicated by Meriwether's decision to refer to Doe by name rather than Doe's preferred pronouns.

\* \* \*

In sum, "the Founders of this Nation . . . 'believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth.'" *Dale*, 530 U.S. at 660–61 (quoting *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring)).  Shawnee State allegedly flouted that core principle of the First Amendment.  Taking the allegations as true, we hold that the university violated Meriwether's free-speech rights.[5]

### III.

Meriwether next argues that as a public university, Shawnee State violated the Free Exercise Clause when it disciplined him for not following the university's pronoun policy.  We agree.

The Constitution requires that the government commit "itself to religious tolerance." *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (citation omitted).  Thus, laws that burden religious exercise are presumptively unconstitutional unless

---

[5]The district court's conclusions about Meriwether's remaining free-speech claims were all premised on the notion that his speech was not protected.  Because that premise was legally erroneous, we vacate all of the district court's free-speech holdings.

they are both neutral and generally applicable. *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877–78 (1990). To determine whether a law is neutral, courts must look beyond the text and scrutinize the history, context, and application of a challenged law. *Masterpiece*, 138 S. Ct. at 1731; *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). In this way, the Free Exercise Clause guards against "even subtle departures from neutrality on matters of religion." *Masterpiece*, 138 S. Ct. at 1731 (cleaned up).

## A.

Meriwether has plausibly alleged that Shawnee State's application of its gender-identity policy was not neutral for at least two reasons. First, officials at Shawnee State exhibited hostility to his religious beliefs. And second, irregularities in the university's adjudication and investigation processes permit a plausible inference of non-neutrality.[6]

## 1.

State actors must give "neutral and respectful consideration" to a person's sincerely held religious beliefs. *Masterpiece*, 138 S. Ct. at 1729. When they apply an otherwise-neutral law with religious hostility, they violate the Free Exercise Clause. *Id.* at 1731. In this case, "the pleadings give rise to a sufficient 'suspicion' of religious animosity to warrant 'pause' for discovery." *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 163 (2d Cir. 2020) (quoting *Masterpiece*, 138 S. Ct. at 1731). Meriwether "was entitled to a neutral decisionmaker who would give full and fair consideration to his religious objection as he sought to assert it in all of the circumstances in which this case was presented, considered, and decided." *Masterpiece*, 138 S. Ct. at 1732. And that, he at least plausibly did not receive.

Start with one of the individuals Meriwether alleges was involved in the action against him—Department Chair Jennifer Pauley. Meriwether came to her to discuss his religious concerns about the new policy. Pauley might have responded with tolerance, or at least neutral objectivity. She did not. Instead, she remarked that religion "oppresses students" and said that

---

[6]Of course, to have standing to bring a Free Exercise claim, Meriwether must have also suffered an injury because of the non-neutrality. Here, he claims that the non-neutrality led to his ultimate discipline. So he has standing to bring his claim.

even its "presence" at universities is "counterproductive." R. 34, Pg. ID 1473. Christians in particular, she said, were "primarily motivated out of fear." *Id.* In her view, "Christian doctrines . . . should not be taught." *Id.* And for good measure, she added that Christian professors "should be banned" from teaching courses on Christianity—knowing that Meriwether had done so for decades. *Id.* Neutral and non-hostile? As alleged, no. In fact, it has the makings of the very religious intolerances that "gave concern to those who drafted the Free Exercise Clause." *Lukumi*, 508 U.S. at 532 (citation omitted).

So what does the university say about these statements? It claims that Pauley was not involved in formulating, interpreting, or applying the university's gender-identity policy, and that she was not involved in the action against him. Maybe so. But at the motion-to-dismiss stage, courts must accept the allegations as true. And here, the complaint alleges that Pauley was involved.[7]

And Pauley was not the only allegedly hostile actor. After Meriwether was disciplined, a union representative presented Meriwether's grievance to Provost Bauer—a supposedly neutral adjudicator. But Bauer did not seem so neutral. He repeatedly interrupted the union representative and made clear that he would not discuss the "academic freedom and religious discrimination aspects" of the case. R. 34-24, Pg. ID 1780. The union representative tried to explain Meriwether's religious beliefs and the teachings of his church. But Provost Bauer responded with open laughter.[8] And after the laughter, Bauer became "so uncooperative" that the union representative "was not able to present the grievance" at all. R. 34, Pg. ID 1489. Bauer's alleged actions and words demonstrated anything but the "neutral and respectful consideration" that the Constitution demands. *Masterpiece*, 138 S. Ct. at 1729.

---

[7]Ultimately, Meriwether bears the burden of proving that Pauley was involved in the decision-making process. And if these were the only allegations in the complaint, this would be a much more difficult case since Meriwether's assertion that Pauley was involved does not make clear how she influenced the disciplinary decision. But we need not resolve this difficult question now because Meriwether has alleged sufficient additional facts against the university to withstand a motion to dismiss.

[8]The defendants and the district court stress that Poirot's notes referencing the open laughter state that Bauer laughed "at some point" during the presentation, without saying precisely when. But the complaint itself clarifies that the laughter occurred "[w]hen Dr. Poirot outlined the religious beliefs that Dr. Meriwether and his church hold." R. 34, Pg. ID 1488; *accord* R. 34-24, Pg. ID 1780 (discussing the laughter in the context of the religious aspects of the presentation). Pending discovery, we must accept that allegation as true.

Shawnee State's Director of Labor Relations (Bauer's representative) then piled on when he reviewed the grievance. In his view, Meriwether's convictions were no better—and no more worthy of tolerant accommodation—than religiously motivated racism or sexism. Bauer adopted this reasoning in denying Meriwether's grievance once again.

If this sounds familiar, it should. In *Masterpiece Cakeshop*, the Supreme Court reversed a decision of the Colorado Civil Rights Commission when the Commission made hostile statements that "cast doubt on the fairness" of the adjudication. 138 S. Ct. at 1729–30. The Commission had said that "religion has been used to justify all kinds of discrimination throughout history," suggesting that the defendant was using religion as a pretext for discrimination. *Id.* at 1729. The Supreme Court called such comments "inappropriate" and said they called the Commission's impartiality into question. *Id.* at 1729–30. That same rationale applies here. Meriwether respectfully sought an accommodation that would both protect his religious beliefs and make Doe feel comfortable. In response, the university derided him and equated his good-faith convictions with racism. An inference of religious hostility is plausible in these circumstances. *See Poole*, 966 F.3d at 168–70.

In sum, Meriwether has plausibly alleged that religious hostility infected the university's interpretation and application of its gender-identity policy. *See Masterpiece*, 138 S. Ct. at 1730. Whether this claim ultimately prevails will depend on the results of discovery and the clash of proofs at trial. For now, we simply hold that Meriwether has plausibly alleged a free-exercise claim based on religious hostility.

2.

While the hostility Shawnee State exhibited would be enough for Meriwether's claim to survive a motion to dismiss, Meriwether has more. He alleges that various irregularities in the university's investigation and adjudication processes also permit an inference of non-neutrality. We agree.

Not all laws that look "neutral and generally applicable" are constitutional. *Lukumi*, 508 U.S. at 534 ("Facial neutrality is not determinative."). The Free Exercise Clause "forbids subtle departures from neutrality and covert suppression of particular religious beliefs." *Id.* (cleaned

up); *Ward*, 667 F.3d at 738 (noting that while a law might appear "neutral and generally applicable on its face, . . . in practice [it may be] riddled with exemptions or worse [be] a veiled cover for targeting a belief or a faith-based practice"). Thus, courts have an obligation to meticulously scrutinize irregularities to determine whether a law is being used to suppress religious beliefs. *See Lukumi*, 508 U.S. at 534–35; *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 481–82 (6th Cir. 2020).[9] And here, that scrutiny reveals signs of non-neutrality.

*First*, the university's alleged basis for disciplining Meriwether was a moving target. The Title IX report claimed that Meriwether violated the university's gender-identity policy by creating a "hostile educational environment." R. 34-13, Pg. ID 1719. Dean Milliken agreed and recommended disciplining Meriwether for this "hostile environment." R. 34-17, Pg. ID 1742. Yet when Meriwether grieved his discipline, university officials conceded that Meriwether had never created a hostile environment. Instead, they said the case was about "disparate treatment." R. 34-27, Pg. ID 1799. But at oral argument, the university changed its position once again: It said that "this really is a hostile-environment case." Oral Arg. 37:00–04.

These repeated changes in position, along with the alleged religious hostility, permit a plausible inference that the university was not applying a preexisting policy in a neutral way, but was instead using an evolving policy as pretext for targeting Meriwether's beliefs. *See Ward*, 667 F.3d at 736–37; *see also Lukumi*, 508 U.S. at 534. And it is also plausible that the re-interpretation of the policy was an "after-the-fact invention" designed to justify punishing Meriwether for his religiously motivated speech, not a neutral interpretation of a generally

---

[9]The obligation to scrutinize irregularities is longstanding. In *Yick Wo v. Hopkins*, for example, the Supreme Court scrutinized the application of a new city ordinance that appeared "fair on its face" only to find that it was being "administered . . . with an evil eye." 118 U.S. 356, 373–74 (1886). The Supreme Court held that San Francisco violated the Equal Protection Clause when it declined to renew the petitioner's laundry-business license under its new ordinance. *Id.* at 374. The Court held that the city acted out of discriminatory animus because the petitioner—a Chinese immigrant—had operated his business for twenty-two years without incident, and because San Francisco tended to use its "arbitrary power" under the new ordinance to deny licenses only to Chinese immigrants. *Id.* at 358 (statement of facts); *id.* at 366, 374 (opinion of the Court). The Court found it constitutionally "intolerable" that a man's "means of living" could be disrupted by the "mere will" of a public official who harbors discriminatory animus against him. *Id.* at 370. The Equal Protection Clause does not tolerate irregular, discriminatory application of "neutral" laws. Nor does the Free Exercise Clause.

applicable policy. *See Ward*, 667 F.3d at 736 (noting that "after-the-fact invention[s]" permit an inference of religious discrimination).

*Second*, the university's policy on accommodations was a moving target. Why does this matter? Because when "individualized exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of "religious hardship" without compelling reason.'" *Lukumi*, 508 U.S. at 537 (quoting *Smith*, 494 U.S. at 884).

When Dean Milliken told Meriwether that he was violating the university's gender-identity policy, Meriwether proposed a compromise: He would address Doe using Doe's last name and refrain from using pronouns to address Doe. Dean Milliken accepted this accommodation. But several weeks later, she retracted the agreed-upon accommodation and demanded that Meriwether use Doe's preferred pronouns if he intended to use pronouns to refer to other students. Now the university claims that its policy does not permit *any* religious accommodations.

This about-face permits a plausible inference that the policy allows accommodations, but the university won't provide one here. If this inference is supported through discovery and trial, a jury could conclude that the university's refusal to stick to its accommodation is "pretext for punishing [Meriwether's] religious views and speech." *Ward*, 667 F.3d at 735.

*Third*, the university's Title IX investigation raises several red flags. On their own, these issues might not warrant an inference of non-neutrality. But combined with the other allegations in the complaint, they provide probative "circumstantial evidence" of discrimination. *Lukumi*, 508 U.S. at 540.

For starters, the Title IX investigator interviewed just four witnesses, including Meriwether and Doe. She did not interview a single non-transgender student in any of Meriwether's classes, nor did she ask Meriwether to recommend any potential witnesses. Indeed, except for Meriwether and Doe, not a single witness testified about any interactions between the two. Even so, the Title IX officer concluded that Meriwether "created a hostile environment." R. 34-13, Pg. ID 1719.

Under the university's policies, a hostile environment exists only when "there is harassing conduct that limits, interferes with or denies educational benefits or opportunities, from both a subjective (the complainant's) and an objective (a reasonable person's) viewpoint." R. 34-2, Pg. ID 1523.  But the Title IX report does not explain why declining to use a student's preferred pronouns constitutes harassment.  It does not explain how Meriwether's conduct interfered with or denied Doe or Doe's classmates *any* "educational benefits or opportunities," let alone how an "objective observer" could reach such a conclusion. R. 34-2, Pg. ID 1523.  And it does not grapple with Meriwether's request for an accommodation based on his sincerely held religious beliefs.  In short, the university's cursory investigation and findings provide circumstantial evidence of "subtle departures from neutrality." *Lukumi*, 508 U.S. at 534 (citation omitted).  And this suggests that the "neutral . . . consideration to which [Meriwether] was entitled was compromised here." *Masterpiece*, 138 S. Ct. at 1729.

3.

The university raises several counterarguments, none of which we find persuasive.

*First*, the university seems to suggest that compliance with nondiscrimination laws can *never* burden an individual's religious beliefs under our holding in *Harris Funeral Homes*.  If that is their argument, it mischaracterizes the case.  In *Harris*, a panel of our court held that Title VII prevented an employer from firing a transgender employee because of the employee's transgender status.  884 F.3d at 574–75.  The employer believed that the law burdened the free exercise of his religion because he would have to endorse the mutability of sex to comply.  *Id.* at 589.  The panel explained that even if the belief were sincere, that did not resolve the question. *Id.*  And ultimately, the panel determined that compliance with Title VII did not burden the employer's religious beliefs because "requiring the [employer] to refrain from firing an employee with different . . . views . . . does not, as a matter of law, mean that [the employer] is endorsing or supporting those views." *Id.*  As the university would have it, that means that compliance with a nondiscrimination law can never amount to coerced endorsement of contrary religious views.

That is not what we said, and that is not the law. Depending on the circumstances, the application of a nondiscrimination policy could force a person to endorse views incompatible with his religious convictions. And a requirement that an employer *not fire* an employee for expressing a transgender identity is a far cry from what we have here—a requirement that a professor affirmatively change his speech to recognize a person's transgender identity. The university itself recognizes that *Harris* was careful not to require an "endorsement regarding the mutability of sex." Defendants' Br. at 46; *see Harris*, 884 F.3d at 589. Remember, too, that Meriwether proposed a compromise: He would consider referring to students according to their self-asserted gender identity if he could also include a note in the syllabus about his religious beliefs on the issue. The university said no; Meriwether would violate the policy even by disclaiming a belief in transgender identity. It cannot now argue that the policy did not require Meriwether to endorse a view on gender identity contrary to his faith.

*Next*, the intervenors submit that because Milliken "issued [the] written warning," and because "there is no allegation that Milliken harbored any animus toward plaintiff's religious beliefs," Meriwether's free-exercise claim must fail. Intervenors' Br. at 52. Why? Because the original disciplinary decision was not the product of animus. But that argument is both factually and legally flawed.

According to the facts in the complaint, Milliken did not issue the warning. She recommended it, but *Bauer* imposed the punishment and notified Meriwether of it. And in any case, *Masterpiece* forecloses this argument: A disciplinary proceeding that is fair at the beginning still violates the Free Exercise Clause if it is influenced by religious hostility later. In *Masterpiece*, the Colorado Civil Rights Division, like Milliken, first "found probable cause that Phillips violated [the Colorado Anti-Discrimination Act] and referred the case to the Civil Rights Commission." 138 S. Ct. at 1726. An ALJ then "ruled against Phillips and the cakeshop." *Id.* And the Commission, like Bauer, "affirmed the ALJ's decision in full." *Id.* Neither the Civil Rights Division nor the ALJ exhibited any hostility. But the Commission was hostile, and that was enough. *Id.* at 1725, 1729–30. It doesn't matter that some stages of a proceeding are fair and neutral if others are not. What matters is whether unconstitutional animus infected the proceedings.

*Finally*, the university argues that Meriwether simply could have complied with the alternative it offered him: Don't use any pronouns or sex-based terms at all. This offer, the university says, would not violate Meriwether's religious beliefs. But such an offer has two problems. First, it would prohibit Meriwether from speaking in accordance with his belief that sex and gender are conclusively linked. *See Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 796 (1988) (explaining that the "difference between compelled speech and compelled silence . . . is without constitutional significance"). And second, such a system would be impossible to comply with, especially in a class heavy on discussion and debate. No "Mr." or "Ms." No "yes sir" or "no ma'am." No "he said" or "she said." And when Meriwether slipped up, which he inevitably would (especially after using these titles for twenty-five years), he could face discipline. Our rights do not hinge on such a precarious balance.

The effect of this Hobson's Choice is that Meriwether must adhere to the university's orthodoxy (or face punishment). This is coercion, at the very least of the indirect sort. And we know the Free Exercise Clause protects against both direct and indirect coercion. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017); *see also McDaniel v. Paty*, 435 U.S. 618, 633 (1978) (Brennan, J., concurring in judgment) (The "proposition—that the law does not interfere with free exercise because it does not directly prohibit religious activity, but merely conditions eligibility for office on its abandonment—is . . . squarely rejected by precedent."). Simply put, the alternative the university offered does not save its policy.

B.

For the reasons just explained, Meriwether has plausibly alleged that Shawnee State burdened his free-exercise rights. Thus, we apply "the most rigorous of scrutiny" to the university's actions. *Lukumi*, 508 U.S. at 546. We uphold them only if they "advance interests of the highest order" and are "narrowly tailored in pursuit of those interests." *Id.* (cleaned up). The university does not even argue that its application of the policy meets this standard. Thus, we hold that Meriwether's free-exercise claim may proceed.[10]

---

[10]Because the complaint sufficiently alleges non-neutrality, we need not consider the harder question of whether *Employment Division v. Smith* applies. Meriwether argues that because the university's speech regulations

III.

Meriwether's final claim is that the policy is unconstitutionally vague as applied to him. The Supreme Court has told us that a policy is so vague as to violate due process when it either (1) fails to inform ordinary people what conduct is prohibited, or (2) allows for arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The standards depend on the legal context: There is "substantially more room for imprecision in regulations bearing only civil, or employment, consequences, than would be tolerated in a criminal code." *Dade v. Baldwin*, 802 F. App'x 878, 885 (6th Cir. 2020) (citing *Arnett v. Kennedy*, 416 U.S. 134, 159–60 (1974) (plurality opinion); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498–99 (1982)). Even where First Amendment values are at stake, "employment standards 'are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk'" of discipline. *Dade*, 802 F. App'x at 885 (quoting *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992)); *see Arnett*, 416 U.S. at 158–61 (plurality opinion). Finally, our analysis must turn on the "particular facts at issue, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) (cleaned up).

Looking to the particular facts here, Meriwether was on notice that the policy prohibited his conduct. As Meriwether alleges, the policy prohibits gender-identity discrimination, with gender-identity being defined to include "how individuals perceive themselves and what they call themselves." R. 34-2, Pg. ID 1522. When Meriwether asked the university administrators for guidance, they ultimately told him he had to use Doe's preferred pronouns. And when he didn't comply, they disciplined him. Since he was clearly on notice that the policy applied to his conduct, he may not challenge it for vagueness. *See Parker v. Levy*, 417 U.S. 733, 755–56 (1974).

---

are "at odds with our nation's history and traditions," they are not subject to *Smith*'s neutral-and-generally-applicable test. *See* Appellant Br. 45 (citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012)). If resolving the applicability of *Smith* becomes necessary as this suit progresses, the district court should do so in the first instance.

Meriwether also failed to argue that the policy allowed for arbitrary and discriminatory enforcement. His conclusory assertion that the policy gives officials "unbridled discretion" in enforcement does not cut it. R. 34, Pg. ID 1465. And to the extent that he developed the point a bit more in his reply brief, that does not suffice. *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010). Thus, Meriwether's argument that the policy allowed for arbitrary and discriminatory enforcement fails as well.

IV.

For the reasons set forth above, we affirm the district court's due-process holding, reverse its free-speech and free-exercise holdings, vacate its dismissal of the state-law claims, and remand for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 20-3289

NICHOLAS K. MERIWETHER,

    Plaintiff - Appellant,

    v.

FRANCESCA HARTOP, JOSEPH WATSON, SCOTT
WILLIAMS, DAVID FURBEE, SONDRA HASH, ROBERT
HOWARTH, GEORGE WHITE, and WALLACE
EDWARDS, Trustees of Shawnee State University, in their
official capacities; JEFFREY A. BAUER, ROBERTA
MILLIKEN, JENNIFER PAULEY, TENA PIERCE,
DOUGLAS SHOEMAKER, and MALONDA JOHNSON, in
their official capacities,

    Defendants - Appellees,

JANE DOE; SEXUALITY AND GENDER ACCEPTANCE,

    Intervenors - Appellees.

**FILED**
Mar 26, 2021
DEBORAH S. HUNT, Clerk

Before: McKEAGUE, THAPAR, and LARSEN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's due-process holding is AFFIRMED, its free-speech and free-exercise holdings are REVERSED, its dismissal of the state-law claims is VACATED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk